## I.    Introduction

NetJumper's patent infringement case suffers from two fundamental flaws: (1) its '172 patent[1] is limited to a computer program that is displayed in a different window than an Internet web browser, while Google integrates its accused Toolbar product into the Internet browser window; and (2) the "invention" claimed in the '172 patent is not an invention at all because it already existed in a third-party product known as CyberPilot – which the patent examiner did not know about, but the NetJumper inventors did. Because of the first problem, Google's Toolbar cannot infringe the claims, and because of the second, the claims are invalid.

There are no factual disputes relevant to this motion — the operation of the claimed "invention," the operation of the prior art CyberPilot program, and the operation of the Google Toolbar can all be seen from the '172 patent, images of the programs shown in this motion and the user documentation. The major issue for the Court to resolve — a purely legal issue · · is the proper construction of the claim phrase "displaying a first and a second icon separate from the search window on said display screen." As Google will show, the plain language of the claims compels a construction that the icons be separately displayed from the web browser; the remainder of the patent is consistent with this requirement of two separate windows and both the patent examiner and the inventors understood the invention as such. By contrast, the Google Toolbar is integrated with, and thus not "separate from", the web browser. Even NetJumper has admitted that the Google Toolbar is not displayed in a separate window from the web browser. Thus, there can be no infringement.

Google will also show by clear and convincing evidence that the CyberPilot program is identical to the claims, thus making them invalid. While Google does not believe there will be a dispute, a few additional claim terms, discussed below, may also need to be construed in the

---

[1] U.S. Patent No. 5,890,172, attached as Exhibit A to the Declaration of Jason W. Wolff in Support of Google's Motion for Summary Judgment of Non-Infringement and Invalidity of the '172 Patent ("Wolff Dec.").

1

context of the invalidity issue. Summary judgment of no infringement and invalidity is fully appropriate here.

## II.    State of the Proceedings

NetJumper accused two Google technologies of infringing two of its patents related to the look and function of software programs for navigating the Internet's World Wide Web. Claims 1-8 of the '172 patent are asserted against the Google Toolbar. Claims 9-14 of the '172 patent, and claims 1-10 of U.S. Patent No. 6,226,655 B1 ("the '655 patent") are asserted against the Google Viewer. Google, in its recent motion for leave to file its second amended answer and counterclaims, requested declaratory relief that the patents-in-suit are not infringed, invalid, and unenforceable. Google also dropped its trademark related counterclaims from the suit.

Google has taken discovery of four of the seven named-inventors on the patents-in-suit. The remaining named-inventors are believed to reside in India and efforts to take discovery upon them have been unsuccessful. The periodic status reports Google has submitted at the request of the Court, beginning September 1, 2004, summarize the pace and progress of this action. Discovery is scheduled to close September 26, 2005. Trial is scheduled for February 7, 2006.[2]

## III.    Statement of Facts

### A.    Background Technology and the '172 Patent

The '172 and '655 patents concern software for navigating or "surfing" a computer network such as the Internet, and in particular software that is used in conjunction with a World-Wide Web browser (e.g. Netscape Navigator or the "Netscape browser") for simplifying this navigation. [Declaration of Joseph Hardin in Support of Google's Motion for Summary Judgment of Non-Infringement and Invalidity of the '172 Patent ("Hardin Dec.") at ¶ 20.] The two patents share the same written description and priority date, although their claims are different.

---

[2] The parties have recently discussed a modification to this schedule due to scheduling conflicts.

On a computer network like the Internet, people can use a home or office personal computer (PC), known in industry parlance as a "client," to obtain data from another computer, known as a "server." [*Id.* at ¶ 21.] The retrieved information could be computer files such as digital music files, e-mails from an e-mail server, or World Wide Web pages, such as those provided by news organizations, airlines, or other companies and individuals. [*Id.* at ¶ 22.]

People use programs known as "browsers," such as Microsoft's Internet Explorer, or Netscape's Navigator, to access the World Wide Web. The "Web" got its name because it is made up of documents, known as "hypertext" documents, that are all linked together and cross-referenced to form a figurative web. The links between pages on the Web are formed by "hyperlinks" that transport a user to a page at the corresponding Web address when a user clicks on the link — for example this Court's website might have links to the Sixth Circuit web page, or to any other available page. [*Id.* at ¶¶ 22-23.] This process of jumping from document to document by clicking on "hyperlinks" is known as navigating, or "surfing," the Web. [Hardin Dec. at ¶ 23.]

Unfortunately, users sometimes get lost when "drilling down" deeper into the pages on a website— i.e., when they are "down deep" looking at a court opinion, they may have trouble reaching other parts of the website easily. [Hardin Dec. at ¶ 24.] The browsers available at the time of the alleged invention, and those of today, provide "back" and "forward" buttons inside the browser window that allow a user to jump step-by-step and layer-by-layer back-and-forth through their path, but this process can create what has been called a "lost in hyperspace" problem. [*Id.* at ¶ 24.] A prior art browser, with its "forward" and "back" buttons highlighted in a red box, is shown below in a blue-bounded "browser window" (400) extracted from Figure 4 of the patents-in-suit:



**(PRIOR ART)**
**FIG. 4**

[Wolff Dec. Ex. A (excerpt from Figure 4, emphasis added).]

The '172 patent attempts to solve this "drill down" problem by providing, in a window separate from the browser window (400), a window (300 – bounded in red) having special navigation "icons" (bounded in green), as shown in Figure 5A:



[Wolff Dec. Ex. A (excerpt of Fig. 5A of the '172 patent, emphasis added); *see also* Hardin Dec. Ex. D.] By providing an extra navigation window separate from the browser window, the patent allowed a user to simultaneously view the pages they were "surfing" and use the extra navigation buttons to get back on track. [Wolff Dec. Ex. B at G 229-34 ("two dimensional traversal", *Id.* at G 231).]

When the inventors originally filed their application, they did not limit their claims to navigation icons separate from the browser window. [Wolff Dec. Ex. B at G 125-131.] They instead sought claims that would cover displaying icons both within and, alternatively, separate from the browser window. However, the inventors had to add the "separate from" requirement after the examiner rejected their claims as being too broad and as covering prior art that showed navigation icons within a browser window. [*Id.* at G 250-257.] When the examiner finally allowed the narrowed claims to issue, he pointed to the specific embodiment of the invention in Figure 5A that shows these two separate windows, which is virtually identical to the prior art CyberPilot system but fundamentally different from the accused Google Toolbar, discussed in more detail below. [*See, e.g.,* Wolff Dec. Ex. B at G 286; Hardin Dec. at ¶¶ 27 and 34.]

## B.    The Prior Art

The Patent Office considered only three prior art references during the prosecution of the '172 patent. [*See* Wolff Dec. Ex. B at G 75 and G 203-15.] Each of the three presented browser navigation aids displayed within the four corners of a single browser window. [*Id.*] No prior art was presented to, or even considered by, the Patent Office that showed a browser navigation aid displayed separately from the browser window. [Hardin Dec. at ¶ 34.]

The CyberPilot product[3] predates the earliest possible date of invention alleged by NetJumper and was publicly available no later than March 1, 1996. [Declaration of Randall

---

[3] The CyberPilot prior art referenced throughout this motion refers to the CyberPilot product when used together with the admitted prior art Netscape Navigator, as well as the user documentation that describes the function and operation of the CyberPilot product in conjunction with the Netscape Navigator. For figures illustrating how CyberPilot functioned with Netscape Navigator, *see* Hardin Dec. Ex. D.

Stark ("Stark Dec.") at ¶¶ 3-4.] This renders CyberPilot prior art under 35 U.S.C. §§ 102(a) and (g).[4] Furthermore, CyberPilot was known to the named-inventors of the patents-in-suit, but was inexplicably withheld from the Patent Office. [Wolff Dec. at ¶¶ 4 and 11, and Ex. I (Borman Dep.) at 123:22-125:11.]

CyberPilot was a software program used in conjunction with a Web browser, such as Netscape Navigator, and operated as a graphical user interface that assisted in the navigation of web pages. [Hardin Dec. at ¶ 29; Stark Dec. at ¶ 5.] As shown from a screen shot of the CyberPilot product from the CyberPilot user documentation from February 1996, reproduced below with highlighting, the CyberPilot "map window" (on the left) contained a series of icons (e.g., "control icons" and "object icons"). [Hardin Dec. Ex. E; Stark Dec. at ¶ 3(a).] The map window and its icons were presented separately from the browser window, or in CyberPilot's own words, it worked "side-by-side with your favorite Web browser." [Stark Dec. ¶ 5(a) and Ex. B.]

---

[4] The filing date of the '172 patent is October 8, 1996. In response to Google's interrogatories, NetJumper alleged that the purported invention was conceived no later than May 1996. [Wolff Dec. ¶ 12, Ex. J (NetJumper's Answer to Google's Interrogatory No. 3)]. However, after Google served invalidity contentions based on CyberPilot, NetJumper changed its position and claimed that "[o]riginal concepts relating to the invention occurred late 1995, and the development of the prove-out technology occurred in early 1996." [Wolff Dec. Ex. C ( NetJumper's Answer to Google's Request for Admission No. 1).] Despite the fact that NetJumper has the burden of production on this point, NetJumper cites no evidence and has yet to produce a single relevant document dated before May 1996. *See Loral Fairchild Corp. v. Matsushita Elec.*, 266 F.3d 1358, 1361 (Fed. Cir. 2001) (A patentee also "would bear a burden of production to present evidence of its asserted actual reduction to practice prior to the filing date of its patent application.") Therefore, until NetJumper proves otherwise, any reference dated before May 1, 1996 qualifies as prior art under 35 U.S.C. § 102(a) and/or (g).



**CyberPilot map window = green**
**first icon/control icon ("?") = red**
**second icon/object icon = purple**

**browser window = blue**

[Hardin Dec. Ex. E; Stark Dec. at ¶ 5(a) and Ex. B.]

Another annotated figure illustrating CyberPilot taken from a running version of the program is depicted below with the Netscape Navigator software.



[Hardin Dec. Ex. D.]

The CyberPilot object icons (e.g., graphic to the left of "Kaua'i, the Garden Island" label in the left window) corresponded to hyperlinks in a web page; the CyberPilot program identified the hyperlinks by parsing them out of the page when the user selected a control icon (e.g., a "?" icon). [Hardin Dec. at ¶ 32; Stark Dec. at ¶ 5(b).] The figure below shows another example of a CyberPilot map window, with the control and object icons, and the hyperlink label, unchanged and taken from the original CyberPilot user documentation from February 1996.



[Stark Dec. at ¶ 5(b) and Ex. B.]

Thus, in operation, CyberPilot presented a tree of navigation icons in a map window, displayed separately from the browser window. [Hardin Dec. at ¶¶ 31-32; Stark Dec. at ¶ 5(a).] A file (in a format known as "HTML") for a Web page could be retrieved and displayed in the browser window, as in the example of Kaua'i above. [Hardin Dec at ¶ 32; *see also* Stark Dec. at ¶ 5(a).] The file would contain hyperlinks, in the form of addresses for other web pages, known as uniform resource locators, or URLs. [Hardin Dec. at ¶ 32.] When a control icon was present in the map window as a question mark, it meant that the hyperlinks from the corresponding web page had not yet been parsed. [*Id.*; Stark Dec. at ¶ 5(b)(i).] But once the control icon was selected, the question mark would change to a plus or minus sign and the hyperlinks from the corresponding HTML file were parsed, saved in a WebMap, and added to the map window display as a new series of object icons and labels – as expandable or collapsible branches hanging from the control icon. [*Id.*] Selecting an object icon caused the corresponding HTML file to be retrieved and displayed in the browser window. [Hardin Dec. at ¶ 33; Stark Dec. at ¶ 5(b)(iii).] As required by the patent claims here, the CyberPilot map window presented a number of navigation icons separate from the browser window. [Hardin Dec. at ¶¶ 32-34 and Ex. G; *see also* Stark Decl. at ¶ 5(a).] Thus, CyberPilot had every limitation of the claims, and in particular the very feature that the NetJumper inventors used to distinguish their claims from the

prior art that the Patent Office considered — navigation icons separate from the browser window rather than within it. [Hardin Dec. at ¶ 34, and Exs. D and F; Stark Dec. Exs. A and B.]

## C.    Prosecution History of the '172 Patent[5]

For simplicity, this motion focuses on issued claim 1 as representative of the asserted claims in this action.[6] As originally filed, claim 1 recited, among other limitations, a process of receiving a file, and parsing that file to extract a list of site identifiers (e.g., hyperlinks):

> 1.    A computer implemented method and system for retrieving information from a network comprising the following steps:
> receiving a 1st file of information which includes site identifiers and other information;
> parsing said 1st file of information to extract a list comprising site identifiers; and
> responsive to a jump command, determining which of the list of site identifiers is currently selected and automatically selecting an other of said site identifiers from said list.

[Wolff Dec. Ex. B at G 125.] Original claim 23 (which issued as claim 15) recited a similar process, but one that used a separate browser window and "jumper window":

> 23.    A computer-implemented method of retrieving information network comprising the following steps:
> receiving into a browser window a 1st file of information which includes site identifiers and other information;
> parsing said 1st file of information to extract a list comprised of said first file site identifiers;
> displaying a jumper window;
> receiving into said jumper window said set of 1st file site identifiers;
> selecting a one of said 1st file site identifiers from said browser window, wherein the browser accesses a location corresponding to said one selected and retrieves from said location a 2nd file which includes side [sic] identifiers and other information;

---

[5] "The court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the true meaning of language used in the patent claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995).

[6] Of the asserted claims, claims 1 and 5 are "independent" or stand-alone claims. The remaining claims add features to either claim 1 or claim 5; they are thus "dependent" claims. Thus, the arguments made as to claim 1 apply to all other asserted claims. When prosecuting the patent application, the inventors treated these independent claims together, and did not make separate substantive arguments for any of them.

> receiving into said <u>browser window</u> said 2nd file of information;
> selecting an other of said 1st file site identifier [sic] from said <u>jumper window</u>,
> wherein the browser accesses a location corresponding to said other selected site
> identifier and retrieves from said location a 3rd file; and
> receiving into said browser said 3rd file.

[*Id.* at G 129-130, emphasis added).]

The examiner rejected every claim in his first "Office Action" as being either identical to

(i.e., "anticipated by," in patent parlance) the Yahoo! website, or obvious in light of the Yahoo!

website and either the Altavista or CNN Interactive websites. The examiner rejected claim 1,

which did not recite separate windows, as identical to the prior art, but rejected claim 23, which

recited separate windows, as obvious — thus recognizing this distinction. [*Id.* at G 213.]

Notably, the examiner found that the prior art Netscape browser identified in figures 4 and 5 of

the '172 patent disclosed the step of "parsing" the first file of information to extract the site

identifiers. [*Id.* at G 209 and G 213.] The examiner expressed his then-belief that the CNN

Interactive sidebar, displayed within the browser window, was a "jumper window." [*Id.*]

In preparing for an interview to discuss the Office Action with the examiner,

NetJumper's attorney, Charles Cary prepared a draft amendment that cancelled a number of

claims and amended many others.[7] [*Id.* at G 217-34 ("Discussed the invention with respect to

the claimed limitations in the Draft Amendment (see attached)." *Id.* at G 217).] Notably, the

attorney amended claim 1 to require the providing of a search window, and amended claim 23 to

require building a "browser window" and "list windows." Those claims, with language added by

the amendment underlined and language removed by the amendment in brackets, recited as

follows:

> 1.    (Amended) A computer implemented method…comprising the
> [following steps] <u>acts performed on the local computer of</u> [:] <u>:</u>
> <u>Constructing a *search window* on a display screen of the local computer;</u>
> <u>displaying a first and a second icon on said display screen;…</u>

---

[7] Claims 2-3, 9-10, 14-15 and 19-20 were canceled. Claims 1, 4-7, 10-13, 16-18, and 21-26 were
amended. The amendments to the claims and argument were reviewed by named inventors
Gilbert Borman and Rajat Bhatnagar. [Wolff Dec. ¶ 8, Ex. F at 77:23-81:15.]

retrieving a first data file corresponding to a selected one of the location identifiers in the stored initial list together with displaying the first data file in the *search window*, responsive to a selection of the second icon.

23.    A computer-implemented method ...comprising the [following steps] acts performed on the local computer of:
constructing a *browser window* on a display screen of the local computer;
displaying a first icon and a *list window* on said display screen;...
maintaining the list window containing the list of location identifiers while displaying any of the data files stored on the network in the browser window; and...
retrieving a first data file corresponding to a one of the location identifiers displayed in the *list window* together with displaying the first data file in the *browser window*, responsive to a selection of the corresponding one of the location identifiers displayed in the *list window*.

[*Id.* at G 220, G 225-226 (italicized emphasis added).] The attorney argued in the draft amendment that the "multi-window" requirement in both of these claims, among other things, distinguished them from the prior art. [*Id.* at G 229-34.]

However, the interview did not result in any agreement and the examiner maintained his rejection. [*Id.* at G 217.] In response, the attorney sent the Patent Office, on the same day as the interview, an official amendment that was nearly identical to the draft amendment. [*Id.* at G 249-64.] Importantly, though, he added the limitation "separate from the search window" to all of the icon "displaying" steps in the independent claims. [*Id.* at G 250, 251, 253, 254, 255, and 256.] For example, in claim 1, he added the following limitation:

...displaying a first and a second icon *separate from the search window* on the display screen...

[*Id.* at G 250 (italicized emphasis added).] With this single new limitation, NetJumper managed to convince the examiner to allow the claims. Upon review of the amendments to the claims, the examiner issued a statement explaining the significance of this "separate from" requirement in his reasons for allowing the claims to issue over the prior art of record:

... the claimed feature of displaying a first and second icon separate from the search window on said display screen...[and] parsing the location identifiers ... responsive to a selection of the first icon...is not shown and would not have been obvious to a person of ordinary skill in the art at the time of the invention in view of the prior art of record.

*As shown in FIGURE 5A of the Applicant's invention, the first and second icons, which initiate parsing of the searched list and retrieve the data from a location in the list, are provided separate (item 300) from the browser window (item 400), which is not shown and not suggested by the prior art of record.*

[*Id.* at G 286 (emphasis added).]   The application then issued as the '172 patent.

## D.   The Accused Product: The Google Toolbar

To locate information on the Web, a navigation tool known as a browser is employed. The browser, for example Microsoft Corporation's Internet Explorer, is displayed as a window on a computer screen, as shown below.



To navigate somewhere in particular, a user can type an address or "URL," such as "http://www.mied.uscourts.gov", into the browser window address bar (outlined in red) and search for information on this Court's website:



This direct entry of web addresses works well when the user knows exactly what to look at or where to go. But more commonly, the user does not know the specific address where information of interest is located; instead, the user has a topic or question in mind and needs help finding where the relevant information is.

That's where search engines like Google's come in. Google earned its reputation by providing a website that provides fast, accurate search results — putting the most relevant information front-and-center — so that a search for "E.D. Michigan District Court" shows, in only 0.06 seconds, a link to this Court at the top, but not links to the millions of other web pages that contain those words, as shown in the following figures:





In December 2000, Google introduced a browser add-on known as the Google Toolbar that allows a user to enter a search right in the browser window without first having to travel to

the Google web page.  A present-day version of the Google Toolbar is shown below (outlined in green):



[Hardin Dec. Ex. C.]  The two buttons contained within the Google Toolbar and bounded in red, known as the "Next & Previous" buttons, are the linchpin of NetJumper's infringement claim. [Wolff Dec. Ex. J, Infringement Chart.]  However, as is plain from this picture, the Google Toolbar, and consequently the "Next & Previous" buttons, is integrated within the four corners of, rather than being displayed separately from, the browser window (blue border).  [Hardin Dec. at ¶ 27(c).]  This integration in the browser window is the only available configuration for the Google Toolbar for the Microsoft Internet Explorer and Mozilla Foundation Firefox Web browsers.  [Hardin Dec. ¶ 27(d)(ii).]  So obvious is this fact that even NetJumper has admitted in this case that the Google Toolbar is <u>inside</u>—not separate from—the browser window:

REQUEST FOR ADMISSION NO. 2:

   Admit that the Google Toolbar is displayed in a browser window (e.g. Internet Explorer).

RESPONSE:

Admit.

[Wolff Dec. Ex. C.]

**IV.    Legal Standards**

    **A.    Summary Judgment**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 98 F.3d 1318, 1321 (Fed. Cir. 1996); *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005).

    **B.    Non-Infringement**

Summary judgment on a question of patent infringement is appropriate "when no material fact is in dispute, or when no reasonable trier of fact could find facts whereby the nonmoving party could prevail." *Canton Bio Med. v. Integrated Linear Techs., Inc.*, 216 F.3d 1367, 1369 (Fed. Cir. 2000). The plaintiff bears the burden of proving infringement by a preponderance of the evidence. *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998). Infringement may be literal or under the so-called "doctrine of equivalents." The "all elements" or "all limitations" rule applies to both forms of infringement; for literal infringement to occur, every single claim limitation must be met and in doctrine of equivalents infringement, every limitation must be met identically or by a substantial equivalent. *Network, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353-54 (Fed. Cir. 2001); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

The patent holder cannot automatically seek a finding of infringement under the doctrine of equivalents, however, because there are several legal limitations to the application of the doctrine: (1) vitiation, (2) disavowal, and (3) prosecution claim amendment.

First, if a patentee's theory of equivalents would "vitiate a particular claim element, [then] partial or complete summary judgment [of non-infringement] should be rendered by the court." *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1322 (Fed. Cir.

2002); *Fin Control Sys. Pty., Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1320-21 (Fed. Cir. 2001) (allowing "front" or "back" to be the equivalent of "lateral" would cause a vitiation of the claim limitation); *Sage Prods, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425-26 (Fed. Cir. 1997); *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed. Cir. 1994) ("[T]he concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims"). Second, a patentee may not claim equivalents for subject matter it disavowed during prosecution. *Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291 (Fed. Cir. 1995). Third, where a patentee narrows a claim by amendment while prosecuting the patent, any narrowed limitation is presumed to have no equivalents at all. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 739-40 (2002).[8]

Summary judgment is often granted against a patentee in cases such as this, where both arguments and amendments made during the prosecution history preclude an interpretation of the claim language that could cover the accused product. *See, e.g., Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319 (Fed. Cir. 2000) (affirming summary judgment of non-infringement because plaintiff clearly disavowed interpretation of claim during prosecution of the patent that would cover accused product); *Desper Prods., Inc. v. QSound Labs., Inc.*, 157 F.3d 1325, 1333-34 (Fed. Cir. 1998) (same, in context of doctrine of equivalents); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1573 (Fed. Cir. 1997) (affirming district court's grant of summary judgment of non-infringement and finding that the plaintiff's

---

[8] The patentee can overcome this presumption only by demonstrating: (1) that the equivalent was unforeseeable at the time of the application; (2) that the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; or (3) that for some other reason the patentee could not reasonably be expected to have described the insubstantial substitute in question. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 740-41 (2002).

"interpretation of these [disputed claim] terms is flatly inconsistent with his interpretation before the Patent and Trademark Office").

### C.    Invalidity

Issued patents are entitled to a presumption of validity. 35 U.S.C. § 282. As a result, invalidity under § 102(b) requires proof by clear and convincing evidence. *See, e.g., Abbott Labs. v. Geneva Pharmaceuticals, Inc.*, 182 F.3d 1315, 1318 (Fed. Cir. 1999). However, where, as here, the challenge to validity is based upon references that were not before the examiner, the burden of proving invalidity "may be more easily carried." *Sibia Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000). A patent claim is invalid as anticipated when a prior art reference discloses each of the elements, or limitations, in the patent claim. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996). Anticipation can be decided by summary judgment. *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319 (Fed. Cir. 2005) (affirming summary judgment of invalidity for anticipation); *Celeritas Technologies, Ltd. v. Rockwell Intern. Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998) (affirming invalidity as a matter of law when each and every claim limitation was found in a single prior art reference).

### D.    Corroboration

In direct response to Google's invalidity contentions, NetJumper has vaguely alleged a date of invention much earlier than is supported by any documentary evidence produced in this case. It is well settled, however, that inventor testimony alone is insufficient to prove conception or reduction to practice; some form of corroboration must be shown to prove both. *See Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993) (conception); *Slip Track Sys. Inc. v. Metal Lite, Inc.*, 304 F.3d 1256, 1265 (Fed. Cir. 2002) (reduction to practice). The purpose of requiring corroboration is to prevent fraud. *See Hahn v. Wong*, 892 F.2d 1028, 1033 (Fed. Cir. 1989). This requirement arose from a concern that inventors testifying in patent infringement cases

"would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent." *Mahurkar v. C.R. Bard*, 79 F.3d 1572, 1577 (Fed. Cir. 1996).

If NetJumper intends to prove it is entitled to a date of invention that is before the filing date of the patents-in-suit, and thus perhaps that CyberPilot is not in fact prior art, NetJumper bears the burden of production to establish this alleged early date of invention. *See Id.* at 1576-77 (when an accused infringer introduces a prior art reference that predates the filing date of the patent-in-suit, the patentee bears "the burden to offer evidence showing he invented the subject matter of his patent before the publication date" of the prior art), and *Loral*, 266 F.3d at 1361 (patentee "bear[s] a burden of production to present evidence of its asserted actual reduction to practice prior to the filing date of its patent application."). To date, NetJumper has yet to produce a single piece of evidence corroborating an invention date earlier than May 1996 and Mr. Borman admitted at his deposition that none exists. [Wolff Dec. Ex. I (Borman Dep.) 59:15-24.]

### E.    Claim Construction

Before a court can determine whether a patent claim matches an accused product (for infringement), or whether it is identical to the prior art (for anticipation), the court must construe the patent claims. *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998); *Kahn*, 135 F.3d at 1476. Claim construction is a legal issue, while comparison to the accused product or the prior art are factual undertakings. *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002).

Claim construction involves determining the meaning of the claim to someone having an ordinary level of skill in the field of the invention when the invention was made (sometimes known as "an artisan of ordinary skill"). *See Phillips v. AWH Corp.*, ___ F.3d ___ (Fed. Cir. 2005), 2005 WL 1620331 (Fed. Cir. July 12, 2005) (*en banc*); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1378 (Fed. Cir. 2003); *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 871 (Fed. Cir. 1998). This task requires the court to place the claim language in its

proper technological and temporal context. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005). The best tools for this enterprise are the various forms of intrinsic evidence and, when the intrinsic evidence does not provide a meaning, extrinsic evidence. *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The intrinsic evidence, "i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history ... is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp.*, 90 F.3d at 1582. There is a "heavy presumption" in favor of the ordinary meaning of claim terms. *Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). Technical dictionaries are "among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Phillips v. AWH Corp.*, ___ F.3d ___.

Google believes that construction of the following five claim terms will be sufficient to decide this motion:

- parsing,
- icon,
- parsing in response to selection of an icon,
- search window, and
- separate from the search window.[9]

A list of these terms and their constructions is attached in summary form to the Wolff Declaration as Exhibit L.

---

[9] Because NetJumper has refused to answer Google Interrogatory No. 1 and state how it is construing the asserted claims, Google is unsure if its constructions will be disputed or if the construction of these or other claim terms may even be relevant. [*See* Wolff Dec. ¶ 13, Ex. K.]

V.    **Argument**

A.    **The Asserted Claims Cover an Internet Navigation Tool That Parses Hyperlinks from a Search Result, Displays Navigation Commands as Icons, and Displays These Icons Separately From the Browser Window.**

1.    **"Parsing" is the act of examining a string of text, breaking it into subunits and establishing the relationships among the subunits.**

The patent uses the term "parsing" in many forms, particularly in referring to a "parser" that "extracts" items from a web page file, but the patent does not define the term. [Wolff Dec. Ex. A ('172 patent at 6:26-39).] According to the IEEE Standard Dictionary of Electrical and Electronics Terms (1996), the term "parse" means: "To determine the syntactic structure of a language unit by decomposing it into more elementary subunits and establishing the relationships among the subunits." [Wolff Dec. Ex. D at 747.]

Google submits that the term "parsing" means the act of examining a string of text, breaking it into subunits, and establishing the relationships among the subunits.

2.    **An "icon" is a graphic symbol, such as text or picture, that can be selected using a pointing device on a computer display.**

The term "icon" does not appear in the original patent application, whether in the patent's written description or in the originally-filed claims. The inventors instead added the term to the claims by amendment, and it first appeared when the examiner referred to alphanumeric, text-based (as opposed to picture-based) hyperlinks as icons. [Wolff Dec. Ex. B at G212, ("Office Action", p. 8, "see page 2 of the [AltaVista] print out, as the 'Prev' icon, 'Next' icon, '1' icon and '20' icon.").] According to the IBM Dictionary of Computing, the term "icon" means: "a graphic symbol, displayed on a computer screen, that a user can point to with a device such as a mouse in order to select a particular function or software application." [Wolff Dec. Ex. E (IBM Dictionary) at 323; Ex. F (Bhatnagar Dep.) at 35:7-10 ("Icon means it's a button that's sitting there...for starting the capture"); Ex. G (Mathur Dep.) at 46:12-19 ("An icon could – could include a hyperlink").] This meaning is consistent with the patent, which shows graphical

"buttons" and highlighted hyperlinks in the "jumper window" that are used to initiate navigational commands (such as parsing and jumping); these items correspond to the "icons" recited in the patent claims. [Wolff Dec. Ex. A ('172 patent, cover page and abstract, Figures. 5C and 6).] It is also consistent with the prosecution history, in which the Patent Office found alphanumeric, text-based icons in the prior art. [Wolff Dec. Ex. B at G 212.]

Google submits that the term "icon" means a graphic symbol, such as text or a picture, that can be selected on a computer display using a pointing device.

### 3.    "Parsing in response to selection of an icon" means that the act of parsing is performed only after an icon has been selected.

The inventors added the limitation "parsing in response to selection of an icon" to the claims by amendment to avoid Netscape browser prior art cited by the examiner. The phrase qualifies the icon-parsing relationship and requires that the parsing step be performed because of and after selection of a displayed icon, not before selection of the icon.

The original claim limitation did not contain any temporal limitation as to when the parsing was to occur. The limitation read:

parsing said 1st file of information to extract a list comprising site identifiers

[Wolff Dec. Ex. B at G 125.] But the Patent Office found that the Netscape browser parsed the first file of information and extracted a list comprising site identifiers. [*Id.* at G 208 and G 213 (Office Action, pages 5 and 9)]. In view of this finding by the Patent Office, the claim limitation was amended to overcome the Netscape browser prior art by requiring that the parsing of the location identifiers from the initial data file be performed on the initial data file after and *in response to selection of an icon.*

parsing the location identifiers from the initial data file to form an initial list of location identifiers together with storing the initial list, responsive to a selection of the first icon;

[Wolff Dec. Ex. A ('172 patent) at 13:60-63.]

Turning to other evidence in the intrinsic record, this construction is consistent with the written description, which describes selecting the refresh/update button 326 in the '172 patent's jumper window 300 to cause hyperlinks to be parsed out of a file retrieved by the browser. [*Id.* ('172 patent) at 7:15-21; also see *Id.* at 6:41-7:15, describing Figure 3, and 10:1-17, describing Figure 8A, steps 802 and 804.] Furthermore, when the inventors argued for patentability of their claims, they used this very limitation (*in response to selection of an icon*), repeatedly, to distinguish their invention from the prior art. [*See, e.g.*, Wolff Dec. Ex. B at G 260 ("Thus the parsing in applicant's invention is an optional treatment accorded to a web page displayed in the browser's view window."), and G 261 ("The applicant claims the ability to select a parsing and storage operation responsive to a selection of a first icon, e.g. the update button.").]

Google submits that the term "parsing in response to selection of an icon" means that the act of parsing of the hyperlinks is performed on the initial data file only after one of the two separately displayed icons has been selected. Because this limitation was added for reasons of patentability, NetJumper is entitled to no equivalents for this term. *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371 (Fed. Cir. 2001).

### 4.    "Search window" means "browser window" and the phrase "separate from the search window" means outside of the four corners of the search window or browser window.

First, the "search window" is simply the browser window (400) shown in the patent. While the exact term appears only in the claims as amended, the inventors used "search window" and "browser window" interchangeably during prosecution.[10]  The patent examiner also used

---

[10] For instance, amended claims 1, 7, and 13 recite a "search window," while amended claim 23 recites a "browser window." The inventors grouped the claims together and argued for patentability by presenting language from the written description referencing the "browser window" aspect of their alleged invention:

"'... if a determination is made that the refresh/update button ... has been selected, then an HTML encoded page displayed in the browser view window is parsed into ... hotlinks ... [t]hen the hot-links [are stored] ... in storage segment 230' (Specification at page 17, lines 19-31). Thus the parsing in applicant's invention is an optional treatment accorded to a web page displayed in the browser's view window." [Wolff Dec. Ex. B at G 260.]

these terms interchangeably; the examiner's Reasons for Allowance grouped all of the independent claims together, tied them to Figure 5A, and used the term "browser window" to explain its understanding of the claims. [Wolff Dec. Ex. B at G 286.]

It is also clear from the written description that the "search window" is the same thing as the browser window. For example, with reference to Figures 4, 5A, 5B, and 5C, all label the browser window (400) with the text "Netscape [Netsearch]," which describes the Netscape browser window as the search window.



[Wolff Dec. Ex. A ('172 patent) at Figure 4).] Furthermore, the '172 patent describes subparts that are constituent parts of the unified browser window (400). For instance, with reference to Figure 4, the inventors describe that the browser window (400) "includes a menu bar (402), a site window (404), and a window (406) for viewing a file." [*Id.* at 7:30-33.] The inventors also stated that the browser "menu bar" (as opposed to a window) "includes a back button 412 and a home button 414." [*Id.* at 7:33-34.] None of these subparts is identified as a search window. Instead, as the title "[NetSearch]" indicates, only the entire window was so identified.

According to the IEEE Standard Dictionary of Electrical and Electronics Terms, the term "window" means "(d) In applications and graphical user interfaces, a defined portion of the display screen that is separated by a frame from the rest of the screen and which may be opened, closed, resized, and moved." [Wolff Dec. Ex. D at 1205.] This definition describes the entire

window 400, and not a subpart of it. The subparts cannot be independently opened, closed, resized and moved.

Google submits that the term "search window" means the area defined by the four corners of the browser window, such as the Netscape browser (element 400 in Figure 5A).

Second, the "separate from" limitation requires that the icons not be part of or inside the browser window. While the patent does not define "separate from," (a) the plain claim language requires such a result; (b) there are multiple embodiments of the invention described, but every one shows the icons displayed in a separate window; and (c) icons integrated into the browser window (as opposed to separate from it), were expressly referenced in the written description and were therefore reasonably foreseeable, but disclaimed, during prosecution.

### (a)    By its plain language, a navigation tool "separate from" a search window cannot be part of the search window.

By definition, one object cannot reside within another object from which is it separate. According to Webster's Ninth New Collegiate Dictionary (1989), the word "separate" means:

> 1 c: set or kept apart : DETACHED  2 a: not shared with another : INDIVIDUAL  <~ rooms>  3  a:  existing  by  itself  : AUTONOMOUS.

[Wolff Dec. Ex. H at 1073.]

### (b)    Multiple embodiments of the invention are described, but every one shows the icons displayed in a window separate from the browser window.

Every embodiment of the physical arrangement of the icons shown in the figures, depicts the first and second icons separate from the browser window (400). In these embodiments, the icons are displayed in a window separate from and floating above the browser window. More particularly, the "icon" is displayed in a "jumper" window (a.k.a. "Internet Buffet"), namely the window shown in Figures 3 and 5A-C as element 300. As depicted and described, the jumper window functionality is achieved through an application program separate from the browser.

The jumper window resides wherever the user places it, and while it can control the display of files in the browser window, it is distinct from, not integrated into, the browser window [Wolff Dec. Ex. A ('172 patent) at 7:51-8:42]:

> [A] first file of information in a hypertext markup language is received and displayed in a browser window. The first file of information contains site identifiers and other information. The first file is displayed in the browser and is parsed, and the site identifiers from that file are stored by the jumper in a list. The stored list of site identifiers is displayed in the jumper window.

[*Id.* at 3:23-30; see also 4:29-30 ("FIG. 3 shows a preferred embodiment of the screen interface and tool bar of the jumper [window (300)]").]

As a hypothetical alternative, the patent surmises that the jumper window functionality (the icons) could take other forms, including as part of the browser window. There are two references to this idea, the first of which reads:

> In alternative embodiments the jumper window may take any of several forms. The user interface may include popup or persistent window, a toolbar, a menu modification of the browser window, a toolbar modification of the browser window...

[*Id.* at 7:22-26.]

Elsewhere, the patent suggests that the jumper functions could be built directly into the browser. [*Id.* at 12:32-34 ("In another embodiment, the jumper functions are built directly into the browser.").]

The inventors admitted, however, that at the time the patent was filed, they had neither the desire nor the ability to integrate their invention into the browser. [*See e.g.* Wolff Dec. Ex. I (Borman Dep.) at 44:24-45:2 ("At the time of the software's creation the Version 3.0 browsers did not support embedded applications, you had to run outside and on top of the browser."); Ex. F (Bhatnagar Dep.) at 82:10-11 ("We did not wish to hardwire our tools or icons into their browser."); Ex. G (Mathur Dep.) at 61:23-62:1 ("You can either embed that technology into the browser technology, which we would if we were Microsoft or Netscape, but if you are not, then you would display that separate window").] In fact, the inventors believed it was "impossible"

to effect such an integrated browser until years later – long after the patent was filed. [Wolff Dec. Ex. I (Borman Dep.) at 61:24-63:1 ("Until…a year and a half or more later than this time period it was impossible to do so." *Id.* at 62:3-6).]

But regardless of whether icons displayed within the browser window were enabled by the patent specification, the inventors ultimately drafted claims that do not cover icons within the browser. They also expressly disavowed this potential embodiment, and, to the extent the idea of including such icons within the browser window was not already in the public domain, the inventors dedicated it to the public. *See Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) ("when a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates that unclaimed subject matter to the public"), and *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1331-4 (Fed. Cir. 2004).

### (c)    The inventors made clear while prosecuting their patents that they were not claiming icons integrated into the browser window.

If the inventors did not make sufficiently clear from the claim language and the distinctions in the specification that they were claiming only a navigation tool "separate from" the browser, they made it abundantly clear during prosecution. The originally presented claims might have encompassed both embodiments – i.e. separate and hypothetically integrated icons relative to the browser window – but the inventors disclaimed the alternative integrated window idea, in favor of the preferred embodiment, to secure grant of the patent with the addition of the "separate from" language to the icon display limitations.

In particular, the inventors repeatedly attempted to distinguish their claims from the prior art by noting that their display of icons in a "list window" and files in a "search window" allowed for so-called "two dimensional traversal." [Wolff Dec. Ex. B at G 261-64.] But the examiner did not allow the claims until the inventors added the requirement that the icons be "separate from the search window." Thus, the inventors disclaimed coverage of a system in which the navigation icons are integrated with the search, or browser, window. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) (citing *ZMI Corp. v.*

28

*Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988) for the proposition that the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution in order to obtain claim allowance); *see also Kinik Co. v. International Trade Comm'n.*, 362 F.3d 1359, 1364 (Fed. Cir. 2004) ("Claims are generally not restricted to the specific examples or the preferred embodiments unless that scope was limited during prosecution.").

Moreover, the "separate from the search window" limitation was critical to the examiner's Reasons for Allowance of the claims:

> As shown in FIGURE 5A of the Applicant's invention, the first and second icons, [bounded in green below] which initiate parsing of the searched list and retrieve the date from a location in the list, ***are provided separate (item 300)*** [bounded in red below] ***from*** the browser window (item 400) [bounded in blue below], which is not shown and not suggested by the prior art of record.

[Wolff Dec. Ex. B at G 286 (emphasis added).]



[Wolff Dec. Ex. A ('172 patent) Fig. 5A (emphasis added)].  *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999), cert. denied, 2000 U.S. 2592 (2000) (patentee disavowed a construction of the claims contrary to the Patent Office's understanding explained in the Reasons for Allowance by failing to respond to the Reasons for Allowance).

Google submits that the term "separate from the search window" means outside of the four corners of the browser window, for instance as shown with respect to the icons in jumper window 300, shown in Figures 5A-C, which are separate from the browser window 400.

## VI.    Claims 1-8 of the '172 Patent Are Not Infringed By The Google Toolbar[11]

If even a single element is missing from the accused product, there is no infringement. *Bayer AG*, 212 F.3d at 1247.  Independent claims 1 and 5, which are asserted against the Google Toolbar, are nearly identical.  For this motion, Google relies on just one of these missing elements from claims 1 and 5, which reads, in both claims:

> [1c]    displaying a first and a second icon separate from the search
> window on said display screen;

As is clearly evident, the Google Toolbar, shown below, including its accused "Next & Previous" control buttons (bounded in red), is displayed *within* the browser window (bounded in blue), not separate from it as required by all the patent claims.

---

[11] While other limitations are also absent from the accused Google Toolbar, Google bases the instant motion for summary judgment of non-infringement only on the absence of the "separate from the search window" limitation.



[Hardin Dec. ¶ 27 and Ex. C.]

Because this element is not found in the accused products, Google cannot infringe independent claims 1 and 5, nor any of claims 2-4 and 5-8, which depend from claims 1 and 5. *Bayer AG*, 212 F.3d at 1247. Moreover, there are three independent reasons why the Google Toolbar does not infringe this limitation under the doctrine of equivalents. First, the "separate from" limitation was added by amendment during prosecution for reasons related to patentability, thereby narrowing the claims, and thus no range of equivalents is permissible. *See Festo*, 535 U.S. at 739-40. Second, removing this limitation from the claims would cause them to cover subject matter disavowed during prosecution, namely the icons displayed within the browser window. Thus, no range of equivalents is permissible for this reason either. *See Mark I*, 66 F.3d at 291 (Fed. Cir. 1995). And third, construing the claims to cover icons displayed within the browser window would completely vitiate the "separate from" requirement. *See Fin Control*, 265 F.3d at 1320-21; *Seachange Intern., Inc., v. C-COR, Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005) (citing *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005)).

Thus, the Google Toolbar does not infringe claims 1-8 of the '172 patent under the doctrine of equivalents either. *Ecolab*, 264 F.3d at 1371.

## VII.    Claims 1-8 of the '172 Patent Are Anticipated By CyberPilot

A detailed invalidity chart for claims 1-8 of the '172 patent is attached as Exhibit F to the Hardin Declaration. The chart shows that every limitation of the claims is met exactly by the CyberPilot prior art as used with the Netscape Navigator browser, thus rendering the claims invalid as anticipated. [12] An annotated screen shot from the CyberPilot tutorial, which depicts the software as used with a prior art Netscape Navigator browser, is provided below.

---

[12] The Netscape Navigator browser is admitted to be prior art to the '172 patent. It is labeled as "PRIOR ART" in Figure 4 and discussed as "prior art" in the written description. [Wolff Dec. Ex. A at 7:27-31 ("FIG. 4 shows a prior art browser user interface and a query form of an information index provider. This interface allows the user to access web files and also displays the file contents to the user. The browser interface 400 is that of Netscape Navigator.").] The Netscape Navigator is also shown to be the preferred embodiment of the browser window, which was used with the Internet Buffet "jumper window." [*Id.* at Figures 5A-C (the figures again show the Netscape browser 400).] In other words, CyberPilot is the same thing as the claimed embodiment of the invention, Internet Buffet, and both operated in cooperation with the prior art Netscape Navigator.



CyberPilot map window = green
first icon/control icon ("?") = red
second icon/object icon = purple

browser window = blue

[Hardin Dec. Ex. E; *see e.g.* Stark Dec. ¶ 5a and Exs. A-B.]

This motion now turns to a discussion of each claim and each limitation.

A.    **Claim 1**

[1a]    **A computer implemented method for searching on a local computer a network of nodes with data files stored at corresponding ones of the nodes and each of the data files identifiable by a location identifier and several of the data files containing location identifiers for others of the data files, and the method for searching comprising the acts performed on the local computer of:**

CyberPilot is a computer implemented software product for navigating and finding information on the Internet, which is a network of computers or "nodes." [Hardin Dec. at ¶¶ 20-22, and 29.] Web pages on the Internet are typically stored in HTML files, which include location identifiers such as hyperlinks or URLs. [Hardin Dec. at ¶ 22.]

**[1b]    constructing a search window on a display screen of the local
computer;**

CyberPilot, in combination with the Netscape Navigator browser, causes a search
window to be constructed on a display screen of the local computer. [Hardin Dec. Exs. D, E and
F.] As shown in the CyberPilot documentation, this is the intended and standard configuration
for operating the software. [Stark Dec. at ¶ 3(a).]

**[1c]    displaying a first and a second icon separate from the search window
on said display screen;**

CyberPilot displays a first icon (a control icon, e.g., "?") and a second icon (an object
icon, e.g., icon to the left of the label "Kaua'i, the Garden Island") separate from the search
window. [Hardin Dec. at ¶ 30.] These icons are displayed in the CyberPilot map window, which
can be displayed above or alongside the browser window. [*Id.*; Stark Dec. at ¶ 5(a).]

**[1d]    retrieving an initial data file from the network together with
displaying the initial data file in the search window, and the initial
data file including location identifiers;**

CyberPilot, in combination with the Netscape navigator, retrieves an initial data file (e.g.,
"index.htm") from the network and displays it in the search window. [Hardin Dec. at ¶ 32 and
Ex. E.] The initial data file includes location identifiers (e.g., URLs in hyperlinks). [*Id.*]

[1e]    parsing the location identifiers from the initial data file to form an initial list of location
identifiers together with storing the initial list, responsive to a selection of the first icon; and

CyberPilot, in response to selection of the first icon (the control icon "?"), parses the
location identifiers from the initial data file forming a list of location identifiers. [*Id.*] The list of
location identifiers is stored as a "Webmap". [*Id.*]

**[1f]    retrieving a first data file corresponding to a selected one of the
location identifiers in the stored initial list together with displaying the
first data file in the search window, responsive to a selection of the
second icon.**

In response to selection of the second icon (i.e., the "object icon") corresponding to a
location identifier (i.e. URL) in the initial list (i.e. the Webmap), CyberPilot causes the Netscape
Navigator to retrieve a first data file (i.e. another HTML file) corresponding to the second icon

34

(i.e. the object icon to the left of the label "Kaua'i, the Garden Island"). [Hardin Dec. at ¶ 33 and Ex. E.] In other words, when an object icon is selected in the CyberPilot window, the corresponding web page is retrieved and displayed in the Netscape browser window. [*Id.*; Stark Dec. at ¶ 5(b)(iii).] Accordingly, each and every limitation of independent claim 1 is expressly taught by CyberPilot, a prior art reference that invalidates the claim by anticipation.

**B.    Claim 2:  The computer implemented method of claim 1 wherein; said initial data file comprises information in a markup language; and said location identifiers comprise URLs.**

The initial data file (e.g., "index.htm") is formatted in HTML and comprises URLs. [Hardin Dec. at ¶ 32.]   Thus, Claim 2 is also anticipated and must be held invalid.

**C.    Claim 3:  The computer implemented method of claim 1 wherein; said initial data file and said first data file comprise information in a markup language; and said location identifiers comprise URLs.**

Both the initial data file (e.g., "index.htm") and the first data file (e.g., HTML file corresponding to the label "Kaua'i, the Garden Island") are formatted in HTML and comprise URLs. [*Id.*] Claim 3 is, therefore, also invalid as anticipated.

**D.    Claim 4:  The computer implemented method of claim 1 wherein said retrieving act further comprises; retrieving the first data file corresponding to the one of the location identifiers in the stored initial list selected from a group consisting of: a next location identifier, a prior location identifier, a first location identifier and a last location identifier, together with displaying the first data file in the search window, responsive to a selection of the second icon.**

The location identifiers stored in the initial list (the Webmap) are arranged in sequence and comprise a "next location identifier," "a prior location identifier," "a first location identifier," and "a last location identifier."[13]  [Hardin Dec. Ex. F.]   For example, the first

---

[13] This claim qualifies the genus (location identifiers in general) by providing various alternative species; accordingly, only one of these "location identifiers" must be found in CyberPilot for it to anticipate the claim. *Medichem, S.A., v. Rolabo, S.L.*, 353 F.3d 928, 934 (Fed. Cir. 2003) ("It is...an elementary principal of patent law that when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art." [citations omitted]").  Nevertheless, all species of the genus are found in CyberPilot.

location identifier in the CyberPilot Webmap is the URL corresponding to the "Places" label; the last location identifier is the URL corresponding to the "Moloka'i" label. [*Id.*] Once, for example, the "Kaua'i, the Garden Island" object icon is selected, the next location identifier is the URL corresponding to the "Activities in Kauai" label, and the previous location identifier corresponds to the "The Island of Kaua'i" label. [*Id.*] Accordingly, Claim 4 is also invalid as anticipated by the CyberPilot prior art.

### E.    Claims 5-8

Claims 5-8 are "computer-readable medium" claims that simply recite a medium (e.g., a computer disk or CD-ROM) that stores computer code for carrying out steps identical to the steps recited in claims 1-4. [Hardin Dec. at ¶ 26.] The CyberPilot program was stored on a computer-readable medium. [Stark Dec. Ex. A.] Thus, claims 5-8 are invalid as anticipated for the same reasons that claims 1-4 (respectively) are anticipated. [Hardin Dec. Ex. F.]

## VIII.  Conclusion

For at least the reasons stated above, Claims 1-8 of the '172 patent are not infringed by the Google Toolbar. In addition, as shown above, the CyberPilot prior art reference clearly anticipates claims 1-8. Accordingly, Google respectfully requests that the court grant its motion for summary judgment and declare (1) that claims 1-8 of the '172 patent are not infringed by the Google Toolbar, and (2) that claims 1-8 of the '172 patent are invalid.

Respectfully submitted,

Dated:  August 17, 2005

By: _____
Kathleen A. Lang (P34695)
L. Pahl Zinn (P57516)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226-3425
(313) 223-3500
*Attorneys for Google Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of Corrected Brief in Support of Google's Motion for Summary Judgment of Non-Infringement and Invalidity of the '172 Patent; Google's Motion for Summary Judgment of Non-Infringement and Invalidity of the '172 Patent and Certificate of Service was served upon all parties and/or attorneys of record to the above cause herein at their respective street addresses as disclosed on the pleadings and/or their respective email addresses and/or their respective facsimile numbers on August 17, 2005, via:

| | |
|---|---|
| ✔ U. S. Mail | ____ Facsimile |
| ____ Overnight Courier | ____ Hand Delivery |
| ____ Email | ____ Federal Express |

I declare under penalty of perjury that the statement above is true to be best of my information, knowledge and belief.

Joyce A. Ford

DETROIT 28155-1 850839v1