UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NETJUMPER SOFTWARE, L.L.C.,                    Case No. 04-70366-CV
a Michigan limited liability corporation,      Hon. Julian Abele Cook
                                               Magistrate Judge R. Steven Whalen

      Plaintiff,

vs.

GOOGLE INC.,
a Delaware corporation,

      Defendant.

_____/

| SOMMERS SCHWARTZ, P.C. | DICKINSON WRIGHT, PLLC |
|---|---|
| Andrew Kochanowski (P55117) | Kathleen A. Lang (P34695) |
| Nabeel N. Hamameh  (P60981) | L. Pahl Zinn (P57516) |
| Attorneys For Plaintiff | Attorneys For Defendant |
| 2000 Town Center, 9th Floor | 500 Woodward Ave., Ste. 4000 |
| Southfield, MI  48075 | Detroit, MI 48226 |
| (248) 355-0300 | (313) 223-3500 |
| | |
| BANIAK, PINE & GANNON | FISH & RICHARDSON P.C. |
| Michael Baniak | Howard G. Pollack |
| Co-Counsel For Plaintiff | Attorneys For Defendant |
| 150 N. Wacker Drive, Suite 1200 | 500 Arguello Street, Ste. 500 |
| Chicago, IL 60606 | Redwood City, CA 94063 |
| (312) 673-0360 | (650) 839-5070 |
| | |
| | FISH & RICHARDSON P.C. |
| | Frank E. Scherkenbach |
| | 225 Franklin Street |
| | Boston, MA 02110-2804 |
| | (617) 542-5070 |

_____/

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

**PLAINTIFF NETJUMPER'S RESPONSE TO DEFENDANT GOOGLE'S MOTION FOR
SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY
OF THE '172 PATENT**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................ III

INTRODUCTION ................................................................................................. 1

    A.    FACTS ........................................................................................... 2

          1.    Background of Invention................................................... 2

          2.    Accused Google Toolbar................................................. 5

    B.    NETJUMPER'S RESPONSE TO GOOGLE'S NON-INFRINGEMENT ARGUMENT ............................................................ 8

          1.    If The Court Properly Construes the Claim Term "Search Window" As The Page Display Area, Google's Non-Infringement Motion Automatically Fails As Its Icons Are Admittedly Separate From The Page Display Area .................. 8

          2.    The Court Must Construe "Search Window" By Reading The Claims First And Foremost In Light Of The Entire Specification and Patent History ....................................... 10

          3.    The "Search Window" Of Claims 1-8 Is Not The Entire Browser Frame But A Subset: Both The Claims And Specification of the '172 Patent Make Clear That The Inventors Did Not Lump These Areas of The Computer Display Together ................................................................ 11

          4.    The '172 Patent Sets Out An Embodiment That Integrates The Navigational Tools Into A Toolbar Exactly Like The Google Toolbar ............................................................... 15

          5.    The Prosecution History Fails To Show That NetJumper "Abandoned" The Integrated Navigational Tool Claims: The History Reveals That They Were Preserved And Claimed in Claims 1-8................................................... 17

          6.    There Is No Need For The Court To Construe A Number Of Terms By Google As They Do Not Pertain To Google's "Separate" Argument; But If The Court Wishes To Construe "Icon" And "Parse" Google's Construction Is Wrong.......................................................................... 22

          7.    There Is Also No Evidence That Making An Embedded Toolbar Was Not Possible In 1996 ................................... 25

    C.    RESPONSE TO ANTICIPATION ARGUMENT.......................... 27

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

1. In Order To Find That A Single Reference "Anticipates" A Claim, All Elements Of A Claim Must Be Found In The Single Reference In The Exact Form As Stated In The Claim ............................................................................................... 27

2. Operation of CyberPilot Software .................................................... 28

3. Claims 1-8 Of The '172 Patent Are Not Anticipated By CyberPilot ...................................................................................... 32

CONCLUSION ............................................................................................... 37

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

# INDEX OF AUTHORITIES

## CASES

*Amgen, Inc. v Hoechest Marion Roussel, Inc.*, 314 F.3d 1313, 1327 (Fed. Cir. 2003) ............................ 17

*Combined Sys., Inc. v. Defense Tech. Corp. of America*
  350 F.3d 1207 (Fed. Cir. 2003) .......................................................................... 13

*Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*
  350 F.3d 1327 (Fed. Cir. 2003) .......................................................................... 13

*Hoechist Celause Corp. v BP Chemicals, Ltd.*, 38 U.S.P.Q. 2d 1126 (Fed. Cir. 1996) ............................ 22

*Intellicall, Inc. v. Phonometrics, Inc.*
  952 F.2d 1384 (Fed. Cir. 1992) .......................................................................... 10

*Interactive Gift Express, Inc. v. Compuserve, Inc.*
  256 F.3d 1323 (Fed. Cir. 2001) .......................................................................... 11

*Markman v. Westview Instruments, Inc.*
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ............................................ 10

*McGill, Inc. v John Zink Co.*, 736 F.2d 666, 673 (Fed. Cir.) *cert. dismissed*, 469 U.S. 1037 (1984) ...... 17

*Quantum Corp. v. Rodime, PLC*
  65 F.3d 1577 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1167 (1996) .................................. 10

*Rexwood Corp. v Laitram Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001) ................................... 21

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002) .......................... 10

*Toro Co.  v. White Consol. Indus., Inc.*
  199 F.3d 1295 (Fed. Cir. 1999) .......................................................................... 14

*Vitronics Corp. v. Conceptronic, Inc.*
  90 F.3d 1576 (Fed. Cir. 1996) ...................................................................... 11, 15

*ZMI Corp. v Cardiac Rescuscitators Corp.*, 844 F.2d 1576, 1579 (Fed. Cir. 1988) ....................... 13

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

## INTRODUCTION

NetJumper Software LLC, is a Southfield, Michigan software company.  In 1996, its founder Gilbert Borman - - whose background included the supermarket business - - and several other individuals applied for and subsequently obtained U.S. Patent No. 5,890,172 (the "'172 Patent").  The '172 Patent essentially provides an improved set of Internet search tools for use with search engines. (**Exhibit 1**).  In 2004, NetJumper sued defendant Google over the set of Internet search navigation tools contained in the popular Google Toolbar, the "Next and Previous" feature, which automatically direct a computer user to a site identifier found by the Google search engine.

If the Court grants Google's motion it will commit error.  The key to Google's non-infringement argument is that the '172 patent is allegedly limited to a navigation tool displayed in a different "window" than an Internet web browser.  But this only one of several expressly disclosed embodiments of the invention of the '172 patent:  statements in the patent specification describe  embodiments in which the navigation  tools are embedded right in a browser just as the Google Toolbar is embedded right in a browser.

To attempt to convince  the Court to buy into its argument, Google suggests a definition of the term "browser window" that actually refers to an entirely different feature of the invention of the '172 patent.  Google is effectively inviting the Court to effectively write out of the patent at least one of the very  embodiments of the invention that just so happens to exactly match its Toolbar. Google's argument is faulty on many different levels, not the least being that the claim terms, the patent specification, and the prosecution history all read contrary to Google's requested  claim construction.

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

1

Google's allegedly invalidating prior art, the CyberPilot product, does not anticipate any, much less all of Claims 1-8 of the '172 patent. This product does not perform the same function of the invention of the '172 patent, let alone anticipate the asserted claims of the '172 Patent. CyberPilot did not include or incorporate at least seven elements of the asserted claims 1-8 of the '172 patent. As a result, Google's anticipation motion must fail as well.

A.    <u>FACTS</u>

1.    <u>**Background of Invention**</u>

By late 1995 the World Wide Web ("WWW") had popularized the Internet to the point where millions of people could connect from their home computers to the vast number of servers which stored data, pictures, and other information. A number of companies offered a service for searching the Internet by indexing the various sites, pages, and other information stored on servers which comprised the WWW. These so-called search engines were accessed through a user's computer through a specialized piece of software called a Web browser.

A browser allows a computer user to translate and display data contained in Web pages on the computer user's display screen. Browsers have a frame, which typically contains the icons that allow the user to give the software directions. It also contains a Web page display area. As a user operates the browser to direct it to display Web pages, the display area will show the different page and the browser frame will remain unchanged. The browser display frame and the separate Web display area typically appear as follows on a computer screen:

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER ● SUITE 900 ● SOUTHFIELD, MICHIGAN 48075 ● (248) 355-0300



Search engine Web sites like Yahoo[TM] permit a computer user to enter a search request through a browser. When a user enters a search request, the search engine looks through its particular WWW index. It typically returns many, sometimes hundreds or thousands of multiple site references to the user in response to a search request. The search engine working through the user's browser shows the listed references in the Web display area. These references contain text together with a site identifier called a uniform resource locator ("URL"). By entering a particular URL reference into a browser a user can find where a particular web page is stored. The URL gives the specific direction to the browser to locate the particular page. The utility of a URL is further enhanced by a computer language called hypertext markup language ("HTML") which allows each URL to be located by a "hotlink" in a web data file. In typical browsers a hotlink is indicated by a differently colored and underlined piece of text. By mouse clicking on a hotlink, a computer user instantly directs the browser to locate the server that contains the hotlink address and to display it on the user's computer screen.[1]

---

[1] This background is explained in the '172 Patent, generally at Cols. 1 and 2. The '172 Patent identifies a number of prior-art search engines, like Yahoo, Alta Vista, Excite, and others.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

In the typical computer operation, once the user opens or launches the browser software, chooses a search engine, and performs a search, the Web page display shows a list of search results. When a user begins to use the search results, he or she is taken "into" the results by clicking on the first search result on the displayed list that appeared relevant to the user. The user's computer automatically saves or "caches" each Web page displayed by the browser. When that search result is clicked, the user's display window changes to show only the page that was clicked on, with the search result list disappearing from sight (the Web page that holds the results is simply cached into memory as every other viewed page). Once the user is in the displayed page, he or she is typically presented with hotlinks on that page which lead to other Web pages. By clicking on those links, the user goes down an additional level of search. A typical WWW search can lead a user to tunnel, or "drill-down" many levels of Web pages. (See generally, **Exhibit 1** at Col.2, ll. 44-60).

What happens when the user wants to go back to the original search result? On a typical browser in 1995 (indeed to this day) the user had to click the "back" button hardwired in the software browser frame as many times as was necessary to traverse back through the cached pages to the original search site results page returned by the search engine. (Col. 2, l. 57). Only then could the user be able to go to another listed search result and begin his search anew. That technique wasted a lot of time and effort.

To improve on this inefficiency, the invention covered by and claimed in the '172 Patent is a method of navigating a list of search results. This is done by the invented software generating a list of site identifiers found in the results of a search, and using automated

---

(Col. 1, ll.64-66). It identifies that these information indexers store indexes of Internet files to allow computer users to find a list of all indexed files that meet a search criterion or criteria. (Col. 2, ll. 2-6).

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

navigation tools to jump directly between those search results without having to retrieve the cached search results page and going page-by-page by using the "back" button on a browser.

## 2.    Accused Google Toolbar

The Google Toolbar is software available from Google.  Its original purpose was to make Web browsing "more pleasurable" to users. (Google's FRCP 30(b)(6) deponent Breen Hagan Dep. at p. 19, **Exhibit 7**). Once installed on a user's computer with its "Next and Previous" buttons activated,[2] the Toolbar  modifies the Internet Explorer or Firefox Mozilla browser to add more functionality to Web browsing. The Toolbar contains a window for typing in searches using the Google search engine, called "edit box" by Google, which is typically shown on the left-hand side of the Toolbar. Clicking on the "Search" icon to the right of the box activates the search by the Google site, and generates a list of search results. Once the "Search" icon is clicked, for example after typing in "Yahoo" in the "edit box" window, the Web display screen of the browser shows the first screen of returned search results generated by Google for the search request "Yahoo." The "Next" and "Previous" buttons are not yet "activated," or lit up, as the user has done nothing with the search results:

---

[2] As downloaded from Google this feature is apparently not activated until the user clicks on the feature in the options menu.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  ●  SUITE 900  ●  SOUTHFIELD, MICHIGAN 48075  ●  (248) 355-0300

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300



When a user clicks on the search result link of his choice, the Web page display area, or what the Toolbar designers refer to as the "control pane,"[3] shows the clicked page. When the user's cursor passes over the "Next" and "Previous" buttons, a drop-down menu appears showing the next result returned by the Google search engine even though the actual search results page has now disappeared from the user's sight:



---

[3]   (Hagan Dep. at p. 11) (**Exhibit 7**).

6

When the user wishes to go to the next search result returned by the Google search engine, instead of traversing back to the cached results page to locate the search result, the user can click on the lit-up "Next" button. The next returned search result is then displayed on the Web page display screen. The user does not need to back up his/her browser to return to the original search result screen:



Successive clicks of the "Next" button result in the display screen displaying the next returned search result. Clicking the "Previous" button traverses the user back one search result:



LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

### B.    NETJUMPER'S RESPONSE TO GOOGLE'S NON-INFRINGEMENT ARGUMENT

#### 1.    If The Court Properly Construes the Claim Term "Search Window" As The Page Display Area, Google's Non-Infringement Motion Automatically Fails As Its Icons Are Admittedly Separate From The Page Display Area

Google's non-infringement argument hinges on a single factual premise - that the '172 Patent specification defines the term "browser window" as only what is labeled as item **400** in **Figure 4.**  From this single faulty premise, Google makes the tautological argument that, since "search window" allegedly includes the entire area of the computer display screen when a browser is activated ("the area defined by the four corners of the browser window, such as the Netscape browser (element 400 in Figure 5A)" (Brief at 26)), then its browser-embedded toolbar cannot be "separate" from the browser window.  Like a house of cards, Google's non-infringement argument falls when this faulty "card" is removed through proper examination of the patent and its prosecution history.

Google is wrong because it misreads the patent.  The very first time item **400** is identified is not as a "browser window," but as a "**browser interface 400,**" ('172 Patent, Col. 7, ll. 30-34.).  In that paragraph, the Inventors say "**Figure 4** shows a prior art browser user interface."  The specification continues, "this interface allows the user to access Web files and also displays the file contents to the user."  (Id. at ll. 27-29).  In this first description of the browser interface, NetJumper specifically delineated a smaller section of the screen where the browser displays a Web file as the "browser view window (**406**)."  This is the area in the browser defined by the term "search window" in Claims 1-8. No credible evidence that the inventors of

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

the '172 patent ascribed any different meaning to the phrase "search window" in either the patent or the file history exists.[4]  The parties' difference is shown graphically below:

**Google's Position**                    **NetJumper's Position**





LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

---

[4]       Item **406** is at points in the '172 patent referred to by the short form of the term "browser view window," or "browser window."  Perhaps this is where Google's term "confusion" arises. (E.g., '172 patent, col. 9, ll. 8, 18, 26-27.)  But it is obvious these terms are first defined in the patent, they are given the precise definition.  "Browser view window" is then contracted a few times as "browser window."  Wherever the short form "browser window" is used in the '172 patent specification, the term is always used **after** the term has been fully identified as the "browser view window."  When read as a whole, there can be no doubt that the specification, when referring to this feature **406** is referring to the "browser view window," or "window **406** for viewing a file" – what is properly the "search window" as that term is used in the claims of the '172 patent.  To do as Google has done – to claim that the term "browser window" actually refers to feature **400** (the "browser interface") and not feature **406** (the "browser view window" or "a window for viewing a file") - is mistaken at best.

9

Google's own expert witness acknowledged that a proper reading of "search window" (one that would not extend to the entire browser screen) would render Google's non-infringement position null and void:

> **Q**:    Assuming that the court were to say, Professor, that the page display as you've defined it in Tab C to your declaration were the search window, as that term is used in the claims of the '172 patent, would it still be your opinion that the Next & Previous buttons were not separately displayed from the search window?
>
> **A:**    Yeah.  If that was an absolute statement and -- then I would have to conclude that the Next & Previous buttons as they're displayed in Exhibit C would be separate from the display page.

(Hardin Dep., p. 75-76, **Exhibit 6**).

### 2.    The Court Must Construe "Search Window" By Reading The Claims First And Foremost In Light Of The Entire Specification and Patent History

Patent infringement analysis is a two-step process.  First, the scope of the claims is determined as a matter of law.  Then, the properly construed claims are compared to the accused product or process to determine, as a matter if fact, whether all of the limitations of at least one claim are present.  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002).

The meaning of claim terminology must be decided by the Court as a legal matter. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  Claim construction requires that the words and phrases of a claim be given their ordinary meaning, unless the specification clearly indicates that the inventor intended a different meaning.  *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1167 (1996); *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).  "[I]n interpreting an asserted claim, the Court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, the specification and … the prosecution history.  Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER   •   SUITE 900   •   SOUTHFIELD, MICHIGAN 48075   •   (248) 355-0300

language." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001), *quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

> 3.     **The "Search Window" Of Claims 1-8 Is Not The Entire Browser Frame But A Subset: Both The Claims And Specification of the '172 Patent Make Clear That The Inventors Did Not Lump These Areas of The Computer Display Together**

There is a structural and functional difference between the "browser window" as Google would have this Court define that term (i.e., the entire computer display screen, or item **400** from the '172 specification), and a "search window," the area where the browser displays Web HTML pages (item **406** from the '172 specification). The functional differences of the various areas that appear on a computer screen were carefully delineated by the inventors of the '172 Patent, and the specification expressly designates each area that appears on the computer screen.

In fact, the untenable and improper nature of Google's position is underscored by the fact that it has actually mis-cited the '172 patent specification. Line 30 of Column 7 of the '172 patent says "*browser interface* **400**" which includes "a window **406** for viewing a file." (Emphasis added).  In argument made on p. 24 of its brief, however, Google asserts something much different.  There, Google claims that "'search window' is simply the browser window (**400**) shown in the patent."  This is simply not so – the specification defines that feature **400** as the "browser interface."  On page 25 of Google's brief, it nevertheless again asserts that the so-called "unified browser window [is] (**400**)," citing to Col. 7, ll. 30-33.  The patent specification is accurate, and Google's position and asserted definition are not.

The patent specification shows why these two terms - "search window" (item **406**) and "browser interface" (item **400**) - are not identical. First, it is not in material dispute that the Web page display area that corresponds to "search window" was explicitly defined by the inventors of

the '172 Patent as structure **406** ("browser view window **406**").  Second, the entire browser screen area that Google wants lumped in with the page display area is *independently* defined as "browser interface" by the inventors as structure **400**:



(PRIOR ART)
FIG. 4

Elsewhere, the patent specification specifically defines several different "windows" within the screen area, all of which have different functions relevant to the invention.  The presence of these sub-components of the browser screen strongly suggests that Google is trying to confuse the Court.  For example, **Figure 3** contains reference **308** to a "jump site window," (Col. 6, l. 48), a separate window in one embodiment of the invention.  A "scrollable window bar **500**" is shown in **Figure 5**, (Col. 7, l. 59), referring to a permanent part of the browser.  And, as described above, the area where the browser displays HTML pages is specifically defined as, a "window **406** for viewing a file."  (Col. 7, l. 32).  This area is also depicted as "browser view window **406**."  (Col. 8, l. 45).  As can be seen in **Figure 4**, the inventors referred to the "browser interface **400**" when referring to what Google now calls the "browser window."  (Col. 7, l. 30.).  Another "window" in the Netscape browser identified by the inventors is "a site window **404**."

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

(Id.). The notion that there is only one "browser window," and that it is the entire screen, is not supported by the '172 patent specification. All these identified structures and their location on a browser interface are shown graphically below:



FIG. 5A

It is well settled that an inventor may be his own lexicographer. *ZMI Corp. v Cardiac Rescuscitators Corp.*, 844 F.2d 1576, 1579 (Fed.Cir.1988). Yet here, when read in terms of the patent's specification, these terms would have been understood by those of ordinary skill in the art as describing different areas of the browser user interface, and specifically the area where the browser would display the returned HTML file, exactly as shown by **406** in **Figure 4**. (See **Exhibit 2**, Declaration of Bernard Galler, Ph.D., at Par. 13, 16, 24-25) .

Google wants the Court to consult a dictionary to find that "browser window" and "search window" are synonyms.[5] But even its own proposed dictionary, the "IBM Dictionary of

---

[5] It is well-settled law that claim terms must be construed in the context of the patent of which they are a part, and not interpreted merely by reference to dictionary definitions. *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,* 350 F.3d 1327, 1338 (Fed. Cir. 2003).

Computing," (Exhibit E to motion) does not support it. The dictionary defines "window" as "**a portion of a display surface** in which display images pertaining to a particular application can be presented…Different applications can be displayed simultaneously in different windows…(2) an area of the **screen with visible boundaries within which information is displayed**. **A window can be smaller than or the same size as the screen**…(3) **A division of a screen** in which one of several programs being executed concurrently can display information…" (emphasis added). The same dictionary also defines "window component" as "the smallest named visual part of a window, such as the title bar, system menu icon, action bar, and scroll bar." These definitions are only consistent with NetJumper's patent disclosure and its description of **Figure 4** in Col. 7, ll. 27-36.

Mis-citations or not, reviewing the patent, one skilled in the art would understand that the inventors of the '172 Patent distinguished between these terms when they delineated both the entire browser as **400** and the as **406**. (**Exhibit 2**, Galler Declaration, Par. 13). The Court cannot properly disregard parts of the specification in which the inventors defined specific areas within the browser interface. The Google toolbar itself, and in particular the "Next" and "Previous" buttons of that toolbar, are displayed "separately" from the "search window." Google itself admits as much. (Hagan Dep. p. 71-72, **Exhibit 7**) (admitting that the "next" and "previous"

---

*See also Combined Sys., Inc. v. Defense Tech. Corp. of America*, 350 F.3d 1207, 1215 (Fed. Cir. 2003) (noting that had the district court relied exclusively on the dictionary definition or allowed it to overcome clear language in the patent itself, its methodology would have been clearly wrong); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999). As the Federal Circuit recently stated, "while extrinsic evidence 'can shed useful light on the relevant art,' we have explained that it is 'less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Philips v. AWH Corp.*, No. 03-1269, 1286, 2005 WL 1620331, at *10 (Fed. Cir. July 12, 2005) (internal citations omitted). As a result, extrinsic evidence in general is less reliable than the patent and its prosecution history in determining how to read claim terms. *Id.* at *11. Dictionary definitions may be helpful, but only up to the point where they contradict the definitions of terms as ascertained from the patent documents.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

buttons and "search button" of Toolbar are never displayed in the "control pane", i.e., the Web page display area).

### 4. The '172 Patent Sets Out An Embodiment That Integrates The Navigational Tools Into A Toolbar Exactly Like The Google Toolbar

Nor can the Court properly disregard that the inventors specifically disclosed invention embodiments that, were the Court to accept Google's invitation, would be rendered superfluous and unclaimed. The first embodiment of the navigation tools described in the '172 Patent is for a "floating" window, referred to in the patent specification as a "jumper window." (Col. 3, l. 18). This is illustratively shown in **Figure 3**, and shown in comparison to an opened browser window in Figures **5A**, **5B**, and **5C**. This figure appears as follows:



FIG. 3

The description of the "jumper window" in the specification provides the concept of navigational controls that are physically[6] separate from the frame of the opened browser. Among other provided tools in the "jumper window," structure **318** describes a "next entry" button, and **314** a "previous entry" button. (Col.6, ll. 47-54, Col. 7, ll. 6-9). The patent describes that "responsive to

---

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1594 n.6 (Fed. Cir. 1996).
[6] Perhaps "virtually" physically is a better term.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

an activation by the user, a computer is directed to determine which of the stored site identifiers is currently selected and automatically selects an other. The other includes the first…the next… or the last on the list." (Col. 3, ll. 18-22).

Google glosses over the fact that the '172 Patent specification *also* discloses alternate embodiments to a "floating" jumper window.  These disclosed alternate embodiments  describe a navigation control that is  not physically removed from the browser frame at all:

> In alternate embodiments the jumper window may take any of several forms. The user interface may include popup or persistent window, **a toolbar,** a menu modification of the browser window**, a toolbar modification of the browser window,** or the use of accelerator keys on the keyboard.

(Col. 7, ll. 22-26) (emphasis added to show the embodiments exactly like the Google Toolbar disclosed in the '172 Patent).

Further in the specification, the inventors again disclose "better integration of the jumper's functions and the browser's functions…" In one embodiment, "the jumper functions are built directly into the browser…All of these embodiments provide a more integrated jumper/browser environment for the user." (Col. 12, ll. 27-34) (emphasis added).[7] Thus, there is no question that the inventors of the '172 Patent conceived of this navigational tool as being contained *both* as a "floating," separate "jumper" and as part of the permanent browser interface. The Google Toolbar is precisely the integrated navigational tools embodiment that is described and claimed in the '172 patent: "a toolbar", or even "a toolbar modification of the browser window."  In fact, Google recently went so far as to admit as much.  (Hagan Dep, p. 26, **Exhibit 7**).  Proper claim construction will not write out of the patent the integrated navigational tools embodiment.

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

**5.    The Prosecution History Fails To Show That NetJumper "Abandoned" The Integrated Navigational Tool Claims: The History Reveals That They Were Preserved And Claimed in Claims 1-8**

Google was forced to admit that NetJumper disclosed the modified-toolbar embodiment. Seeking to stand the patent on its head, Google asserts (as it must to avoid infringement) that NetJumper "abandoned" this embodiment during the prosecution of the patent. But to write out an embodiment takes clear, unambiguous evidence that the inventors relinquished the coverage. It is black letter law that the prosecution history may not be used to infer an intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage. *Amgen, Inc. v Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1327 (Fed. Cir. 2003). Here, much as Google tries to spin it, the prosecution history factually *supports* NetJumper's position that it never "abandoned" and left the embodiment unclaimed.

When the patent application was first filed, the inventors' first set of claims sought coverage for a "computer implemented method and system for retrieving information from a network." (Original Claims 1-17) (**Exhibit 3** file history of '172 Patent at G000125-128). The Examiner rejected a number of original claims because they were anticipated by features contained in the Yahoo search engine depicted in the patent application. The Examiner pointed out that to the Yahoo site "automatically select[s] an other of said site identifier form [sic] said list (e.g., the Yahoo search engine shown in FIG. 5C, item 588 "Next 20" shows where the user activates the next page request, and in view of the current page, the next page (i.e., site) identifier

---

[7] The inventors also cautioned those reading the patent that the "figures and the text are to be viewed in the illustrative sense only, and not limit the present invention." (Col. 13, ll. 21-23.)

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

is automatically chosen"). (Id. at G000210)[8].   The Examiner then referenced the Alta Vista search engine site, and rejected as anticipated two original claims,  pointing out again that the Alta Vista Web site provides a "Next" and other icons within the display field which act as automatic jump commands for the user. (Id. at G000211). This is graphically shown below with the screen display area shaded, the automated feature near bottom:



With reference to the original presented claims 23-26 (which used the "browser window" language), the Examiner cited to a Web page of the CNN Interactive site.  (Id. at G000212). There, the Examiner noted that a subpart of the Web page is a "jumper window."  This area consists of a series of hotlinks which appear in the browser display window, (Id. at G000213). While the file contains a photocopied version, (Id. G000271), a current version of the same page makes the area easier to see, shaded to show the Examiner's cited "jumper window":

---

[8] Even here it is notable that the Examiner cited to the "Yahoo search engine (in FIG.5C, **item 406**)," (id., emphasis added), evidencing that *the Examiner* understood what Google purports not to - - that there is a distinction between the browser itself and the screen space where the browser displays a Web page.



LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

The sum total of the art which caused rejection of the original claims had one common feature: the combination of (1) the Yahoo Alta Vista search engine HTML page, showed a navigational tool **in the Web page display window** when the browser called up the Yahoo URL, and (2) the CNN Interactive page "jumper window," (cited specifically against the original claims directed to "browser window") also appeared **in the Web page display window** when the user called up the CNN Interactive URL.

In response to the rejection, NetJumper amended the claims in two significant ways.[9] First, it amended the claims that would become granted Claims 1-8, from "computer implemented method," to "a computer implemented method for searching on a local computer…" This introduced the concept of "search" into the claims. Second and more important, it amended the claims to add the step of "**constructing a search window on a display screen** of the local computer." (Id. at G000249-252). The response it filed with the amendment pointed to the distinction that the navigational tools of the Yahoo, CNN and Alta

Vista Web pages do not achieve the same functionality as the invention because they are hard-coded **into the Web page;** "Thus the button bar is a transient phenomenon, viable only within the confines of the Yahoo page." Explaining how the claimed invention differed from the Yahoo/Alta Vista references, the patentees said:

> The applicant claims that the subsequent display of any of the data files stored on the network **in the search window…will not prevent the display of a first data file corresponding to a selected one of the location identifiers in the stored initial list responsive to the selection of the second icon.** This ability to perform a two dimensional traversal to next site on the initial list is a unique feature of the applicants' invention. (emphasis added)

(Id., G000262). And, crucial to this discussion, the inventors similarly addressed the CNN Interactive reference separately. There they told the Examiner that the "subsequent display of any of the data files stored on the network **in the search window**…will not prevent the display of a first data file **in the browser window** responsive only to a selection from the list window of a location identifier…" (G000264) (emphasis added).

Using the two terms that Google says are the same in a single sentence describing different structures ought to make crystal clear that the Inventors treated the Web page display area and the browser interface as separate concepts at all times during prosecution. The "subsequent display" referenced in the response is the "separation" of the navigational tools from the Web page display window. Dealing with the concept of a navigational tool in the display window per the Yahoo/Alta Vista site references, the inventors "separated" the navigational tool by putting it outside the Web page display area—exactly as Google Toolbar does. Dealing with a "jumper window" inside the display area, as per the CNN Interactive site, the inventors "separated" the jumper window by placing it outside the four corners of the screen, the "browser

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER ● SUITE 900 ● SOUTHFIELD, MICHIGAN 48075 ● (248) 355-0300

---

[9] The Court may consider the arguments made during the prosecution history. *Rexwood Corp. v*

window," as in the "floating" embodiment. It is clear that the concept of separation can be accomplished **both** by the "floating" embodiment *and* by the integrated/embedded embodiment, as **both** are "separate" from the only area that concerned the Examiner, **the Web page display area**. The inventors thus did not "abandon" the integrated embodiment to leave it "unclaimed" by this amendment. (**Exhibit 2**, Galler Declaration at Par. 32). Put another way, the only manner in which the separation **cannot** be accomplished is by reading out the structural distinction precisely made in the amendment —precisely what Google is trying to get over on this Court. By defining the area in which the navigational tools could not exist as a "search window," the inventors kept the "embedded" embodiment. This is shown below:



The drafted claims that are directed to this concept, i.e., Claims 1-8, preserve the distinction. To read them otherwise would suggest that the inventors meant to exclude one of the preferred embodiments, which is rarely correct. *Hoechst Celanese Corp. v BP Chemicals, Ltd*., 38 U.S.P.Q. 2d 1126 (Fed. Cir. 1996).[10] If the Court construes the claims correctly, there is

---

*Laitram Corp*., 274 F.3d 1336, 1343 (Fed. Cir. 2001).

[10]     Google tries to make mileage out of the fact that the Examiner in issuing a short statement for reasons for allowance, apparently confused the terminology. Specifically, Google

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

infringement, as Google has admitted that its implementation of the Toolbar separates the Toolbar from the Web page display window. Claims 1-8 are consistent with the amendment, the specification, and the cited prior art. Google's proposed conflation of the terms is wrong, and its proposed construction inconsistent with the patent.

> **6.    There Is No Need For The Court To Construe A Number Of Terms By Google As They Do Not Pertain To Google's "Separate" Argument; But If The Court Wishes To Construe "Icon" And "Parse" Google's Construction Is Wrong**

Google's motion curiously seeks to have the Court define the term "icon." The limitations of the '172 patent's claims in which this term appears are not at issue in Google's motion, and the Court need not and simply should not address the term at this juncture. To the extent the Court wishes to do so, however, Plaintiff simply notes that the '172 patent specification does not specially define this very ordinary and well understood term.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER   •   SUITE 900   •   SOUTHFIELD, MICHIGAN 48075   •   (248) 355-0300

---

argues that the inventors' silence in response the Examiner's statement that "as shown in the **FIGURE 5A** of the Applicant's invention, the first and second icons, which initiate parsing of the searched list and retrieve the data from a location in the list, are provided separate (item 300) from the browser window (item 400), which is not shown and not suggested by the prior art of record," was a disavowal of a construction of the claims that would include a "search window" within item 400. One simple response to this could be that the Examiner was only referring to the statement in the second part of NetJumper's response, not the first, as pointed out above. But that is immaterial, as is the Examiner's statement. Google cites *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973 (Fed. Cir. 1999) for support. However, as is settled in more recent case law that specifically analyzes and distinguishes the *Elkay* case, silence to an examiner's unilateral statements in the examiner's reasons for allowance does not create a clear and unambiguous disavowal of claim scope by the applicant. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347-1348 (Fed. Cir. July 8, 2005). As the Federal Circuit explained in *Salazar*, *Elkay* merely held that the Examiner's Statement of Reasons for Allowance may help show that the applicant's own arguments during prosecution constitute a clear disavowal of claim scope. *Id.* at 1346. In this case, the applicant never distinguished over the prior art by arguing the search window was "separate from" item 400. Thus the Examiner's statement to the contrary cannot constitute a clear and unambiguous disavowal of claim scope by the inventors.

Plaintiff further notes that, even after having proposed a construction of the term ("a graphic symbol, such as text or a picture, that can be selected on a computer display using a pointing device" from Exhibit L to Google's motion), Google admits that its "search web", "next" and "previous" buttons are, or at least include, "icons." (Hagan Dep., p. 36, **Exhibit 7**.) Again, however, this term is not at issue at present, and Plaintiff reserves the right to address the term and submit a proposed construction at a later time. At a minimum, the term "icon" could include the "graphic symbol, such as text or a picture, that can be selected on a computer display using a pointing device."

Google's motion also seeks to have the Court define the terms "parse" and "parsing" unnecessarily. Neither term figures in the non-infringement motion, and while Plaintiff does not agree that CyberPilot anticipates Claims 1-8, the lack of anticipation does not revolve around the "parsing" step. The meaning of these terms is therefore not at issue in this motion.

To the extent that the Court does wish to take up construing "parsing," the patent specification makes clear that Google's proposed construction, derived from some technical dictionary, is incorrect.[11] (**Exhibit 2**, Galler Declaration at Par. 35). The patent specification nowhere restricts the common word "parse" to one requiring (1)"examining a string of text," (2) "breaking it into subunits," and (3) "establishing the relationships" among the subunits. These are all elements simply added by Google as limitations to be read into the Claims, for the obvious purpose of somehow avoiding infringement.

What the patent specification **does** say in numerous places is that there **is** a parsing step which can take different forms and functions. In short the specification makes clear that the terms "parse" and "parsing" should simply be defined at a minimum as "extracting information

or data from a file." As explained in the specification, "parsing" is performed when the jumper software takes the HTML file obtained by the browser and "parses" it in a variety of alternative ways for access by the local computer. For instance, the software may handle the task of "converting an HTML encoded file uploaded from browser user…into a format suitable for a single jump or automatic jump mode search…" (Col. 6, ll. 26-28). Or the "parsing" may involve extracting hotlinks: "The jump site window **308** has an associated drop down list…this list comprises parsed hot-links… These hot-links are extracted from a file initially retrieved by the browser"" (Col. 6, ll. 55-58). The "parsed list" may "be stored in [the local computer's] HTML storage segment **230**…" (Col. 7, ll. 20-21). The software may provide for parsing "categories… given their location in the search result," or to allow the user to define "how many site identifiers should be parsed from the search results," or "what types of results should be parsed." (Col. 12, ll. 44-58). Nothing in the file specification suggests that "parsing" as defined by the Inventors has the added steps of breaking down text, establishing relationships, and so on.

The file history is equally consistent. When the Examiner rejected the first set of claims he concluded that by underlining the URL links on the display page, the Netscape browser "parses" the original data file. In response, the Inventors pointed out that the "parsing" in the invention "results in the extraction from the web page displayed in the browser's view window[12] the selection of which option results in the extraction from the selected web page of specific information…and the storage of that information for later use." (G000260). There is simply no indication that the act of "parsing" was more involved, detailed, or complex. The Court should resist the effort to be invited into erroneous claim construction by Google.

---

[11]    Its proposed construction is, "The act of examining a string of text, breaking it into subunits, and establishing the relationships among the subunits." (Exhibit L to motion).

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

### 7.  There Is Also No Evidence That Making An Embedded Toolbar Was Not Possible In 1996

The statements by the Inventors cited by Google about the ability to make an embedded toolbar are not to the contrary of making such an embodiment.  In fact the statement Google cites from the Mathur Deposition directly supports a construction including these alternative embodiments:  "You can either embed that technology into the browser technology, which we would do if we were Microsoft or Netscape…"  (Mathur Dep., pg. 61, ln. 23 - pg. 62, ln. 1).  In reality, the only difficult thing about the embedded programming in 1996 was the fact that Microsoft and Netscape had not yet come out with developer aids to allow access to their browser code.  The actual programming itself was, in the words of one of the Inventors easy to do.  (**Exhibit 4**, Declaration of Anup Mathur).  There is often a great gulf between what can be done, and what is a commercially viable product.  The disclosure of the former is all that the patent law requires of an applicant.

---

[12]    Not to belabor the point, but "browser view window" was the exact phrase in the specification for structure **406**, the Web page display screen.

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

### 8.    There Is No Prosecution History Estoppel To The Doctrine Of Equivalents

Google's argument that there are three reasons why the Google Toolbar does not infringe the "displaying a first and second icon separate from the search window on said display screen," under the doctrine of equivalents simply comes down to an erroneous application of prosecution history estoppel.   "Infringement under the doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent."  *Aquatex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. Aug. 19, 2005), *citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).  "An element in the accused product is equivalent to a claim limitation if the differences between the two are insubstantial. The analysis focuses on whether the element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation."  *Id. citing Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950).  "The doctrine of prosecution history estoppel serves to limit the doctrine of equivalents when the applicant makes a narrowing amendment for purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments made to the examiner."  *Id. quoting Salazar, 414 F.3d at 1344.*

Here, Google's argument that the amendment adding the limitation "separate from the search window," limits the claim scope to something outside the four corners of the browser interface is entirely based on an incorrect interpretation of the term "search window," and is moot.  And the inventors made no arguments during prosecution that would amount to a clear and unmistakable surrender of several embodiments provided in the '172 patent specification.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

C.    <u>**RESPONSE TO ANTICIPATION ARGUMENT**</u>

    1.    **In Order To Find That A Single Reference "Anticipates" A Claim, All Elements Of A Claim Must Be Found In The Single Reference In The Exact Form <u>As Stated In The Claim</u>**

The '172 Patent is presumed valid, and Google has the burden of overcoming this presumption of validity by clear and convincing evidence.  35 U.S.C. § 282; *E.I. DuPont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.*, 706 F. Supp. 1135, 1141 (D. Del.), *aff'd*, 887 F.2d 1095 (Fed. Cir. 1989).  Whether a prior art reference anticipates the '172 Patent is a question of fact.  *In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986).  Thus, Google can only prevail on its motion for summary judgment if it can meet its heavy burden of showing by clear and convincing evidence that there is no material issue of fact underlying the anticipation determination in dispute and that it is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c); *E.I. DuPont de Nemours*, 706 F. Supp. At 1140.  However, as set forth below, there are numerous issues of material fact in dispute relating to Google's anticipation claim.  Therefore, Google's Motion for Summary Judgment must be denied, and this issue must be submitted to a jury to resolve at trial.

The Federal Circuit has made it clear that the test for anticipation, also referred to as lack of novelty, is one of strict, not substantial, identity.  *See generally* D. Chisum, 1 *Chisum on Patents* §3.02[1][b] ("Federal Circuit decisions, explicitly or implicitly, reject any standard of 'substantial identity.'"); *Newell Window Furnishings, Inc. v. Springs Window Fashions Division Inc.*, 53 USPQ 2d 1302, 1320 (N.D. Ill. 1999) ("The standard for anticipation is strict:  any difference between a prior art reference and the claim limitation will negate the possibility of anticipation and prompt an inquiry into obviousness."), *aff'd in relevant part*, 15 Fed. Appx. 836,

2001 WL 744460 (Fed. Cir. 2001). Thus, anticipation of a patent claim can only be established if each and every element and limitation of that claim is identically set forth and taught in a single prior art reference. *See, e.g., Scripps Clinic & Research Found. V. Genentech, Inc.*, 927 F.2d 1565, 1576-77 (Fed. Cir. 1991); *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990). In addition, every element of the claimed invention must be literally present, arranged as in the claim, in order for a reference to anticipate. *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989). Thus, it is not sufficient that each element be found somewhere in the reference - the elements must be arranged as in the claim in order for there to be anticipation. *Novo Nordisk A/S v. Becton Dickinson & Co.*, 96 F. Supp. 2d 309, 312 (S.D.N.Y. 2000) (citing *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1458 (Fed. Cir. 1984)), *aff'd*, 304 F.3d 1216 (Fed. Cir. 2002); *see also Sandisk v. Lexar Media, Inc.*, 91 F. Supp. 2d 1327, 1336 (N.D. Cal. 2000) ("Unless all the elements are found in a single piece of prior art in exactly the same situation and united the same way to perform the identical function, there is no anticipation.").

2.    **Operation of CyberPilot Software**

The CyberPilot software operates in the following fashion. The computer may contain an installed browser. The screen of a computer with Internet Explorer 2.0, a 1996-vintage browser looks like this[13]:

---

[13]    All of the screenshots in this section of the brief were captured in August, 2005 from a computer with "period" Windows 95 operating system with both a "period" Internet Explorer 2.0 browser and the copy of CyberPilot provided in discovery by Google. (**Exhibit 5**, Declaration of Nabeel Hamameh).

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER   •   SUITE 900   •   SOUTHFIELD, MICHIGAN 48075   •   (248) 355-0300



Without CyberPilot being activated, performing a search using the Google search engine on this browser shows the following on the computer display screen:



As seen below, the CyberPilot software can be activated whether or not a browser has also been launched. It therefore works independent of a Web browser. When it is launched, a small

dialogue box appears on top of a window created by the software. When a Web site address like

[www.yahoo.com](http://www.yahoo.com) is typed in, the "white" window creates a directory from the Yahoo site without

using the browser (**Exhibit 2,** Galler Decl. at Par. 38):



If the user clicks on the icon appearing in that directory with a question mark, the

directory expands to show further items. If the user clicks on the icon indicating a document, the

software then directs the computer to activate the browser. The Web page corresponding to the

selected directory link is then displayed in a **new** window—the window formed by the newly

launched browser. This is shown as follows:

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300



And when the user manually clicks on another one of the hotlinks in the original window, for example the Yahoo "Finance," the computer display shows a **new** generated instance of a browser window:



31

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

3.  **Claims 1-8 Of The '172 Patent Are Not Anticipated By CyberPilot**

a.  **There Is No Evidence CyberPilot "Searches" Anything (Claims 1-8)**

First and foremost, CyberPilot cannot anticipate any of Claims 1-8 because it is not software for use with a "search." All of the asserted claims are directed to either a computer implemented method **for searching** (Claims 1-4), or a computer usable medium having computer readable code means embodied therein **for searching** (Claims 5-8).  CyberPilot does not "search," and Google's own expert admits this.  (Hardin Dep., p. 123, ll. 8-14.)  As its own documentation acknowledges, it is merely a tool for aiding in navigation of an already known site. "CyberPilot Pro uses a NetCarta WebMap$^{TM}$ to let you see at a glance the content of a Web site…" (Stark Declaration, Exh. B, pg. 1 of 30).  The lack of a search capability is evident from the CyberPilot instructions: one does not enter keywords or terms to search the Internet for, but enters an already known URL.  (*Id.* at page 5 of 30.)  Google even acknowledges this in its brief: "CyberPilot is a computer implemented software product for navigating and finding information on the Internet…" (Google Brief, pg. 33).

Nor does CyberPilot necessarily work with a Web browser. It only launches a browser when the user directs the display of a particular page. Lacking the ability to work with a search function of sites like Google, CyberPilot cannot anticipate any claim dependent on "searching." (**Exhibit 2**, Geller Decl. at Par. 38).

b.  **There Is No Evidence CyberPilot "Constructs" a "Search Window" (Claim 1a, 5a)**

For the same reason—because the Court ought not write out the meaning of the word "search" from the patent-- Cyber Pilot does not "construct a search window" on a display screen

of a local computer. Cyber Pilot is a stand-alone piece of software that can be used to create a "map" of any Web site. The '172 Patent specification clearly directs the invention towards the use of the navigational tools with a **search** engine. Cyber Pilot does nothing to "construct" a search window: the Web browser can be asked to go to a Web site that performs searches independently of CyberPilot. And if CyberPilot is asked to go to a Web site that performs searches, like Yahoo, it will not obtain a search result, but will "map" the Yahoo site like any other site. Therefore, CyberPilot does not disclose the first element of Claim 1 or Claim 5, independent claims of the '172 patent. (**Exhibit 2**, Geller Declaration at Par. 38).

> **c.    There Is No Evidence That The "First And Second Icon" Is "Separate From The Search Window" (Claim 1b, 5b)**

Nor can it be said that it constructs a "search window" of any kind separate from the "first and second icons," a requirement of Claims 1b and 5b. Google is not particularly precise in its description of what it considers to be the CyberPilot "search window," and for good reason: the software creates at least two windows during operation, but neither fits the requirements of Claim 1. If the "search window" is the box created after the user types in a web site URL (for example the "yahoo.com" shown in the screenshot above), the software creates a directory map in the white box before a browser is called upon to do anything, even activate. (**Exhibit 2**, Geller Decl. at Par. 42). To the left of the directory items the software creates the two icons identified by Google as corresponding to the "first and second icons" of Claim 1:

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300



But obviously, if **that** box is the "search window," these icons are not "separate" from the "search window" and cannot meet the limitation of Claim 1b. If, improbably enough, the "search window" is the launched Web browser window that is created after the user clicks on the icons in the first box, the limitation of the claim is not met either. The Claim speaks of **one** "search window." That makes perfect sense given the patent specification. Claim 1 (and 5) requires that the "first data file" of Claim 1e be shown in "**the** search window"—the **same** "search window" in which the "initial data file" referred to in Claim 1c was shown. But if the "search window" is defined as Google apparently has,  this limitation cannot be met, as there is one window too many.  This is shown below:

34



LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

**d.     There Is No Evidence CyberPilot "Displays" The Initial Data File "In The Search Window" (Claims 1b, 5b)**

For the same reason, other elements of Claim 1 (and 5) are not met. The asserted claims of the '172 patent also require  "retrieving an initial data file from the network **together with displaying the initial data file in the search window**…" When a URL is entered into the Home Page Address box of the CyberPilot New Map dialog box, CyberPilot merely displays a label for the home page, and does not display the homepage itself as required by the claim. (Stark Declaration to Google motion, Exh. B, pg. 5 of 30).

**e.     There Is No Evidence CyberPilot Forms "An Initial List" "Responsive To A Selection Of The First Icon (Claims 1d, 5d)**

Claim 1d (and 5d) requires  "parsing the location identifiers from the initial data file to form an initial list of location identifiers together with storing the initial list**, responsive to a selection of the first icon…**"  According to the claims, the first icon is displayed separate from the search window on a display screen.  However, at the point when CyberPilot retrieves an initial data file and prepares a directory from that initial data file to form an initial list of location

35

identifiers, there is no first icon (a control icon, e.g., "?" according to Google) displayed anywhere. The control icon of CyberPilot does not come into play until after its initial directory-retrieving step. Therefore, CyberPilot cannot possibly parse the location identifiers from the initial data file to form an initial list of location identifiers together with storing the initial list, responsive to a selection of the first icon. (**Exhibit 2**, Geller Decl. at Par. 40).

**f.    There Is No Evidence That CyberPilot Has Automated Navigational Icons (Claims 4 and 8)**

Google also misreads the limitations of Claims 4 and 8. These claims are directed to parts of the invention clearly set forth in the patent specification which provide automated navigational tools, such as the "next" and "previous" buttons described in **Figure 3** and at **314** and **318**. The utility of these devices is to allow the user to click a pre-defined tool—for instance a "next" button, and be able to redirect the browser to the next file from a search result. Other embodiments described in the patent would allow the user to click a pre-defined tool and go to a "last" or "first" search result. Cyber Pilot does not contain, or even suggest, any such automation. (**Exhibit 2**, Galler Dec. at Par. 43).

Instead, what the software appears to do is create a list of URL references from a Web site. The user is not provided a pre-defined navigational tool to direct the browser to perform any "next", "previous," "first", or "last" function. Instead, the user must **manually** choose a URL link from the displayed "map" and manually click on that link in order to have the browser create a new window displaying that HTML file. In this the Cyber Pilot is no different than any Web page which displayed more than one hot-link. And Cyber Pilot is less broad than the art considered and rejected by the Examiner, namely the Yahoo/Alta Vista/CNN Interactive Web sites, which did provide the user with a pre-defined navigational tool such as the "Next" icon

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

36

displayed on the Yahoo Web page.  For that reason, there is a complete lack of anticipation of Claims 4 and 8.

> **g.     There Is No Evidence That CyberPilot's Initial Data File "Comprise[s] Information In A Markup Language" (Claims 2, 6)**

While it merely asserts this, Google never actually provides evidence that the initial data file displayed in whatever window Google decides is the "search window" is in a markup language. Plaintiff's expert opines it is not. (**Exhibit 2**, Geller Decl. at Par. 41). Google's expert never actually looked at the code, so he is not in a position to tell the Court in what language the data file is actually presented. For that reason, this element fails as well.

## **CONCLUSION**

For the above reasons, Google's Motion for Summary Judgment should be denied.

Respectfully submitted,

s/Andrew Kochanowski (P55117)
SOMMERS SCHWARTZ, P.C.
Attorneys for Plaintiff
2000 Town Center Drive, Suite 900
Southfield, MI  48075-1100
(248) 355-0300
akochanowski@sommerspc.com

DATED:  September 27, 2005

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER   •   SUITE 900   •   SOUTHFIELD, MICHIGAN 48075   •   (248) 355-0300

## PROOF OF SERVICE

I certify that on 9-27-05, I electronically filed
the forgoing paper with the Clerk of the Court using
the ECF system which will send notification of such
filing to the following:

Kathleen A. Lang; klang@dickinsonwright.com
L. Pahl Zinn; pzinn@dickinsonwright.com

and I hereby certify that I have mailed by United
States Postal Service First Class Mail the paper
to the following non-ECF participants:

FISH & RICHARDSON P.C.
Howard G. Pollack
500 Arguello Street, Ste. 500
Redwood City, CA 94063

FISH & RICHARDSON P.C.
Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804

s/Andrew Kochanowski (P55117)
Sommers Schwartz, PC
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300
akochanowski@sommerspc.com

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.