# EXHIBIT 1

Dockets.Justia.com

Bernard A. Galler
October 28, 2005

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF MICHIGAN

3

4    NETJUMPER SOFTWARE, L.L.C.,

5    a Michigan Limited liability

6    corporation,

7                    Plaintiff,

8       -vs-                          Civil Action

9                                     No. 2:04CV70366

10   GOOGLE, INC.,

11                   Defendant.

12   _____/

13   PAGE 1 TO 197

14

15       The Videotaped Deposition of BERNARD A. GALLER,

16       Taken at 300 East Liberty Street,

17       Ann Arbor, Michigan,

18       Commencing at 9:23 a.m.,

19       Friday, October 28, 2005,

20       Before Laurel A. Frogner, RMR, CRR, CSR-2495

21

22

23

24

25

Bernard A. Galler
October 28, 2005

Page 2

1    APPEARANCES:
2    MR. ANDREW J. KOCHANOWSKI (P55117)
3    Sommers, Schwartz, Silver & Schwartz, P.C.
4    2000 Town Center, Suite 900
5    Southfield, Michigan  48075
6       Appearing on behalf of the Plaintiff
7
8    MR. JASON W. WOLFF
9    Fish & Richardson
10   12390 El Camino Real
11   San Diego, California  92130
12      Appearing on behalf of the Defendant
13
14   ALSO PRESENT:  John Zawacki, Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    Ann Arbor, Michigan
2    October 28, 2005
3    About 9:23 a.m.
4            THE VIDEOGRAPHER:  Today's date is
5    October 28, 2005, and we are on the record at 9:23 a.m.
6    This is a videotaped deposition of Bernard A. Galler.
7    We are at 301 East Liberty Street, Suite 500, Ann
8    Arbor, Michigan.  This matter is pending in United
9    States District Court, Eastern District of Michigan,
10   NetJumper versus Google, Incorporated, Case Number 04
11   CV70366.
12            Counsel, would you please put your
13   appearance on the record.
14            MR. WOLFF:  Jason Wolff from the law
15   firm Fish & Richardson for Defendant Google, Inc.
16            MR. KOCHANOWSKI:  Andrew Kochanowski
17   for the plaintiff, NetJumper.
18            THE VIDEOGRAPHER:  Would the court
19   reporter please swear the witness.
20            BERNARD A. GALLER,
21   having first been duly sworn, was examined and
22   testified on his oath as follows:
23   EXAMINATION BY MR. WOLFF:
24   Q.    Good morning, Mr. Galler.
25   A.    Good morning.

Page 4

1    Q.    Could you please state your full name and
2    address for the record.
3    A.    Bernard A. Galler, 1056 Ferdon Road, Ann
4    Arbor, Michigan, 48104.
5    Q.    All right.  Is there any reason you cannot
6    provide your best testimony here today?
7    A.    No.
8    Q.    Are you under the care or supervision of a
9    physician?
10   A.    Well, like anyone else, yes.
11   Q.    Are you on any medication or anything that
12   would affect your testimony today?
13   A.    No.
14   Q.    Have you been deposed before?
15   A.    Yes.
16   Q.    How many times?
17   A.    Maybe 30 times.
18   Q.    When was the last time you were deposed?
19   A.    About four months ago maybe.
20   Q.    And what was the subject matter of that
21   deposition?
22   A.    It was a contract dispute related to
23   software.
24   Q.    And were you an expert --
25   A.    Oh, yes.

Page 5

1    Q.    -- in that case?  How many times have you
2    appeared as an expert witness in a patent case?
3    A.    In a patent case, maybe a dozen times.
4    Q.    Do you recall when the last time you were an
5    expert witness in a patent case?
6    A.    It might have been a year ago, I don't
7    recall specifically.
8    Q.    Was it the stamps.com?
9    A.    Well, that might have -- if that was the
10   last one, most recent, yes.  I should mention that the
11   list you have does not contain cases which are ongoing,
12   and I might have been deposed in a patent case.  I
13   don't think the recent depositions have been patent,
14   but that list does not contain ongoing cases, I never
15   put them on there.
16            MR. WOLFF:  Okay.  Counsel, I will
17   ask that you provide us a list of the current cases.
18            MR. KOCHANOWSKI:  Yes, I think we
19   have that.
20   BY MR. WOLFF:
21   Q.    And are any related to internet
22   technologies?
23   A.    No.
24   Q.    Any related to any business of Google?
25   A.    No.

2 (Pages 2 to 5)

Bernard A. Galler
October 28, 2005

Page 6

1    Q.    Or any business?
2    A.    No.
3    Q.    In the Stamps.com litigation, in what
4  capacity were you an expert witness?
5    A.    I was helping Stamps.com.  They were being
6  sued by Pitney Bowes for patent infringement.
7    Q.    So you were on the defendant's side?
8    A.    In that case, yes.
9    Q.    And what sort of opinions did you offer
10  generally in that case?
11    A.    Well, the usual opinions related to on the
12  one hand validity, on the other hand infringement.
13    Q.    And you offered an opinion that the patent
14  was invalid in that case?
15    A.    No, I don't give legal opinions, I give
16  opinions on the software and the interpretation of the
17  patent in terms of technical terms, but I don't give
18  opinions on whether something is invalid.
19    Q.    Did you come to a conclusion in that
20  litigation that the patent or some of the patents
21  asserted were invalid?
22    A.    No.  I think in that case I think in
23  invalidity was I think maybe not an issue, I don't
24  recall specifically.  It was more an infringement case.
25    Q.    Okay.  And did you offer or come to a

Page 7

1  conclusion in that case that one or more of the patents
2  were not infringed?
3    A.    Again, I don't give legal opinions.
4    Q.    Well, I asked for a conclusion.
5    A.    Conclusions, well, okay, I believe I -- the
6  opinions I gave would have supported conclusions of
7  noninfringement.
8    Q.    Do you have your reports or any declarations
9  you submitted in that litigation?
10    A.    I looked for reports.  I don't have any.  I
11  never did get a copy of that, that I could find.
12    Q.    Okay.  And how about your deposition
13  transcript, was your deposition taken in that
14  litigation?
15    A.    Yes, but, again, I couldn't -- I did look in
16  case it came up, but I couldn't find a copy.
17    Q.    Okay.  Since you've been deposed before,
18  I'll just kind of lay out the ground rules real quick.
19  I'll do my best to ask clear and concise questions.  If
20  you don't understand a question, please ask for a
21  clarification.
22    A.    Okay.
23    Q.    I'll assume that you did understand the
24  question if you provide an answer.
25    A.    Yes.

Page 8

1    Q.    From time to time Mr. Kochanowski's
2  indicated he will object.  You still have to answer the
3  question unless he instructs you not to answer the
4  question, at which point I will ask you whether you
5  intend to follow his instruction not to answer the
6  question.
7          I will try to take a break
8  approximately once every hour.  If you need more
9  frequent breaks or for any reason you just need to take
10  a break, just let me know.  We'll finish the question
11  and questions we're on and we'll take a break for your
12  comfort.  There's water and some refreshments off to
13  the side, there's restrooms, of course, provided,
14  facilities, so any time you need a break, just let me
15  know and I'll make sure that you're comfortable.
16    A.    Sure.
17    Q.    Now, are you retired presently?
18    A.    I'm retired from the university.
19    Q.    Okay.
20    A.    I have other activities from which I'm not
21  retired such as being here.
22    Q.    Okay.  So you still are employed in an
23  expert capacity or a consulting capacity?
24    A.    Yes.
25    Q.    And how much time do you work approximately

Page 9

1  every year?
2    A.    Not very much.  Of course, as you know,
3  legal cases sometimes become intense and then are
4  dormant for a long time.  Perhaps the equivalent of a
5  week or two a year.
6    Q.    All right.  And when was the last time you
7  taught at the University of Michigan?
8    A.    1993, I believe.
9    Q.    Okay.  And have you taught --
10    A.    I'm sorry, I have given occasional lectures,
11  invited lectures at the University over the years since
12  then, sure.
13    Q.    And have you taught or instructed classes
14  anywhere else since then?
15    A.    No.
16    Q.    Okay.  Did you ever teach computer science
17  classes?
18    A.    Yes.
19    Q.    Okay.  Did you ever teach programming
20  classes?
21    A.    Yes.
22    Q.    Do you consider those to be the same,
23  programming and computer science?
24    A.    No, computer science is a broader term than
25  that.

3 (Pages 6 to 9)

Bernard A. Galler
October 28, 2005

Page 10

1    Q.    Okay.  When is the last time you taught a
2  computer science course?
3    A.    I believe 1993.
4    Q.    Okay.  And what was the course?
5    A.    Well, I taught a variety of courses.  That
6  year it might have been the large first or second
7  course in programming, but I have taught other courses.
8  I don't remember specifically what I taught that year.
9    Q.    Well, if it was the first or second course
10  in programming, what would be the general subject
11  matter of the course?
12    A.    Introduction to computer languages, some
13  information on architecture, data structures, history,
14  I always included some ethics, and overall system
15  organization, try to give people an idea of how
16  computers worked and the relationship of the user to
17  the computer.
18    Q.    Are you familiar with object oriented
19  programming?
20    A.    Yes.
21    Q.    Have you ever taught courses in object
22  oriented programming?
23    A.    Not specifically.  I mentioned them and
24  explained them to my students, but I never taught a
25  course in that.

Page 11

1    Q.    Have you ever programmed in an object
2  oriented fashion?
3    A.    I don't think I have.
4    Q.    Have you ever taught C language courses?
5    A.    I didn't teach it as a language.  In my more
6  advanced courses I would assign a project to the entire
7  course or to small groups in the courses, and then I
8  would review what they did, and they generally wrote in
9  C or something related to it.  I've also worked with C
10  in various legal cases, I've written some C programs.
11    Q.    And how about Java, have you programmed in
12  Java?
13    A.    I have not programmed in Java.
14    Q.    Have you instructed any courses in Java?
15    A.    No.
16    Q.    Are you familiar generally with the Java
17  architecture?
18    A.    Generally, yes.  Again, I've run into it in
19  these cases, and I went to a short course on it once
20  and so on.
21    Q.    When your students prepared programs in C,
22  did you review those programs?
23    A.    Very often I did review them, yes.
24    Q.    So do you have the capacity to review source
25  code?

Page 12

1    A.    Yes.
2    Q.    Okay.  C source code?
3    A.    Yes.
4    Q.    And Java source code?
5    A.    I'm not sure I would.  I would probably have
6  someone assist me or interpret it for me in Java.
7    Q.    And how about C++?
8    A.    Similar.
9    Q.    So you could read and understand a C++ or C
10  program?
11    A.    Sure.
12    Q.    But Java you're not so sure about?
13    A.    I probably would ask for some help, yeah.
14    Q.    Okay.  Are you familiar with the various
15  internet standards promulgated by the W3C?
16    A.    In general, not specifically.
17    Q.    How about the HTTP standard?
18    A.    Well, I've used it, but I have not actually
19  seen the standard.
20    Q.    Okay.  And how have you used the standard?
21    A.    Well, I mean as a user, as part of URLs and
22  so on, but I have not specifically had occasion to
23  refer to the standard.
24    Q.    And how does the HTTP standard relate to
25  URLs?

Page 13

1    A.    Well, a typical URL -- I mean when you
2  communicate with a browser, you very often embed the
3  URL in an HTP sequence.
4    Q.    Do you know the difference between a URI and
5  a URL?
6    A.    I don't think I know the term URI.
7    Q.    Okay.  So you're not familiar with the URI
8  standard, either?
9    A.    No.
10    Q.    Okay.  When you say that you've used the
11  HTTP as a user, does that mean you've implemented a
12  program that used the HTTP protocol?
13    A.    No.
14    Q.    Or you just used a web browser and it's
15  inherent?
16    A.    I meant the latter, yes.
17    Q.    Okay.  So you've never actually programmed
18  or used HTTP for purposes of creating a computer
19  programming?
20    A.    No.
21    Q.    And you've never reviewed the specifications
22  for HTTP?
23    A.    That's correct.
24    Q.    How about the document object model
25  specifications?

4 (Pages 10 to 13)

Bernard A. Galler
October 28, 2005

Page 14

1    A.    I don't think I know that term.
2    Q.    Do you -- you've never heard of the document
3 object model specifications?
4    A.    I don't think so.
5    Q.    If I told you that it was a standard
6 promulgated by the W3C, would that refresh your
7 recollection?
8    A.    No.
9    Q.    Do you know what the W3C stands for?
10    A.    I think it's related to the Worldwide Web
11 Consortium or something, but I don't specifically work
12 with that.
13    Q.    Do you know what the W3C is?
14    A.    I presume it's a standards group, but I
15 don't know.
16    Q.    Okay. Are you familiar with the Microsoft
17 Internet Explorer application programming interface?
18    A.    Yes.
19    Q.    And how so?
20    A.    I've used it.
21    Q.    The application programming interface?
22    A.    The API, no, I have not actually used that.
23 I've used IE.
24    Q.    You've used the program, the software
25 Microsoft Internet Explorer?

Page 15

1    A.    That's right.
2    Q.    As a user?
3    A.    That's right.
4    Q.    Have you ever examined it in an expert
5 capacity?
6    A.    No.
7    Q.    Okay. How about the Mozilla Firefox
8 application programming interface, are you familiar
9 with that?
10    A.    Generally, but I have not used it.
11    Q.    Okay. And, again, the question was about
12 the application programming interface. You are
13 familiar with the application programming interface for
14 the Mozilla Firefox browser?
15    A.    No.
16    Q.    You're just familiar with using the Firefox
17 web browser?
18    A.    I am familiar with the availability of it, I
19 have not used it.
20    Q.    You've not used the Firefox?
21    A.    That's right.
22    Q.    Web browser?
23    A.    Right.
24    Q.    You've never used it?
25    A.    No.

Page 16

1    Q.    Okay. Did you -- strike that. Have you
2 used the Google Toolbar?
3    A.    I've had it demo'd for me, so in that sense
4 I have used it, I did use it.
5    Q.    How did you use it?
6    A.    I asked it to do things for me and it did.
7    Q.    You typed into your -- you typed into your
8 computer?
9    A.    I typed or I used the mouse, whatever, yes.
10    Q.    And where did you type and what did you use
11 it for?
12    A.    As part of preparation for this case.
13    Q.    And was it on your computer at home?
14    A.    No. I was going to I think install it on
15 mine, but it was available at the offices of the legal
16 counsel, and so I saw it there.
17    Q.    So you went to counsel's office?
18    A.    That's correct.
19    Q.    And you used the computer yourself?
20    A.    Yes.
21    Q.    With the program on it. And what kind of a
22 computer do you have at home?
23    A.    I have a Mac at home.
24    Q.    And what web browser do you use?
25    A.    Netscape or Internet Explorer, Safari.

Page 17

1    Q.    Do you use Firefox?
2    A.    No.
3    Q.    You haven't used Firefox?
4    A.    That's correct.
5    Q.    And how many times did you go to counsel's
6 office to use the computer with?
7    A.    Twice.
8    Q.    Twice, and when was that?
9    A.    The first time was about two weeks ago, and
10 the second time was earlier this week.
11    Q.    And when earlier this week --
12    A.    Monday.
13    Q.    -- did you go to counsel's office?
14    A.    Monday.
15    Q.    So before -- approximately what was the date
16 of the first time you went to counsel's office to use
17 the computer?
18    A.    My records would show it, but about the --
19 let's see, about maybe the 10th or 12th or
20 approximately till the end of October.
21       MR. WOLFF: Counsel, I'll make a
22 request on the record for Mr. Galler's records or
23 Professor Galler's records indicating when he went to
24 counsel's office to inspect the --
25       MR. KOCHANOWSKI: I think he's got

5 (Pages 14 to 17)

Bernard A. Galler
October 28, 2005

Page 18

1  his billing records ready to produce.  That will be --
2       THE WITNESS:  Okay, it's on the
3  billing record.
4  BY MR. WOLFF:
5       Q.   Okay.  And I haven't seen the billing
6  records.
7       MR. KOCHANOWSKI:  Well, I think
8  he -- I thought Nabeel sent them.
9       THE WITNESS:  No, I sent them in
10  response to the subpoena, but I don't know how they got
11  to you or didn't get to you.
12  BY MR. WOLFF:
13       Q.   They haven't?
14       Andy, could you have him e-mail
15  those to me?
16       MR. KOCHANOWSKI:  It's just one
17  page.
18       MR. WOLFF:  That's fine.
19  BY MR. WOLFF:
20       Q.   And so you -- when did you prepare your
21  report or your declaration for the summary judgment
22  motion?
23       A.   I see, you're trying to relate when I did it
24  to the affidavit.  In preparation of the report I saw a
25  screen printout of screens of the Google Toolbar, and

Page 19

1  my report is based on that, and then I -- on Monday of
2  this week I actually went and used it to verify that
3  the screens were what I -- what I had learned from the
4  screens were -- was really there, and it was, and
5  that -- so what's in the report is based on the screens
6  that are shown in the report.
7       Q.   Okay.  So at the time you submitted your
8  declaration you had not used the Google Toolbar?
9       A.   That's correct.
10       Q.   And when was the first time you used the
11  CyberPilot program?
12       A.   I don't recall that.  That'll be in the
13  records, also.
14       Q.   Would it have been after your report?
15       A.   I believe that was before the report, but I
16  can't be sure.
17       Q.   And why do you believe that was before the
18  report?
19       A.   Because I believe that what's in the report
20  is based on my use of it, to the best of my
21  recollection.
22       Q.   When was the first time you went to Mr.
23  Kochanowski's office?
24       A.   That's the date I can't remember, that's
25  the -- I said maybe the 10th.  Now, this date I think

Page 20

1  is September 27, as I recall, of the report, so it must
2  have been before that, because I'm quite sure the
3  report was after I was there, but the record will show.
4       Q.   But earlier you testified that it was about
5  two weeks ago?
6       A.   Well, that's my faulty memory.  The record
7  will show what it is.
8       Q.   And the record being your billing record?
9       A.   My billing record, yes.
10       Q.   Your billing record will say, will indicate
11  whether you went to counsel's office?
12       A.   Yes, well, it'll show something, I forget
13  what I wrote down, but tried the software or reviewed
14  the software or whatever, and, in fact, it'll show that
15  I was in, not in Ann Arbor but in Birmingham, West
16  Birmingham, I guess it is, at their office.  I mean my
17  billing record shows what city I was in at the time,
18  and so that'll show when I was there.  I'm sorry that I
19  can't remember the date, and the records will show it.
20       Q.   But sitting here today you have no
21  recollection of when you first used the Google Toolbar?
22       A.   Well, my sitting here I remember, I believe
23  I remember correctly that I saw the CyberPilot and
24  modified whatever the draft said about it on the basis
25  of my experience using it, that's what I recollect.

Page 21

1       Q.   So when you say you saw the CyberPilot --
2       A.   I used it, I put my hands on it, I tried it,
3  I did various things with it.
4       Q.   So in your declaration if you said that you
5  used it, then you actually used it, and if you said
6  that you saw it, you actually used it, or did you just
7  see screen captures of it?
8       A.   No, no, no.  I forget what I said in the
9  report.  If I said I used it, then that clearly means I
10  did it, and it only seemed like two weeks ago, it might
11  have been more weeks than that, I just don't recall.
12       Q.   All right.  And who prepared the figures
13  that are in your report?
14       A.   I believe Mr. Kochanowski did.
15       Q.   And how were those figures provided to you?
16       A.   On printouts.
17       Q.   On printouts.  Were the figures provided to
18  you separately from a report?
19       A.   No.
20       Q.   Actually, here, let me strike that.  Let me
21  go back to a foundational thing.  Did you draft your
22  declaration?
23       A.   The original draft was done by Mr.
24  Kochanowski.
25       Q.   Okay.  And you received the copy of that

6 (Pages 18 to 21)

Bernard A. Galler
October 28, 2005

Page 22

1    declaration, I presume?
2        A.    Of the draft?
3        Q.    Of the draft.
4        A.    Yes.
5        Q.    And how was that sent to you?
6        A.    Probably in PDF as an attachment on e-mail.
7        Q.    Not in Microsoft Word?
8        A.    Probably in Word rather than -- yeah,
9    because I was modifying it, sure.
10       Q.    Okay.  And that draft included screen
11   captures?
12       A.    Yes.
13       Q.    The figures that are shown in the report?
14       A.    Yes.
15       Q.    Did you ask Mr. Kochanowski to prepare the
16   figures for you?
17       A.    No, that was part of the draft.
18       Q.    Before you received the draft had you
19   discussed any of the figures or information that would
20   be in the report?
21       A.    Not the figures, I don't think so.
22       Q.    Had you discussed the CyberPilot program?
23       A.    Yes.
24       Q.    And what had you discussed about the
25   CyberPilot program?

Page 23

1        A.    Well, the fact that it was -- I had read
2    about it in some of the material I had seen in terms of
3    invalidity and so on.  We discussed, I guess, I don't
4    recall specifics, the fact that it would be good for me
5    to see it, so we arranged it, to see it and use it, be
6    careful, and I don't remember that we discussed
7    anything more specific than that.  The discussion
8    became more specific when I actually sat there in front
9    of it and tried things and we discussed its
10   capabilities and so on.
11       Q.    And that would have been after you submitted
12   your declaration?
13       A.    No, I think that's before, that's what --
14       Q.    Okay.  And you think that the billing
15   records would clear up that ambiguity --
16       A.    Yes.
17       Q.    -- as to whether you had used it before or
18   after?
19             MR. KOCHANOWSKI:  Objection, there's
20   no ambiguity from the witness' testimony.
21             THE WITNESS:  Yeah, that's correct.
22   I'm quite sure that I saw it and used it before --
23   well, there may have been a draft describing things
24   about it, but certainly the final report, which I
25   strongly revised and edited and added to, certainly

Page 24

1    included my experience using CyberPilot, as far as I
2    can recall.
3    BY MR. WOLFF:
4        Q.    And is the same true for the Google Toolbar?
5        A.    No, the Google Toolbar part of the report
6    was based on the screen shots, which I then verified by
7    using it just this last Monday.
8        Q.    Okay.  So before you prepared your
9    declaration you had not used the Google Toolbar?
10       A.    That's correct.  I should mention, of
11   course, I use Google all the time, but I had not used
12   the Google Toolbar.
13       Q.    And have you reviewed any of the Google
14   source code?
15       A.    No.
16       Q.    So your report is not based on any of the
17   Google source code for the toolbar that's been produced
18   in this case?
19       A.    That's correct.
20       Q.    When you did use the Google Toolbar after
21   your report was created, did you have an opportunity to
22   go back and look at your report?
23       A.    Yes.
24       Q.    And was everything consistent with what you
25   experienced when you used it?

Page 25

1        A.    Yes.
2        Q.    So when approximately were you first engaged
3    in this case?
4        A.    I think at the beginning of September.
5        Q.    And how many hours have you spent working on
6    this case not including your time today?
7        A.    Yeah, no, again, the billing record will
8    show.  I don't recall specifically, 13, 15 hours,
9    something of that, not including today I did some
10   review, so it might be 18 hours.  Again, I want to say
11   that the record will show what it actually was.
12       Q.    The billing record?
13       A.    The billing record.
14       Q.    That I don't have?
15       A.    Which you don't have.
16       Q.    All right.  How many drafts of your report
17   were created?
18       A.    Three or four maybe.
19       Q.    So Mr. Kochanowski sent you by e-mail the
20   first draft of the report?
21       A.    I believe so.
22       Q.    And you reviewed that report?
23       A.    I reviewed it, I added several paragraphs, I
24   changed words in many places, and I sent it back.
25       Q.    And then Mr. Kochanowski sent you another?

7 (Pages 22 to 25)

Bernard A. Galler
October 28, 2005

Page 26

1    A.    I think so.  We went back and forth a few
2   times.
3    Q.    And you think that was -- he sent you three
4   versions of the report and you sent him --
5    A.    Something like that.
6    Q.    More than two?
7    A.    No -- well, I don't know if it's more than
8   two, maybe three, I don't --
9    Q.    He sent you three.  How many times did you
10  send him reports?
11   A.    I really don't recall.  I don't keep drafts.
12  I have only the most current one always so there's no
13  confusion, and by the time I get to the final I don't
14  have any drafts around, and I don't really recall how
15  many there were.
16   Q.    So what did you do with your e-mail with the
17  drafts in them?
18   A.    I delete them once I'm done with them.
19   Q.    Do you permanently delete them?
20   A.    The cover e-mail I keep, but the draft
21  documents I don't.
22   Q.    Where do you put the draft documents?
23   A.    In the trash, I don't print them out
24  usually.
25   Q.    You put them in trash.  You emptied your

Page 27

1   trash --
2    A.    Sure.
3    Q.    -- in your Mac?
4    A.    Yes.
5    Q.    Did you check to see if you have any draft
6   copies of your report in your trash in your Mac?
7    A.    Well, the trash is really gone every time I
8   quit Eudora, okay.  I checked my folders of files
9   related to this case just a few days ago.  In
10  connection with responding to the subpoena I checked
11  what do I have in my computer, and I checked, there
12  were no drafts.
13   Q.    So you used the Eudora e-mail client?
14   A.    Right.
15   Q.    You don't use the mail client that's
16  provided with the Mac?
17   A.    No.
18   Q.    And when you delete the drafts, you delete
19  them into your mailbox in Eudora or do you delete them
20  into the trash bin on your desktop?
21   A.    No, you delete it in the trash of Eudora,
22  which when you quit Eudora at the end of some session
23  it sends information back to the server to delete the
24  images that are retained there.
25   Q.    What server are you referring to?

Page 28

1    A.    University of Michigan is my ISP.
2    Q.    And you don't keep local cached copies on
3   your personal computer of your Eudora mail?
4    A.    Well, I do, of the mail.  Now, of
5   attachments, I usually keep them, too, but in the case
6   of drafts like this, when a new draft comes or the
7   final report, I delete previous ones.  And those are
8   files not in Eudora but in the Mac operating system,
9   and when I empty the trash there, they're gone.  I mean
10  your forensic scientists can probably retrieve them
11  from my disk if it becomes that important, but they are
12  deleted, I have not reformatted my disk.
13   Q.    Okay.  We'll ask that you do preserve them
14  and not destroy any draft reports and documents you've
15  received in the case.
16   A.    No, I have not.
17   Q.    No, I'm asking you now to make sure you do
18  not?
19   A.    That's right, I have not preserved any
20  drafts either in the computer or in print form.
21   Q.    Okay.
22   A.    I guess there's a document which I put on in
23  response to the subpoena called the Google Toolbar,
24  which were the early printouts.  I think it's identical
25  to what's in the report.  I did have that and I

Page 29

1   produced that, and that may be considered a draft, but
2   as far as I know, it's identical to what actually ended
3   up in the report.
4           MR. WOLFF:  Counsel, is there a
5   reason we didn't receive those?
6           MR. KOCHANOWSKI:  I can't think of
7   one, so I had assumed you had gotten that.  It was a
8   very tiny stack of things.
9           THE WITNESS:  Yeah, about five or
10  six pages, whatever was in the report.
11          MR. KOCHANOWSKI:  And I assumed, and
12  I just e-mailed Nabeel with the question as to where it
13  is and why.  I don't have an answer for you.
14          MR. WOLFF:  Okay, because that was
15  part of that drag we had the other day about production
16  of documents.
17          MR. KOCHANOWSKI:  Well, it was -- I
18  mean what there is is I think that that little screen
19  shot thing that Dr. Galler just testified about,
20  there's one page of billing records and I think an
21  updated list of cases.
22          THE WITNESS:  Yes.
23          MR. KOCHANOWSKI:  I think -- and
24  that's it, as I recall.
25          THE WITNESS:  I think so.

8 (Pages 26 to 29)

Bernard A. Galler
October 28, 2005

Page 30

1          MR. KOCHANOWSKI:  Yeah.  So the
2    billing record is one page, it just shows the dates
3    that he worked on, that updated list of cases as he
4    testified about, and a set of the Google Toolbar screen
5    shots, I think that's --
6          THE WITNESS:  With a little bit of
7    text glue between the screen shots.
8          MR. KOCHANOWSKI:  Right.
9          THE WITNESS:  Yes.
10          MR. KOCHANOWSKI:  And that's what
11    you have.  I mean that's what I have for you, and I
12    don't know why you don't have it.
13          MR. WOLFF:  All right.
14          MR. KOCHANOWSKI:  And I'll try to
15    get it as soon as --
16          MR. WOLFF:  If you could send it as
17    a PDF, I could probably grab it and take a look at it
18    and clear up any ambiguities there might be.
19          MR. KOCHANOWSKI:  There's no
20    ambiguities.  Only suspicious minds have ambiguity.
21          MR. WOLFF:  All right.  Now would be
22    a good time to take a quick break.
23          THE WITNESS:  Fine.
24          THE VIDEOGRAPHER:  We are going off
25    the record at 9:55 a.m.

Page 31

1          (A short recess was taken)
2          THE VIDEOGRAPHER:  We are going back
3    on the record at 10:02 a.m.
4    BY MR. WOLFF:
5          Q.    Professor Galler, I'm going to have the
6    reporter mark as Exhibit 101 a copy of NetJumper's
7    response to Google's motion for summary judgment.  What
8    I have done with this exhibit is separated out
9    Exhibit 3 with a better copy from a previous
10    deposition so --
11          MR. KOCHANOWSKI:  Wait, this is my
12    call.
13          MR. WOLFF:  Let's go off the record.
14          THE VIDEOGRAPHER:  Off the record at
15    10:03 a.m.
16          (A short recess was taken).
17    DEPOSITION EXHIBIT 101
18    WAS MARKED BY THE REPORTER
19    FOR IDENTIFICATION
20          THE VIDEOGRAPHER:  We are going back
21    on the record at 10:29 a.m.
22    BY MR. WOLFF:
23          Q.    Before we took a break, Professor Galler,
24    the reporter marked -- or after we took the break but
25    before we got back the reporter marked as Exhibit 101,

Page 32

1    which is -- which is a copy of Plaintiff's opposition
2    brief to Google's motion for summary judgment.  I've
3    noted on the front of it that Exhibit 3 to Exhibit 101
4    has been excluded from it but is provided separately as
5    Exhibit 30, and so it's here, too.  So I'll have the
6    reporter just enter into the record the fact that we're
7    putting Exhibit 30 in front of Professor Galler as
8    well, which is Exhibit 3 of Exhibit 101.  Hope somebody
9    understands that when they review this later.
10          MR. KOCHANOWSKI:  You presume
11    anybody will care.
12    BY MR. WOLFF:
13          Q.    Professor Galler, have you seen Exhibit 101
14    before?
15          A.    Yes.
16          Q.    And when did you first see that?
17          A.    I believe it was one of the documents that
18    Mr. Kochanowski gave me to read early in my
19    participation here.
20          Q.    Before you prepared your declaration or
21    after?
22          A.    Right now I don't recall.
23          Q.    Because your declaration is attached as
24    Exhibit 2 to -- as Tab 2 to Exhibit 101?
25          A.    Yes.  I might have seen a draft, I just

Page 33

1    don't recalling.
2          Q.    When you prepared for your deposition did
3    you review a copy of these papers?
4          A.    Yes.
5          Q.    Okay.  And if you could take a look at
6    Exhibit 30, do you recognize Exhibit 30?
7          A.    This is the file history, I think I saw,
8    this, too, yes.
9          Q.    Okay.  And when did you first see that?
10          A.    Again.  It was one of the early documents
11    that was given to me to become familiar with the case.
12          Q.    And were you provided a copy of Google's
13    motion for summary judgment?
14          A.    I'm not sure.  I'd have to see it to see if
15    I recognize it.
16          MR. WOLFF:  I'll have the reporter
17    mark as Exhibit 102 a copy of Google's summary judgment
18    brief.
19    DEPOSITION EXHIBIT 102
20    WAS MARKED BY THE REPORTER
21    FOR IDENTIFICATION
22          THE WITNESS:  Should I have this?
23    BY MR. WOLFF:
24          Q.    Yes, you should.  Do you recognize
25    Exhibit 102?

9 (Pages 30 to 33)

Bernard A. Galler
October 28, 2005

Page 34

1    A.    I think I saw this, I'm not really sure.  I
2 mean so much of this is repeated in so many different
3 documents that I'm just not sure.  I believe I saw
4 this.
5    Q.    You believe you saw this before you prepared
6 your declaration?
7    A.    Oh, yes, yes, this does look familiar, yes.
8 I believe I saw this before I prepared my report.
9    Q.    And how was it provided to you?
10    A.    By Mr. Kochanowski.
11    Q.    By e-mail?
12    A.    Oh, no, I don't think so, I think probably
13 on paper.
14    Q.    Okay.  It was a color copy?
15    A.    No, I don't think it was color.
16    Q.    Did you have any questions about the figures
17 or --
18    A.    No, I understood.
19    Q.    Even without the color?
20    A.    Yeah.  I mean the text was clear enough.
21    Q.    Was it mailed to your home or was it
22 something you saw at his office?
23    A.    No, sent to my home.  I don't know if it was
24 mailed, might've been delivered.
25    Q.    Courier?

Page 35

1    A.    It might have been, I don't recall.  I might
2 say now I understand the references to Kauai.
3    Q.    I'll have the reporter mark as Exhibit 103 a
4 copy of the declaration of Joseph Hardin with the
5 attached exhibits.
6    DEPOSITION EXHIBIT 103
7    WAS MARKED BY THE REPORTER
8    FOR IDENTIFICATION
9 BY MR. WOLFF:
10    Q.    Professor Galler, have you seen what's been
11 marked as Exhibit 103 before?
12    A.    Yes.
13    Q.    Would you look through each one of the
14 exhibits and tell me if you recognize the exhibits, I
15 should say the tabs.
16    A.    (Witness complied.)  Yes, I think I've seen
17 all of these.
18    Q.    And would that have been before you prepared
19 your declaration?
20    A.    Yes.
21    Q.    Would it have been part of the package that
22 came with Google's --
23    A.    Yes.
24    Q.    -- brief?  And, I'm sorry, did you say it
25 was in color or not?

Page 36

1    A.    I didn't say, but I think it was not in
2 color.
3    Q.    Okay.  And you considered both of these, the
4 Exhibit 103 and 102, in the preparation of your report
5 or your declaration?
6    A.    Yes.
7    Q.    Now, your declaration begins in Exhibit 101
8 at Tab 2.  I'm going to have you take a look at Tab 2
9 on Exhibit 101 and make sure that that is a correct
10 copy of the declaration you executed, and let me know
11 when you've confirmed that.
12    A.    I believe this is a copy of my report.  The
13 one difference is there is a printed line across every
14 page that talks about when the document was filed that
15 was not part of the report.
16    Q.    Okay.  Are you able to make out the figures
17 that are --
18    A.    Not very well.  I know what figures are
19 there, but I can't make them out very well from this
20 copy.
21    Q.    From this copy?
22    A.    From this copy.
23    Q.    I'll have the reporter mark as Exhibit 104 a
24 clean copy, a color copy provided by Mr. Kochanowski of
25 your declaration.

Page 37

1    A.    Thank you.
2    Q.    I do not believe that it is signed.  It's
3 not an issue for me if it's not an issue for you.
4    MR. KOCHANOWSKI:  Assuming we gave
5 you --
6    MR. WOLFF:  Assuming you gave me the
7 right copy.
8    MR. KOCHANOWSKI:  I think there's
9 only one copy.
10    MR. WOLFF:  And would you like to
11 make a representation on the record?
12    MR. KOCHANOWSKI:  Of what?
13    MR. WOLFF:  Whether this is the same
14 as Exhibit 2 other than the stray lines through the
15 pages and the clean --
16    MR. KOCHANOWSKI:  I don't know.
17    MR. WOLFF:  You don't know?
18    MR. KOCHANOWSKI:  I don't know -- I
19 mean if this is what we sent you, you were complaining
20 about not being able to read the figures, so we printed
21 off this to show you the figures, and, you know, I have
22 to assume it's the right one, looks like the right one,
23 but I'm not comparing it line-by-line.  Looks like the
24 right one.  I mean when we served this, we made sure to
25 print off a clean copy with -- in color on this from

10 (Pages 34 to 37)

Bernard A. Galler
October 28, 2005

Page 38

1 this same printer, and that was delivered both to Kathy
2 Lang or Pahl Zinn and to Howard, to your partner,
3 Howard, at the time, so I can't tell you whether this
4 is what we just sent you by overnight courier
5 or whether this is --
6          MR. WOLFF:  Well, I'll tell you that
7 that is what I received by overnight courier.
8          MR. KOCHANOWSKI:  That's fine.
9          MR. WOLFF:  But you're not sure
10 whether this is the same?
11          MR. KOCHANOWSKI:  I'm just saying
12 I'm not comparing line-by-line.  I don't know, maybe
13 you're sneaky guys, maybe it's -- put in a different
14 page, I have no idea.
15          MR. WOLFF:  All right.  Could you
16 mark that as Exhibit 104?  And we'll use this because
17 it's readable.
18          THE WITNESS:  Sure.  I will let you
19 know if I observe any discrepancies.
20     DEPOSITION EXHIBIT 104
21     WAS MARKED BY THE REPORTER
22     FOR IDENTIFICATION
23          MR. KOCHANOWSKI:  I mean just for
24 the record, we also delivered a court copy of -- you
25 know, that was nice and cleanly printed, because I know

Page 39

1 how stuff looks when you get it off of the ECF, the
2 Pacer system, it doesn't look so hot, so the Court has
3 a clean copy, you have a clean copy, we have a clean
4 copy, and hopefully that should do it.
5 BY MR. WOLFF:
6     Q.   Is that a better copy, Mr. Galler?
7     A.   Yes, thank you.
8     Q.   All right.  Well, let's dig into your
9 declaration.  At Paragraph 4 on Page 3 of
10 Exhibit 104 --
11     A.   Yes.
12     Q.   -- you state that for purposes of this
13 declaration, I believe, that the level of ordinary
14 skill in the art is a person with a Bachelor's
15 degree --
16     A.   And where are you on -- okay, about
17 one-third of the page, down the page.
18     Q.   Correct.
19     A.   Fine.
20     Q.   It says, "For purposes of this declaration,
21 I believe the level of ordinary skill in the art is a
22 person with a Bachelor's degree in computer science or
23 equivalent experience in the computer programming
24 field."  Is that what you believe to be a person of
25 ordinary skill in the art?

Page 40

1     A.   Yes.  I mean that term, ordinary skill in
2 the art, is perhaps a technical legal term, but when I
3 was asked what I thought it ought to be, this was my
4 response.
5     Q.   Okay.  And would they have an advanced
6 degree or not?
7     A.   Not ordinary skill in the art.  This was my
8 response.
9     Q.   So would this be somebody who just came out
10 of undergraduate?
11     A.   I think so.
12     Q.   Would they have any programming experience?
13     A.   Well, with a Bachelor's degree in computer
14 science, they should have had experience in
15 programming.
16     Q.   And do you think that this is a high level
17 of skill in the art or a low level of skill in the art?
18     A.   Compared to what population?
19     Q.   Compared to the general population of people
20 that work in the field of computer science.
21     A.   I think it's fairly low.
22     Q.   Okay.
23     A.   But ordinary skill.
24     Q.   And so you -- is it your opinion that the
25 person of ordinary skill in the art would have any work

Page 41

1 experience?
2     A.   Well, I say not necessarily if they have a
3 Bachelor's degree or they may have had work experience
4 equivalent to that.  My view of what goes into a
5 Bachelor's degree in computer science, you know, is
6 based on my years of teaching, and my students would
7 have had programming experience, and many of them would
8 have had work experience over the summer during their
9 education and so on, but I'll stop there.
10     Q.   All right.  So is it your opinion, then,
11 that a person working in the field of the technology
12 described in the patent, and I'll refer to this as the
13 172 patent, the only one at issue in the motion --
14     A.   Yes.
15     Q.   -- would have been a newly minted graduate
16 right out of university --
17     A.   I'm sorry, I interrupted you.  Ask the
18 question again, please.
19     Q.   Is it your opinion that a person of ordinary
20 skill in the art, the person working on the type of
21 technology described in the 172 patent, would have been
22 a newly minted graduate right out of the university?
23     A.   Might have been.  I know that the Patent
24 Office considers their examiners as ordinary skill in
25 the art, and I think a person with a Bachelor's degree

11 (Pages 38 to 41)

Bernard A. Galler
October 28, 2005

Page 42

1  in computer science from a reputable university would
2  have as good background as those examiners in this
3  field.
4      Q.   Okay.  And what does the phrase or
5  equivalent experience in the programming field mean?
6      A.   Well, there are people who don't go to a
7  university and get a degree in computer science, they
8  might have a degree in something else or maybe no
9  degree or a two-year university, whatever, but then
10 they, I would assume they've had some work experience
11 equivalent to what a person in a computer science
12 undergraduate program would have had.
13     Q.   And how much work experience are you
14 referring to?
15     A.   I don't know that one can quantify it, two,
16 three, four years of work in the industry.
17     Q.   Work in the industry, would it be a
18 particular type of work working on client server
19 technology, working on software in general?
20     A.   Well, I say in the computer programming
21 field, that's broad enough.
22     Q.   So they could have been doing anything to
23 qualify as a person of ordinary skill in the art?
24     A.   I think so.
25     Q.   It wouldn't have to be on user interfaces

Page 43

1  or --
2      A.   Not for ordinary skill.  I think certainly
3  one can talk about people with a great deal more skill
4  than that.
5      Q.   Uh-huh.
6      A.   But I'll stick with this definition.
7      Q.   If you could turn to Tab 4 of Exhibit 101.
8      A.   If it's okay with you, I'll take the clip
9  off.
10     Q.   That's fine with me.  Just make sure we keep
11 them back together.
12     A.   That's right.  Okay, Tab 4.
13     Q.   Have you -- do you recognize the document
14 that begins at Tab 4?
15     A.   I don't think I've seen this.
16     Q.   Why don't you take a moment and review it.
17 This is the declaration of Anup Mathur.
18     A.   How much of the exhibit do you want me to --
19     Q.   The whole thing.
20     A.   The whole thing?  Okay.
21     Q.   And let me know when you're finished,
22 please.
23     A.   Sure.  Okay, thank you.
24     Q.   Do you know who Mr. Mathur is?
25     A.   No.  From reading this, I assume he was

Page 44

1  involved in the early developments of NetJumper, but I
2  don't know any more than that.
3      Q.   If I told you he was one of the inventors,
4  the named inventors on the patent in suit, would that
5  refresh your recollection?
6      A.   Well, he says I'm one of the named
7  inventors.
8      Q.   Okay.  Does Mr. Mathur qualify under your
9  definition of a person of ordinary skill in the art?
10     A.   He has more than the required background, so
11 it depends whether you are using that definition as a
12 limiting or an enabling.
13     Q.   All right.  Well, how are you using the
14 definition?
15     A.   I would include him.
16     Q.   As a person of level -- of ordinary skill in
17 the art at the time of the invention?
18     A.   Yes.
19     Q.   Are you sure?
20     A.   Well, it depends the use.  I mean I believe
21 he has much more skill in the art, so if you ask is he
22 of ordinary, no, he's not of ordinary, he's much more
23 than that.  Would I respect his opinion?  I probably
24 would, but I would not take him down to the level of
25 ordinary skill in the art because he has much more

Page 45

1  skill than that.
2      Q.   Okay.  And what I'm trying to do is figure
3  out whether you used your definition as a minimum
4  threshold for a person of ordinary skill in the art or
5  whether you were using your definition as the maximum
6  threshold for a person of ordinary skill in the art at
7  the time of the invention.  Can you tell me which?
8      A.   Well, again, I think I would have to look at
9  it in the context of a specific statement that I might
10 make, but in general I think I would use it as a
11 minimum.
12     Q.   Okay.  So the level of ordinary skill in the
13 art could be, in fact, much greater than what you've
14 indicated in your --
15     A.   No, the level of ordinary skill in the art
16 is what I said it is.  A particular person might have
17 more skill than that.
18     Q.   But you've said that it's a minimum
19 threshold?
20     A.   Yeah.
21     Q.   So --
22     A.   So I would say he qualifies as having
23 enough, okay.
24     Q.   But doesn't he also qualify as having too
25 much?

12 (Pages 42 to 45)

Bernard A. Galler
October 28, 2005

Page 46

1    A.    That depends on the argument you're making.
2  How can one have too much skill?
3    Q.    Well, did you use a different definition of
4  a person of ordinary skill in the art at different
5  times in your declaration?
6    A.    I don't think so.  When I said in some
7  particular instance that a person of ordinary skill in
8  the art would know this or would see this or whatever,
9  that doesn't rule out his knowing it.  It means that a
10  person with at least that much experience or education,
11  as I outlined it, would understand what I was claiming.
12    Q.    So when you've used that term, and you have
13  throughout your report, correct?
14    A.    Yes, yes.
15    Q.    You always used it in terms of the minimum
16  threshold?
17    A.    If we -- I mean sometimes it's possible to
18  misconstrue minimum and maximum.  I use it in the sense
19  that when I said a person of ordinary skill in the art
20  would come to this conclusion or that conclusion, I
21  meant that a person who had at least that much skill
22  and maybe no more but at least that much would come to
23  that conclusion.  Certainly I imply that a person with
24  more skill in the art would agree with that, would also
25  come to that conclusion.

Page 47

1    Q.    So you used it as a minimum?
2    A.    I don't want to tag it as minimum or maximum
3  because that could be misinterpreted.  I just explained
4  to you how I used it.
5    Q.    So do you disagree when I suggested you've
6  used it as a minimum in your report?
7    A.    I just told you the sense in which I used
8  the definition of ordinary skill in the art.  I say I
9  think we can disagree on how the word minimum is used,
10  and I guess I don't want to answer that question
11  because of the possible misinterpretation of the
12  definition of minimum.
13    Q.    All right.  Well --
14    A.    I think my response is clear.
15    Q.    So are you refusing to answer whether this
16  is the minimum level of ordinary skill in the art?
17        MR. KOCHANOWSKI:  Objection, now
18  you're arguing.  He's given you the answer.  Let me
19  object, let me object.
20        THE WITNESS:  Go ahead.
21        MR. KOCHANOWSKI:  Objection, now
22  you're arguing.  He's given you the answer several
23  times, and you're sort of past the point of inquiry now
24  into argument, and I don't think it's proper.
25        MR. WOLFF:  I disagree with the

Page 48

1  objection.
2  BY MR. WOLFF:
3    Q.    And, again, what I'm trying to understand is
4  that if you used it in any other context in your
5  declaration, if you used the term a person of ordinary
6  skill in the art, if you used it to mean anything more
7  than the minimum threshold that's been identified at
8  Paragraph 4 of your declaration.
9    A.    I think I was consistent in my use of it
10  throughout, as I explained a moment ago.  I do not want
11  to characterize how I used it as minimum or maximum.  I
12  think I was consistent, and I always used it the same
13  way, as I explained.
14    Q.    And you explained that you used it as the
15  baseline?
16    A.    You're trying to use the word base instead
17  of minimum.
18    Q.    Well, let's use the word minimum.
19    A.    I don't want to use the word minimum.  I
20  said that in every case where I stated that a person of
21  ordinary skill in the art would come to a conclusion, I
22  assume that any person with at least the amount of
23  education or experience that I stipulated would come to
24  that conclusion, and that doesn't rule out a person
25  with more skill in the art coming to the same

Page 49

1  conclusion, which I expect it would happen.  Now, it's
2  your term minimum or base or whatever, and I just don't
3  think that's an appropriate way to describe it.  I've
4  told you what my answer is, and I think I'm consistent,
5  I claim consistency throughout my report.
6    Q.    Okay.  At Enumeration 6 in Paragraph 4, this
7  is towards the bottom of the --
8    A.    I'm sorry, where are you now?
9    Q.    I'm at what's been marked with Roman Numeral
10  VI at Paragraph 4 of your declaration --
11    A.    Back to my report?  You're going back to
12  104?
13        MR. KOCHANOWSKI:  Roman Numeral VI?
14  You mean Number 6?
15        MR. WOLFF:  I'm sorry, Number 6.
16        MR. KOCHANOWSKI:  Okay.
17        THE WITNESS:  Paragraph 6 of my
18  report, okay.
19        MR. KOCHANOWSKI:  I think it's
20  Paragraph 4 and that's Subdivision 6.
21        MR. WOLFF:  Paragraph 4.
22        THE WITNESS:  Paragraph 4, I'm
23  sorry.
24        MR. KOCHANOWSKI:  Page 3.
25        THE WITNESS:  Page 3, okay, fine.

13 (Pages 46 to 49)

Bernard A. Galler
October 28, 2005

Page 50

1  Oh, I see, there's a 6 near the bottom of the page,
2  okay.  What is the question?
3  BY MR. WOLFF:
4      Q.    Were there any elements in the Claims 1
5  through 8 of the 172 patent that were shown in the
6  CyberPilot prior art?
7      A.    I can't think of any right now.  If we want
8  to go through it and look at them, we can do that, but
9  I can't think of any right now.
10     Q.    I'm just wondering why you used the word
11  many instead of all,.
12     A.    All is harder to defend than many, so it's
13  easier to say many and that's enough.
14     Q.    So there could be some elements, claim
15  elements that are found in the CyberPilot --
16     A.    Possible, I can't think of any right now.
17     Q.    Okay.  And when you say not present in a
18  single alleged reference, what are you referring to
19  when you say single alleged?
20     A.    Well, the single alleged reference is
21  CyberPilot, that was the only prior art that I believe
22  was really offered for invalidity.
23     Q.    And what do you consider to be that
24  CyberPilot reference?  Is it the tutorial and the
25  software or is it just the software or just the

Page 51

1  tutorial?
2      A.    I think the software.
3      Q.    Did you look at the tutorial?
4      A.    I looked at it, but my view of prior art
5  would be that the art is there.  I guess maybe if
6  something is stated in a tutorial, I guess it could be
7  considered, but it surely has to be consistent and
8  backed up by the software, so I would guess in my
9  interpretation, unless somebody tells me otherwise,
10  it's the software that is the prior art.
11     Q.    So did you consider whether the tutorial was
12  also prior art in your declaration?
13     A.    I believe that I did not.  I believe that I
14  only looked at the software as the claimed prior art.
15     Q.    Okay.  And when you considered the software
16  as the claimed prior art, did you consider CyberPilot
17  with the Netscape Navigator as prior art or without the
18  Netscape Navigator as prior art?
19     A.    Without any browser necessarily.  The
20  CyberPilot -- well, it uses a browser in carrying out
21  its function, but I believe that the -- well, I guess
22  you have to look at the whole thing.  CyberPilot plus
23  the browser that it's using is what is claimed as the
24  prior art, so I guess I would consider both of them
25  together.

Page 52

1      Q.    And so -- and that's what you did in your
2  report, you considered CyberPilot working with the
3  Netscape Navigator as prior art?
4      A.    Actually, I think in the -- in my report it
5  wasn't Netscape, it was Internet Explorer, I mean IE.
6      Q.    And let's -- since you raised it, that's a
7  good point.  Why did you use Internet Explorer as the
8  web browser in your consideration of the CyberPilot
9  prior art?
10     A.    I received the software on a DVD or
11  whatever, and I tried to install it on my Mac.  It runs
12  in Windows, and I do have Virtual PC, and I run Windows
13  XP on it.  And I got through part of the installation,
14  I installed CyberPilot, as I recall, but I was having
15  trouble installing Netscape 2.0, which was the Netscape
16  of that time at issue here.  And about that time Mr.
17  Kochanowski suggested that I could see the CyberPilot
18  in action if I just came to his office, so I gave up
19  installing it on my computer and I went to his office.
20  And they happened to have had it installed with IE
21  rather than Netscape, and I considered that equivalent
22  in terms of the behavior of CyberPilot, that is, its
23  use of the browser would have been the same no matter
24  what browser was used because the uses it made of the
25  browser functionality would have been the same, and so

Page 53

1  I was not bothered by using IE instead of Netscape.
2      Q.    So they would be equivalent for purposes of
3  your analysis?
4      A.    That's right.
5      Q.    When you said you installed it on your PC,
6  the CyberPilot software, how far did you get?  Did you
7  actually get it to work or not?
8      A.    No, no, I didn't even try it, because I
9  assumed that it needed the browser.  When I couldn't
10  get the browser in there, as I say, about that time,
11  rather than fight with it, I found an easier way to see
12  it work by going to their office, and so I did, and I
13  gave up any attempt to get it working on my machine, I
14  didn't try to execute it at all.
15     Q.    Did you unpack all of the files that were on
16  the DVD you received?
17     A.    I don't recall now.  I went through an
18  installation process for CyberPilot in Windows XP.  I
19  got to some point, and, as I say, I stopped and I -- so
20  I really had no experience with CyberPilot at all on my
21  machine at home, and I went to see the demonstration
22  and tried it and used it, and that was sufficient for
23  me.
24     Q.    All right.  The figures that occur
25  throughout your report, those were provided to you by

14 (Pages 50 to 53)

Bernard A. Galler
October 28, 2005

Page 54

1  Mr. Kochanowski?
2      A.   Yes.
3      Q.   Did you work with Mr. Hamameh at all?
4      A.   Not at that time.
5      Q.   But you have since then?
6      A.   Since then, yes.
7      Q.   Since the time of your report?
8      A.   Yes.
9      Q.   Is that -- when you say since that time --
10     A.   I'm sorry, you're right, since the time of
11  my report.  I mean I was thinking of -- I had two
12  visits.  On the first visit where we did the CyberPilot
13  he was not there, I had not yet met him.
14     Q.   Okay.  And you went through at this later
15  time all of the steps that are shown in Paragraphs 5
16  through --
17     A.   Now I have to ask you at this later time,
18  what do you mean by that?
19     Q.   At the time you went to inspect it, the
20  software at Mr. Kochanowski's office.
21     A.   Yes, we went through all of the examples and
22  lingos.
23     Q.   So let's turn to Paragraph 13 in your
24  declaration.
25     A.   Okay.

Page 55

1      Q.   And if you could, take a look at the figure
2  that's on Page 9.  What exactly are these arrows, the
3  blue arrows and the green arrows?  Take them one at a
4  time, pointing to in the figure on Page 9.
5      A.   Well, the blue arrow is identifying, as it
6  says, browser frame, it's the part of the displayed
7  window that is independent of the application, and the
8  green or yellow arrow is pointing to the part that is
9  presented by the application and is called the web page
10  display area or in the context of this patent the
11  search window.
12     Q.   And what do you mean by the term application
13  in your answer?
14     A.   Well, that which is carrying out the
15  function which the user wants separate from the
16  functions provided by the browser of display and of all
17  the icons at the top and so on.
18     Q.   So you view the arrow that's in green here
19  that says Web Page Display Area, that's a separate
20  application than the things that are arrows in blue
21  that are pointing to the browser frame?
22     A.   Well, you said do I view the arrow as a
23  separate application?
24     Q.   Do you view what the arrow is pointing to --
25     A.   What the arrow is pointing to --

Page 56

1      Q.   -- as a separate application?
2      A.   -- is a window, a subwindow which is
3  separate from that which the blue arrow is pointing to,
4  yes.
5      Q.   Do you mean the green arrow or the blue
6  arrow?
7      A.   On this printout it looks blue.  Okay, let's
8  identify them, there are blue arrows, two of them, and
9  we can call it a green arrow, okay.
10     Q.   And does the browser frame go beyond where
11  you've marked with your blue arrows?
12     A.   Well, it depends how you interpret what the
13  blue arrows are pointing to.
14          MR. KOCHANOWSKI:  Object to the form
15  of the question.  I don't know what beyond means.
16  BY MR. WOLFF:
17     Q.   All right.  Why don't you take a red pen and
18  mark for me with -- circle it or put a box around what
19  you think is the browser frame.
20     A.   It's a little hard to see, I mean it's very
21  small.  Let's see.  I'm trying to read where it says is
22  that getting started -- it's hard to read the words
23  there.
24     Q.   Well, you were able to read this before you
25  signed your declaration, right?

Page 57

1      A.   Well, yes, but I wasn't asked to draw a line
2  exactly where it is.  There's a part -- if I open up a
3  browser by itself, okay, some of this will be there and
4  some of it won't, and that's the distinction I make.
5  If I haven't begun a search or run any application,
6  some of this will be there, and, for example, the top
7  line will be there.
8      Q.   What is the top line?
9      A.   I mean the top blue line will have something
10  there from the --
11     Q.   What is the top blue line?  Could you
12  identify the text in it for me?
13     A.   It's a stream of text, I guess, presented
14  by -- perhaps by an application to be shown by the
15  browser.
16     Q.   Could you read what the actual text is?
17     A.   Yahoo search results for Google Mozilla
18  Firefox.  The next line, which says file, edit, view,
19  et cetera, is a browser line, not part of the
20  application.  The next line is also I would consider
21  part of the browser, and it's the next line that's hard
22  to read, getting started -- I can't make out that next
23  word.
24     Q.   How about if you just circle with the pen
25  the browser frame, make a box around the browser frame

15 (Pages 54 to 57)

Bernard A. Galler
October 28, 2005

Page 58

1  in this figure for me so I know what it is you're
2  referring to when you're using this term.
3      A.   (Witness complied.)
4      Q.   Okay.
5      A.   They're not visible, may be a line along the
6  left side.
7      Q.   So what you've done is you've drawn kind of
8  a backwards C, a little box around what you say is the
9  browser frame?
10     A.   Uh-huh.
11     Q.   Is that what you view to be a browser window
12 in the context of your report?
13     A.   No, the browser window would be the entire
14 thing, the entire window that's shown.
15     Q.   So the whole graphics area that's shown
16 here, the full, you know, bounded by the four corners
17 of the edge of the color is what you say is the browser
18 window?
19          MR. KOCHANOWSKI:  I'm going to
20 object for this reason.
21          MR. WOLFF:  State your objection
22 concisely, please.
23          MR. KOCHANOWSKI:  I'm going to --
24          MR. WOLFF:  Object to form.
25          MR. KOCHANOWSKI:  Don't instruct me.

Page 59

1  I think --
2          MR. WOLFF:  I prefer you not
3  instruct the witness.
4          MR. KOCHANOWSKI:  I'm not
5  instructing the witness on anything.  I'm asking -- I'm
6  going to state an objection this way.  If you're asking
7  what he means by browser window, I don't believe that
8  the report purports to have him define it.  It defines
9  the word search window and disagrees with you on your
10 construction.  So I don't know what you mean by browser
11 window, whether you mean what the patent says it means
12 or what you think it means, and that's why I'm
13 objecting, because now we're going to start getting
14 into your semantics, so why don't you be precise with
15 your questions instead of doing the, you know, what
16 you've been doing, and that is my objection, and it's
17 going to be my objection for the rest of this
18 deposition.  Ask him what he means by his report,
19 terrific.  Ask him to interpret what you mean is
20 imprecise, incorrect, unfair, and I'm going to object
21 to it every single time.
22          MR. WOLFF:  Counsel, I'd appreciate
23 it if you'd just concisely state your objection to form
24 and not give long speaking coaching objections to the
25 witness.

Page 60

1          MR. KOCHANOWSKI:  I'll try to make
2  you happy, but I can't guarantee I will in every
3  instance.
4  BY MR. WOLFF:
5      Q.   So what do you understand the term browser
6  window to mean?
7          MR. KOCHANOWSKI:  Same objection.
8  BY MR. WOLFF:
9      Q.   Professor Galler?
10     A.   I'm trying to respond in terms of the
11 definitions of the patent.
12     Q.   Uh-huh.
13     A.   Now, maybe that's not what you're asking.
14     Q.   That is what I'm asking, and based on
15 your -- I assume that your report is based on the
16 patent.
17     A.   Yes.
18     Q.   And so when you've used the term browser
19 window in your report, you're using it in terms of the
20 way the patent used it?
21     A.   Yes.
22     Q.   And --
23     A.   At least I tried to, yes.
24     Q.   And is that what your understanding of what
25 the term browser window means?

Page 61

1      A.   I don't -- I normally don't use the word
2  browser window, okay; therefore, I'm using it as I
3  believe it was intended in the patent, Number 400 in
4  their figures.  So the browser window, if we're looking
5  at Page 9, I believe, would be the entire picture
6  without the arrows, the blue and green arrow.  That is
7  what I believe the patent identified as Number 400.
8      Q.   Okay.  Now, with the blue pen, could you
9  draw a circle around what you say is the browser window
10 so I understand.
11          MR. KOCHANOWSKI:  Same objection.
12          THE WITNESS:  (Witness complied.)
13 BY MR. WOLFF:
14     Q.   Okay.  I see on this Page 9 you've drawn a
15 blue line around the entire picture that's shown there.
16     A.   Yes.
17     Q.   Is there a reason that when the -- when
18 these images were taken the browser application was
19 maximized?
20     A.   Well, first of all, I didn't take these
21 pictures, so you're asking me intent on the person who
22 did it, and I don't know.
23     Q.   So you didn't ask why they were maximized?
24     A.   No.
25     Q.   And would it make any difference in your

16 (Pages 58 to 61)

Bernard A. Galler
October 28, 2005

Page 62

1  analysis whether the application was maximized or only
2  a partial screen?
3      A.   No.  I'm looking at the function here.
4  There is a search window and there is what the patent
5  calls a browser window or browser interface, whatever.
6  Those terms became very fuzzy at times, and I relied
7  primarily on the 400 and the 406, the distinction, and,
8  to me, that has nothing to do with whether something is
9  maximized or not or whatever.  I looked at this
10 diagram, I looked at the screen.
11     Q.   Okay, and what do you mean when you say that
12 the terms became fuzzy at times?
13     A.   Well, I mean certainly there are all kinds
14 of uses of browser interface, browser window, browser
15 this, browser that, search this, and so on.  Not
16 everybody was totally consistent every time in things I
17 read.  What was consistent was -- were the distinctions
18 between Window 400 and Window 406 and how they were
19 used and so on, and that's the way I'm using it.
20     Q.   Okay, and so when you refer to browser
21 window in your report or your declaration, you're
22 referring to Element 400?
23     A.   I believe I'm consistent with that, yes.
24     Q.   And when you refer to element or to --
25 excuse me, strike that.  When you refer to the term

Page 63

1  search window in your report -- strike that.  When you
2  refer to the term search window in your declaration,
3  you're referring to Element 406?
4      A.   Well, when I'm referring to the patent.
5  Now, when you get to CyberPilot where it gets almost
6  impossible to know what is intended to be the search
7  window, then there is no 406.
8      Q.   All right.  I move to strike your response.
9  My question is what do you consider -- do you in your
10 declaration when you used the term search window, is it
11 Element 406 as shown in Figure 5(a) of the patent?
12     A.   I don't want to be argumentative, but you
13 struck my response and CyberPilot -- consideration --
14     Q.   I'm not asking about CyberPilot --
15     A.   I know you're not asking about it, but you
16 said in my report when I use it, and I use the term
17 search window in discussing CyberPilot.  So maybe
18 that's not what you intended, but that's what you
19 asked.
20     Q.   We will ask about CyberPilot, but what I
21 want to know is when you've done your -- when you've
22 defined this term search window, what portion of the
23 browser window did you intend it to be?
24     A.   And you're asking not about CyberPilot but
25 about --

Page 64

1      Q.   I'm asking about the patent and your
2  understanding of what the term means as used in the
3  claims.
4      A.   Okay.  As used in the patent and the claims,
5  search window referred to what they had labeled as 406,
6  yes.
7      Q.   Why don't we mark as Exhibit 105 -- this a
8  single printout from the patent.
9      A.   You know, I'm very sorry but I won't
10 explain, but I'd like to take another break, very short
11 break.
12          MR. WOLFF:  Okay.
13          THE VIDEOGRAPHER:  Going off the
14 record at 11:18 a.m.
15     DEPOSITION EXHIBIT 105
16     WAS MARKED BY THE REPORTER
17     FOR IDENTIFICATION
18          THE VIDEOGRAPHER:  We are going back
19 on the record at 11:23 a.m.
20 BY MR. WOLFF:
21     Q.   Professor Galler, when you took your break,
22 did you review any of the notes you brought with you
23 today?
24     A.   No.
25     Q.   Did you talk about your previous testimony

Page 65

1  with your counsel?
2      A.   Yes.  I asked him if it was going okay, and
3  he said yes.
4      Q.   Okay.  Do you recognize what's been marked
5  as Exhibit 105?
6      A.   Yes.
7      Q.   And could you tell me what it is?
8      A.   Well, it's a figure from the patent.
9      Q.   Okay.  And in the context of this figure,
10 could you mark for me with the pen you've been provided
11 in red what the browser window is, and here you can
12 just label the text or numeral, if that's easier.
13          MR. KOCHANOWSKI:  Objection, browser
14 window as what?
15          THE WITNESS:  Well, again, the terms
16 browser window, browser interface, et cetera, have
17 been, as I said, muddied.  There is a 400 here, and I
18 believe that's what is referred to as the browser
19 window in the patent, but if there's ever a difference
20 between them, it's the 400 that's relevant and not what
21 the name is that's given to it.
22 BY MR. WOLFF:
23     Q.   So the words don't matter, the numbers do?
24     A.   Well, everything matters, but if there's a
25 conflict, the number is what I would take as

17 (Pages 62 to 65)

Bernard A. Galler
October 28, 2005

Page 66

1  determinant.
2      Q.    Okay.  Well, in light of what you marked on
3  Page 9 of Exhibit 104, what would be the equivalent
4  browser window in Figure 5(a)?
5      A.    I think, well, it's Number 400.
6      Q.    Okay.  Could you write browser window next
7  to 400, please?
8          MR. KOCHANOWSKI:  I'm going to
9  object.  He's given testimony.  He's not here to give
10 you writing lessons.  I object continuously, and I will
11 continue to object to the term browser window as you
12 are defining it.  If you're asking him to agree with
13 you about your use of browser window, and that's what
14 this argument's about, he's given his report.  If you
15 want to talk about particular structures, ask him to
16 tell you about the structures.  But this record, I'm
17 not going to let this little snippets of stuff when you
18 ask him browser window and get some answer and you ask
19 him browser window, so it's going to be a continuous
20 objection, that's all it's going to be.
21         MR. WOLFF:  I'll give you a standing
22 objection.
23         MR. KOCHANOWSKI:  No, no, I'm going
24 to keep -- I'm going to make sure it's on the record
25 every single time.

Page 67

1          MR. WOLFF:  If you would like, Mr.
2  Kochanowski, we can call the Court and see if we can
3  get a protective order.
4          MR. KOCHANOWSKI:  Go ahead.
5          MR. WOLFF:  To get a clear statement
6  of what it is.  Let's take a break.
7          MR. KOCHANOWSKI:  Call him right
8  now, and you explain to him that you are using the term
9  you want defined imprecisely in every question, and I'm
10 objecting to every single question.
11         MR. WOLFF:  Well, let me see if
12 Pahl's available.
13         MR. KOCHANOWSKI:  Sure.
14         THE VIDEOGRAPHER:  We're going off
15 the record at 11:26 a.m.
16         (A short recess was taken)
17         THE VIDEOGRAPHER:  We are going back
18 on the record at 11:30 a.m.
19         MR. ZINN:  Just for the record, L.
20 Pahl Zinn, P-a-h-l Z-i-n-n, for Defendant Google,
21 co-counsel with Mr. Wolff.
22 BY MR. WOLFF:
23     Q.    Professor Galler, before the break we had
24 somewhat of an issue with the questions and the
25 objections, so what I'm going to try to do is ask the

Page 68

1  question in a way that it can avoid the objection from
2  Mr. Kochanowski and make sure that you understand what
3  it is the question that is being asked.
4      A.    Thank you.
5      Q.    So what I've asked you to do with regard to
6  Exhibit 105 is identify to me the browser window as you
7  understand the term as it is used in the patent on
8  Exhibit 105.
9          MR. KOCHANOWSKI:  And same objection
10 as before.  Are you meaning the way it's used in the
11 spec, the way it's used in the claims, the way you used
12 it?  There are at least three different ways one can
13 interpret that question.  That's my objection.
14         MR. WOLFF:  I'll give you that
15 standing objection.  So is it your suggestion that this
16 term means different things in light of all these?
17         MR. KOCHANOWSKI:  Not my suggestion
18 at all.  I'm asking what you mean by the term.  Tell
19 the witness what you mean.
20         MR. WOLFF:  I asked the witness what
21 he means by the term, and what you understand, Mr.
22 Galler, I want you to identify for me on Exhibit 105
23 what the term browser window is referring to as you
24 understand the patent.
25         MR. KOCHANOWSKI:  And I am posing

Page 69

1  the same objection, because you're not pointing him to
2  any particular claim.  Your motion is based on a claim,
3  on Claims 1 through 8.  You're not pointing him to
4  those claims.
5          MR. WOLFF:  All right.
6          MR. KOCHANOWSKI:  I'm asking
7  because, you know, it's going to be the same objection.
8          MR. ZINN:  Could we go off the
9  record for a second?
10         MR. KOCHANOWSKI:  Same exact
11 objection, and we can call the Court right now if you'd
12 like.  I don't want this deposition to turn into a
13 snippet.
14         MR. ZINN:  Can we go off the record
15 for a second?
16         MR. KOCHANOWSKI:  No, I don't want
17 to be off the record, I want to be on the record.
18         MR. ZINN:  Well, I want to consult
19 with co-counsel.  Thank you very much, Mr. Kochanowski.
20 So we'll go off the record.
21         THE VIDEOGRAPHER:  We're going off
22 the record at 11:32 a.m.
23         (An off the record
24           discussion was held)
25         THE VIDEOGRAPHER:  We are going back

18 (Pages 66 to 69)

Bernard A. Galler
October 28, 2005

Page 70

1  on the record at 11:33 a.m.
2          MR. WOLFF:  Could I have the
3  reporter read back the previous question.
4          (Record repeated as requested).
5  BY MR. WOLFF:
6      Q.    And I'm going to try the question one more
7  time.  Professor Galler, could you please identify for
8  me what the term browser window means in view of your
9  analysis of Claims 1 through 8 of the patent.
10          MR. KOCHANOWSKI:  Same objection.
11  Those claims do not contain that term.
12          THE WITNESS:  Let's look at Claims 1
13  through 8, if you will.  Could we get a copy of the
14  patent now and look at them?
15  BY MR. WOLFF:
16      Q.    You can't do this without looking at the
17  claims?
18      A.    Well, I'd like to see how the term is used
19  there.  As far as I know, in the patent, as I said
20  before, the words have gotten muddied, but it is very
21  clear when they are referring to Number 400, and I want
22  to see what the claims say.
23      Q.    Okay.  We'll mark as Exhibit 106 a copy of
24  U.S. Patent Number 5890172.  You want another copy of
25  that?

Page 71

1          MR. KOCHANOWSKI:  Sure.
2  DEPOSITION EXHIBIT 106
3  WAS MARKED BY THE REPORTER
4  FOR IDENTIFICATION
5          MR. WOLFF:  Could the reporter
6  please read back the question.
7          (Record repeated as requested).
8          THE WITNESS:  Well, in fact, the
9  term browser window does not occur in Claims 1 through
10  8 as far as I can tell by reading them, it talks about
11  a search window, so I can talk to you about a search
12  window if you'd like.
13  BY MR. WOLFF:
14      Q.    But you won't answer me or you won't talk to
15  me about the term browser window?
16      A.    Well, you said with respect to Claims 1
17  through 8.
18      Q.    I said with respect to your analysis of
19  Claims 1 through 8.
20      A.    There is a search window, right, and there
21  is a window that the patent calls 400.
22      Q.    And --
23      A.    Okay.
24      Q.    -- what is that window that the patent calls
25  400, is that the browser window?

Page 72

1      A.    Well, it's 400.
2      Q.    Is it the browser window or no?
3      A.    Look, I told you that the terms have gotten
4  muddied and different people call them different
5  things.  The Patent Examiner I think called it
6  something else, whatever.  If we want to call it 400
7  and always refer to it, then we know what we're talking
8  about.  To attach specific labels which later can be
9  muddied up again I think is not fruitful.
10      Q.    Okay.  I will have you turn in Exhibit 30 to
11  Page G 286.
12      A.    Oh, here, okay.  286?
13      Q.    Yes, and please tell me when you're there.
14      A.    Got you.  All right.
15      Q.    Have you reviewed the notice of allowability
16  that's contained on Pages G 285 through G 287?
17      A.    Yes.
18      Q.    Have you considered this in your report or
19  in your declaration?
20      A.    Not specifically, but it was one of the
21  things I looked at.
22      Q.    Okay.  If you could, read on Page G 286 the
23  Examiner's statement of reasons for allowance to
24  yourself, and let me know when you're finished.
25      A.    Okay.

Page 73

1      Q.    All right.  The second paragraph beginning
2  as shown in Figure 5(a), what is your understanding in
3  your analysis of Claims 1 through 8 what the Patent
4  Examiner's referring to when he refers to the browser
5  window as Item 400?
6      A.    He's referring to 400.
7      Q.    Is he referring to the claims that he
8  allowed in the patent in his notice -- his reasons for
9  allowance?
10      A.    He's referring to 400, he's allowing the
11  patent, okay, I mean if you -- as shown in this figure,
12  et cetera, et cetera, and he refers to Item 300 and he
13  refers to Item 400, okay.
14      Q.    So on Exhibit 105 what -- can you label for
15  me what your understanding and your analysis of Claims
16  1 through 8 the Examiner's referring to by Item 400?
17          MR. KOCHANOWSKI:  Objection.  The
18  Examiner's understanding was not at issue in Dr.
19  Galler's declaration or in Mr. Hardin's, as I recall.
20  That asks for speculation.
21          THE WITNESS:  I interpret this as
22  the Examiner's attempt to communicate to the patentees
23  by mentioning 400, and in their patent the 400 is the
24  entire window.
25  BY MR. WOLFF:

19 (Pages 70 to 73)

Bernard A. Galler
October 28, 2005

Page 74

1    Q.    The browser window?
2    A.    The entire window that's shown.
3    Q.    And what window --
4    A.    I don't know if they call it a browser
5  window, and I don't want to get pinned down to any
6  particular names. It's 400. We all know what 400
7  means.
8    Q.    And where is the term 400 in the claims?
9    A.    It's in the specification, right?
10    Q.    But in the claims, we need to pin it down
11  because these are claims in a patent, and so what I'm
12  trying to understand is what -- how you understood the
13  Examiner's reasons for allowance. If you -- do you
14  think he was mistaken?
15    A.    He may have been mistaken, I don't know, but
16  he referred to 400, and I would assume, as I said
17  before, if there's any conflict or tension between the
18  number and the words, I'd use the number.
19    Q.    And the Examiner used it, the Number 400?
20    A.    Right.
21    Q.    And so you think that what has been
22  identified as Item 400 controls in the Examiner's
23  understanding of what the claim is?
24    A.    I think so.
25    Q.    And you agree with the Examiner's opinion?

Page 75

1            MR. KOCHANOWSKI: Objection.
2  BY MR. WOLFF:
3    Q.    I'm sorry. Strike that. You agree with the
4  Examiner's conclusion?
5            MR. KOCHANOWSKI: Objection. Why
6  don't you ask a predicate question.
7            THE WITNESS: I don't know if --
8  what's to agree with? He issued the patent.
9  BY MR. WOLFF:
10    Q.    But isn't he referring to Claims 1, 7, 13,
11  18, 23, and 25 in his reasons for allowance?
12    A.    Would you ask that again.
13    Q.    Well, isn't he referring to the independent
14  claims cited in his reasons for allowance and using
15  this as his understanding of what these claims mean?
16            MR. KOCHANOWSKI: Objection, calls
17  for speculation.
18            THE WITNESS: Yeah, I don't think I
19  want to interpret what the Examiner said. He said what
20  he said.
21  BY MR. WOLFF:
22    Q.    Do you have an opinion on what the Examiner
23  said?
24    A.    No, I don't think I have an opinion, he
25  allowed the patent, and I assume that the inventors

Page 76

1  convinced him of what they had in mind and that it was
2  okay to issue the patent. I don't have any opinion on
3  that.
4    Q.    Do you have an opinion on the Examiner's
5  statement of reasons for allowance on Page 286?
6            MR. KOCHANOWSKI: Asked and
7  answered.
8            THE WITNESS: I don't think I have
9  an opinion.
10  BY MR. WOLFF:
11    Q.    You don't think you have an opinion or you
12  don't have an opinion?
13    A.    I don't have an opinion -- I have an
14  opinion -- well, the opinion I have is that it was his
15  job to issue the allowance and give his reasons.
16    Q.    But I want to know if you have an opinion on
17  the Examiner's reasons for allowance. Did you use this
18  in your analysis of Claims 1 through 8 when you came to
19  your conclusions on both infringement and invalidity?
20    A.    I don't think I used what he said in my
21  opinion.
22    Q.    And do you have any opinion of what the
23  Examiner said? Do you agree with it?
24    A.    Well, that would be certainly on the border
25  of being a legal opinion, and I don't give legal

Page 77

1  opinions.
2    Q.    Without it being a legal opinion as --
3  reviewing as a person of ordinary skill in the art
4  would have reviewed this at the time, do you have an
5  opinion as to what the Examiner's statement of reasons
6  for allowance meant?
7            MR. KOCHANOWSKI: Objection, assumes
8  a duty of a person of ordinary skill in the art to read
9  and know the reasons for allowance. We know of no such
10  duty.
11            THE WITNESS: I find no reason to
12  disagree with him, let's put it that way.
13  BY MR. WOLFF:
14    Q.    But earlier you indicated that he may have
15  been mistaken in his reasons for allowance.
16    A.    No, not in his reasons. He may -- I think
17  there was a question as to whether Item 400 is
18  appropriately called a browser window, and I said to
19  the extent that there may be tension between the Number
20  400 and the term browser window, I would go with the
21  400 in reading this, because I'm reading the whole
22  case history here, I find that people are using the
23  words differently in different places, and I will go
24  with the number, that's what I said.
25    Q.    So are you saying that the terms were

Hanson renaissance Court Reporting & Video
(313) 567 - 8100  www.hansonreporting.com

Bernard A. Galler
October 28, 2005

Page 78

1    intermixed throughout the prosecution history?
2        A.   No, I'm not saying anything about
3    intermixed.  I said they've become fuzzy.
4        Q.   Are they clear?
5        A.   Pardon?
6        Q.   Are they clear?  Were consistent definitions
7    used for --
8        A.   I'm not sure they were.  I think -- and I
9    cannot point you to any right now necessarily, but I
10   think there was some question about some of the terms
11   used, and I certainly know that there's a confusion
12   between browser and window and search window throughout
13   this case as a basic issue here.  I prefer to interpret
14   the patent in terms of the numbers given, and that's
15   it.
16       Q.   Okay.  So in light of the numbers given and
17   on Exhibit 105 can you identify for me where the first
18   and second icons must be to fall within the scope of
19   Claims 1 through 8?
20           MR. KOCHANOWSKI:  Objection, that's
21   a completely unintelligible question.
22   BY MR. WOLFF:
23       Q.   Can you answer the question, Professor
24   Galler?
25       A.   I think I'm going to have to go back and

Page 79

1    look at the patent, but maybe you should repeat the
2    question.
3            MR. WOLFF:  Could you read back the
4    question.
5            (Record repeated as requested).
6    BY MR. WOLFF:
7        Q.   Let me try that question again.  In light of
8    the Examiner's reasons for allowance on Page G 286 of
9    Exhibit 30, could you please identify for me on
10   Exhibit 105 where the first and second icons in Claims
11   1 through 8 can be?
12           MR. KOCHANOWSKI:  Objection, same
13   unintelligible question.  I'd also pose an objection
14   that Dr. Galler did not consider the Examiner's
15   opinion, and I really would prefer not to interpret them.
16   BY MR. WOLFF:
17       Q.   Can you answer the question, Professor
18   Galler?
19       A.   I'm not sure I can answer it.  You're saying
20   in the light of his -- of the Examiner's analysis.
21       Q.   Reasons for allowance on Page G 286.
22       A.   I did not really take those into account,
23   and I really would rather not interpret them.  I
24   will do what you -- I will try to do what you're
25   asking.  Maybe you could rephrase the question without

Page 80

1    referring to the Examiner's statement.
2        Q.   So you've offered no opinion or no
3    analysis -- you did not consider the Examiner's reasons
4    for analysis of allowance in your declaration, is that
5    correct?
6        A.   That's correct.  They -- well, everything I
7    read was part of my background and analysis, right.  I
8    did not explicitly refer to his analysis in my report.
9        Q.   I understand that, but what I want to know
10   is if it weighed at all in the analysis in your report,
11   not whether you explicitly referenced it in your
12   analysis.
13       A.   It did not weigh in my report.
14       Q.   At all?
15       A.   That I can recall. I mean --
16       Q.   Well, that's equivocal.
17       A.   Well, it's equivocal.  We can't always know
18   psychologically what in the past that we've experienced
19   or read may have influenced a specific behavior at a
20   later time.
21       Q.   All right.  So beyond the psychological
22   things that you've suggested here, looking at the
23   reasons for allowance on Page G 286, now, do you have
24   any opinion on the Examiner's reasons for allowance?
25       A.   I said I do not have an opinion.

Page 81

1        Q.   Okay.  And is it also your testimony that
2    the written description or the specification of what's
3    been marked as Exhibit G -- I'm sorry, strike that.  Is
4    it also your testimony that the term browser window is
5    used inconsistently in the patent?
6            MR. KOCHANOWSKI:  Objection, asked
7    and answered, the patent speaks for itself.
8            THE WITNESS:  I do not recall that
9    it's used inconsistently in the patent.  I think it's
10   used inconsistently in all of the -- many of the
11   documents -- in some of the documents that I've read
12   about the patent.  I can't point you to any now, but I
13   remember coming across one or more inconsistencies, but
14   not in the patent, as I recall.
15   BY MR. WOLFF:
16       Q.   Okay.  And on Exhibit 105 are you able to
17   identify for me where the first and second icons may be
18   displayed in light of the Examiner's reasons for
19   allowance?
20           MR. KOCHANOWSKI:  Objection, asked
21   and answered.
22           THE WITNESS:  If you will remove the
23   reference to the Examiner's allowance, I can try to
24   relate that to the patent, but not in terms of what the
25   patent -- the Examiner might have thought at the time

21 (Pages 78 to 81)

Bernard A. Galler
October 28, 2005

Page 82

1  he wrote the allowance.  I did not interpret his
2  statement, and I don't think he's explicit, either,
3  there in his allowance.
4  BY MR. WOLFF:
5      Q.    What do you mean he's not explicit?
6      A.    Well, let me look again at that Page 286, if
7  I remember right.
8            Well, I don't think the Examiner
9  spells out in any sense what are the first and second
10  icons, so I'm not about to help him in this regard.
11     Q.    Well, doesn't the Examiner refer to the
12  language displaying a first and second icon separate
13  from the search window on said display screen?
14     A.    Well, certainly not with respect to Figure
15  5(a).  Oh, okay, he does say the first and second icons
16  are provided separate in 300 from the browser window
17  400, all right, so he says that, fine.
18     Q.    Well, on Exhibit 105 would you identify for
19  me where these first and second icons can be placed?
20     A.    Now, let me refer to the description in the
21  patent as to where they intended them to be.
22     Q.    Okay.  And you're looking at Exhibit 106?
23     A.    Yes, Columns 7 and 8 I think are the
24  relevant columns.
25     Q.    Mr. Galler --

Page 83

1      A.    Yes.
2      Q.    -- weren't you looking in the patent
3  specification for the term browser window?
4      A.    No, no, no.  There was a reference in the
5  specification to Figure 5(B), and I wanted to see what
6  Figure 5(B) was.  You only gave me 5(a) to look at so
7  far.
8      Q.    Well, I gave you the whole patent.
9      A.    That's why I was looking.
10     Q.    Exhibit 30 as well.
11     A.    I was looking in the patent.  I mean you
12  asked me to answer the question specifically with
13  respect to Exhibit 105.
14     Q.    Right.
15     A.    That's 5(a).
16     Q.    Because that's the one that the Examiner
17  referred to in G 286.
18     A.    Right, but in the specification there's a
19  reference to 5(b) and 5(c), and I wanted to see to
20  understand those.
21     Q.    Okay.  And can you answer the question now?
22     A.    Not yet.  Okay, you asked me for the first
23  and second icons in -- as they would show up in this
24  example of Exhibit 105, is that correct?
25     Q.    Correct.

Page 84

1      A.    Okay.
2      Q.    In sum or substance.
3      A.    All right.  The first icon was the -- is no
4  longer visible here, in my opinion, in the Yahoo
5  inter -- implementation.  They gave the word rat and
6  indicated that.  That was the first icon which then
7  brought in this display.
8      Q.    So are you -- what are you referring to when
9  you say this display, what reference numeral in Figure
10  5(a)?
11     A.    Yes, well, the display in Window 406.
12     Q.    Okay.
13     A.    The search, what the patent calls a search
14  window.
15     Q.    All right.  And so your opinion is that the
16  first icon is contained within the structure identified
17  as Element 406 in Figure 5(a)?
18     A.    Well, not at this stage.  It was.
19     Q.    It was.  What do you mean it was?
20     A.    Well, it's been replaced by the results of
21  the search.
22     Q.    So going back to the language of the claim,
23  let's take, for example, Claim 1, how would that first
24  icon be separate from the search window?
25          MR. KOCHANOWSKI:  Can you read back

Page 85

1  the question that preceded that?  What is the question
2  that is actually being asked here?
3          MR. WOLFF:  Read the question, not
4  the preceding question, the question I just asked
5  Professor Galler.
6          (Record repeated as requested)
7          MR. KOCHANOWSKI:  I object.  It
8  isn't a complete question.  How would the first icon be
9  separate from the display window, what, in 5(a), in
10  anywhere?
11         MR. WOLFF:  In Figure 5(a), yes.
12         MR. KOCHANOWSKI:  Then I object.
13  The words first icon haven't been defined by you to the
14  witness.
15         THE WITNESS:  I should point out,
16  now that I reflect on this, that the search was
17  initiated using the -- in this example by the prior art
18  browser and Google and not necessarily separate at that
19  point.
20  BY MR. WOLFF:
21     Q.    So does it still fall within the scope of
22  Claim 1?
23         MR. KOCHANOWSKI:  Objection, calls
24  for a legal conclusion.
25         THE WITNESS:  Well, let me --

22 (Pages 82 to 85)

Bernard A. Galler
October 28, 2005

Page 86

1    THE VIDEOGRAPHER:  I need to change
2    the tape.
3    MR. WOLFF:  All right.  Why don't we
4    change the tape, go off the record.
5    THE VIDEOGRAPHER:  We are going off
6    the record at 12:04 p.m.
7    (An off the record
8    discussion was held)
9    THE VIDEOGRAPHER:  Tape 2.  We are
10   going back on the record at 12:05 p.m.
11   BY MR. WOLFF:
12   Q.   Are you still working on a response?
13   A.   Yes, I'm not sure, there's a mixture here
14   between the prior art and the jumper window
15   interpretation.  In the specification they talk about
16   the prior art where you enter the search word and cause
17   it to search as being in the search window.  I think
18   with the jumper window example in 5(a) it would have
19   been in the jumper window, which is separate from the
20   search window, that's not clear from the description.
21   MR. WOLFF:  I'm sorry, could you
22   read his statement back for me?
23   (Record repeated as requested).
24   BY MR. WOLFF:
25   Q.   I'm sorry, I did not understand that

Page 87

1    response.
2    A.   Okay.  Let me look at this for a moment,
3    please.
4    MR. KOCHANOWSKI:  Well, I object.  I
5    mean whether you understood it or not, that was the
6    response, so unless there's another question pending,
7    we should move on.
8    BY MR. WOLFF:
9    Q.   Can you clarify your response, Professor
10   Galler?
11   A.   I will in a moment.  I think I will stick
12   with the original answer that I gave.
13   Q.   And what was that?
14   A.   Well, we can have it read back.
15   Q.   No, and that was that the -- was that that
16   the search, the first icon was displayed in the region
17   identified as 406 on Exhibit 105?
18   A.   Using this prior art software, yes, and that
19   the example given is a mixture of the two, I would --
20   Q.   What do you mean a mixture of the two?
21   A.   Well, in that the original search is --
22   search icon or first icon happens to be displayed in
23   the search window of the prior art browser.
24   Q.   Okay.  So how, if it's displayed in the
25   search window of the prior art browser, how is that

Page 88

1    separate from the search window?
2    A.   I can't find where they say it in the patent
3    and describe it, but I would assume that in an
4    implementation where it's separate, it would -- the
5    original search would be triggered in the Internet
6    Buffet jumper window that they're talking about.
7    Q.   And can you find any reference to the term
8    search window in the patent other than in the claims?
9    A.   Well, I'll have to look.
10   Q.   Are you going to read the patent again?
11   A.   Well, you asked me if I could find one
12   anywhere in the patent, and before I can answer that,
13   if you want to stipulate that it's not there, I guess I
14   could take your word for it.
15   Q.   Did you find the term search window when you
16   did your analysis?
17   A.   Well, I don't recall, so I'd have to look at
18   the patent to answer your question.  Are you willing to
19   tell me that it's not there?  Then I will accept that.
20   Q.   Well, I will tell you that it's not there.
21   A.   Okay, other than in the claims.
22   Q.   Other than in the claims.
23   A.   All right.
24   Q.   And it was first added by amendment in 1998?
25   A.   All right.  Let's go from there.

Page 89

1    Q.   Go from 1998?
2    A.   No, from your comment, from your stipulation
3    that it's not in there.
4    Q.   Okay.  And --
5    A.   If it's important that you said that it was
6    first added then, that's a separate issue.
7    Q.   Well, I'm trying to understand like how you
8    say that something is in the prior art or it's
9    described in prior art, but it's also in the claim, and
10   so let me see all I can get a question out here.  Is it
11   your opinion that the first icon is the search icon
12   that's displayed in the region identified as 406 in
13   Exhibit 105?
14   A.   Okay, would you repeat that now, please?  I
15   just want to be sure.
16   Q.   Well, we'll move on to another question.
17   Are there more than one embodiments covered by the
18   claims in this patent?
19   A.   Yes.
20   Q.   Claims 1 through 8?
21   A.   No, I mean --
22   Q.   Do Claims 1 through 8 cover more than just
23   the embodiment that's identified in Figure 5(a)?
24   A.   There are two different embodiments in the
25   claims.  Right now I'm --

23 (Pages 86 to 89)

Bernard A. Galler
October 28, 2005

Page 90

1    Q.   There are two different embodiments covered
2 by the claims?
3    A.   Yes.
4    Q.   Okay. And can you tell me where in the
5 written description the second embodiment is, other
6 than the jumper window that's shown in Figure 5(a), I
7 assume that's what you're referring to, is that
8 correct?
9    A.   Yes. Now, what is the question, where?
10    Q.   Where is the alternate embodiment of the
11 claims described in the written description?
12    A.   Written description, you mean the
13 specification, for example, or --
14    Q.   Yeah. I used that term a little bit more
15 precisely. Everything but the claims is the written
16 description. The specification is the entire written
17 description and the claims.
18    A.   Okay. Okay. In Column 12 you have some
19 alternative embodiments.
20    Q.   All right. Let's focus on the first and
21 second icon limitation. Is there another place in the
22 written description of the 172 patent where the
23 alternate embodiment of the claims that you're
24 referring to in your earlier testimony is described?
25 And particularly I'm asking about the first and second

Page 91

1 icons separate from the search window.
2    A.   Okay. Now, please repeat the question.
3 Sometimes when you get to the end of the question
4 you're not sure how it started out, so please repeat
5 that.
6    Q.   Actually, let me do it this way. Let's go
7 in your report. If you'll turn to Page 13 of your
8 declaration, and take a look at Paragraphs 19, 20, and
9 21, and let me know if you agree with your statements
10 in those paragraphs. Just a yes or no, yes, I agree.
11    A.   Yes, okay.
12    Q.   Yes, you agree with the statements about
13 that. And is that referring to the embodiment
14 generally described in Figure 5(a) in what's been
15 marked as Exhibit 105?
16    A.   Now, to be complete, you ought to talk about
17 5(a), 5(b), and 5(c), but generally yes to answer your
18 question.
19    Q.   Okay. And beginning in Paragraph 22, is
20 this the alternate embodiment you referred to earlier?
21    A.   Yes.
22    Q.   And how does -- strike that. Which
23 embodiment do you believe is the preferred embodiment,
24 the one described in Paragraphs 19, 20, and 21 or the
25 one described in Paragraph 22?

Page 92

1    A.   If there is a legal interpretation of that,
2 I'm not prepared to give a legal interpretation.
3 Otherwise you're saying --
4    Q.   In your analysis of the patent and your --
5    A.   Well, what is preferred? They give an
6 example embodiment, and then they say alternate ones
7 are these kinds. I don't know which is preferred.
8 They chose to describe one in more detail. I don't
9 know if that in the legal context says that's -- the
10 preferred one is the one they chose to use as an
11 example.
12    Q.   Having read the patent, do you have any sort
13 of conclusion or analysis as to whether one was
14 preferred or not?
15    A.   When I read the patent, I read it, as I just
16 said, that one was chosen as a more explicit example,
17 and the others are perfectly acceptable, and I did
18 not -- I didn't read it as one is preferred over
19 another.
20    Q.   Okay. And is it the conclusion of your
21 analysis that the embodiment described in 22 is also
22 covered by the claims, Claims 1 through 8?
23    A.   That was my interpretation, I believe so.
24    Q.   Okay. And Claims 1 through 8, do they use
25 the term search window or browser window?

Page 93

1    A.   Search window.
2    Q.   Okay. And 22, in Paragraph 22 of your
3 report, is that referring to search window or browser
4 window?
5    A.   Well, in 22 there's specific references to
6 browser window. I think you should read it as it says.
7    Q.   So in this alternative embodiment, it's your
8 conclusion that browser window and search window mean
9 the same thing?
10    A.   Absolutely not. Where did that come from?
11    Q.   Because it's part of the claims, you said it
12 was covered by the claims.
13    A.   The term search window is in the claims.
14 This is not part of the claims. This refers to a
15 modification of a browser -- of the browser window and
16 does not refer to the search window, and I don't see
17 any relationship that can be drawn from that.
18    MR. KOCHANOWSKI: Is now a good time
19 to take a lunch break? It's almost 12:30.
20    MR. WOLFF: Yeah, why don't we do
21 that.
22    THE VIDEOGRAPHER: We're going off
23 the record at 12:23 p.m.
24    (A short recess was taken)
25    THE VIDEOGRAPHER: We are going back

24 (Pages 90 to 93)

Bernard A. Galler
October 28, 2005

Page 94

1  on the record at 1:24 p.m.
2  BY MR. WOLFF:
3      Q.    Professor Galler, over the lunch break did
4  you have an opportunity to review any additional
5  documents --
6      A.    No.
7      Q.    -- pertaining to your report?  You didn't
8  review any documents during the break?
9      A.    I did review some documents, not additional
10 documents.
11     Q.    Okay.  Well, what documents were those you
12 reviewed?
13     A.    I looked at the patent some more, and that's
14 it, the patent.
15     Q.    That's it, there's no other documents you
16 looked at?
17     A.    No.
18     Q.    And did it refresh your recollection at all,
19 your previous testimony?
20     A.    I think with respect to one aspect, my --
21 what did you --
22     Q.    Your recollection.
23     A.    My recollection.
24     Q.    Was refreshed?
25     A.    Okay, in looking at Claim 1 I remembered

Page 95

1  better the separation between the parsing step and the
2  initial retrieval and so on, but that's -- fine.
3      Q.    And how does that bear on your previous
4  testimony?
5      A.    I'm not sure it does, we'll see.
6      Q.    Okay.  Before I get, go over this, let's
7  turn back in Exhibit 30 to Page G 286.
8      A.    Okay.
9      Q.    And in your analysis you did not consider
10 this Examiner's reasons for allowance in your analysis
11 of --
12     A.    No.
13     Q.    -- the patent?  Okay.  Is there a reason why
14 you didn't consider it?
15     A.    I didn't feel that I needed to.
16     Q.    Why is that?
17     A.    Because I was more concerned with the patent
18 than the issues in the case.
19     Q.    So isn't this part of the prosecution
20 history?
21     A.    Yes.
22     Q.    And so why did you exclude the reasons from
23 allowance in your consideration of the prosecution
24 history?
25     A.    I didn't exclude it.  As I said, I didn't

Page 96

1  come back and pay much attention to it.  It was part of
2  what I read as background, and then I went ahead with
3  the report based on the issues in the case, and this
4  was part of my background, but I didn't exclude it.
5      Q.    And when you considered Google's motion for
6  summary judgment, it referenced the reasons for
7  allowance, correct?
8      A.    Yes.
9      Q.    And did you --
10     A.    I guess.  Again, that was part of my
11 background, too.  I didn't -- at various times I
12 referred to relevant parts of that, but I didn't feel
13 the need to come back and look at this.
14     Q.    Okay.  And why didn't you feel the need to
15 come back and take a look at this?
16     A.    That's kind of a negative question.  I
17 didn't feel the need because I didn't feel the need.
18     Q.    But it was part of Google's motion for
19 summary judgment, correct?
20     A.    I guess it is, there were references to it.
21     Q.    And in Professor Hardin's declaration he
22 referred to his reasons for allowance, correct?
23     A.    Maybe.  Let's look at my report and see
24 where you think I might have needed to refer to it or
25 whatever.

Page 97

1      Q.    Well, let's look at --
2      A.    And if I did, I did.  I don't recall.
3      Q.    What I'm trying to do is figure out what
4  your -- if you have an opinion on it, and it sounds
5  like you don't have any opinion on the reasons for
6  allowance.
7      A.    That's right.
8      Q.    Okay.  And it was your decision to ignore
9  the reasons for allowance in your --
10     A.    No, I don't say that I ignored it.  I did
11 not -- well, I don't recall referring to it explicitly
12 in my report, and if I didn't refer to it explicitly, I
13 didn't feel a need to.  For the statements I was making
14 in my report I referred to the documents I needed to
15 refer to, and I didn't exclude anything deliberately, I
16 just, if something wasn't included, it's because it
17 wasn't needed.
18     Q.    In your view, is the reasons for allowance a
19 substantive part of the prosecution history of the 172
20 patent?
21     A.    It can be, it can be, depending on the
22 patent and the case and so on.  I don't know that it
23 was -- I felt that it was relevant to refer back to it
24 in this case.
25     Q.    And in what circumstances can it be part of

25 (Pages 94 to 97)

Bernard A. Galler
October 28, 2005

Page 98

1  the --
2      A.   Well, if there's a dispute on the history of
3  something or other, that could be part of the history
4  of it.
5      Q.   And isn't there a dispute in this case as to
6  the history, to the prosecution history?
7      A.   Well, you show me what you have in mind.
8      Q.   Well, do you recall whether there is or not?
9      A.   I don't recall it, no.
10     Q.   Okay.  If you could turn to Exhibit 103,
11 Declaration of Joseph Hardin, Paragraph 27.
12     A.   Okay.
13     Q.   And familiarize yourself with Paragraph 27
14 again.
15     A.   Okay.
16     Q.   Did you consider Professor Hardin's
17 statement in Paragraph 27 in your analysis?
18     A.   Yes.
19     Q.   And where did you do that in your analysis
20 in your report?
21     A.   I don't -- I have to look for it.
22          I'm smiling because I see you
23 looking at this that I did make extensive reference to
24 the history and to the Examiner and so on, but I
25 remember that it went by so fast here, it was so clear

Page 99

1  and logical what I said that I just didn't remember
2  that that was the issue, whether or not it referred to
3  the file history.  I'll stand by what's in the report.
4  Your question has to do with Mr. Hardin's statements,
5  and I guess the main dealing with what he says is the
6  argument simply that he bases almost everything he says
7  on the identity between the search window and the
8  browser window, which I disallow, disavow from the
9  start; therefore, I disagree with almost everything he
10 says.
11     Q.   Now, but with respect to the Examiner's
12 reasons for allowance, you offered no opinion of that
13 in your declaration?
14          MR. KOCHANOWSKI:  Okay.  I'm going
15 to object now.  This is the 7th time you've asked this
16 question, and at this point I'm going to, if you ask it
17 one more time, I am going to call the Judge.
18          MR. WOLFF:  Call the Judge.
19          MR. KOCHANOWSKI:  Because you can't
20 ask a question, the same question seven times.
21          MR. WOLFF:  I want an answer to the
22 question.
23          MR. KOCHANOWSKI:  No.  Are you still
24 confused about whether or not Dr. Galler addressed this
25 snippet that you like to quote from Page G 286?  Is

Page 100

1  there a confusion in your mind?
2          MR. WOLFF:  Yes.
3          MR. KOCHANOWSKI:  There is confusion
4  in your mind?
5          Dr. Galler, have you answered seven
6  times already in this deposition that you did not
7  address that particular snippet from the Examiner's
8  reasons for allowance in reaching your opinion?
9          THE WITNESS:  I think I answered it.
10 I think there's a discussion of a history here, but
11 that has to do with the actions of the inventors in
12 modifying their -- in responding to the initial
13 rejection and so on and so on.  The specific wording of
14 his allowance I don't think made much difference to
15 anything here, the history is here, and I guess I've
16 answered it.
17 BY MR. WOLFF:
18     Q.   So your opinion is the statement of reasons
19 for allowance does not matter?
20     A.   No, I'm certainly not saying that something
21 doesn't matter.  I'm saying everything matters.  It's a
22 matter of what you choose to say in the report, and
23 I'll stick with what I said in the report.
24     Q.   And in your report you did not address the
25 Examiner's reasons for allowance, correct?  It's a yes

Page 101

1  or no question.
2      A.   I'll have to look at my report again to see
3  if I specifically reference those words.  I just don't
4  recall.  Either you know I do or you know I don't, and
5  I don't recall --
6          Okay.  On the bottom of Page 24 of
7  my report I say, "It is my opinion the patentees never
8  disavowed a claim, et cetera.  The sole distinct --
9  introduced by them to address a particular thing by the
10 Examiner was to require" -- and that's -- apparently,
11 you know, he allowed the patent with those changes.  He
12 allowed it, period.
13     Q.   But I want to know about his reasons for
14 allowance and I --
15     A.   Those are his reasons, those are his
16 reasons.  I don't presume to know his reasons.  He
17 asserted on Page 286 a statement that says, "I'm
18 allowing it," and he gave a few sentences, okay.
19     Q.   And so what's --
20     A.   I have no reason to disagree with him; I
21 said that before.
22     Q.   I guess that's where I'm getting hung up is
23 because you never specifically addressed it, and so I
24 can't tell whether you agree with his reasons for
25 allowance if substantively he was correct or if you

26 (Pages 98 to 101)

Bernard A. Galler
October 28, 2005

Page 102

1  disagree as well, if you agree or disagree with
2  Paragraph 27 (a) and (b), for instance, of Professor
3  Hardin's declaration.
4           MR. KOCHANOWSKI:  Is that a
5  question?  I object to the form of the question.
6           THE WITNESS:  That's correct, is
7  there a question specifically?
8  BY MR. WOLFF:
9      Q.   What is your response or your opinion
10  regarding Professor Hardin's declaration and his
11  consideration of the reasons for allowance?
12           MR. KOCHANOWSKI:  Objection, calls
13  for a narrative answer, it's contained in the 25-page
14  report.
15           THE WITNESS:  Well, you pointed me
16  to Paragraph 27 of Professor Hardin's report.
17  BY MR. WOLFF:
18      Q.   Correct.
19      A.   Okay.  For example, in Part B of that, the
20  claims referenced to a search window must be understood
21  to refer to the browser window, Number 400.  The
22  Examiner clearly made this connection and interpreted
23  the claims in this manner.  Well, I disagree with that.
24  I mean Mr. Hardin says the Examiner did something, and
25  I don't agree that the Examiner did that, period.  And

Page 103

1  almost everything else he says is based on his making
2  the equivalence between search window and browser
3  window 400, and to the extent that it's based on that,
4  I don't agree with him.
5      Q.   Okay.  So if search window as used in Claims
6  1 through 8 is Element 400 --
7      A.   Which I disagree with.
8      Q.   But if it is --
9      A.   Well, that's hypothetical that I disagree
10  with so, I mean I disagree with the assumption even
11  making it a hypothetical, but go ahead if you want,
12  better be labeled as hypothetical, because I will not
13  answer it any other way.
14      Q.   If the search window is Element 400, as
15  shown in Figure 5(a) of the 172 patent and referenced
16  by the Examiners as reasons for allowance, isn't it
17  true that Google would not infringe?
18      A.   That's a legal opinion which I surely
19  wouldn't give.
20      Q.   You won't give me your --
21      A.   No.
22      Q.   -- opinion on this?
23      A.   Whether something infringes or not is a
24  legal opinion, I wouldn't do it, and, besides, I guess
25  you're entitled to ask any hypothetical you want, but I

Page 104

1  surely find it impossible to give any kind of an
2  opinion, legal or otherwise, based on -- I can't say a
3  false premise but an inoperable premise, if you will.
4      Q.   So you can't give me -- let me see, so if
5  it's -- if search window refers to Element 406 as shown
6  in Figure 5(a), would you give an opinion on
7  infringement of the patent?
8      A.   No, I would not give an opinion on
9  infringement. I'll be happy to give you lots of
10  opinions, but that I regard as a legal opinion.
11      Q.   So your report offers no opinion on
12  infringement?
13      A.   I don't know, does it?  I hope not.
14      Q.   Well, you offer an opinion on -- you say
15  that Google's analysis of it not infringing the patent
16  is incorrect.
17      A.   The analysis, I think, is incorrect.
18      Q.   Is it -- so what is your analysis?  If you
19  were to assume that Element 400 is the search window,
20  can you give me an opinion as to whether Google would
21  infringe Claims 1 through 8 of the patent?
22      A.   I would have a very difficult time making
23  that assumption, because I don't believe it's correct.
24      Q.   Well, I want you to assume that it's
25  correct.

Page 105

1      A.   All right, and then you're saying can I give
2  you a legal opinion based on that.
3      Q.   I'm asking an opinion.
4           MR. KOCHANOWSKI:  Objection.
5           THE WITNESS:  Yeah, you're asking
6  for a legal opinion.
7  BY MR. WOLFF:
8      Q.   I'm asking you for an opinion, however your
9  opinion is.
10           MR. KOCHANOWSKI:  I'm objecting to
11  this line of questions.  Now, the witness has given you
12  an answer.  You want to ask a question if assume you
13  killed your wife, can you give an opinion whether
14  you're a murderer.  Okay.  Well, yeah, I guess if you
15  assume that, then the assumption predefines its own
16  terms, and, you know, and you're looking for snippets,
17  and you are not asking substantive questions, and to
18  that extent, I'm probably about three minutes away from
19  calling not the Judge but the Magistrate, who I think
20  is across the street so, and I'd be happy to show him
21  the transcript of this deposition to this point.
22           MR. WOLFF:  I'm happy to do that,
23  too.
24           MR. KOCHANOWSKI:  Fine, keep asking
25  questions --

27 (Pages 102 to 105)

Bernard A. Galler
October 28, 2005

Page 106

1          MR. WOLFF:  What I want is a
2   response to the question.  What I want to know is if
3   the Court construed the search window to be Item 400,
4   would Google infringe Claims 1 through 8?
5          MR. KOCHANOWSKI:  Objection.  This
6   is outside the scope of his report.  His report
7   addressed the narrow issue you raised.  Now you're
8   asking about infringement.  There could be other
9   embodiments, as you well know.  He's not been asked
10  those questions.  I'm not going to have this deposition
11  turn into -- turn into an a-ha, because that's how you
12  operate, it's just not going to happen, sorry.
13  BY MR. WOLFF:
14      Q.   Okay.  Do you know what claim element is at
15  issue in Google's noninfringement motion?
16      A.   I'm not sure how to pin --
17      Q.   Okay.
18      A.   -- the claim statements in there.
19      Q.   Let's go back -- let's look at Exhibit 102.
20          MR. KOCHANOWSKI:  Is that the file
21  history?  Which one you looking at?
22          THE WITNESS:  No, it's the corrected
23  brief in support of Google's motion.
24  BY MR. WOLFF:
25      Q.   Okay.  And beginning at Page 30 there is

Page 107

1   analysis as to why Claims 1 through 8 of the 172 patent
2   are not infringed by Google Toolbar.
3      A.   Yes.
4      Q.   Have you reviewed this section before?
5      A.   I don't think so.  Well, I don't know, it
6   says corrected, so I just don't remember if I saw the
7   corrected version, whatever that is.  I did read a
8   version of this.
9      Q.   Okay.  And here the issue that's before the
10  Court is whether Claim Element 1(c) is found in or is a
11  limitation that's met by the Google Toolbar as used
12  with one of the browsers, okay?
13      A.   Yes.
14      Q.   And the Claim Element 1(c) is displaying a
15  first and second icon separate from the search window
16  on said display screen.  You understand what that
17  claim --
18      A.   Yes.
19      Q.   -- means?  And your view -- you can correct
20  me if I'm wrong -- is that search window is Element 406
21  as shown in Figure 5(a)?
22      A.   Yes.
23      Q.   Okay.  And Professor Hardin's view is that
24  it's referring to Element 400 in Figure 5(a), do you
25  understand that?

Page 108

1      A.   I believe that's right, okay.
2      Q.   Okay.  Now, if the Court picks your view,
3   takes your view, meaning that the search window is 406,
4   do you believe that this limitation is met by the
5   Google Toolbar?
6      A.   Yes.
7      Q.   And if the Court takes the view that the
8   search window means Element 400, would your opinion
9   change?
10          MR. KOCHANOWSKI:  Objection
11  because -- objection, calls for opinions that have not
12  been offered in this case.
13          THE WITNESS:  Well, I was going to
14  ask you to say my opinion changed -- flesh out that
15  part of it so that I know exactly what the question is.
16  BY MR. WOLFF:
17      Q.   Well, what I'm wondering is if you even
18  considered Google's analysis of the claims in making
19  your to declaration.  See, your declaration, as I
20  understand it, assumes that search window means Element
21  406, and what I want to know is whether your analysis
22  considered Google's position, and that is that the
23  search window is Element 400.
24      A.   I don't recall if I had put any analysis of
25  that in my report.  I don't think I really considered

Page 109

1   that because it was to me so obvious that it didn't,
2   that the predicate is false.
3      Q.   Okay.  Now, if the predicate were correct or
4   were true, would your analysis and your conclusions
5   have changed?
6      A.   Well, there might be other circumstances, et
7   cetera, I don't know, I'd have to think through the
8   whole thing again.  I did not consider that.  I find it
9   very difficult to internalize that hypothesis because
10  it simply isn't true.  I don't understand how the Court
11  could come to that conclusion given that the patent
12  says 400 is this, and 406 is that, and if there was any
13  reason to assume that those are the same, they would
14  not have made that distinction.  I'll stop there.
15      Q.   But you understand that the Examiner then
16  would, of course, have disagreed with you in his
17  reasons for allowance.
18          MR. KOCHANOWSKI:  Objection.
19          THE WITNESS:  I don't know anything
20  about the Examiner, and I certainly won't comment on
21  his possible analysis, his motivation or intent or
22  whatever, I can't answer that question.
23  BY MR. WOLFF:
24      Q.   So you can't offer any opinion on what the
25  Examiner said in his statement of reasons for

28 (Pages 106 to 109)

Bernard A. Galler
October 28, 2005

Page 110

1 allowance?
2             MR. KOCHANOWSKI: Objection Number
3 10, the 10th time you asked this question.
4             THE WITNESS: I think I said I found
5 no reason to disagree with him, I think I've said this
6 before. I don't want to evaluate his statement. I see
7 no reason to differ with him, and that is the history.
8 BY MR. WOLFF:
9     Q.    Well, I guess my problem is it's equivocal,
10 because the Examiner's statement says that the search
11 window says the search window and browser window are
12 essentially the same.
13     A.    You show me where he says that.
14     Q.    All right. Let's look at Page G 286 again.
15 All right. So in the first paragraph the Examiner
16 identifies all independent claims that were then
17 pending, correct?
18     A.    Okay, well, I -- he identifies some, I don't
19 know if it's all, I mean unless we go back, I will not
20 say all, but go ahead.
21     Q.    And the language from the claims that the
22 Examiner references is separate from the search window
23 on said display screen, correct?
24     A.    Yes.
25             MR. KOCHANOWSKI: Objection. Are

Page 111

1 you asking the professor to now reach more opinions as
2 to what the Examiner thought? If that's where you're
3 going, I'm going to call the Magistrate now. Yes or
4 no?
5             MR. WOLFF: I'm not sure.
6             MR. KOCHANOWSKI: No, no, no, you
7 know.
8             MR. WOLFF: I don't understand your
9 question.
10             MR. KOCHANOWSKI: No, you're
11 absolutely sure. I mean this is now 10 times, I think
12 11, you've delved into this issue. So I'm going to
13 call the Magistrate unless you move on to a different
14 topic.
15             MR. WOLFF: I'm going to finish
16 examining the witness on the reasons for allowance.
17             MR. KOCHANOWSKI: I'd like to call
18 the Magistrate.
19             MR. WOLFF: Let's go off the record
20 for just one second. We'll go back on to get the
21 Magistrate on the phone. We'll just go off the record
22 real quick while I get local counsel.
23             THE VIDEOGRAPHER: We're going off
24 the record at 1:52 p.m.
25             (An off the record

Page 112

1             discussion was held)
2             THE VIDEOGRAPHER: We are going back
3 on the record at 2:03 p.m.
4 BY MR. WOLFF:
5     Q.    Professor Galler, if you could turn to
6 Exhibit 102, Page 31, in fact, actually, let me strike
7 that, let's do this a different way. If you could turn
8 to Exhibit 103, Tab C.
9     A.    Yes.
10     Q.    Could you identify for me on the figure
11 shown at Tab C where the search window is?
12     A.    If you look at the -- either of the two
13 pictures, there is a horizontal dark blue line across
14 the middle of the screen that's presented here. That
15 horizontal blue line down, not including the very
16 bottom line, I would consider the search window.
17     Q.    Okay. Now, is that Element 406 as described
18 in Figure 5(a)?
19     A.    I believe so.
20     Q.    Okay. Now, if the search window were
21 construed by the Court to be Element 400, understanding
22 all your reservations about how illogical that might
23 be, are the Google Toolbar next and previous icons
24 which are bounded in red separate from the search
25 window 400?

Page 113

1     A.    Given that hypothetical premise with which I
2 disagree, I mean one can't exactly disagree with a
3 premise, one can disagree with assuming the predicate
4 on the premise, the next and previous icons would be
5 contained, they are contained, let's put it that way,
6 they are contained in Window 400.
7     Q.    So they would not be separate from the
8 Window 400?
9     A.    They are not separate from 400, period,
10 under any circumstances.
11     Q.    Can you explain what you mean by they are
12 not separate from 400 under any circumstances?
13     A.    Well, they're contained in Window 400.
14     Q.    Okay. I see what you're saying. So if the
15 Court were to construe search window to be Element 400,
16 the browser window, the next and previous buttons would
17 not be -- or, I'm sorry, they would be displayed within
18 the search window?
19     A.    I'm a logician.
20     Q.    Okay.
21     A.    Given the premise, one can draw that
22 conclusion. That doesn't mean one has to accept the
23 premise or the conclusion.
24     Q.    All right. We'll move on.
25             MR. KOCHANOWSKI: Who says you can't

29 (Pages 110 to 113)

Bernard A. Galler
October 28, 2005

Page 114

1  learn anything?
2  BY MR. WOLFF:
3      Q.    If you could turn to Page 35.
4      A.    I'm sorry, which document?
5      Q.    I'm sorry, Paragraph 35 of your report, your
6  declaration, Exhibit 104.
7      A.    Paragraph 35?
8      Q.    Paragraph 35, correct.
9      A.    Okay.
10     Q.    What is your definition of the term parsing?
11     A.    Let me first say that from my experience in
12  the computer industry, I don't believe there is a
13  technical definition of parsing that is specific to the
14  computer industry. I have always regarded that term as
15  a common English language linguistic term. So you
16  asked me my definition, it's whatever I would find in
17  an ordinary dictionary, which would be to accept --
18  well, the dictionary wouldn't explain it this way
19  necessarily, but you accept input of some form, you
20  break it into the parts, and you understand the parts.
21  That's, I think, as far as I would go in a definition.
22     Q.    And how do you understand the parts in your
23  definition?
24     A.    By some analysis, I mean it's normally
25  applied -- it's normally applied to linguistics like

Page 115

1  taking a sentence apart, and so the analysis would say
2  I have a word here and my analysis says it's a verb,
3  and I look at another word and my analysis says this
4  function is as a noun, but the analysis is relevant to
5  the purpose and the context of parsing.
6      Q.    And the purpose and the context of parsing
7  in the 172 patent is what?
8      A.    I think there are several places where the
9  word parse is used in different context. The purpose
10  is always to accept some input and break it down and
11  maybe to extract some information.
12     Q.    Have you ever heard of a YACC parser?
13     A.    Yes.
14     Q.    And what is a YACC parser?
15     A.    It accepts input language and trans -- takes
16  something apart so that it can be translated into
17  something else.
18     Q.    And how does it do that?
19     A.    I don't remember any details. I remember my
20  students used it once in a translator, fine, but I did
21  not question how it does it.
22     Q.    So is it fair to say that whatever your
23  definition of parsing is, it's broader than what Google
24  defined it as?
25     A.    I think so.

Page 116

1      Q.    But you don't have a specific definition?
2      A.    Well, it happens that I this morning looked
3  in an ordinary dictionary, and I found a definition, so
4  I prepared it in case it was relevant.
5      Q.    Okay.
6      A.    I'll give it to you here. This is from the
7  Webster's New World Dictionary of the American
8  Language, David B. Gorelnic, editor in chief, published
9  by the Faucett Library New York, copyright 1979 by
10  William Collins Publishers, Inc. Parse, to break, and
11  then in parentheses (a sentence), because I think
12  they're sort of suggesting that there is a linguistic
13  interpretation, but you don't need that, to break down,
14  giving the form and function of each part. So I'll
15  give you this, and I think that's a pretty good, common
16  definition, which is what I had in mind.
17     Q.    Okay. And that was a 1973 dictionary?
18     A.    1979.
19     Q.    1979?
20     A.    Actually, I think it was published before
21  that, and that was the latest copyright that was in
22  that particular book.
23     Q.    So you would use a regular dictionary to
24  define the word parse?
25     A.    I would.

Page 117

1      Q.    You would not use it in terms of computer
2  science?
3      A.    I always have, in all of my years of
4  teaching and of talking about languages and
5  translators, which was my area of expertise, I used the
6  word parse without ever pinning it down any more
7  technically than that.
8      Q.    And you went back and looked at your papers
9  from 1968 and earlier?
10     A.    I didn't go back, I just remembered from my
11  experience how I used the language.
12     Q.    Okay. Let's turn to Paragraph 36 in your
13  report. Now, I want to make sure I understand what
14  exactly you considered, and I think you testified
15  earlier today that you did not consider the CyberPilot
16  tutorial?
17     A.    Well, I looked at it once in a while. I
18  don't think that I relied on it for any specific
19  wording, although I think it's in the report, there are
20  some references to the document maybe.
21     Q.    Are the paragraphs from 36 to 43 where you
22  are discussing the CyberPilot prior art, are they
23  referring to the software that you used then?
24     A.    Software and maybe the wording of tutorial,
25  I think somewhere it says I relied on something, but

30 (Pages 114 to 117)

Bernard A. Galler
October 28, 2005

Page 118

1  it's primarily the software, I mean let's talk about
2  the facts of how the thing behaves.
3      Q.    Okay. Well, if you could turn back to
4  Exhibit 103, this is the declaration of Joseph Hardin,
5  and take a look at Tab F.
6      A.    Yes.
7      Q.    And here -- well, I'll represent to you that
8  Professor Hardin is referring to the CyberPilot
9  tutorial. Did you look at the CyberPilot tutorial and
10 do any analysis of this chart that is Hardin
11 declaration, Exhibit F?
12     A.    I think for the things that he points to, I
13 think, yes, I did look and see those quotes, yes.
14     Q.    You've looked in the user manual -- the
15 CyberPilot tutorial?
16     A.    It's part of that other deposition, is it
17 Stark?
18     Q.    Stark, it's attached to the Stark
19 declaration?
20     A.    That's right, that's where I got it.
21     Q.    And did you -- and what parts of Exhibit F
22 did you disagree with, if any?
23     A.    Well, let's look at my report, if we can.
24 In Exhibit F, on the first page of Exhibit F, Claim
25 1(b), on the right-hand side it says the web browser

Page 119

1  constructs a search window on the display screen of the
2  local computer to browse the data files. CyberPilot
3  does not construct the search window. I mean we're
4  talking about CyberPilot here as the prior art. Well,
5  so I would expect that CyberPilot would construct a
6  search window, but it doesn't.
7      Q.    Well, it says actually at 1(b) that the web
8  browser, Netscape Navigator, constructs the search
9  window on the display screen of the local computer.
10     A.    Well, I don't think the web browser
11 constructs the search window, either.
12     Q.    And with reference to Figure 5(a) in the
13 patent -- I forget which -- Exhibit 105, what is
14 constructing a search window in this embodiment of the
15 claims?
16     A.    You know, I think I said before that I
17 thought -- no, strike that. Ask me a question again,
18 please.
19         MR. WOLFF: Could you read the
20 question back again, please.
21         (Record repeated as requested)
22         MR. KOCHANOWSKI: Object to form,
23 calls for a legal conclusion.
24         You can answer it.
25         THE WITNESS: I think the browser in

Page 120

1  this case, as a result of the search, the initial
2  search constructs the search window.
3  BY MR. WOLFF:
4      Q.    So the Netscape Navigator shown there in
5  Figure 5(a) is what constructs the search window?
6      A.    Yes.
7      Q.    Okay. And why do you disagree, then, with
8  1(b), with Professor Hardin's analysis on Claim Element
9  1(b) in Exhibit 103?
10     A.    Because I don't think there's a search
11 window when CyberPilot starts up, I don't think the web
12 browser has yet been invoked and there is no search
13 window.
14     Q.    So you think there's a particular sequence
15 that must be performed in Claim 1, a particular
16 sequence of the steps?
17     A.    I've interpreted it that way, yes.
18     Q.    Okay. If you could turn to Figure 4 in the
19 172 patent.
20     A.    Yes.
21     Q.    Can you tell me what -- can you describe to
22 me your understanding of what's displayed in Figure 4?
23     A.    Let me see what they say is displayed in
24 Figure 4. They say that Figure 4 shows a prior art
25 browser user interface and a query form of an

Page 121

1  information index provider. So that's what the prior
2  art provides.
3      Q.    And is it showing a search window as you
4  understand it?
5      A.    I think probably at the time that this
6  browser was created they didn't have any idea of a
7  search window, but it is, in fact, in 406 -- I mean in
8  Figure 4 there is a pointer 406, so that there would be
9  in the interpretation of this patent a search window.
10     Q.    But Figure 4 is labeled prior art, correct?
11     A.    Yes.
12     Q.    Do you disagree that Figure 4 is showing you
13 prior art?
14     A.    No.
15     Q.    So the prior art is the Netscape Navigator
16 with a search window shown in it?
17     A.    Yeah.
18     Q.    With regard to the second sentence in 1(b),
19 CyberPilot was intended and does work in conjunction
20 with a web browser like Netscape Navigator. Do you
21 agree with that statement?
22     A.    Well, it doesn't really say anything. I
23 mean I work in conjunction with a browser like Netscape
24 Navigator, but it doesn't mean anything.
25     Q.    If you could turn in Exhibit 103 to Tab D.

31 (Pages 118 to 121)

Bernard A. Galler
October 28, 2005

Page 122

1    A.    Yes.
2    Q.    Is what's shown in Exhibit D --
3    A.    D, I'm sorry, B or D?
4    Q.    D as in dog.
5    A.    Okay, all right.  Okay.
6    Q.    Is this showing a search window as that term
7    is used in the claims?
8    A.    I believe so.
9    Q.    And is this showing icons separate from the
10   search window?
11   A.    Yes.
12   Q.    Did you consider in your analysis the --
13   whether each of the icons --
14   A.    I'm sorry, we're both looking at Figure 5(a)
15   in D?
16   Q.    I'm sorry, you know what, is there another
17   page to this that is missing in mine?  I'm looking at
18   Page 2, comparison of the 172 patent, Figure 5(a).
19   A.    So let's disregard my previous answers.
20   Q.    All right.
21   A.    Now --
22   Q.    Where it says comparison of 172 patent,
23   Figure 5(a), to working copy of CyberPilot with
24   Netscape Navigator.
25   A.    Okay.

Page 123

1    Q.    Now, in what has been identified as the
2    Browser Window 400, is that showing a search window as
3    that term is used in the claims?
4         MR. KOCHANOWSKI:  Objection to the
5    form.  Now you're mixing up words again.
6         THE WITNESS:  I guess my answer is
7    it's up to -- in the context of this being argued as
8    prior art, I think it's up to the people who are
9    presenting this as prior art to show that it's a search
10   window, not me.
11   BY MR. WOLFF:
12   Q.    Well, do you have an opinion on whether
13   that's a search window, whether a search window is
14   shown with reference to --
15   A.    Well, I think I argued in my report that
16   there is no search window or nothing that satisfies
17   search window, so if you want to ask me about that,
18   I'll be happy to --
19   Q.    Yeah, so why don't you tell me what does the
20   term search window mean to you?
21   A.    Well, first of all, it's a window that
22   reports the results of a search.
23   Q.    And how did you come to that conclusion?
24   A.    First of all, by the choice of name, but by
25   the use of the term in the claims, for example, and I

Page 124

1    think from the common use of the word search in the
2    computing field and the whole description of the patent
3    as directed toward search engines.
4    Q.    And in Exhibit 103 at Tab B you don't think
5    that that qualifies as a search window?
6    A.    Because I don't think, yes, that's correct,
7    because I don't think it reports the result of a search
8    in the sense of a search engine.
9    Q.    So it -- in your view, does it -- did the --
10   to be a search window, do you actually have to be on
11   the domain name where the search engine is?
12   A.    I didn't see anything about domain names.
13   Let's start over again, please.
14   Q.    Well, what I want to know is is it context
15   specific then, the term search window in your
16   construction?
17   A.    At least that much context, that is, that it
18   shows the results of the kind of search that people
19   understand from a search engine.
20   Q.    So it would be the results list from doing a
21   query at a search website?
22   A.    A query with search parameters of the kind
23   that we have come to expect from Google, for example.
24   Q.    Convenient the way you defined it in terms
25   of the product.

Page 125

1    A.    Well, I Google all the time, that's my point
2    of reference.
3    Q.    I forgot if I asked this earlier, had you
4    used the toolbar before you started working on this
5    case?
6    A.    You may have asked me, no, I use Google a
7    lot but not the toolbar.
8    Q.    So is -- what is the search window?  Does it
9    depend on the type of information that's displayed in
10   Element 406?
11   A.    That's a factor, but it's not sufficient,
12   okay.  The type of information that a search engine
13   displays might be displayed by another application, but
14   that doesn't make the other application a search
15   engine.  A search engine searches.
16   Q.    You mean a search window or a search engine?
17   A.    A search window depends on having in the
18   context a search engine which does the kind of search
19   that we expect from Google, for example.
20   Q.    What is the initial data file referenced in
21   Claims 1 through 8, in your opinion?
22   A.    Well, it's whatever comes back -- I presume
23   it can take various forms, because it has not yet been
24   parsed, but it's the initial data file is what comes
25   back from the network after a search.

32 (Pages 122 to 125)

Bernard A. Galler
October 28, 2005

Page 126

1    Q.    And it says here in the claim retrieving
2 initial data file that it's displaying the initial data
3 file in the search window.
4    A.    Yes.
5    Q.    And your construction of search window is
6 still the same as it was for Element 1(b), is that
7 correct?
8    A.    Yes.
9    Q.    So there's still a query box and a search
10 button, is that how you're understanding search window?
11           MR. KOCHANOWSKI:   At what point in
12 time?  Objection.
13 BY MR. WOLFF:
14    Q.    At the time this claim -- you're displaying
15 an initial data file in a search window.
16    A.    Well, let's start over again, please.  Ask
17 the question again, please.
18    Q.    When the initial data file is displayed in
19 the search window, according to this claim element,
20 it's 1(d), what is the search window?
21    A.    I guess it's where the initial data file is
22 displayed.
23    Q.    Is that Element 406 in the patent?
24    A.    Yes.
25    Q.    Is that a general area on the screen?

Page 127

1    A.    I don't know what you mean by general area.
2    Q.    Well, is it just a geography on the screen
3 or is it something context specific?
4    A.    I think it's context specific.
5    Q.    So it actually has to be -- there has to be
6 something more than just four corners in a window for
7 something to be a search window?
8    A.    Yeah, it has to be a place where search
9 results are displayed.
10    Q.    Okay.  But you could not have any data from
11 a search engine and still be a place where search
12 results are displayed, correct?
13    A.    I'm not sure I follow that.
14    Q.    Okay.  Let's move down to Claim Element
15 1(f).
16    A.    I'm sorry, you're looking in --
17    Q.    At the 172 patent.  This would be the --
18    A.    There's no (f) yet.  Are we in Hardin's --
19    Q.    You can do Hardin's or we can look at the
20 patent, whatever is easiest for you.
21    A.    But there's no (f) in the patent itself.
22    Q.    Okay.
23    A.    So where are we looking?  I guess we're
24 looking at --
25    Q.    Hardin, Claim Element 1(f).

Page 128

1    A.    All right.  Okay.
2    Q.    What is the first data file in Claim 1(f)
3 according to the patent,?
4    A.    According to the patent, it's a data file
5 which corresponds to one of the location identifiers
6 that you've selected.
7    Q.    Can it be a search result?
8    A.    I think the accepted interpretation of
9 search result in the computing industry is the location
10 identifier, which is then used to get a data file.  I
11 think one would probably reserve the term search result
12 to the location identifiers, but they come from a
13 search.
14    Q.    Uh-huh.  A search from a search engine?
15    A.    Yes.
16    Q.    Okay.  If you could turn to Figure 6 in the
17 172 patent.
18    A.    Yes.
19    Q.    Is Figure 6 showing what happens in
20 accordance with Claim Element 1(f)?
21    A.    I'm sorry, I need to get better organized
22 here.  I'm sorry, I'm getting some of these pages a
23 little mixed up.  I don't want to do that.  Okay.  I'm
24 in Column 8 of the patent.  It says a later search of
25 the search session is shown.  It shows a File 600,

Page 129

1 which is the inset window there, my terminology, it
2 shows a File 600 in Browser View Window 406, URL
3 corresponding to 600 in Browser U 404, and a highlight
4 602 around Hotlink 580.  In both the jumper drop-down
5 list and the jumper -- the File 600 was obtained in a
6 drill-down conducted in the Browser Window 406.  So
7 they haven't shown the intervening steps here, that's
8 my interpretation, okay.  Now, could you ask your
9 question again?
10    Q.    Sure.
11    A.    I'll have it in context.
12    Q.    I'll try that.  So if in the -- what's been
13 identified as the Internet Buffet, and I believe it was
14 previously marked as 300 in an earlier figure shown in
15 Figure 6, if a user had selected on the hyperlink at
16 602, is it your understanding that the page associated
17 with the hyperlink -- I should say with Element 602
18 would be called up in the search window?
19    A.    I believe that's right.
20    Q.    So it would still be a search window, what's
21 been identified as 406 in Figure 6, even though there
22 was not a text entry area displayed in that region?
23    A.    I don't think there needs to be a text entry
24 area in the search window.
25    Q.    Okay.

33 (Pages 126 to 129)

Bernard A. Galler
October 28, 2005

Page 130

1    MR. KOCHANOWSKI: Can we take a
2    two-minute break?
3    MR. WOLFF: Go ahead.
4    THE VIDEOGRAPHER: We're going off
5    the record at 2:42 p.m.
6    (A short recess was taken)
7    THE VIDEOGRAPHER: We are going back
8    on the record at 2:47 p.m.
9    BY MR. WOLFF:
10   Q.   If you could please turn to Page 26 of your
11   declaration that's in Exhibit 104, Dr. Galler.
12   A.   Uh-huh. Page 26?
13   Q.   26. And we're going to look at Paragraph
14   37.
15   A.   Okay.
16   Q.   Now, this -- you agree with this, what you
17   said in this paragraph, correct?
18   A.   Oh, yes.
19   Q.   Okay. Did -- have you -- do you know where
20   Defendants got the CyberPilot prior art, where we
21   located it?
22   A.   I don't think so.
23   Q.   Okay. I'll give you what's been marked as
24   Exhibit 62 and ask if you've seen that document before?
25   MR. KOCHANOWSKI: May I see it,

Page 131

1    please?
2    MR. WOLFF: For the record, this
3    document was produced by NetJumper to Google.
4    THE WITNESS: You asked me if I've
5    seen this before?
6    BY MR. WOLFF:
7    Q.   Yes.
8    A.   No.
9    Q.   Okay. Do you see the date at the lower
10   right corner of the first page?
11   A.   May 24, '96.
12   Q.   Right. And do you know what date the patent
13   was filed?
14   A.   Well, it says filed October 8th, '96.
15   Q.   Have you met with Gilbert Borman?
16   A.   No.
17   Q.   Have you spoken to him over the phone?
18   A.   No.
19   Q.   Have you seen or been provided any documents
20   that could establish that CyberPilot is not prior to
21   his alleged invention?
22   A.   No.
23   Q.   But you're not sure whether it qualifies as
24   prior art, is that correct?
25   A.   Well, the date shows prior date. I guess

Page 132

1    I'm arguing I don't think it's prior art for this
2    patent.
3    Q.   Okay, in the 102 or 103 sense of Title 35,
4    is that correct?
5    A.   I don't make those distinctions, those are
6    legal distinctions.
7    Q.   Okay. And in Paragraph 38, do I understand
8    your testimony correct that you do not believe that the
9    Netscape Navigator shown in connection with the
10   CyberPilot prior art qualifies as meeting Claim Element
11   1(b)? If you want, you could look at Hardin
12   Declaration Tab F.
13   A.   Okay. Now repeat the question, please.
14   Q.   Is it your testimony that you don't believe
15   that the Netscape Navigator described in Professor
16   Hardin's declaration would qualify as meeting
17   Limitation 1(b) in Claim 1(a) -- I'm sorry, Claim 1?
18   A.   I understand what you mean. I don't -- I
19   agree -- sorry, let's put it this way. I do not
20   believe that the Netscape Navigator constructs a search
21   window, because I explained what I mean by a search
22   window, and I don't think that's what happens. I
23   should mention, I mean we said it before, that I
24   observed the Internet Explorer, this talks about
25   Netscape, but in terms of the equivalence I described

Page 133

1    before, I think what I'm saying holds.
2    Q.   And what was it you said before again?
3    A.   That the functions that the CyberPilot
4    expects to be carried out by whatever browser it works
5    with will be the same whether it's Netscape or IE. So
6    that the answer to this question is independent of
7    which browser we're talking about.
8    Q.   Did you consider in your analysis CyberPilot
9    working with the Netscape Navigator when the Netscape
10   Navigator was directed to the Yahoo search page?
11   A.   I think you have to be more explicit. What
12   do you mean by directed? Who directed Navigator to a
13   Yahoo search page?
14   Q.   Well, Professor Hardin did an analysis of
15   the CyberPilot Pro software working in conjunction with
16   the Netscape Navigator, correct?
17   A.   Well, he claims to have, yes, okay.
18   Q.   Well, do you dispute that it can work in
19   conjunction with the Netscape Navigator?
20   A.   I'm sorry, say it again.
21   Q.   Do you dispute that it can work in
22   conjunction with the Netscape Navigator?
23   A.   No. You were saying something about what he
24   did, and I'll take your word for it that he says
25   something.

34 (Pages 130 to 133)

Bernard A. Galler
October 28, 2005

Page 134

1    Q.   I just want to know whether you performed or
2  you conducted the same experimentation as Professor
3  Hardin to confirm whether Professor Hardin's opinion
4  was or analysis was correct?
5           MR. KOCHANOWSKI:  Well, objection, I
6  think Professor Hardin testified he didn't even operate
7  the software, so to that extent you're asking questions
8  that are not in evidence.
9           THE WITNESS:  Maybe we should start
10  over and you should ask me very explicitly what it is
11  you're asking me about what he did or said or whatever
12  and what I did or said.
13  BY MR. WOLFF:
14    Q.   Okay.  If you turn to Tab D, I think this is
15  the second page in Tab D of Professor Hardin's
16  declaration.
17    A.   Okay.
18    Q.   Where he shows a comparison of the 172
19  patent Figure A to a working copy of CyberPilot with
20  Netscape Navigator.
21    A.   Yes.  This is from the CyberPilot tutorial,
22  okay.
23    Q.   These are actually screen shots.
24    A.   From the tutorial.
25    Q.   No, from --

Page 135

1    A.   It says so.
2    Q.   -- his use of the software.
3    A.   It says so.
4    Q.   Well, in 1(d)?  I'm sorry, in Tab D?
5    A.   Okay, we're missing again.  I went to E.  I
6  thought you said E.  D, now we're talking about the
7  second page now?
8    Q.   The second page.
9    A.   Okay.  Okay.
10    Q.   Did you perform the same test or
11  experimentation with CyberPilot as Professor Hardin
12  did?
13    A.   You're asserting that he did this?
14    Q.   Yes.
15    A.   Okay.  And I say I did the equivalent
16  experimentation with the Internet Explorer browser with
17  comparable results.
18    Q.   And does all your analysis turn on what the
19  term search window means?
20    A.   Most of it, yes.
21    Q.   Okay.  And so if the Court were to construe
22  the term search window consistent with the way Google
23  has proposed it be constructed, would your ultimate
24  analysis or conclusion be different?
25    A.   I don't think I can answer that because

Page 136

1  whatever the Court might construe, I would then have to
2  say, okay, in that light, whatever it is, now tell me
3  what you think it is as prior art, what do you think
4  the search window is, et cetera.  Only then could I
5  make -- comment or answer the kind of question you're
6  asking now, because with different assumptions there
7  would be different claims as to prior art.
8    Q.   So sitting here today you have no opinion
9  with regard to --
10    A.   No, that's not --
11    Q.   -- what Professor Hardin did?
12    A.   No, that's not the point.  The point is that
13  for prior art, the burden is on the person who's
14  claiming something is prior art to argue that it is,
15  and I would not want to give opinions.  I still think
16  that there is no search here.  So no matter what the
17  windows are, there is no search in the sense of a
18  search engine in the computer industry here, so I guess
19  my opinion wouldn't change in that respect.
20    Q.   Even though in Tab D it's showing the Yahoo
21  search site?
22    A.   In Tab --
23    Q.   In Tab D as in dog.
24    A.   D?
25    Q.   Right.

Page 137

1    A.   Well, I thought we were talking about
2  CyberPilot as the prior art.
3    Q.   But --
4    A.   Not Yahoo.
5    Q.   Well, what I'm asking, it's showing Netscape
6  Navigator working on the Yahoo website, correct?
7    A.   I'm sorry, say it again.
8    Q.   What is shown in the second figure in Tab D
9  of Professor Hardin's declaration, it's showing
10  CyberPilot Pro working in conjunction with the Netscape
11  Navigator at the Yahoo website, correct?
12    A.   Whatever in conjunction means.
13    Q.   Did you create a web map in CyberPilot of
14  the Yahoo website?
15    A.   I don't know that we did it of the Yahoo
16  website.  We did it for various websites.  Might have
17  been the Yahoo, I don't recall.
18    Q.   And where is this reflected in your report?
19    A.   Page 27, Paragraph 38.
20    Q.   Okay.  So did you create a web map of the
21  Yahoo site with CyberPilot?
22    A.   I created a web map of one or more websites,
23  index pages of websites.  I don't recall whether we did
24  it for Yahoo.
25    Q.   Did you -- when you created these web maps,

35 (Pages 134 to 137)

Bernard A. Galler
October 28, 2005

Page 138

1  did you test each of the icons that were created in the
2  CyberPilot window to see what happened when they were
3  selected?
4      A.   I tested several, certainly not all.
5      Q.   Uh-huh.
6      A.   What came back was a web map, a list of
7  items that you could select, I selected some, I saw
8  what happened.
9      Q.   And what happened when you selected some,
10 and which icons were you pressing -- selecting when
11 things happened?
12     A.   Well, I don't recall which icons, but they
13 were several subsidiary icons to the home page, and
14 then what was displayed was the subsidiary icons or
15 links from those page.
16     Q.   Did you see icons that Google identified as
17 the first and second icons?
18     A.   No.
19     Q.   So you didn't see a question mark icon ever
20 come up?
21     A.   Oh, I saw question marks.
22     Q.   Did you see a question mark icon come up as
23 that icon is identified at Tab D of Professor Hardin's
24 declaration?
25     A.   Yes.

Page 139

1      Q.   And what happened when you selected on the
2  question mark icon?
3      A.   It expanded into the web map for the
4  subsidiary, subdirectory.
5      Q.   Could you tell from your analysis whether it
6  went out to a website and collected hyperlinks from a
7  page?
8      A.   As I recall, it did not go out at first.  If
9  you went deep enough, it went out.
10     Q.   How do you mean deep enough?
11     A.   Down to enough levels.
12     Q.   But if -- so Mr. Stark submitted a
13 declaration that you considered, correct?
14     A.   Yes.
15     Q.   And Mr. Stark said that selecting a question
16 mark icon, what was identified as a control icon, I
17 believe, parsed an HTML file and created a series of
18 subsidiary icons which he identified as object icons,
19 you recall that?
20     A.   Yes.
21     Q.   And did you -- do you dispute Mr. Stark's
22 declaration?
23     A.   No.  I think that I accept what he says.
24     Q.   You don't challenge any of what Mr. Stark
25 has said in his declaration, is that correct?

Page 140

1               MR. KOCHANOWSKI:  Whoa, whoa, whoa,
2  objection.  That's --
3               THE WITNESS:  From what you just
4  said, I don't dispute it.
5  BY MR. WOLFF:
6      Q.   Okay.  Was there anything else in his
7  declaration that -- was there anything else in his
8  declaration that you did dispute?
9      A.   Not that I can recall right now.
10     Q.   Okay.  If we looked at Mr. Stark's
11 declaration, would that refresh your recollection as to
12 whether there was anything that was disputed?
13     A.   I don't think there's anything to dispute
14 with him right now.
15     Q.   Right now?
16     A.   Well, I mean I can't recall any, and I have
17 no idea if we're looking at it I would think of
18 anything that was there.  I think the differences we
19 have here are in the interpretation of what he says,
20 not what he says.
21     Q.   And, again, it sounds like --
22     A.   But we could look at it.  I mean if he uses
23 terms like search window and browser window and so on,
24 I'd be very careful how I looked at it, I just don't
25 recall if he confuses those issues which are the issues

Page 141

1  of the case.
2      Q.   I think, but I'm not sure, do you have a
3  copy of Stark's declaration, Mr. Hardin?
4      A.   I don't have it with me.
5      Q.   I think you do, actually.
6      A.   If you could point me to the things you want
7  to use out of his statement, I could tell you whether I
8  disagree with them or not.  Otherwise, we're going to
9  go through the whole thing.
10     Q.   Sure.  I'll have the reporter mark as --
11 this is a copy of Exhibit B from Mr. Stark's
12 declaration.
13          DEPOSITION EXHIBIT 107
14          WAS MARKED BY THE REPORTER
15          FOR IDENTIFICATION
16     A.   Okay.
17     Q.   If you could turn -- now, have you reviewed
18 this document before?
19     A.   Yes.
20     Q.   Okay.  And you considered that in your
21 declaration that you submitted to the Court?
22     A.   Yes.
23     Q.   Did you provide any specific analysis of the
24 CyberPilot tutorial that's been marked as Exhibit 107?
25     A.   No.  There are references -- I think one

36 (Pages 138 to 141)

Bernard A. Galler
October 28, 2005

Page 142

1  place where I said I relied on him to back up a
2  statement I made, but I think that's all.
3      Q.   If you turn to Page 12 of Exhibit 107.
4      A.   Okay.
5      Q.   And at Numeral 1 it says double click a page
6  with black label.  Could you read the two sentences
7  there that follow.
8      A.   You want me to read it out loud or --
9      Q.   You could read it to yourself.
10     A.   Okay.
11     Q.   Tell me when you're done, please.
12     A.   Okay, fine.
13     Q.   Okay.  Now, here the term browser window is
14 used, correct, the last sentence?
15     A.   Yes.
16     Q.   It says, "Set up your browser window so that
17 it's next to the CyberPilot Pro window."
18     A.   Yes.
19     Q.   And if you'll turn to the next page, does
20 that show the browser window set up so that it's next
21 to the CyberPilot Pro window?
22         MR. KOCHANOWSKI:  Objection to the
23 extent you're using it as used in the patent as opposed
24 to this tutorial.
25         THE WITNESS:  Yeah, he doesn't have

Page 143

1  a number 400 or 406 after it, so one can't necessarily
2  relate this to the patent.
3  BY MR. WOLFF:
4      Q.   So you think it has to have a 400 or a 406
5  in prior art reference to relate it to the patent?
6      A.   Well, if you want to argue from it to
7  something in the patent, I think you better know which
8  one he's referring to.  He is -- I think my
9  interpretation of his language is that your browser
10 window is the subwindow that he's telling you to locate
11 it next to the left part of the overall display window,
12 and he's calling it a browser window, and one can infer
13 from that that he has in mind that there will be
14 several windows, one can move them around, and one can
15 locate them.
16     Q.   Now, I'm sorry, which one of these windows
17 did you think is the CyberPilot window, the one on the
18 left or the one on the right, and I'm referring to Page
19 13?
20     A.   The one on the right.
21     Q.   The one on the right is --
22     A.   I think what he's calling the browser
23 window.
24     Q.   Okay.  And that would be the whole four
25 corners of the Netscape Navigator?

Page 144

1         MR. KOCHANOWSKI:  Objection.
2  BY MR. WOLFF:
3      Q.   The area defined here?
4         MR. KOCHANOWSKI:  Objection to the
5  form.
6         THE WITNESS:  I don't know --
7         MR. KOCHANOWSKI:  I think that's
8  asking him to interpret what Mr. Stark meant.
9         THE WITNESS:  It would be nice if we
10 had this in front of us and we could move it around and
11 see what part is moving at that point so we can tell
12 what it is he's telling you to locate.  Looking at a
13 static window like this, it's not entirely clear, but
14 it looks like the Net -- that there's a Netscape window
15 there, yes, okay.
16 BY MR. WOLFF:
17     Q.   And that's what he's referring to when he
18 says the browser window, in your understanding, is that
19 correct?
20     A.   It appears that that's what he's referring
21 to as the browser window -- as your browser window.
22     Q.   And what were you saying about moving
23 something around?
24     A.   Well, that's what he says.
25     Q.   What who says?

Page 145

1      A.   Or he says, "Set up your browser window so
2  that it's next."  I interpret that as move it to that
3  particular position.
4      Q.   I'll have the reporter mark as Exhibit 108
5  the declaration of Randall Stark.
6  DEPOSITION EXHIBIT 108
7  WAS MARKED BY THE REPORTER
8  FOR IDENTIFICATION
9         THE WITNESS:  Should I hold onto
10 this page?
11 BY MR. WOLFF:
12     Q.   You can hold onto that page, sure.
13     A.   Okay.
14     Q.   And could you turn to Page 2 of Exhibit 108
15 and read Paragraph 5(a)?
16     A.   Okay.
17     Q.   And earlier you mentioned about running the
18 program and seeing whether you could move the -- it
19 sounds like move the browser window around in the
20 display screen?
21     A.   I said that he made it sound like you could.
22 I didn't say I did, but I think I may have.
23     Q.   You may have.  You don't recall whether you
24 did or didn't?
25     A.   That was not something I was particularly

37 (Pages 142 to 145)

Bernard A. Galler
October 28, 2005

Page 146

1  interested in.
2      Q.   But you've raised it when you were giving
3  your previous answer, so I was wondering if it somehow
4  made a difference to you in your analysis as to whether
5  you could move this browser window around on the
6  display screen.
7      A.   No, I don't think it makes any difference.
8      Q.   Okay, all right, so -- but you have no issue
9  with Paragraph 5(a) in Mr. Stark's declaration, is that
10 correct?
11     A.   No, no, if that's what you were moving
12 toward, no, I have no issue.
13     Q.   I wasn't sure whether your statement on your
14 analysis was somehow dependent on whether you could
15 move the browser window around in the display screen.
16     A.   Fine, no.
17     Q.   No.  Thank you.  And you don't recall
18 whether you moved the browser window around to --
19     A.   I think I did.
20     Q.   Okay.  And when you did double click on
21 object icons -- you know what object icons are?
22     A.   Yeah, uh-huh.
23     Q.   Did it open up a web page in the browser
24 window?
25          MR. KOCHANOWSKI:  Object to the use

Page 147

1  of the word browser window unless you tell him exactly
2  what you mean.
3  BY MR. WOLFF:
4      Q.   The Netscape Navigator -- I'm sorry, not the
5  Netscape Navigator because you didn't use the Netscape
6  Navigator, the Microsoft Internet Explorer?
7      A.   It opened up an IE window with that web
8  page.
9      Q.   And you don't think that meets Limitation
10 1(f) that Mr. Hardin identified in -- at Tab F of his
11 declaration, is that correct?
12     A.   Well, I think every answer to this kind of
13 question is going to be subject to my saying that they
14 don't have a search window; therefore, none of this
15 applies.
16     Q.   So your whole analysis is premised on your
17 construction of what is a search window?
18     A.   Well, I don't know about the whole analysis.
19 I start out that way, and, therefore, almost everything
20 else falls out of it.  CyberPilot does not do a search,
21 it does a web map, period.
22     Q.   There's no teaching or suggestion in the
23 CyberPilot product to do any sort of a search?
24     A.   Not --
25          MR. KOCHANOWSKI:  Objection, you

Page 148

1  didn't move for obviousness, you moved for
2  anticipation, so to that extent, he's not been offered
3  as obviousness expert at this juncture.
4  BY MR. WOLFF:
5      Q.   Does the CyberPilot teach performing any
6  type of a search?
7          MR. KOCHANOWSKI:  Same objection.
8          THE WITNESS:  Any type is pretty
9  broad.  It does not teach doing a search of the kind I
10 expect to see in a search engine, which says give me
11 key words and I will search for whatever pages on the
12 network contain those terms.  Giving an URL and saying
13 go get this for me is not part of my definition of a
14 search.
15 BY MR. WOLFF:
16     Q.   Okay.  Let's turn back to the CyberPilot Pro
17 tutorial.  Would you turn to Page 20.
18     A.   Okay.
19     Q.   And do you see the section that begins
20 search the NetCarta web map?
21     A.   Yes.
22     Q.   Did you consider this description in the
23 CyberPilot tutorial when you prepared your declaration?
24     A.   I don't recall this part.
25     Q.   And are you reviewing it now?

Page 149

1      A.   Yes.
2      Q.   Okay.  Tell me when you're done.
3          THE VIDEOGRAPHER:  End Tape 2.  We
4  are going off the record at 3:15 p.m.
5          (An off the record
6           discussion was held)
7          THE VIDEOGRAPHER:  Videotape 3.  We
8  are going back on the record at 3:16 p.m.
9  BY MR. WOLFF:
10     Q.   Professor Galler, did you test the
11 functionality of the --
12     A.   No.
13     Q.   -- CyberPilot product?
14     A.   No.
15     Q.   Okay.  In your view, would it -- would this
16 type of a search as described here be different than
17 the search you've defined in your declaration?
18     A.   Very different.
19     Q.   Very different.  How's that?
20     A.   Well, I'm looking on Page 23 about five
21 lines down.  He says, "You'll note that one thing you
22 can't do is search for text on a page.  That's because
23 you'd have to access the remote file server to do that.
24 When you search, you're only searching the web map, not
25 the website itself."  And, of course, he claims this is

38 (Pages 146 to 149)

Bernard A. Galler
October 28, 2005

Page 150

1  an advantage.
2          My definition of a search, a search
3  engine that does a real search connects to the
4  worldwide web, does a search on the web for, in
5  particular, key words that have shown up on pages, and
6  he's explicitly disclaiming that.
7      Q.    Who is explicitly disclaiming that?
8      A.    The tutorial, Mr. Stark, if he wrote it.
9      Q.    Okay.  And so your construction is that it
10  has to do a search on the internet to be qualified as a
11  search?
12      A.    I think that is the intent and
13  interpretation of the patent.
14      Q.    Are you sure that's the right construction?
15      A.    I think so, yes, I'm quite sure.
16      Q.    If you'll turn to Page 8 of your
17  declaration, I'm looking at Exhibit 104.
18      A.    Page 8.
19      Q.    I'm looking at the figures at the end of
20  Paragraph 12.
21      A.    Okay.  The context here is the Google
22  Toolbar?
23      Q.    That's correct.
24      A.    Okay.
25      Q.    Does what is shown or displayed in the

Page 151

1  figures on Page 8 meet this limitation of search as
2  required in Claims 1 through 8?
3          MR. KOCHANOWSKI:  Objection, what
4  form are you asking him about?  What limitation are you
5  asking him about?
6  BY MR. WOLFF:
7      Q.    Can you answer the question?
8      A.    Well -- I think I can answer it.  Let's hear
9  it again.  I'd like to be sure I know what I'm
10  answering.
11      Q.    Does what is shown in the figures at the end
12  of Paragraph 12, does it show the search as you've
13  defined that as being somehow required by all the
14  claims, Claims 1 through 8?
15          MR. KOCHANOWSKI:  Same objection.
16          THE WITNESS:  What is shown is
17  the results of the kind of search I've been describing,
18  and the whole point of the next and previous buttons so
19  you don't have to go back and show the location
20  identifiers, but you can select among them by these
21  buttons, but what you are working on is the results of
22  a real search as I've been discussing.
23      Q.    And what is the search window in these
24  figures in Paragraph 12?
25      A.    The part where the data page is displayed.

Page 152

1      Q.    What do you mean the data page?
2      A.    Well, the data page is what came back from
3  the internet, Flickr, et cetera, and the text below it,
4  and the paragraphs there, and so on.
5      Q.    But didn't you say earlier that a search
6  page had to have like a text area and a way to perform
7  the search?
8      A.    I don't think I used those words.
9      Q.    So you still think that what's shown in
10  Figure 12 is one of the one of the -- it meets
11  limitations for example 1(f) in Claim 1?
12      A.    Yes, I do.
13      Q.    Okay.  Are you sure?
14          MR. KOCHANOWSKI:  Objection.  Okay,
15  I've asked you two --
16          MR. WOLFF:  I can ask that question.
17          MR. KOCHANOWSKI:  No.  You asked him
18  the same question twice, and I think you asked him are
19  you sure twice, so I don't know what they teach you but
20  once is usually enough.
21  BY MR. WOLFF:
22      Q.    Referring to Paragraph 38 in your
23  declaration, it says first or, I'm sorry, the second
24  sentence, "CyberPilot is a stand-alone piece of
25  software that can be used to create hot links -- create

Page 153

1  a hot links map of any website."  Did that statement
2  somehow factor into your analysis?  I mean is this some
3  limitation of the claims?
4      A.    No, it's a description of CyberPilot.
5      Q.    But is that something that would make it not
6  be prior art because it's a stand-alone application --
7  I'm sorry, a stand-alone piece of software?
8      A.    No.  The fact it's a stand-alone piece of
9  software does not, but the fact that it is used to
10  create a hot links map is what is important there in
11  supporting the first sentence that it doesn't construct
12  a search window.
13      Q.    So why did you use the term a stand-alone
14  piece of software in that sentence?
15      A.    It's just descriptive.  I don't think
16  that's -- one could leave that out.  CyberPilot is
17  software.  Sometimes you put in extra words just
18  because they help understand things.  I would not put
19  any weight on that.
20      Q.    Okay.  And the sentence, the last sentence
21  that begins on Page 26 says, "It is" -- and it
22  continues to Page 27, "It is merely a tool for aiding
23  in the navigation of an already known website -- I'm
24  sorry -- an already known site."
25      A.    Thank you.  What about that?

39 (Pages 150 to 153)

Bernard A. Galler
October 28, 2005

Page 154

1    Q.    And does that sentence somehow affect your
2    analysis that CyberPilot is not prior art?
3    A.    Yes.
4    Q.    Okay. And that's --
5    A.    That supports the previous sentence that
6    there's no indication that it performs a search.
7    Q.    Okay. Well, a search in the context of
8    being on the internet, a search of a web map file.
9    A.    That's the context I'm using.
10    Q.    Okay. And then the next two sentences, if
11    you could read those.
12    A.    Uh-huh.
13    Q.    Tell me when you're done.
14    A.    Oh, yeah.
15    Q.    One does not enter key words or terms to
16    search the internet but enters an already known URL?
17    A.    Right.
18    Q.    Now, is that something that makes CyberPilot
19    not prior art?
20    A.    Yes, that's what makes it not a search.
21    Q.    Okay. And where is this limitation found in
22    Claim 1, for instance?
23    A.    The limitation there has to be a search?
24    Q.    Yes.
25    A.    Well, let's look at the patent. Claim 1

Page 155

1    says a computer implemented method for searching so,
2    and then you have to construct the search window, and
3    my definition of searching and search window imply that
4    it has to do a search.
5    Q.    And what is it in the term search window,
6    just the term search, the fact that they've used the
7    term search that makes you --
8    A.    Yes.
9    Q.    And was that argued during prosecution of
10    the patent?
11    A.    I don't recall if it was argued. Certainly
12    in amending the original application, they made a point
13    of introducing the word search or the concept of
14    searching, in order to limit the scope of the patent,
15    it was well understood that this was searching, and I
16    don't recall if they defined it, I just don't know, but
17    I think it is -- searching as understood in the
18    computer industry and certainly that's the way I read
19    it.
20    Q.    Now, can you show me where in the
21    prosecution history they added the term search for the
22    reasons you've just described?
23    A.    I think you quoted it to me this morning. I
24    can look through it if you wish. We're going back to
25    the file history now?

Page 156

1    Q.    Yes.
2    A.    It's going to take a while for me. Maybe
3    you could help me find where it is.
4         I would welcome any help. I don't
5    find my way around this file history very easily.
6    Q.    You could turn to Page G 249. This is the
7    actual -- in Exhibit 30 -- this is the actual final
8    response to the August action.
9    A.    I'm sorry, you say 239?
10    Q.    G 249.
11    A.    49, okay. Well, I guess it's right on Page
12    250, a computer implemented method [and system for
13    retrieving information from] -- and I guess that's
14    what's deleted -- for searching on a local computer, if
15    I understand the underlining means that that's added,
16    am I correct that that's the interpretation?
17    Q.    Yes.
18    A.    So that's where it's introduced.
19    Q.    So because they added this limitation, you
20    said that it restricts the scope of the claim?
21    A.    I think so, yes. And then Line 7 you have
22    to construct a search window.
23    Q.    Was this limitation added to get around any
24    of the prior art?
25    A.    Well, now you're asking me for their

Page 157

1    motivation.
2    Q.    I'm asking you for your analysis of the
3    prosecution history.
4    A.    Well, I don't know if -- I know that saying
5    that first and second loci, whatever, has to be
6    separate was to get around the prior art. I don't know
7    why it was restricted to a search engine or searching,
8    I don't know that it was necessary. They did it, and I
9    don't know their motivation, but it's there.
10    Q.    But can you show me in here where in the
11    response to the Office Action, where they said that
12    this was being amended to get around the prior art?
13    A.    It may be here somewhere. I can't -- as I
14    say, I can't find things in here easy. And, again, it
15    would be, seems to me, it would be somebody else's job
16    to find prior art that would have made this necessary,
17    but I don't know, they did it, the Examiner accepted
18    it, it's a limitation on the scope of the patent, so
19    they must have felt it was important to do it or
20    necessary, and I don't know why.
21    Q.    But in your analysis you couldn't find
22    anything or you don't know one way or the other whether
23    there's anything in this prosecution history that --
24    A.    I did not look for it, I don't know.
25    Q.    If you turn to Page G 258 --

40 (Pages 154 to 157)

Bernard A. Galler
October 28, 2005

Page 158

1    A.    Uh-huh.
2    Q.    -- do you know what 35 USC 112 refers to?
3    A.    I've never really pinned down the 102, 103,
4  12, whatever it is.  You can help me, tell me, if you'd
5  like, and we'll talk about it.
6    Q.    Do you -- sitting here today do you have any
7  understanding of what that term means?
8    A.    Well, these are the obviousness and
9  usefulness and so on conditions.  I know the
10  conditions, but I've never worried about which section
11  they come from in the patent code.
12    Q.    You don't know what Section 112 refers to,
13  35 USC 112?
14    A.    Usually from context I can but -- okay, 1 to
15  6 rejected as being indefinite.  I don't know what that
16  means, I didn't worry about that.  I did not try to do
17  the work of the inventors or the Examiner.  I said,
18  "Okay, they've made these arguments, he's accepted
19  them, we've got a patent," and as appropriate, things
20  are, you know, quoted from here, et cetera, but this is
21  part of the legal part that I'm exempted from, if you
22  will, okay, I don't make legal conclusions.
23    Q.    But you submitted a declaration --
24    A.    Yeah.
25    Q.    -- saying that CyberPilot does not

Page 159

1  anticipate the patent --
2    A.    Well.
3    Q.    -- Claims 1 through 8.
4    A.    That's right, but I'm not pointing you to a
5  particular part of the legal code, I'm saying I don't
6  think it anticipates it.
7    Q.    But you've made a legal conclusion.
8    A.    I made a technical conclusion.  What they
9  have is not a search window.
10    Q.    So that's all your analysis is premised on,
11  your understanding what the term search window means?
12         MR. KOCHANOWSKI:  Objection, that's
13  the fourth time you've asked that question.
14         THE WITNESS:  Every time you say
15  that's all, no it's not all.
16  BY MR. WOLFF:
17    Q.    It's one of the things.
18    A.    It's one of the things.
19    Q.    But in each of your each step of your
20  analysis you assumed that search window meant Element
21  406 and not 400?
22    A.    Yes, yes.
23    Q.    Okay.  If you could look at Claims 23
24  through 26, and they begin at G 255, this is in this
25  amendment we're still looking at.

Page 160

1    A.    These are the original claims numbered this
2  way.
3    Q.    Correct.
4    A.    Okay.  Which ones specifically?
5    Q.    All, I think all of those claims, Claims 23
6  through 26, and tell me if you see the word search
7  window in any of these claims.
8    A.    No, I think these claims as amended don't
9  refer to a search window.
10    Q.    Okay.  What do they refer to instead?
11    A.    A browser window.
12    Q.    Okay.
13    A.    And a -- let's see, and a jumper window.  I
14  mean there are more than one window being referred to
15  here.
16    Q.    In your view, the browser window is not the
17  same thing as the search window?
18    A.    That's correct.
19    Q.    Okay.  Now, if you'll turn to Page G 286,
20  the first paragraph says, "Examiner is looking at
21  Claims 1, 7, 13, 18, 23, and 25," correct?
22    A.    And these are obviously the initial, the
23  initial --
24    Q.    These are the claims from the previous
25  amendment.

Page 161

1    A.    Right.
2    Q.    Okay.  And the language he cites is that
3  each of those claim limitations or, I'm sorry, I won't
4  say that, but if you go down about five lines, he says,
5  he notes that he cites to Claim 1, Lines 8 through 15,
6  and says substantially similar and others.
7    A.    Well, you're just referring to the first
8  paragraph now?
9    Q.    Yes.
10    A.    Okay.
11    Q.    Do you have any view as to why he says
12  substantially similar when he's referring to all of the
13  independent claims?
14    A.    When it says substantially similar,
15  generally to avoid repeating them, but the word
16  substantially generally implies but with minor
17  differences, but I don't know why he said it.  You're
18  asking me why he says something.
19    Q.    I'm just asking if you have some analysis
20  of --
21    A.    That would be my interpretation of why he
22  said that, that there is similar wording in the others
23  but there may be minor differences which are not
24  relevant here or not important that's how I read what
25  he says.  Could be wrong.  I mean this may be technical

41 (Pages 158 to 161)

Bernard A. Galler
October 28, 2005

Page 162

1  legal language that I'm not familiar with.
2      Q.   Okay. And then in the next paragraph when
3  he refers to why he's allowed this, he uses the term
4  browser window instead of the term search window.
5      A.   Well, I don't know if it's instead of
6  something. No, he uses Item 400 which we have been
7  interpreting as the entire browser window, so I don't
8  know that he's using something instead of something
9  else. He says 400, and 400 is 400. We've been through
10 this.
11     Q.   Okay. And you did not consider this in your
12 analysis, these statements?
13         MR. KOCHANOWSKI: It's Number 12
14 just for the record, please.
15         THE WITNESS: I didn't say one way
16 or the other. I didn't necessarily quote this, I
17 think, but everything was considered. I'm not going to
18 agree with that statement.
19 BY MR. WOLFF:
20     Q.   Okay. If you could turn to Paragraph 27 in
21 your declaration.
22     A.   In my declaration?
23     Q.   Exhibit 104. And I'd like you to read that
24 paragraph and let me know if you agree with their
25 conclusion.

Page 163

1      A.   I agree with it.
2      Q.   So you don't think there's anything
3  inconsistent in the claim language and in the patent
4  specification?
5      A.   No.
6      Q.   With regard to the term search window and
7  browser window?
8      A.   No. I don't have any problem with what's
9  there.
10         MR. WOLFF: Now would be a good time
11 for a break.
12         THE VIDEOGRAPHER: We're going off
13 the record at 3:40 p.m.
14         (A short recess was taken)
15         THE VIDEOGRAPHER: We are going back
16 on the record at 3:48 p.m.
17 BY MR. WOLFF:
18     Q.   If you could turn to Paragraph 41 of your
19 declaration, Professor Galler.
20     A.   Okay.
21     Q.   Now, here I think is the first spot where
22 you've analyzed Claim 2. Is your analysis premised on
23 the statement that reads "From what is displayed during
24 operation of the software, I see no basis for this
25 statement"?

Page 164

1      A.   I'm not sure I understand the question.
2      Q.   Well, Claim 2, the portion that you cite,
3  says the initial data file comprises information in a
4  markup language. Do you -- is hypertext markup
5  language file a file in a markup language?
6      A.   I suppose so, well, yes, I mean what's the
7  point of the question?
8      Q.   Well, what type of a page is displayed in a
9  web browser?
10     A.   Are you talking about the display or the
11 page that's being understood to be displayed?
12     Q.   I'm talking about the underlying file that
13 is displayed in the web browser, what type of file is
14 it?
15     A.   It's typically an HTML file.
16     Q.   And was that the case prior to 1996?
17     A.   I don't know when that came in, it might
18 have been around then.
19     Q.   Do you disagree with the statement that a
20 web browser displays a hypertext markup language file?
21     A.   That's one of the forms of a file it might
22 display, but there might be other forms.
23     Q.   Sure, sure, but it could have?
24     A.   It could have.
25     Q.   At the time -- before the time that the

Page 165

1  alleged invention a web browser could display an HTML
2  file?
3      A.   Even now it could.
4      Q.   I'm talking about before the time of the
5  patent.
6      A.   All right. My point here in Paragraph 41 is
7  that I don't know from looking at it without looking at
8  the source code exactly what it's interpreting, what
9  it's -- what it brings in and what it -- whether
10 initial data file is in a markup language. All I'm
11 saying is I don't know that it is, I don't know that it
12 isn't.
13     Q.   Because when you ran the software you
14 couldn't see the markup?
15     A.   That's right.
16     Q.   Okay. But did you try to open up the page
17 that was displayed in the web browser?
18     A.   I didn't.
19     Q.   Why not?
20     A.   I wasn't particularly interested in it at
21 the time.
22     Q.   But you've said that -- I mean doesn't that
23 mean that if you had, this statement might not be true
24 in Paragraph 41?
25     A.   No. What it says is from what is displayed,

42 (Pages 162 to 165)

Bernard A. Galler
October 28, 2005

Page 166

1  I don't see a basis for the statement.  I could have
2  gone further, I didn't, I don't know that he did in
3  making his comparison chart, but there's no argument,
4  there's no support in the comparison chart for that
5  statement, that's all I'm saying here, from what is
6  displayed I don't see a basis.
7      Q.   You don't think a web page is a page that
8  can contain hypertext text markup?
9      A.   It can contain, he's saying it does, and I
10  say I don't have a basis for that statement.  Either he
11  or I could have pursued it further and found that out.
12  I didn't, and I don't see anything to suggest he did.
13  All I'm saying is I see no basis for saying so from
14  what is displayed, that's all I'm saying.
15      Q.   Just what's shown on the computer screen
16  without trying to examine the underlying file?
17      A.   That's right.
18      Q.   But do you disagree that a web browser could
19  display a hypertext markup language file in 1995, for
20  instance?
21      A.   I don't know what was available in 1995,
22  everything was just getting going at that point, and I
23  don't know what was available, but web browsers
24  probably could have displayed it.  What I'm saying here
25  is there's no indication from what is displayed, I see

Page 167

1  no basis for saying it was.  I'm not arguing that it
2  wasn't.  I mean just what my report says is what I
3  stick with.
4      Q.   Now, turning to Paragraph 43, you're
5  referring to the Claims 4 and 8.  What I'd like to do
6  is try to understand how you interpret Claims 4 and 8.
7  Do you think that Claims 4 and 8 essentially mean the
8  same thing?
9      A.   No, I would never say two claims mean the
10  same thing because you wouldn't have both of them there
11  obviously.
12      Q.   You think they're equivalent?
13      A.   I wouldn't think they're equivalent.
14  They're both there because something is different, but
15  that's not the issue here.  The issue here is
16  apparently he is saying that they don't add anything,
17  and that's the issue.
18      Q.   And why do you think he said that they don't
19  add anything?
20      A.   Well, I'd have to go back and look.  At the
21  time I read his, that was the understanding I got.  You
22  want to help me find it?
23      Q.   Yeah, it's in the Hardin declaration,
24  Exhibit F.  Did you find it?
25      A.   Yeah, I think it's Page 8, right?

Page 168

1      Q.   Page 8, Page 4, I think.
2      A.   Page 4, let's see.
3      Q.   Are you looking at -- I'm looking at Exhibit
4  F, Tab F.
5      A.   Oh, I was looking at his --
6      Q.   His declaration?
7      A.   Yeah, the declaration.  All right.  You're
8  saying Page 4 is a good place to look at it?
9      Q.   Page 4 in Tab F is where he addresses Claim
10  4.
11      A.   Well, this is where he's totally -- it's
12  totally nonsensical to claim that there is a first
13  button and a last button, and so on.  If that's what
14  you want to argue about what they're talking about in
15  Paragraph 43, I thought we were talking about they add
16  nothing to the previous claims, but that's fine, they
17  do add something to the previous claims, the automated
18  buttons that we're talking about --
19      Q.   No, I asked you whether you thought
20  Professor Hardin's analysis was that Claim 4 added
21  nothing to Claim 1(f).
22      A.   Yeah, I don't see where he says specifically
23  it adds nothing but --
24      Q.   Well, if you could look at Paragraph 43 of
25  your --

Page 169

1      A.   Yeah, I know I said that.  I was trying to
2  find where he said that it added nothing, I may have
3  overstepped on those words, but, you see, he says --
4  well, right now, okay, I guess right now I can't pin
5  down where he said that they're essentially
6  unnecessary, but his argument that these next and
7  previous are present in CyberPilot, I'm prepared to
8  discuss that anytime, it's ridiculous.
9      Q.   Next and previous what?
10      A.   Buttons.
11      Q.   Buttons?
12      A.   Well, or let's see what he says.  Okay.  On
13  Page 4 of the chart there on the right-hand side, the
14  location identifiers stored in the list in the web map
15  file are arranged in sequence and comprise a next,
16  prior, first, last, et cetera.  The whole point
17  apparently is that you can chose the first one to ask
18  for, and, therefore, that must be equivalent of a next
19  button or I mean of a first button, and I don't --
20      Q.   And why do you keep using the term button
21  instead of location identifier?
22      A.   Okay, location identifier, right.
23      Q.   Is there a difference between the term
24  button and location identifier?
25      A.   If you wish, if we need to make that

43 (Pages 166 to 169)

Bernard A. Galler
October 28, 2005

Page 170

1  distinction, I'll make that distinction.
2      Q.   What is that distinction?
3      A.   Well, it might not be in the form of a
4  button, that's all, it might be some other way of
5  looking at it.
6      Q.   Do you understand a location identifier can
7  be a URL?
8      A.   Yeah, but, you see, I read -- I don't read
9  this as a next location identifier, I read it as a next
10 location identifier, a prior location identifier, and
11 so this is an identifier, which means next location and
12 prior location, and there isn't any such thing in
13 CyberPilot.
14     Q.   So --
15     A.   All right, go ahead.
16     Q.   So you think that -- you think that the
17 terms location identifier here is completely different
18 than the next location identifier in Claim 1(d)?
19     A.   No.
20     Q.   You don't?
21     A.   No.  I'm saying that there is a next
22 location identifier, it's a way of reading that
23 three-word phrase, okay, and a last location
24 identifier, and if you look at the Google Toolbar, for
25 example, you have an icon, a button, whatever you want

Page 171

1  to call it, which when you click on it or indicate it
2  somehow gives you the next location, the identifier of
3  the next location.  That's how I'm interpreting next
4  location identifier.  To me, it's the identifier of the
5  next location.  It's not the next one of a bunch of
6  things called location identifiers in a list.
7      Q.   Had you considered whether the location
8  identifier could be a URL in your analysis, so meaning
9  that -- I know you construed the term to mean first
10 location and then some separate identifier.
11     A.   No, not separate identifier, no, no, no.  If
12 you look at Claim 4, it talks about one of the location
13 identifiers in the stored list selected from a group,
14 so there has to be a group of some sort consisting of a
15 next location, a prior location, a first location, and
16 a last location identifiers.
17     Q.   Okay, but you've just skipped the word
18 identifier in each --
19     A.   No, I've factored it out.
20     Q.   You factored it out?
21     A.   Yeah, that is, if I talk about John Smith,
22 Joe Smith, Tom Smith, I might say John, Joe, and Tom
23 Smith, okay, I have a bunch of Smiths, and I'm
24 referring to the three different ones.  And here I'm
25 saying I have a bunch of identifiers, there's one

Page 172

1  called the first location, the next location, the prior
2  location, the last location, because they're identified
3  as a group.  There's nothing grouping about the
4  description in the right-hand side of the page.
5  There's a list, and the list says, oh, by the way, you
6  can chose the first one if you want to, you can choose
7  the last one if you want.  That's a totally different
8  interpretation.
9      Q.   So what does the term identifier mean to
10 you?
11     A.   A symbol or a piece of text or any
12 representation of something which identifies something.
13     Q.   So could it be a URL?
14     A.   Yeah.
15     Q.   Okay.  And so if you take the construction
16 that identifier means URL --
17     A.   All right, and I want a group of first
18 location URL?  I want a group, somewhere where I could
19 identify it as a group, a first, last, next, and
20 previous, and there's no such thing in CyberPilot.
21     Q.   Do you know what a Markush claim is?
22     A.   Markush no I'm sorry I don't know that term.
23     Q.   Did you read the summary judgment motion,
24 correct, that Google filed?
25     A.   Yeah, I think so, yeah.

Page 173

1      Q.   And Google did an analysis where it talked
2  about this element being a Markush grouping?
3      A.   I don't recall that, I'm sorry.
4      Q.   Okay.  So you had no opinion on that because
5  you didn't consider that?
6      A.   I don't recall seeing it, I mean I must have
7  seen it but I don't recall, so I have no idea.
8      Q.   Okay, fine.
9           THE VIDEOGRAPHER:  Off the record at
10 4:05 p.m.
11          (An off the record
12           discussion was held)
13          MR. KOCHANOWSKI:  I want to the put
14 on the record, then, I want to put on the record that
15 we were interrupted by a phone call from the Magistrate
16 who called, and apparently -- and I asked Mr. Wolff
17 whether we still have a problem, and he indicated we do
18 not, he's finished with his examination, and I so
19 informed the Magistrate, and finished with his
20 examination on the topics that we had an argument about
21 and called the Court about originally, so I have so
22 informed the Magistrate and we hung up, but we did not
23 discuss it any further.
24          THE VIDEOGRAPHER:  We are going back
25 on the record at 4:07 p.m.

44 (Pages 170 to 173)

Bernard A. Galler
October 28, 2005

Page 174

1  BY MR. WOLFF:
2      Q.   Okay.  And so, Professor Galler, before the
3  break we were talking about the various location
4  identifiers in Claim 4, and can you explain to me what
5  this group consisting of the various location
6  identifiers is to you structurally in the claim?
7      A.   Well, structurally I don't think the word
8  group has any technical interpretation, so I rely on my
9  normal interpretation of the word group, which would
10  mean that somehow in the structure of whatever I'm
11  looking at I can identify a substructure of what I
12  perceive to be in a group.  If they're all over the
13  place not connected by anything at all, it would be
14  hard for me to perceive a group.  If it's a list of
15  things such as CyberPilot has a web map, the fact that
16  there is a first and a last and something as amorphous
17  as next and previous, which I have no idea what that
18  means, they explain that if you're looking at
19  something, then there is clearly a next and a previous,
20  but that's not a grouping of something that I can
21  interpret as available as a group in my interpretation
22  of the normal use of that word.
23      Q.   Okay.  So is it your conclusion, then, that
24  this -- the Claim 4 and Claim 8 require all four of
25  these what you've referred to as identifiers?

Page 175

1            MR. KOCHANOWSKI:  Objection, I think
2  that calls for a legal conclusion.  I think he's given
3  you a technical answer.  You can answer if you can.
4  BY MR. WOLFF:
5      Q.   Please do answer it.
6      A.   Yeah, I will try to answer it.  It reads as
7  if one ought to have the group, all four, but, again,
8  there may be a legal interpretation of the way it's
9  written, so that one need not have all of them present,
10  I don't know.
11      Q.   But in your interpretation, you never
12  considered whether only one was required?
13      A.   Oh, I think it isn't a group unless you have
14  more than one.
15      Q.   Let's say if you had two.
16      A.   Well, I don't know.  I would expect all
17  four.
18      Q.   So you'd have to have at least -- CyberPilot
19  would have to have at least four of these identifiers?
20      A.   Well, if it's going to anticipate this as
21  prior art, it's got to have at least one, I mean that
22  could be identified this way.
23      Q.   Did -- and I can't recall if we covered
24  this, did you open the web map file that you created
25  with CyberPilot in a text editor to see the contents of

Page 176

1  the file?
2      A.   No, I saw the web map.
3      Q.   And why didn't you open the web map file to
4  see what its underlying structure was?
5      A.   The patent is at the level of the user of
6  the system, and I wanted to have a view of it as
7  described in the patent.  I didn't see a need to go
8  below.  If it had been a copyright case of people
9  copying the source code, I would have gone to the
10  source code, but that was not the issue here.
11      Q.   Okay.  Now, later on in the same paragraph,
12  Paragraph 43 towards the bottom of the page, the
13  sentence beginning "Moreover, in my opinion, CyberPilot
14  is less broad than the art considered and rejected by
15  the Examiner during the prosecution history."
16      A.   Yes.
17      Q.   Why did you make that statement?
18      A.   Well, that's what came to mind when I was
19  looking at CyberPilot.  I immediately thought that some
20  of the things that were considered prior art had more
21  than it had.  I mean it really had very little of the
22  search, anything we'd call searching and so on.  I
23  think I remarked that to Mr. Kochanowski, and when he
24  drafted this thing he put that in there, and I was
25  happy with it.

Page 177

1      Q.   Now, why do you say less broad?
2      A.   Well, because they provided some facility,
3  some function which -- such as the next icon, which
4  CyberPilot didn't provide.  I mean it was even weaker
5  than they were.  It's just an observation, it's not,
6  there's no legal context as far as I know, well, maybe
7  somebody would read that into it, but I don't.
8      Q.   Did you agree with the -- or let me strike
9  that.  Do you agree that you can press an icon in
10  CyberPilot and parse URLs from a hypertext source?  I'm
11  sorry, strike that.  I'm thinking of another case.
12            MR. KOCHANOWSKI:  I don't know what
13  you're talking about.  I have no idea what you're
14  talking about, but even I didn't object.
15            THE WITNESS:  Well, I was trying to
16  parse what he said.
17  BY MR. WOLFF:
18      Q.   I meant to say an HTML file.  Let's start
19  again.  Do you agree that you can -- that CyberPilot
20  provides the functionality to parse URLs from an HTML
21  file?
22      A.   Actually, I don't know what or how it does
23  it.  For example, I don't know if there's a directory
24  of hot links that may come in with a file, in which
25  case that parsing is already done and it gets it, or if

45 (Pages 174 to 177)

Bernard A. Galler
October 28, 2005

Page 178

1  it somehow has to get the file and parse it. According
2  to this tutorial, it has not made a connection to the
3  internet until later. So it may be that it gives a
4  directory and uses that until it has to actually get
5  the data file, I don't know what goes on underneath, so
6  I don't know how to answer it.
7      Q.   But you ran the program, correct?
8      A.   Yes.
9      Q.   And you clicked -- you went to live websites
10  with the program, correct?
11     A.   Yes.
12     Q.   And you clicked on the question mark --
13     A.   Yes.
14     Q.   -- icon in CyberPilot?
15     A.   Right.
16     Q.   And when you selected the question mark
17  icon, the web map file expanded and added more icons to
18  the web map, correct?
19     A.   That's right, but I don't know how much of
20  that was provided by the software that goes out to
21  follow the URL to get something how much of that came
22  in as -- maybe it -- I just don't know, maybe it
23  provided all the hot links first down to some level,
24  and I remember in the tutorial it says you can specify
25  the level that you want. So it may be that those come

Page 179

1  in without -- that CyberPilot doesn't have to do the
2  parsing until it gets beyond some level when it has to
3  go out there and get more, I don't know how it works
4  underneath. If I were designing the system, I might
5  design it that way for speed, but I don't know.
6      Q.   When you were running CyberPilot, do you
7  recall what was happening at the bottom, the bottom of
8  the little display screen that was presented on the
9  display window?
10     A.   Not specifically, but I know that up to some
11  point it had not yet connected to the internet and used
12  the browser, so that it was doing something with what
13  it got without asking for the full functionality of the
14  whole system, so I don't know how much it -- how it did
15  things underneath.
16     Q.   But you don't recall seeing the little URLs
17  flashing up --
18     A.   I don't.
19     Q.   -- when you clicked on the question mark
20  icon?
21     A.   I don't recall that.
22     Q.   You don't recall it at all?
23     A.   No.
24     Q.   And you didn't test it a couple ways to
25  verify that it did not?

Page 180

1      A.   No, I was interested more in the search
2  window, browser window distinction and the fact that it
3  wasn't doing searching, I did not pay a lot of
4  attention to what it did do underneath. Those are
5  interesting questions. I just didn't follow up on them
6  at the time.
7      Q.   But I just assume that when you ran the
8  software you were looking at all of the functionality
9  to make sure --
10     A.   Yes, but what you're asking about is a
11  detail that I just don't recall.
12     Q.   If you could turn to Tab F in Exhibit 103,
13  this is the declaration of Joseph Hardin, and I'm
14  looking at claim Element 1(E) and his analysis and then
15  citation to the CyberPilot tutorial.
16     A.   Uh-huh.
17     Q.   Can you tell me how you understand, you
18  understand what's happening in CyberPilot from this
19  section, and if you would like, if you'd rather look at
20  Exhibit 107, that tutorial --
21     A.   Let me read this and see if it's enough.
22  Okay. Let's see what your question is.
23     Q.   Do you have an understanding of how
24  CyberPilot works from that section of text?
25     A.   I have some understanding. Let's see what

Page 181

1  your questions are.
2      Q.   Okay. So the first sentence says, "However,
3  since CyberPilot has only located the home page so far,
4  the child pages have question mark icons next to them.
5  This means CyberPilot Pro found the links on the home
6  page but hasn't actually gone on the web yet to locate
7  the objects those links point to."
8      A.   Okay.
9      Q.   So doesn't that say that CyberPilot goes out
10  to the web and gets the pages?
11     A.   It gets one page, the home page, right.
12     Q.   But he's referring to the child pages.
13     A.   It hasn't gotten those yet.
14     Q.   Right, and what he's saying is that's
15  what -- he's saying that it hasn't actually gone out to
16  the web yet to locate the object those links point to.
17     A.   Right.
18     Q.   So you wouldn't conclude that CyberPilot
19  actually does ever go out to the internet to get web
20  pages?
21     A.   Well, somehow it appears that it's got the
22  home page without going to the internet, it's done a
23  certain level of URL following to a location and
24  retrieves a page, okay. That much it does. There's no
25  browser involved yet.

46 (Pages 178 to 181)

Bernard A. Galler
October 28, 2005

Page 182

1    Q.   Okay.  And if you clicked on the question
2  mark, do you have an understanding of what happens?
3    A.   Well, I presume at that point it does go to
4  the browser, it wouldn't have to, it can use the same
5  facility the browser uses to go out and retrieve more
6  pages, another level of pages, and extract the links
7  from those.
8    Q.   Okay.  And you didn't look for that in the
9  CyberPilot software?  You don't recall whether it did
10  that or not?
11   A.   Well, yes, I do, I remember noticing that
12  the browser had not yet been invoked when it got the
13  initial page and so on, yes.
14   Q.   And so if you double clicked on an object
15  icon, would it invoke the browser?
16   A.   I think it probably would.
17   Q.   Okay.  And did it display the page that was
18  corresponded to the object icon in the browser?
19   A.   Yes.
20   Q.   And if the web map file was for the Yahoo
21  home page, would it show the Yahoo search engine in the
22  browser?
23           MR. KOCHANOWSKI:  Objection to the
24  extent you're using the word browser generically, you
25  know, same objection I've had the whole deposition.  As

Page 183

1  long as we understand what you're talking about is the
2  browser display area, go ahead.
3           THE WITNESS:  Yeah, I'm going to
4  ignore the word browser there and talk to the context
5  of what you're asking.  If it went to the Yahoo page,
6  it would treat the Yahoo website like any other website
7  and give you a web map of the Yahoo home page and so
8  on.  There's nothing about the Yahoo search engine
9  that's involved in any of what we just said.  Yahoo has
10  hot links in its home page.  CyberPilot would go there
11  and extract the hot links or the location identifiers
12  and give you a list of them.  As I say, you mentioned
13  the Yahoo search engine, that is not involved, that is
14  not involved in any aspect of this.
15  BY MR. WOLFF:
16   Q.   So you don't think somebody could have
17  created a web map from the Yahoo website?
18   A.   Yes, somebody could have created a web map,
19  period, but that's not a search and that's not a search
20  engine.
21   Q.   Okay.  If we can take another quick break, I
22  think I can wrap this up in another couple minutes.
23           THE VIDEOGRAPHER:  We're going off
24  the record at 4:24 p.m.
25           (A short recess was taken)

Page 184

1           THE VIDEOGRAPHER:  We are going back
2  on the record at 4:30 p.m.
3  BY MR. WOLFF:
4    Q.   Professor Galler, if you could turn to
5  Paragraph 22 on Exhibit 104.
6    A.   104 is my report?
7    Q.   Yes.
8    A.   Yes, Paragraph 22?
9    Q.   That's correct.
10   A.   Okay.
11   Q.   And read that paragraph to yourself, and
12  then we're going to look at the patent and have you
13  describe to me what -- how you interpret.
14   A.   Okay.  Now the patent.  Column 7?
15   Q.   Right.
16   A.   Okay.
17   Q.   Now, this is an embodiment, as I understand
18  your declaration, you're saying that the claims cover
19  this embodiment, too, Claims 1 through 8?
20   A.   Which embodiment?
21   Q.   The one that's referenced in Paragraph 22.
22   A.   Well, Paragraph 22 says there are a number
23  of alternate embodiments.  So when you're saying the
24  embodiment, which one do you have in mind?
25   Q.   I'm referring to the one you referenced in

Page 185

1  Paragraph 22, the one at Column 7, Lines 22 to 26.
2    A.   We're not reaching each other.  Those lines
3  talk about several alternate embodiments, okay, not
4  just one.
5    Q.   Okay.  Let's go to Paragraph 19.
6    A.   Okay.
7    Q.   I think I understand what you're saying.
8    A.   Okay.
9    Q.   Here in Paragraph 19 I understand you to be
10  saying that the patent Claims 1 through 8 cover
11  multiple embodiments that are described in the written
12  description.
13   A.   They allow several alternate embodiments,
14  okay, yes.
15   Q.   And then the last sentence says the granted
16  claims of the 172 patent pertain to these two general
17  embodiments.  What are the two general embodiments?
18   A.   The general embodiments are, one, a jumper
19  window that is an identifiable separate window which
20  contains the first and second icons and so on, and an
21  embedded -- an embodiment that embeds the appropriate
22  things in the browser.
23   Q.   Okay.  And then in Paragraph 22 I understand
24  you to be identifying this second general embodiment,
25  is that correct?

47 (Pages 182 to 185)

Bernard A. Galler
October 28, 2005

Page 186

1      A.    I see what you mean now.  Yeah, they're
2  saying -- wait a minute now, the jumper window may take
3  any of several forms.  All right.  User interface may
4  include a pop-up window, et cetera, et cetera.  Okay,
5  let me get that back in the context of the patent
6  itself.  Okay.  I'm ready to answer questions.
7      Q.    Okay.  Which -- are all of these embodiments
8  of the claims, all of what's described in this
9  cited -- or, excuse me, I'm on West Coast time still,
10  are all of the embodiments described here this general
11  second embodiment that you referred to in Paragraph 19?
12      A.    Let me say it a different way.  As I read
13  this, and I believe I'm reading it correctly, they have
14  been describing a jumper window with various
15  characteristics, and in this little paragraph they're
16  saying the jumper window itself may or the
17  functionality of it may show up in other ways, it may
18  be a modification of the browser window, a toolbar, or
19  whatever, it need not be a separately identifiable
20  jumper window, that's what they're saying.  And any one
21  of the ones on the list would represent the same
22  functionality that the jumper window provides, that's
23  what I believe this paragraph is saying.
24      Q.    Okay.  Now, what is a menu referring to in
25  this section of the written description?

Page 187

1      A.    Well, I would interpret that to be something
2  you might pull down from a word at the top of the menu
3  bar at the top.
4      Q.    Okay.  If you'll refer to Paragraph 7, Line
5  27 --
6      A.    I'm sorry, Column 7?
7      Q.    Column 7, Line 27, there's a paragraph that
8  describes various elements that --
9      A.    Yes.
10      Q.    Do you understand, do you understand the
11  term a menu modification of the browser window to be,
12  for example, a browser menu bar 402?
13      A.    You mean a modification of --
14      Q.    Right.
15      A.    -- 402?
16      Q.    Right.
17      A.    Let me see the picture again.  Yes, that
18  would be, I think, how I would interpret a menu
19  modification, perhaps an additional word along that bar
20  with a menu pull-down to represent the functionality
21  here.
22      Q.    Okay.  And what -- and a toolbar
23  modification of the browser window, what does the
24  toolbar modification -- what is that?
25      A.    Well, that might refer to the line just

Page 188

1  below 402 or one of the lines, two or three lines just
2  below that where they might insert the functionality
3      Q.    And where are you -- are you looking at
4  Figure 4?
5      A.    I happen to be looking at 5(b) just there,
6  but let's see.  It's the same comments.
7      Q.    And is the accelerator keys on the keyboard
8  also covered by the claims?
9            MR. KOCHANOWSKI:  Object to form,
10  that's a --
11            THE WITNESS:  Well, it says so, it
12  says or the use of accelerator keys on the keyboard.
13  BY MR. WOLFF:
14      Q.    So if there were keys on a keyboard you
15  could do this functionality with, it would also qualify
16  as this icon, the first or second icon?
17      A.    I think they're claiming it could, yes.
18      Q.    How do you understand the claims?
19      A.    I think one could, they're separate from the
20  search window certainly.
21      Q.    Okay.  Are they displayed on the display
22  screen?
23      A.    I don't, I suppose they could be, I don't
24  recall that they are, but if we look at the claims,
25  let's see if they have to be.  Displaying the first and

Page 189

1  second -- well, they're not, but they could be, I mean
2  you could have a representation of those accelerator
3  keys on there.
4      Q.    Are you saying they're covered by the claims
5  or not?
6            MR. KOCHANOWSKI:  Objection, this is
7  asking hypotheticals.
8            THE WITNESS:  That's a legal
9  question, sorry.
10            MR. KOCHANOWSKI:  No, no, the
11  objection is he's not been offered for that opinion.
12            MR. WOLFF:  He cited the section in
13  the --
14            MR. KOCHANOWSKI:  That's fine.
15            MR. WOLFF:  -- in the patent about
16  alternate embodiments.  I just want to know if he's
17  saying that this is something that's covered by the
18  claims.
19            MR. KOCHANOWSKI:  But those are two
20  separate questions.  I mean he may be, he may not be.
21  I don't know.
22  BY MR. WOLFF:
23      Q.    Do you know whether you are or you aren't?
24      A.    You better say the whole question.
25      Q.    Do you know whether you're saying this is an

48 (Pages 186 to 189)

Bernard A. Galler
October 28, 2005

Page 190

1  embodiment of the claims or not?
2         MR. KOCHANOWSKI:  Objection.
3  BY MR. WOLFF:
4      Q.  In particular, the use of accelerator keys
5  on a keyboard?
6         MR. KOCHANOWSKI:  Go ahead.
7         THE WITNESS:  The inventors claimed
8  it.  Whether they are or are not I guess is really a
9  legal question.  They're saying, you know, you could do
10  it this way.  Well, whether you -- if you do it that
11  way, it's covered by the claims or not, I guess I don't
12  know, because one could display the accelerator keys on
13  the screen, too, and then you could use the accelerator
14  keys and be the same as selecting something on the
15  screen, so I wouldn't rule it out.
16  BY MR. WOLFF:
17      Q.  Okay.  What do you understand to be the
18  browser window that's referred to in this passage?
19      A.  In this -- in Paragraph --
20      Q.  Column 7, Lines 22 through 26.
21      A.  I'm sorry -- I would interpret that to be
22  400.
23      Q.  Okay, not 406?
24      A.  Not 406.
25      Q.  Okay.  One more document I have to look at;

Page 191

1  probably excited to hear that.
2         MR. KOCHANOWSKI:  Depends what the
3  document is.
4         THE WITNESS:  Well, one more
5  document could be an hour.
6         MR. WOLFF:  Go off the record for
7  just one second.
8         THE VIDEOGRAPHER:  Going off the
9  record at 4:42 p.m.
10         (An off the record
11            discussion was held)
12         THE VIDEOGRAPHER:  We're going back
13  on the record at 4:43.
14  BY MR. WOLFF:
15      Q.  Professor Galler, if you could turn to
16  Exhibit 30, the prosecution history.
17         MR. KOCHANOWSKI:  I trust you're not
18  going to go to Page G 286 now, are you?
19         MR. WOLFF:  No.
20         THE WITNESS:  What page
21  specifically.
22  BY MR. WOLFF:
23      Q.  We're going to go to the Office Action that
24  begins on Page G 249.
25      A.  Okay.

Page 192

1      Q.  Now, if you will --
2         MR. KOCHANOWSKI:  I'm sorry, you
3  said 249?
4         MR. WOLFF:  249, yes.
5  BY MR. WOLFF:
6      Q.  Would you turn to Page G 262.
7      A.  262.
8      Q.  And the penultimate paragraph beginning "The
9  applicant claims the ability to select a parsing."
10      A.  Okay.
11      Q.  And read that paragraph to yourself, and let
12  me know when you're finished.
13      A.  Okay.
14      Q.  Okay.  Is it correct that here the applicant
15  is referring to the term search window in the claims
16  when it's describing how his claims differ over the
17  prior art?
18      A.  I lost the second half of that question.  Is
19  he referring to the search window?  Yes.  And what's
20  the rest of the question?
21      Q.  Right.  And he's distinguishing over the
22  prior art?
23      A.  Well, are you asking me in the context of
24  this paragraph?  I suppose so, but I read the
25  paragraph.  Let's stick with that.

Page 193

1      Q.  Okay.  Do you understand -- you suppose so.
2  You're not sure?
3      A.  Well, let's see what the question is.
4      Q.  Well, that's the question.  Is he
5  distinguishing over the prior art when he's making this
6  argument in the paragraph on Page G 262?
7      A.  I guess so, yes.
8      Q.  Okay.
9      A.  Uh-huh.
10      Q.  And he uses the term search window, correct?
11      A.  Yes.
12      Q.  Okay.  And that's the term that's in the
13  claims, correct?
14      A.  Yes.
15      Q.  Claims 1 through 8?
16      A.  Right.
17      Q.  Okay.  If you turn to Page G 264, the first
18  paragraph, read that to yourself.
19         Do you understand why in the
20  paragraph on Page 264 both the term search window and
21  browser window are used in reference to Claims 23
22  through 26?
23      A.  I guess at this point I don't see -- there's
24  probably a reason, I just don't recall.  I can't
25  reinterpret the reason for that.

49 (Pages 190 to 193)

Bernard A. Galler
October 28, 2005

Page 194

1    Q.   Okay.  Do Claims 23 through 26 in this
2  amendment we're referring to in Exhibit 30, do those
3  claims use the term search window?
4    A.   No, they refer to -- I assume that these,
5  without checking back, these are the ones that turned
6  into the 15 to 18, is that correct?
7    Q.   Let's just talk about them as 23 to 26.
8    A.   Well, we did look at them before, and
9  they've become 15 -- all right, 23, 25 would probably
10  be 15 to 17.
11    Q.   I think it's marked on there with the
12  numbers.
13    A.   Yeah, all right, and so what's the question?
14    Q.   Do you have any understanding why the term
15  search window and browser window were used in the same
16  claim or with reference to Claims 23 through 26?
17    A.   I believe these are the claims that refer to
18  the embodiment about the jumper window, et cetera, but
19  I'm not sure I can answer your question intelligently
20  at this point.
21    Q.   Okay.  No further questions.
22      THE WITNESS:  Thank you.
23      MR. KOCHANOWSKI:  Okay.
24      THE VIDEOGRAPHER:  This deposition
25  is concluded at 4:50 p.m.

Page 195

1      (The deposition was concluded at 4:50 p.m.)

Page 196

1      CERTIFICATE OF NOTARY
2
3  STATE OF MICHIGAN   )
4            ) SS
5  COUNTY OF OAKLAND   )
6    I, Laurel A. Frogner, Certified Shorthand
7  Reporter, a Notary Public in and for the above county
8  and state, do hereby certify that the above deposition
9  was taken before me at the time and place hereinbefore
10  set forth; that the witness was by me first duly sworn
11  to testify to the truth, and nothing but the truth,
12  that the foregoing questions asked and answers made by
13  the witness were duly recorded by me stenographically
14  and reduced to computer transcription; that this is a
15  true, full and correct transcript of my stenographic
16  notes so taken; and that I am not related to, nor of
17  counsel to either party nor interested in the event of
18  this cause.
19
20
21      _____
22      Laurel A. Frogner, CSR-2495, RMR, CRR
23      Notary Public,
24      Oakland County, Michigan
25  My Commission expires:  4-22-08

Page 197

1      INDEX TO EXAMINATIONS
2  Witness            Page
3  BERNARD A. GALLER
4  Examination by Mr. Wolff        3
5
6      EXHIBITS
7
8    (Exhibits Retained by Mr. Wolff)
9  101 - Plaintiff's Opposition Brief     31
10  102 - Google's Summary Judgment Brief      33
11  103 - Declaration of Joseph Hardin      35
12  104 - Declaration of Bernard A. Galler     38
13  105 - Figure from Patent       64
14  106 - U.S. Patent       71
15  107 - CyberPilot Tutorial      141
16  108 - Declaration of Randall Stark      145

50 (Pages 194 to 197)