# EXHIBIT 2

Dockets.Justia.com

*IN THE MATTER OF:*

*Net Jumper Software, L.L.C.,*
*a Michigan Limited liability corporation,*

    *Plaintiff/Counterclaim*
    *Defendant*

*vs.*

*Google, Inc.,*
*a Delaware corporation,*

    *Defendant/Counterclaim*
    *Plaintiff.*

    *Deposition Testimony of:*

    *JOSEPH HARDIN*

*Multipage™ and Index*

*Lori Caretti & Associates   (586) 415-9008*

Case 2:04-cv-70366-JAC-RSW    Document 62-4™    Filed 11/03/2005    Page 3 of 44

Net Jumper Software, L.L.C. vs.    Multi-Page™    Joseph Hardin
Google Inc.    September 16, 2005

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NET JUMPER SOFTWARE, L.L.C.,
a Michigan limited liability
corporation,

    Plaintiff,    Civil Action No. 04-70366-CV
        Hon. Julian Abele Cook
vs.
        Magistrate Judge R. Steven Whalen
GOOGLE INC.,
a Delaware corporation,

    Defendant.
            /

DEPOSITION OF JOSEPH HARDIN

The Deposition of JOSEPH HARDIN taken before Eileen
S. Higer, Notary Public in the County of Oakland, in the above-
entitled cause on Friday, September 16, 2005, at 2000 Town
Center, Suite 900, Southfield, Michigan, commencing at about
8:00 a.m.

APPEARANCES:

For the Plaintiff    GARY HOOD, ESQUIRE
Net Jumper Software    WILLIAM F. WARD, ESQUIRE
    for: MICHAEL H. BANIAK, ESQUIRE
        Baniak, Pine & Gannon
        150 North Wacker Drive, Suite 1200
        Chicago, Illinois 60606

For the Defendant    JASON W. WOLFF, ESQUIRE
Google, Inc.    Fish & Richardson, P.C.
        12390 El Camino Real
        San Diego, CA 92130-2081

Reported by:    Eileen Higer (CSMR 5018)
        Lori Caretti & Associates
        (568) 415-9008

**Page 2**

I N D E X

                    PAGE:

WITNESS:

JOSEPH HARDIN

    Examination by Mr. Hood . . . . . . . . . . . . . . . 3

    Examination by Mr. Wolf . . . . . . . . . . . . . . 164

EXHIBITS:

    Deposition Exhibit Number 95 . . . . . . . . . . . . 4

    Deposition Exhibit Number 96 . . . . . . . . . . . 84

    Deposition Exhibit Number 97 . . . . . . . . . . . 113

**Page 3**

1    Southfield, Michigan
2    Friday, September 16, 2005
3    At about 8:30 a.m.
4
5        J O S E P H   H A R D I N,
6    having been duly sworn was examined upon his oath and
7    testified as follows:
8                -    -    -
9            EXAMINATION
10 BY MR. HOOD:
11 Q    Please state your name and spell your last name for the
12    court reporter.
13 A    Joseph Hardin, H-a-r-d-i-n.
14 Q    Mr. Hardin, what is your current business address?
15 A    University of Michigan.
16 Q    That's good enough.
17 A    Does it need to be closer than that?
18 Q    No.  That's good enough.
19 A    And it's the Duderstadt Center.
20        MR. HOOD:  Mr. Hardin, I already introduced
21    myself, but for the record my name is Gary Hood.  I'm an
22    attorney in a case involving my client, Net Jumper
23    Software, L.L.C., and we're here for your deposition
24    today.  I understand that you have another appointment
25    this afternoon, and we need to finish up about three

**Page 4**

1    o'clock.  Is that correct?
2        THE WITNESS:  That's right.
3        MR. HOOD:  Okay.  We'll do what we can to
4    make sure that you can get to your other appointment.
5 BY MR. HOOD:
6 Q    I'd like to show you what has been previously marked.
7        MR. HOOD:  It's our understanding, Counsel,
8    correct me if I'm wrong, it's Exhibit
9    Number 30 to the depositions in this case.  This is the
10    prosecution history of the '172 patent.  That's United
11    States Patent No. 5,890,172.
12        MR. HOOD:  Let's also start by marking as --
13    I believe Exhibit No. 95 we're going to start with.
14        (Whereupon Exhibit Number 95 marked for
15        identification.)
16 BY MR. HOOD:
17 Q    Mr. Hardin, I'm handing you what's been marked as Exhibit
18    Number 5 to the depositions.  Do you recognize that
19    document?  Please feel free to review it --
20 A    Exhibit Number 95?
21 Q    That's correct.
22 A    All right.
23 Q    Take a look at that and let me know if you recognize that
24    document.
25 A    Yep.

---

Page 5

1  Q  And what is --
2  A  I recognize the document.
3  Q  What is what's been marked as Exhibit No. 95?
4  A  It's the declaration and associated exhibits. The
5     declaration being one that I gave, and the exhibits being
6     the ones that are associated with it.
7  Q  Let me direct your attention to -- it's an unenumerated
8     page, but it's the page right after page number nine and
9     right before the tab A. It purports to have a signature
10    on it. Is that your signature there on that page, sir?
11 A  Yes, it is.
12 Q  Okay. Let me direct your attention to Exhibit A to
13    Exhibit Number 95 -- or tab A, I guess it would be.
14 A  Uh-huh.
15 Q  Let me ask you: Is this your current curriculum vitae,
16    Mr. Hardin?
17 A  Yes, it is. It looks current.
18 Q  Are there any updates or corrections to this CV that we
19    need to know about?
20 A  No. The Assistant Professor, School of Information could
21    be stated Clinical Assistant Professor, School of
22    Information. Either works.
23 Q  That's the January 2003 to present --
24 A  Right.
25 Q  -- entry?

---

Page 6

1  A  Right. To present Director, Collaborative Technologies
2     Lab, yep. Assistant Professor, School of Information.
3     PI, Chairman of the Board. Yep. That all looks current.
4  Q  Okay. How about in Section C, Publications, are there any
5     additional publications that you have authored that are
6     not listed there?
7  A  Oh, there could be. I don't know. These were a
8     representative set of publications.
9  Q  Let me ask you a couple of questions. Back up to Section
10    B, Appointments. You mentioned in the first entry PI and
11    Chairman of the Board, Sakai Project. That's S-a-k-a-i.
12    What was or is the Sakai Project?
13 A  Right. The Sakai project is a collaborative software
14    effort, collaborative in two senses of the term. The goal
15    of the project is to build a set of software that can be
16    used for collaboration and a variety of types of
17    collaboration, the main one being between faculty and
18    students in the form of a course management system.
19    There's lots of these around, but combining that with a
20    set of tools that can be used by faculty for research and
21    for collaboration with their peers has advantages we
22    think. And building an open source set of code has
23    significant advantages. So this is a project that was
24    initially funded by the Mellon Foundation and that
25    involved in its first stages University of Michigan,

---

Page 7

1     Indiana University, MIT and Stanford, and its job -- the
2     first two years of the project the job is to get the core
3     set of software in place. Out of that effort has grown a
4     community of about 80 universities and about a dozen
5     commercial organizations that are now Sakai partners. So
6     this is a -- an open source software effort. It is
7     initiated by a number of universities with contributions
8     of staff and talent, expertise code and experience and has
9     been joined by a number of other universities and
10    commercial organizations.
11 Q  Okay. Thank you. The second entry under appointments
12    January 2003 to present is the Assistant Professor, School
13    of Information, University of Michigan. Could you tell me
14    what you teach or have taught in that position at the
15    University of Michigan?
16 A  The course that I teach -- I teach one course a year.
17    It's a graduate level course, and it's a course on
18    semantic Web technologies.
19 Q  Tell me what that is.
20 A  You really want me to?
21 Q  Yes, please.
22 A  I mean the whole thing?
23 Q  Give me the shortened version. We'll see if we --
24 A  Right.
25 Q  -- need to ask some follow up.

---

Page 8

1  A  Remember that you're talking to a professor here. I
2     mean --
3  Q  Sure.
4  A  -- I just -- the -- gosh, where to start. The semantic
5     Web is an idea that was developed initially by the same
6     person that came up with the initial protocols for the
7     Web, Tim Berners-Lee, and it involves providing a number
8     of features to the Web, especially to the data that's on
9     the Web to allow that data to be portable. The main way
10    to do that is to provide a set of standard languages,
11    which include something called the resource description
12    framework, RDF, and OWL, the Web ontology language which
13    is spelled O-W-L. Just as Tigger did. Actually it was
14    Owl that -- when talking to Tigger. That's an inside Web
15    joke. Anyway, it allows you to have a way of
16    characterizing data in a database -- or in a -- let's just
17    say in an environment behind a Web portal, for instance,
18    that can be easily read and understood by other people,
19    not the originators. So there's sufficient markup.
20    There's sufficient data modeling and both of those are
21    done in a standard way so that I could go and pull the
22    data off of your site, where it's behind your site and use
23    it in an application that I have. That data portability
24    comes partially through the use of XML as one of the
25    markup languages that is at the foundation, but RDF and

---

Case 2:04-cv-70366-JAC-RSW   Document 62-4   Filed 11/03/2005   Page 5 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page ™                    Joseph Hardin
Google Inc.                                                                    September 16, 2005

**Page 9**

1 the modeling capabilities of it add a semantic layer, a
2 layer of machine understandable capability that's not
3 there with just -- I shouldn't say just, but that's not
4 there with simple markup languages. So the whole effort
5 of determining what the correct form for the research
6 description framework or for the OWL language, the
7 ontology language that sits on top of it -- ontologies are
8 dictionaries and descriptive sets of terms that have --
9 that show the relationships between the elements and the
10 data. Building that, getting it through the standards
11 processed or the specification process, more correctly
12 put, at the worldwide Web consortium is that task of those
13 that are interested in building a semantic Web, and
14 bringing that into commercial or applications like Sakai,
15 places where you have things like student information or
16 you have data about who used what tool in their class
17 when, and you want to tag that, and you want to be able to
18 make sure that other tools that are plugged in to
19 something like Sakai are able to read that data. Then the
20 kinds of capabilities that semantic Web technologies
21 provide become useful. The class that I teach is an
22 introduction to the whole idea of semantic technologies.
23 It goes into some detail when it comes to things like the
24 resource description framework or the various ontology
25 languages that have been proposed and the resultant OWL

**Page 10**

1    language. Where that fits in the whole layer cake, the
2    whole stack of Web technologies that are working their way
3    up from a foundation of simple protocols and methods like
4    we have now in the Web through markup languages like XML
5    up through modeling and markup languages like RDF through
6    ontology languages and up into layers that ultimately have
7    as a goal the ability to develop and transmit trust across
8    the Web.
9 Q  Okay. Thank you. The next entry in your CV, January 2003
10   to present, Director, Collaborative Technologies Lab and
11   Duderstadt Center at University of Michigan. What are
12   your duties or responsibilities or involvement there in
13   that particular position?
14 A  The Collaborative Technologies Lab is a place that was
15   established partially by the School of Information and
16   partially by the Duderstadt Center in order to
17   investigate, build, test, prototype and bring into some
18   cases production what we thought were collaboration or
19   collaborative technologies that were used to people that
20   were pursuing the scholarly arts. So faculty and students
21   that are engaged in learning and teaching or that are
22   engaged in research, finding ways, evaluating software,
23   building software, evaluating the user experience, looking
24   at the user interfaces, looking at the design, finding out
25   how it fits into the practices of the people that are

**Page 11**

1    using it in the particular context. Those are the tasks
2    that are sort of given over to the Collaborative
3    Technologies Lab. As the director, my job is to oversee
4    all the activities in the lab, which includes activities
5    of developers and designers and gooey (phonetic)
6    developers and user analysis folks and support people, and
7    move forward at the University of Michigan understanding
8    and application of these kinds of technologies. Sakai is
9    right now the capstone project in that effort.
10 Q  Okay. Moving back to Section C of tab A to your
11   declaration publications, I believe you said that this
12   list is a representative set of your publications; is that
13   correct?
14 A  Right.
15 Q  How did you --
16 A  It was meant to be complete.
17 Q  Okay. How did you choose this particular representative
18   set to list under C?
19 A  These generally -- yeah, excuse me. Go ahead. Finish
20   your --
21 Q  No, go ahead. How did you choose this set?
22 A  These were publications that had to do with Internet
23   technology, Web-based technology, publications from the
24   period that the patent application took place in and that
25   were examples of the work that I've done dealing with or

**Page 12**

1    talking about and working with early Web technologies.
2 Q  Did you author any other publications other than those
3    listed that fit into those categories that you just stated
4    that are not presently listed in Section C of your CV?
5 A  I'd have to go back and look.
6 Q  Okay. Are you a named inventor on any United States
7    patent?
8 A  A named inventor? No.
9 Q  Are you a named inventor on any patent anywhere in the
10   world?
11 A  No.
12 Q  Okay. Moving to Section D of your CV, again we're on
13   Exhibit -- or tab A to what's been marked as Exhibit
14   Number 95 to the depositions. You say there led the NCSA
15   Software Development Group. Do you see that?
16 A  Yes.
17 Q  What does that acronym, NCSA, stand for?
18 A  The National Center for Super Computing Applications.
19   Full title could be NCSA at University of Illinois,
20   Urbana, Champaign. So sometimes it's characterized as
21   NCSA, UIUC or - UIUC.
22 Q  Moving down to the second to last bullet point in Section
23   D, you mention initiator and development lead for the
24   C-H-E-F, CHEF project, an open source effort to develop
25   collaboration technology. What type of collaboration

Page 13

1     technology are you referring to there?
2 A   The CHEF project, which is an acronym for -- well, it's
3     built up out of -- gosh, what is the phrase --
4     Comprehensive Collaborative Framework -- those letters in
5     that order can be found in those three words -- is the
6     project that we were working on prior to the Sakai
7     project. So it carried many of the same types of
8     principles and goals as the current Sakai project, only it
9     was a project that was largely done at the University of
10    Michigan. There were other schools, universities in the
11    states and in other countries that were involved in it,
12    but the Sakai project sort of brought that -- brought the
13    CHEF project into a larger universe of participation by
14    other universities, and it has -- it was working on the
15    same kind of things, building a collaborative learning
16    environment, sometimes called a course management system
17    or a virtual learning environment or an online learning
18    system as well as building the tools that were used by
19    researchers to work across the net and work with
20    collaborators on research projects. It had a component of
21    high performance computing in it. If you're familiar with
22    any of the grid projects that have to do with putting
23    together large scale resources, the kind that you'd find
24    at super computing centers or computation or data storage
25    or visualization or just big pipes for networking. It has

Page 14

1     interfaces and hooks to use a lot of the technology that's
2     been developed through NSF grants around the grid
3     technology, so it was a combination again of trying to
4     bring together the research and the teaching and learning
5     activities of faculty and make sure that they could --
6     they were enabled, facilitated in their work across those
7     domains.
8 Q   Okay. Thank you. Let me move next to tab B to your
9     declaration, Exhibit 95. This is titled Hardin Dec.,
10    Exhibit B Documents Considered. Is this, Mr. Hardin, a
11    list of documents that you considered in putting together
12    the declaration that you've submitted as Exhibit 95?
13 A  This is the Patent '172, '655, the Infringement Chart for
14    '172, Claim Constructions, Google's Proposed Claim
15    Constructions, Google Toolbar both on the IE browser and
16    the Firefox browser, the NetCarta Corporation CyberPilot,
17    Wood's Hyperspace document which was a general trip into
18    the past. That was a fun one to read again. And then the
19    other documents referenced in my declaration, yes.
20 Q  So is this a complete list of everything that you reviewed
21    in preparing your declaration?
22 A  Well, it mentions other documents and things referenced in
23    my declaration so it's kind of an open -- that kind of
24    completes the list of things.
25 Q  Does that refer to things specifically referenced in your

Page 15

1     declaration?
2 A   Yes.
3 Q   You're talking about entry number nine there?
4 A   Right.
5 Q   Okay. Let me ask you: Who provided to you the materials
6     that are listed on Exhibit B -- tab B to your declaration?
7 A   Almost all of them were provided by Jason Wolff. The
8     Wood, et al., Hyperspace -- Wood had a number of articles,
9     and the one that was provided to me was a different -- a
10    slightly different version of this particular document.
11    I'd have to go back and remember what the title of it was,
12    but that one I just went and pulled down from the site
13    from the Third International World-Wide Web Conference.
14 Q  And you believe that the version that you actually
15    reviewed was a slightly different version than what's
16    listed in number eight here?
17 A  I think it is the version listed in number eight. I think
18    what was provided to me from Jason Wolff was a slightly
19    different version. They talk about much the same thing,
20    and they demonstrate many of the same features and
21    capabilities. Wood did a lot of writing around that time
22    because he had a particular method and perspective, and it
23    was generally applicable to lots of different things.
24 Q  Okay. Entry number four on tab B says Google's Proposed
25    Claim Constructions. Tell me what that document was.

Page 16

1 A   Could we have a copy of that?
2 Q   I don't have a copy of that.
3 A   So that I could remind myself.
4         MR. WOLFF: I have a copy of it if you want
5     me to --
6         MR. HOOD: Do you?
7         MR. WOLFF: Yeah.
8         MR. HOOD: Yeah. That'd be great.
9         MR. WOLFF: Yeah, Exhibit L I think to my
10    declaration.
11        MR. HOOD: Why don't we go off the record for
12    a second and just take a look at it.
13        (Off the record.)
14        MR. HOOD: Back on the record.
15 BY MR. HOOD:
16 Q  With respect to entry number five and entry number six,
17    Mr. Hardin, let me ask you: It mentions Google, Inc.,
18    Toolbar, four. Number five is the Internet Explorer Web
19    browser, and number six is the Firefox Web browser. What
20    in particular did you review with respect to number five,
21    the Google Toolbar for the Internet Explorer Web browser?
22 A  Well, I entered -- I looked at the installation of it and
23    the Internet Explorer Web browser and played with it,
24    looked at its operation, did some searches with it, used
25    the different buttons on it and just generally

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 7 of 44

Net Jumper Software, L.L.C. vs.      Multi-Page™      Joseph Hardin
Google Inc.      September 16, 2005

Page 17

1  investigated how it functioned.
2 Q And was that the same with respect to number six on the
3   Firefox Web browser?
4 A Yes, it was.
5 Q Okay. So what you did, you actually installed an operated
6   that particular Toolbar; is that what you're referring to?
7 A Yes.
8 Q Let me move into your declaration itself, the substance of
9   it, and if I could point you to paragraph number 20. And
10  let me back up and just make sure we're on the same page.
11  I'm going to be referring to, if it works for you, the
12  '172 patent, and by that I mean United States Patent No.
13  5,890,172. Does that work for you?
14 A That works for me.
15 Q Okay. Great. Paragraph number 20 -- I won't read the
16  whole thing, but feel free to. I want to make sure I
17  understand what you believe the subject matter of the '172
18  patent is, and that is subject matter concerns software
19  for navigating or quote, "surfing," end quote a computer
20  network such as the Internet, and in particular software
21  that is used in conjunction with an Internet browser. Did
22  I read that correctly or at least that portion correctly?
23 A Yes.
24 Q That's what you believe to be the subject matter of the
25  '172 patent; am I correct?

Page 18

1 A Yes.
2 Q Okay. Let me move you to paragraph number 26 of what's
3   been marked as Exhibit No. 95 to the depositions. You say
4   in paragraph 26 that it is your opinion that the scope of
5   claims 1 and 5 is the same, meaning neither claim is
6   broader or narrower than the other. Likewise, claims 2-4
7   and 6-8, respectively, are also equivalent in scope.
8   First of all, are you referring in that particular
9   paragraph number 26 to the claims of the '172 patent?
10 A Yes.
11 Q Okay. Tell me what you mean by your opinion that the
12  scope of claims 1 and 5 are the same. Can you elaborate
13  upon that?
14 A Well, I think it's pretty clear I mean that they cover the
15  same thing. They cover the same ground. Neither claim is
16  broader or narrower than the other implies that the ground
17  that they cover is pretty much identical. All right. So
18  the claims -- in my opinion what's claimed in number 1 is
19  largely echoed in the claim in number 5.
20 Q Is it your opinion that there are no differences in the
21  claims 1 and 5?
22 A I'd have to go back and look. I think there are certainly
23  differences in the wording between 1 and 5, but again, I
24  think the scope of the claims is the same.
25 Q And we'll get to the claims so we can get into that in a

Page 19

1   minute. I just want to understand that particular
2   statement. I take it then with respect to claims 2
3   through 4 and 6 through 8 that's what you're referring to
4   as well, that the scope or coverage in your opinion is the
5   same?
6 A Uh-huh.
7 Q Let me ask you some basic background questions so I
8   understand your understanding of certain terms. Based on
9   your experience in the field that we're talking about, and
10  when I say the field we're talking about I'm referring
11  back to the subject matter that you believe the '172
12  patent relates to as you said in paragraph 20 of your
13  declaration. What do you understand an Internet browser
14  to be or refer to?
15 A An Internet browser is a tool for moving around, looking
16  for files, pages on the Internet, so it's an interface
17  that allows you to enter addresses, to look at the files
18  that are displayed usually as HTML and click on elements
19  within those files, which are commonly known as hyperlinks
20  or URLs or just links, and move from one file to the next,
21  back and forth, across the network. This is the concept
22  of surfing, moving along in this larger sea of
23  information. So the browser is the tool that allows you
24  to do that.
25 Q Can a user then of an Internet browser search the Internet

Page 20

1   with the browser?
2 A Yes.
3 Q What's your understanding of the term user interface with
4   respect to the field that we're talking about?
5 A The term user interface, user interface is composed of all
6   of the elements that are presented to the field of view of
7   the user and that are the presentation of an underlying
8   application that the user is expected to control, interact
9   with.
10     Whereupon Mr. Ward entered deposition site.)
11 BY MR. HOOD:
12 Q When a user of a computer is using an Internet browser,
13  tell me what the user interface would be with respect to
14  that user's use of the Internet browser.
15     MR. WOLFF: Object to form, ambiguous. Go
16  ahead and answer the question.
17     THE WITNESS: Could you repeat the question
18  then?
19     MR. HOOD: Could you repeat the question?
20  (Previous question played back.)
21     MR. WOLFF: Same objection.
22     THE WITNESS: Well, the user would be
23  involved in a browser window, would be using a browser
24  that has a window. That window would sit in a context of
25  the desktop or the operating system, whatever the

### Page 21

1    background context was, and so the user would be
2    interacting with the different areas in the browser
3    window.
4  BY MR. HOOD:
5  Q  And that would be the user interface?
6  A  For the browser, right.
7  Q  Okay. You used the term window. What is your
8    understanding of that term with respect to this particular
9    technology?
10         MR. WOLFF:  Object to form, ambiguous, and
11    calls for a legal conclusion. Go ahead and answer the
12    question.
13         THE WITNESS:  My understanding is that it's
14    those elements and all those elements that are within the
15    four corners of the browser. That's the commonly
16    understood. The browser window -- if somebody refers to
17    the browser window, one's referring to the -- to all the
18    things that are inside the rectangle of the browser.
19  BY MR. HOOD:
20  Q  Okay. How about a search window? What is a search
21    window?
22         MR. WOLFF:  Object to form, ambiguous. Calls
23    for a legal conclusion. Go ahead.
24         THE WITNESS:  I would echo the point that
25    that's an ambiguous question. It's difficult to answer.

### Page 22

1    In the context of searching on the Web, it would be
2    everything that's inside the browser window, controls,
3    display, form fields, everything that would be referred to
4    as the overall search environment and the search window.
5  BY MR. HOOD:
6  Q  What about the term jumper window? What is your
7    understanding of the term jumper window?
8  A  Yeah. Jumper window is a term that I first encountered
9    really in this claim. I had heard the phrase jump, of
10    course. It's often to go across a link. It's the way
11    it's usually used, but it's a separate window that has
12    some kind of controls and display in it that is used to
13    aid or attempt to aid in navigation and the use of the
14    browser.
15  Q  Okay. In your experience and/or in your opinion, was the
16    term Internet browser understood differently in say
17    February of 1996 from what you've just testified to?
18         MR. WOLFF:  Object to form.
19         THE WITNESS:  February of 1996? No, I don't
20    think so.
21  BY MR. HOOD:
22  Q  Okay. How about with respect to "window"? Was that term
23    understood differently in February 1996 than what you just
24    testified to?
25  A  I wouldn't think so.

### Page 23

1  Q  And how about the term user interface? Was that term
2    understood differently in February of 1996 than what
3    you've just testified to?
4  A  I wouldn't think so.
5  Q  You'd mentioned, and we reviewed in tab B to your
6    declaration that you had reviewed the Google Toolbar with
7    respect to two Internet browsers. Do you recall that?
8  A  Yes.
9  Q  Is it your opinion that the Google Toolbar modifies a
10    browser window?
11         MR. WOLFF:  Object to form, ambiguous,
12    incomplete hypothetical, and lastly I don't see exactly
13    what this has to do with anything that Professor Hardin
14    offered the declaration on, so I think that it is fairly
15    outside of the scope of this deposition.
16         MR. HOOD:  Are you instructing him not to
17    answer?
18         MR. WOLFF:  So I'm instructing the witness
19    not to answer.
20         MR. HOOD:  Okay.
21         MR. WOLFF:  Unless you want to articulate how
22    it's related, and I would obviously reconsider that --
23         MR. HOOD:  Yeah. I'll get specifically into
24    the patent.
25         MR. WOLFF:  Okay.

### Page 24

1         MR. HOOD:  I think you'll see where we're
2    going with that.
3  BY MR. HOOD:
4  Q  Let's do that. Paragraph 27, Mr. Hardin, of your
5    declaration. On page number seven of Exhibit 95,
6    subparagraph (a) you state there that "as I understand
7    this claim limitation, and as I understand from my review
8    of the prosecution history of how the United States Patent
9    & Trademark Office (USPTO) examiner understood this claim
10    limitation, a construction of the claim should at least
11    cover the embodiment shown with reference to Figure 5A,
12    referred to by the USPTO in its reasons for allowing the
13    '172 patent." Did I read that correctly?
14  A  Yes, you did.
15  Q  Why in your opinion should a construction of the claim at
16    least cover the embodiment shown with reference to
17    Figure 5A?
18  A  Well, that was one of the main references that was used in
19    the patent, and it was referred to in the USPTO, and it
20    seemed to me to be a clear -- as clear as it could get or
21    as it gets description of the claim and this particular
22    limitation.
23  Q  Now, '172 patent -- well, let me back up. Are there any
24    particular statements or pieces of information in the '172
25    patent itself or its prosecution history that you base

Case 2:04-cv-70366-JAC-RSW   Document 62-4   Filed 11/03/2005   Page 9 of 44

Net Jumper Software, L.L.C. vs.                 Multi-Page™                    Joseph Hardin
Google Inc.                                                             September 16, 2005

Page 25

1  that particular paragraph 27A opinion upon? And feel
2  free, -- I think we have Exhibit No. 30, which is the '172
3  prosecution history here for you to review if you'd like
4  to.
5          MR. WOLFF: Object to form. Go ahead.
6          THE WITNESS: So what was the question again
7  exactly?
8  BY MR. HOOD:
9  Q  I'd like you to point out if there's anything in the '172
10     patent itself or its prosecution history that you base
11     that particular statement 27(a) upon. I'd like you to
12     point that out for me.
13 A  Well, I think the claims talk about, as we quoted here,
14     displaying a first and a second icon separate from the
15     search window on said display screen, so we could go and
16     find that quote if we'd like to. That would be in the
17     claim section of the patent itself. And in the
18     prosecution history, if I remember correctly, the patent
19     was granted when it was made clear that this distinction
20     of displaying in a separate window separate from the
21     search window was made clear. So those are the things
22     that I thought were most important when I was looking at
23     this particular claim.
24 Q  How was that distinction made clear as you just stated?
25 A  In the text and in the image in 5A.

Page 26

1  Q  The text of what?
2  A  The text of the patent itself of '172 and in the text of
3     the prosecution history.
4  Q  Could you point me where in the text of the patent that
5     statement was made clear? And let me direct you. In the
6     '172 history, I believe the patent starts at the page
7     that's numbered G000075.
8          MR. WOLFF: Object to the form of the
9     question that it's ambiguous.
10         THE WITNESS: This is going to take a minute
11     to dig this out.
12 BY MR. HOOD:
13 Q  Okay. Take your time.
14 A  You don't happen to have one of these that has this in a
15     slightly larger text, do you?
16 A  I think I do.
17 Q  There you go.
18         MR. HOOD: Jason, do you want a copy?
19         MR. WOLFF: No.
20         THE WITNESS: So on -- in '172, column 13
21     where we see -- it's down in the first claim. I'm on a
22     page that's identified at the bottom right as G000096.
23     There's the phrase displaying a first and a second icon
24     separate from the search window on said display screen.
25     So that would be where I would look for this in the

Page 27

1  patent.
2  BY MR. HOOD:
3  Q  And let me clarify. You're saying that that particular
4     claim language is what at least in part makes clear to you
5     the opinion that you state in paragraph 27(a) of your
6     declaration?
7  A  Yes. And in the prosecution history -- gosh.
8          MR. HOOD: Let's take a quick break.
9          (Brief recess.)
10         MR. HOOD: Back on the record.
11 BY MR. HOOD:
12 Q  We were discussing Paragraph 27(a) of your declaration,
13     and I'd like to know other than the claim language that
14     you've pointed to in claim one of the '172 patent, what if
15     anything from the prosecution history of the '172 patent
16     makes that opinion in 27(a) of your declaration clear as
17     you testified?
18         MR. WOLFF: Object to form, ambiguous. Calls
19     for a legal conclusion. Go ahead.
20         THE WITNESS: Okay. If we look at page
21     G00286 and the reasons for allowance in the prosecution
22     history, we find the phrase -- or the statement paragraph
23     -- it says -- it's talking about independent claims, and
24     in claim 1 in conjunction with other -- let's see, yada,
25     yada, yada -- displaying a first and second icon separate

Page 28

1     from the search window on said display screen and parsing
2     the location identifiers. It goes on. And then as shown
3     -- and so we've got separate from the search window on
4     said display screen there, and as shown in Figure 5A the
5     first and second icons are provided separate, item 300
6     from the browser window, item 400, and so that seemed to
7     me to be fairly clear and motivates my understanding
8     that's expressed in 27(a).
9  BY MR. HOOD:
10 Q  Who made the statement that's -- that you just read from
11     page number G000286?
12 A  It says the following is an examiner's statement of
13     reasons for allowance.
14 Q  Okay. So you take it that the examiner made that
15     particular statement; is that correct?
16 A  An examiner.
17 Q  An examiner?
18 A  Right.
19 Q  Okay. It's your understanding that that statement that
20     you just read was not made by an inventor or applicant for
21     the '172 patent; is that correct?
22 A  Well, it quotes the patent, so I would assume that the
23     part that's in quotes was a statement of the inventor or
24     the patent applicant. But this -- reasons for allowance
25     is clearly an examiner's statement.

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 10 of 44

Net Jumper Software, L.L.C. vs.                          Multi-Page™                          Joseph Hardin
Google Inc.                                                                                September 16, 2005

Page 29

1 Q  Okay.  Other than the embodiment of Figure 5A, as you
2      reference in paragraph 27(a) of your declaration, are
3      there any other embodiments of the invention that are
4      included in the specification of the '172 patent?
5          MR. WOLFF:  Object to form, calls for a legal
6      conclusion, ambiguous.
7          THE WITNESS:  By embodiments, are you
8      referring to pictures?
9 BY MR. HOOD:
10 Q  Let me ask this -- let me ask a different question.  You
11      used the term embodiment in paragraph 27(a), correct?
12 A  Prosecution history -- at least cover the embodiment
13      shown.  Right.
14 Q  I'm asking it in the same way that you're using that word,
15      embodiment, and let me ask you what do you understand the
16      term embodiment to mean as you use it in paragraph 27(a).
17 A  Implementation is a -- or bringing, you know, to a form
18      where you can see it or that describes it sufficiently is
19      what I think I'm -- is what I mean by embodiment.  There
20      are a number of figures there referenced by -- Figure 5A.
21      I think there is -- we could look, but there is a B, C --
22      or a 5A.  There's a 5C.  All right.  So there's a number
23      of pictures that I would consider embodiments, a Figure 6.
24      Yes.
25 Q  Is it your opinion that there are other embodiments in the

Page 30

1      '172 patent other than figures that you've just described,
2      in other words, textual embodiments?
3          MR. WOLFF:  Object to form.
4          THE WITNESS:  No, no -- yes.  There are other
5      things that I would consider as more -- as descriptions,
6      but the embodiments that I was focusing on were those that
7      had to do with clear examples of the interface, and those
8      were in the graphics.  All right.  The descriptions
9      period.  Right.
10 BY MR. HOOD:
11 Q  Is it your opinion that a construction of the claim as you
12      describe in paragraph 27(a) covers the other embodiments
13      that in your opinion are shown in the '172 patent?
14          MR. WOLFF:  Object to form, ambiguous, calls
15      for a legal conclusion.
16          THE WITNESS:  Yeah.  I don't know.
17 BY MR. HOOD:
18 Q  You have no opinion on that?
19 A  No.
20 Q  Let me direct your attention to column seven of the '172
21      patent, and this is in the exhibit -- the page marked
22      G000093.  Feel free to use the other text version if you
23      want to, but you can at least refer to it.  I think it's
24      underneath here.  We're in column seven.
25 A  Okay.

Page 31

1 Q  And particularly I'd like to ask you questions starting on
2      line 22, the paragraph that starts "in alternate
3      embodiments."  Do you see that there?
4 A  Yes.
5 Q  The first sentence in line 22 of column seven says "in
6      alternate embodiments the jumper window may take any of
7      several forms.  The user interface may include pop-up or
8      persistent window, a Toolbar, a menu modification of the
9      browser window, a Toolbar modification of the browser
10      window or the use of accelerator keys on the keyboard."
11      Did I read that correctly?
12 A  Yes, you did.
13 Q  In your opinion do any of those embodiments that are set
14      forth -- or let me back up.  Should, as you say in
15      paragraph 27(a) of your declaration, a construction of the
16      claim at least covered those embodiments that are
17      described as I just read from column seven of the '172
18      patent?
19          MR. WOLFF:  Object to form.  Same objection
20      as before.  Go ahead and answer the question.
21          THE WITNESS:  I think when I look at this
22      patent, overall the characterization that I have in 27(a)
23      is a better characterization of -- and certainly the best
24      that I can give of the limitations that are expressed in
25      the claim.

Page 32

1 BY MR. HOOD:
2 Q  What do you mean by a better characterization, as you just
3      said?
4 A  More consistent.  It's consistent with more of the -- my
5      reading of the patent and the prosecution history.
6 Q  So is it then your opinion that the embodiments, the
7      alternate embodiments that are set forth at lines 22
8      through 26 of column seven are not properly included
9      within a proper claim construction as you've described in
10      your declaration?
11          MR. WOLFF:  Same objection.
12          THE WITNESS:  No.  My understanding is that
13      they would not be consistent if they were to be included.
14      Right.  There are too many places where as we just
15      described there's a fairly clear representation of the
16      claim, and these as they're phrased alternate embodiments
17      simply to me don't fit the larger, more consistent
18      coherent pattern of the overall claims.
19 BY MR. HOOD:
20 Q  What is that larger, coherent, more consistent pattern of
21      the claims?
22 A  As what's described in the claims that we just quoted,
23      that there's a first and second icon separate from the
24      search window, right, that there's a clear delineation
25      between the search window and whatever other window those

Case 2:04-cv-70366-JAC-RSW     Document 62-4 ™ Filed 11/03/2005     Page 11 of 44

Net Jumper Software, L.L.C. vs.          Multi-Page ™                    Joseph Hardin
Google Inc.                                                        September 16, 2005

Page 33

1  icons or whatever other space those icons appear in.
2  Q  Just so I'm clear, it's your opinion then that these
3     alternate embodiments in lines 22 through 26 are
4     inconsistent with that particular claim element?
5  A  Yes. They just don't seem to make anywhere near as much
6     sense as the characterization that I've given.
7  Q  In your review of the '172 patent, did the applicants
8     specifically disavow or say that any particular
9     embodiments were not included or covered by the claims of
10    the patent?
11       MR. WOLFF: Object to form, calls for a legal
12    conclusion. Go ahead and answer the question.
13       THE WITNESS: Could you repeat the question?
14    So the applicants --
15 BY MR. HOOD:
16 Q  Let me ask it a different way.
17 A  Yeah.
18 Q  I understand it's your testimony that the alternate
19    embodiments on lines 22 through 26 are inconsistent with
20    your view of the claim limitation --
21 A  Right.
22 Q  -- that we discussed. I want to ask you, did you in your
23    review of the '172 patent, not the prosecution history,
24    just the patent at this point, find anywhere where the
25    patent applicant specifically said that any of those

Page 34

1  alternative embodiments that are described in lines 22
2  through 26 are not covered by the claims of the '172
3  patent?
4       MR. WOLFF: Object to form, incomplete
5  hypothetical, calls for a legal conclusion. Now, I don't
6  understand why you've included the claims, which issued
7  after the prosecution history from the called question
8  asking him to opine as to what was meant when the
9  prosecution -- when the claim is issued. So I don't
10 understand how you can ask a question about the patent as
11 a whole and the claims and then exclude the entire
12 prosecution history.
13 BY MR. HOOD:
14 Q  And, Professor Hardin, for your benefit, Counsel, too, I
15    was simply trying to make it as clear as possible. Talk
16    with the '172 patent first and then the prosecution
17    history. If it makes more sense to you feel free to
18    include in the scope of that question the '172 prosecution
19    history. And again, my question -- and let me make it
20    broad to address I think at least in part counsel's
21    concern -- did you find in your review of either the '172
22    patent or the '172 patent's prosecution history anywhere
23    where the applicants for what was issued as the '172
24    patent specifically stated that embodiments of the patent
25    as described in its specification were not somehow

Page 35

1  included or covered by the claims of the patent?
2       MR. WOLFF: Object to form. Same objections
3  as before. And asked and answered. Go ahead.
4       THE WITNESS: I don't have an opinion on
5  that.
6  BY MR. HOOD:
7  Q  Okay. I don't think I asked for an opinion. I was asking
8     if you saw anywhere in the prosecution history of the
9     patent where the applicant specifically said that
10    particular embodiments were not covered by the claims of
11    the patent.
12 A  Well, I don't have an opinion because I don't remember any
13    specific place, but as I said, my overall reading lead me
14    to the conclusion that the clearer description that was
15    given in the claims and in the reasons for allowance that
16    we cited earlier were sufficient to make a judgment.
17 Q  Okay. Let me back you up to paragraphs 16 through 19 of
18    your declaration, which is Exhibit 95. You set forth
19    there in those paragraphs as I understand it your
20    understanding of certain legal standards that are applied.
21    Is that correct?
22 A  Yes.
23 Q  Do you have any understanding with respect to the coverage
24    of alternative embodiments in a patent by a patent's
25    claims?

Page 36

1       MR. WOLFF: Object to form, ambiguous.
2       THE WITNESS: So you're asking what is my
3  understanding of alternative embodiments?
4  BY MR. HOOD:
5  Q  I'm asking do you have any understanding of coverage of
6     alternative embodiments by a patent's claims.
7  A  I clearly don't know what the legal standing of such a
8     phrase is. I would expect that alternate embodiments
9     would refer to different ways that the -- that the
10    invention or the method could be realized. And I would
11    expect those if -- to be consistent if I were looking at a
12    coherent set of claims. I would expect them to be
13    consistent with the claims.
14 Q  Jumping forward again to paragraph 27 sub (b) of your
15    declaration. And here you state that "based upon my
16    review of the '172 patent and its prosecution history, the
17    claims' reference to a 'search window' must be understood
18    to refer to the browser window (Figure 5A reference number
19    400). The examiner clearly made this connection and
20    interpreted the claims in this manner in the statement
21    [for reasons -- or statement] of reasons for allowance."
22    Did I read that correctly?
23 A  Yes, you did.
24 Q  Why in your opinion must the term search window refer to
25    browser window as it's used in the '172 patent?

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 12 of 44

Net Jumper Software, L.L.C. vs.                   Multi-Page ™                    Joseph Hardin
Google Inc.                                                                September 16, 2005

Page 37

1 A   Again, to refer you to the same section and the reasons
2     for allowance, I think that's the explicit text there, and
3     again, when I look at this and look at the patent as a
4     whole and the prosecution history as a whole, this is the
5     only interpretation that I can come away with that allows
6     me to have a consistent view of the claims and indeed the
7     overall meaning of the patent itself.
8 Q   You mentioned the reasons for statement of allowance. Are
9     you referring again to what we discussed earlier on page
10    G000286 of the prosecution history?
11 A  Yes.
12 Q  Okay. Are there any other particular statements in the
13    prosecution history upon which you base the opinions set
14    forth in paragraph 27(b) of your declaration?
15 A  I'd have to go through and look. There's none that I
16    remember that I can bring to mind specifically. Again, in
17    following through a long strain or a string or a train of
18    discussion like this, I needed to keep a few things clear
19    as to what different terms referred to, and the one -- the
20    only way that I could make a consistent picture out of
21    this -- the only way I think a consistent picture can be
22    made indeed was to characterize the search window as the
23    browser window.
24 Q  Just so I'm clear, have you had any discussions verbally
25    with the examiner that issued these reasons for allowance

Page 38

1     that you're referring to in the prosecution history?
2          MR. WOLFF: Object to form. Go ahead and
3     answer that question.
4          THE WITNESS: What is -- no. Could I ask
5     what an objection to form actually means? I mean --
6          MR. HOOD: Let's go off the record for a
7     minute. Go ahead.
8          (Brief recess.)
9          MR. HOOD: Back on the record.
10 BY MR. HOOD:
11 Q  I think we had an answer to that question so I'll ask a
12    different question. Let me move to Figure 5A of the
13    patent that you referred to. I believe it's at page
14    G000080 of Exhibit No. 30.
15 A  Right. I'm looking at the '172 document that's
16    independent, so I don't have those characterizations. But
17    I'm looking at the page. Sheet 5 of 14 of the '172 patent
18    that's labeled Figure 5A.
19 Q  Okay. Do you have any --
20         MR. WOLFF: I'll agree that it's the same.
21         MR. HOOD: Very good. That's good that we
22    can dispense with those kinds of things.
23 BY MR. HOOD:
24 Q  And feel free as I ask these questions, Professor Hardin,
25    to look through the patent if you need to. I'm going to

Page 39

1     ask you about certain features of the figure and your
2     understanding. There is a feature number or an item
3     number 400 at the top right. Do you see that with an
4     arrow?
5 A   Yes.
6 Q   What in your understanding of the '172 patent is
7     feature 400 directed to?
8 A   It's directed to the browser window, which is referred to
9     as the search window.
10 Q  Referred to where as the search window?
11 A  In the discussion that we've had previously in the text of
12    the patent and in the prosecution history.
13 Q  Okay. I think I misunderstand. Could you point me in the
14    '172 patent you believe that feature 400 is called the
15    search window?
16 A  Well, let's look. So in column seven, we have the browser
17    interface 400, and then over -- let's see if I can find a
18    reference like that. Browser interface 400 in line 51, 2,
19    3, 4, and it's characterized in opposition to a jumper
20    window so -- and later on we see characterizations of
21    search window versus jumper window. That's the conclusion
22    I come to. I don't know if I can find without reading
23    through the whole thing again a specific characterization
24    of the search window.
25 Q  But you believe the '172 patent somewhere in the

Page 40

1     specification refers to feature 400 as a search window?
2 A   I think that in --
3          MR. WOLFF: Object to form. Sorry. Give me
4     a chance.
5          THE WITNESS: Yeah, I know. I need to slow
6     down. I think as I've said that that's the only
7     consistent characterization that I can make of it.
8 BY MR. HOOD:
9 Q   But you believe there's a specific reference in the patent
10    itself to feature 400 as the search window?
11         MR. WOLFF: Object to form, misstates the
12    witness' testimony.
13         THE WITNESS: Yeah. I couldn't state that
14    unequivocally. I have to go back and go through the whole
15    patent again. And again my declaration and my
16    understanding of this encompasses the patent and the
17    prosecution history -- my understanding of those.
18 BY MR. HOOD:
19 Q  In column seven, and I believe you just noted this, about
20    line 30 of the '172 patent, and I believe this is what you
21    read -- it says "the browser interface 400 is that of
22    Netscape Navigator"; is that correct?
23 A  You read about 30?
24 Q  Line 30.
25 A  Right.

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 13 of 44

Net Jumper Software, L.L.C. vs.    Multi-Page™    Joseph Hardin
Google Inc.                                       September 16, 2005

Page 41

1 Q Yeah.
2 A That was one of the ones that I referenced.
3 Q And then I think you went down. It was 50 --
4 A Yeah, 54.
5 Q Okay. It also says a browser interface 400 at line 54,
6   correct?
7 A Right. And the arrow's pointing to the rectangle that
8   encompasses all of the -- everything inside that browser
9   interface.
10 Q And with reference to Figure 5A then, describe for me your
11   understanding of what the browser interface is.
12 A Well, it's everything that's inside that window.
13   Everything that's encompassed within the four corners or
14   within that rectangle that's composed of the outside edge
15   that the 400 arrow is pointing to.
16 Q And is that browser interface as it's used in the '172
17   patent different in your opinion than the browser window?
18 A Well, first let me say that there's a number of different
19   terms that are used in the patent itself, and in different
20   places there's some vagueness in referent for the terms.
21   The browser in this case and the term -- I'm qualifying
22   this for a couple of reasons -- one is that there are
23   quite a few places in this that it's difficult to tell
24   exactly what we're talking about. The other is that the
25   term, window, browser window is used at times somewhat

Page 42

1   differently, but again, in the context of reading the
2   whole document and looking at the prosecution history I
3   would say that yes, the browser interface here that's
4   referred to by 400 is congruent with the construction of
5   the term browser window.
6 Q So at least with respect to the patent it's your opinion
7   that browser interface is browser window; is that correct?
8 A In this case, yes.
9 Q And that's what I mean, with respect to the '172 patent.
10 A Yes.
11 Q Okay. With respect to Figure 5A again -- I'm still on 5A,
12   if you want to go back to that figure -- there is an item
13   or element number 404. Do you see that, Professor?
14 A Yes.
15 Q Just below the 400. And what in your understanding is
16   item or element 404 as listed on Figure 5A?
17        MR. WOLFF: Object to form.
18        THE WITNESS: Could you ask the question
19   again?
20 BY MR. HOOD:
21 Q Yeah.
22 A What is element 404?
23 Q I'm just wanting to know exactly in your understanding
24   what is element 404 as shown in Figure 5A of the '172
25   patent?

Page 43

1 A It's an element of the browser window.
2 Q Okay. And let me direct you to line 32 of column seven of
3   the '172 patent. It says a site window 404. Do you see
4   that?
5 A Yes.
6 Q Do you agree with that characterization of that term, site
7   window, as used with 404 in Figure 5A?
8        MR. WOLFF: Object to form. The document
9   speaks for itself.
10        THE WITNESS: Right. I would agree. Yes,
11   the document --
12        MR. WOLFF: Don't agree with my objection --
13        THE WITNESS: The document speaks for itself.
14   I personally in -- as a term within the field it's not the
15   best. Right. A site window. The site -- a site -- and
16   I'm just objecting there to the ambiguity that I think is
17   inherent in the use of the term site and window together
18   there. There's many -- the site that we're at is the
19   Yahoo site. So you could call the site window the display
20   there. Again, it's a sub element of the browser window.
21 BY MR. HOOD:
22 Q Not referring to what the '172 patent calls it, what would
23   you in your experience call element 404?
24        MR. WOLFF: Object to form.
25        THE WITNESS: I'd call it the place where you

Page 44

1   enter a URL.
2 BY MR. HOOD:
3 Q Regardless of what it's called, if I didn't misunderstand
4   you it's your opinion that element 404 is part of the
5   browser window as you've testified?
6 A Yes.
7 Q Okay. Professor, there's also an element that is
8   labeled 406 in Figure 5A. Do you see that? It's at the
9   bottom, kind of bottom right.
10 A Uh-huh.
11 Q What in your opinion does element 406 refer to?
12 A Well, it's pointing to the bottom bar that has the phrase
13   "document done" in the browser window. Its
14   characterization within the text is as a window for
15   viewing a file -- 406. So I would think that it would
16   probably more properly have extended the arrow to match up
17   the text description with the representation to go past
18   that notification bar at the bottom and move into the
19   actual screen area that we see that's used for the HTML
20   display. But again, my understanding is that that is a
21   sub element of the browser window that is part of the
22   overall browser interface.
23 Q So you believe that the arrow on element 406 on Figure 5A
24   should extend into the -- I think you said the search
25   display or screen display?

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 14 of 44

Net Jumper Software, L.L.C. vs.    Multi-Page™    Joseph Hardin
Google Inc.    September 16, 2005

Page 45

1    MR. WOLFF: Object to form, ambiguous.
2    THE WITNESS: It would help me in my
3  understanding of what it was pointing to. I have to do a
4  little bit of construction to make sense of exactly what
5  the text is saying and what that arrow's pointing to. So
6  I think that's a yes. Right? It would be better for me
7  as a reader trying to understand what's being
8  characterized here if that arrow was in a slightly
9  different place.
10 BY MR. HOOD:
11 Q  Actually going into the --
12 A  Yeah.
13 Q  -- screen display area?
14 A  Right.
15 Q  Okay. Let me just ask you a follow up. With respect to
16    what you believe 406 is pointing to, what if anything do
17    you call that particular area of this -- whatever you want
18    to call it, browser window --
19    MR. WOLFF: Object to form.
20 BY MR. HOOD:
21 Q  -- of Figure 5A?
22    MR. WOLFF: Are you saying in the patent or
23    in the abstract sense?
24    MR. HOOD: I'm saying in the abstract sense
25    so we can get on the same page. I'm going to refer to

Page 46

1    that area. I just want to use a term that you view that
2    as so that we are talking about the same thing.
3    THE WITNESS: That's a page display.
4  BY MR. HOOD:
5  Q  A page display? Okay. Again on Figure 5A, I want to ask
6    you some questions now on the item that is labeled 300,
7    kind of a third of the way down on the right. You see
8    that, Professor?
9  A  Yes.
10 Q  Okay. What is in your opinion figure 300 referencing --
11    or item 300 rather?
12    MR. WOLFF: Object to form.
13    THE WITNESS: Three hundred is referencing a
14    separate window, which has the characterization here of
15    Internet buffet, and in the text is referred to as a
16    jumper window, I think. Let me find it. Yes. It's -- on
17    column seven again, 19 and 54 again, a jumper window. So
18    it's a separate window from the browser window.
19 BY MR. HOOD:
20 Q  And you say that's a separate window from the browser
21    window. Why in your opinion is that a separate window
22    from the browser window?
23 A  Well, you can -- there's a number of reasons. One, just
24    by inspection you can see that it is floating above the
25    browser window. It can be moved independently of the

Page 47

1    browser window. It can be opened and closed, re-sized,
2    independently of the browser window. It has a set of
3    controls that are independent of the browser window. It
4    has its own scroll bars. It's a separate rectangle that
5    is commonly referred to as a window, and it is not
6    contained within in any sense of the term that I can think
7    of the browser window, so it's separate.
8  Q  Okay. The page display, item 406 as we're going to call
9    it, all in Figure 5A, is it your opinion that that is a
10    window?
11    MR. WOLFF: Object to form, calls for a legal
12    conclusion.
13    THE WITNESS: It could be referred to as a
14    window. It's more properly referred to in this context I
15    think as a component since we're trying to figure out a
16    couple things here as a component of the browser window, a
17    component of the browser display, a component of the
18    browser interface.
19 BY MR. HOOD:
20 Q  Would it be reasonable in your opinion to refer to the
21    page display as a window?
22    MR. WOLFF: Object to form, calls for a legal
23    conclusion. You can answer the question.
24    THE WITNESS: It could be in some context,
25    not in this one. In this context it's more properly

Page 48

1    referred to as a sub window of the larger browser
2    interface or browser window. The term window -- I mean
3    the reason that I say that is the term window is in the
4    field of user interface design used fairly loosely. Like
5    there's times in which you'd refer to a form element in
6    that way, but again within the context of my understanding
7    and my construction -- characterization of what's -- what
8    we're talking about here, it's better referred to as a sub
9    window of the larger browser interface or browser window.
10 BY MR. HOOD:
11 Q  Okay. Would you disagree with a characterization of
12    element 404 in Figure 5A as a search window?
13    MR. WOLFF: Object to form, calls for a legal
14    conclusion.
15    THE WITNESS: In this context, yes, I would
16    disagree with it as a term for a search window.
17 BY MR. HOOD:
18 Q  Why?
19 A  It can be used for searching, but the kinds of things that
20    are done and that are described as being part of the
21    functionality of search windows in the patent discuss
22    display, results, things like that, while this window is
23    merely a holder for a URL.
24 Q  Let me ask you the same question with respect to element
25    406. Would you disagree with the characterization of

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 15 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page™                    Joseph Hardin
Google Inc.                                                                September 16, 2005

| Page 49 | Page 51 |
|---|---|
| 1    element 406 as a search window? | 1    the data file -- and these data files are referencing Web |
| 2 A  I think that again a consistent reading -- or the reading | 2    pages. Right. That the search window is -- has at least |
| 3    that I have that allows for consistency within the context | 3    the function of displaying a file. All right. For |
| 4    of the '172 patent that would be a sub element of the | 4    instance, I think -- I'm sorry, I've lost the thread. I'm |
| 5    larger search window, which in this case is the browser | 5    not sure why -- could you repeat the question? Because |
| 6    display. | 6    I'm trying to remember if I'm answering whether or not -- |
| 7 Q  And what is that position based upon? | 7    giving the reasons why I think that 404 doesn't classify |
| 8 A  My reading of the documents, my understanding of the | 8    as a search window or why I think something else. So I'm |
| 9    descriptions of operation, looking at the graphics, | 9    sorry. I'm kind of lost -- |
| 10   reading the text, simply my overall understanding of the | 10 Q  Let's -- yeah, just so you're clear. |
| 11   patent. | 11 A  Right. |
| 12 Q  Are there any particular passages from the patent or its | 12 Q  Let's start with 404. Give me the reasons why you believe |
| 13   claims that that understanding is based upon? You knew | 13   that does not classify, as you said, a search window. |
| 14   that was coming. | 14 A  Okay. And that is because search windows when they're |
| 15 A  Yeah, yeah. That was the next one, right? | 15   described as I've said in claim one, section -- or |
| 16       MR. WOLFF: Object to form. Go ahead. | 16   line 57, search windows involve the displaying of data |
| 17       THE WITNESS: Again, I would have to go | 17   files, and 404 in Figure 5A can't display a data file. |
| 18   through and step through some of the operations. Let's | 18   Okay. So that would be the -- one of the main reasons. |
| 19   see if I can't -- if I could take a minute to look I will | 19   And, in fact, let's just stop there. Yeah. |
| 20   try and find something. | 20 Q  Now, let's go to 406. |
| 21 BY MR. HOOD: | 21 A  Okey-doke. |
| 22 Q  Please do. | 22 Q  Why in your opinion can 406 of Figure 5A not be classified |
| 23 A  Well, if we just look at column 15, and we go down to | 23   as a search window? |
| 24   line 17, I think. Is it -- yeah. | 24 A  While I'm looking in the document -- |
| 25       MR. WOLFF: Just as a moment, it might be | 25       MR. WOLFF: Object to form. Asked and |

| Page 50 | Page 52 |
|---|---|
| 1   helpful if we used the actual claims from the patent that | 1   answered too. |
| 2   we're talking about as opposed to unasserted claims, just | 2       THE WITNESS: I think I'll have to say that |
| 3   for the clarity of the record. | 3   it's simply based on my overall characterization of the -- |
| 4       THE WITNESS: Right. And I'm in the claims | 4   and my reading of the claims and the patent and the |
| 5   section here. | 5   prosecution history. I can't find a particular quote to |
| 6       MR. WOLFF: But they have to be the right | 6   point to at this point. |
| 7   number. | 7 BY MR. HOOD: |
| 8       THE WITNESS: Oh, so I should say nine -- | 8 Q  Do you believe there is a particular quote that you would |
| 9       MR. WOLFF: I'm not telling you what you | 9   base that opinion upon? |
| 10   should say -- | 10 A  I think there's a number of them, and I think again it's a |
| 11       THE WITNESS: Right. I know you're -- | 11   question of the overall characterization that comes from |
| 12       MR. WOLFF: -- look at claim one or five. I | 12   reading the patent and the prosecution history. |
| 13   think that would help us -- | 13 Q  How would you go about finding those particular quotes? |
| 14       THE WITNESS: Okay. Look at claim -- | 14 A  I'd reread the whole thing. |
| 15       MR. WOLFF: -- the record. | 15 Q  How long has it been since you last reread the whole |
| 16       THE WITNESS: -- nine. Right. | 16   thing, the '172 patent and prosecution history? |
| 17 BY MR. HOOD: | 17 A  The patent, a few days. The prosecution history has been |
| 18 Q  You're referring to claim nine of the '172 patent; is that | 18   read over the last couple months -- three months. |
| 19   correct? | 19 Q  Okay. Referring again to Figure 5A, is there a place, for |
| 20 A  In definitions one, yes. I could alternatively refer to | 20   lack of a better term, on this particular screen where a |
| 21   claim one. I think the same thing is there. In either | 21   user could type in a search query, you know, terms with or |
| 22   case -- let's look at column 13 and look at claim one. It | 22   without connectors, those kinds of things, to do a search |
| 23   talks about retrieving an initial data file from the | 23   on the Internet? |
| 24   network together with displaying the initial data file in | 24 A  A place where a user could -- on this interface that's |
| 25   the search window. So there's the obvious conclusion that | 25   displayed here? |

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 16 of 44

Net Jumper Software, L.L.C. vs.    Multi-Page™    Joseph Hardin
Google Inc.    September 16, 2005

Page 53

1  Q  That's correct.
2          MR. WOLFF: Object to form. What does this
3  have to do with his declaration?
4          MR. HOOD: He's testified what he believes a
5  search window is. I want to ask him about --
6          MR. WOLFF: So are you --
7          MR. HOOD: -- search.
8          MR. WOLFF: So you've qualified what the term
9  search window means as some place you type in a form?
10         MR. HOOD: I'm just asking him a general
11  question. Is there a place a person could do that kind of
12  a search on this particular window?
13         MR. WOLFF: Object to form, ambiguous. I
14  suppose it calls for a legal conclusion too. Go ahead.
15         THE WITNESS: In this interface that's
16  displayed here just in the browser interface itself people
17  can -- a user can type in a URL. Right. That's the main
18  form of navigation here. To call that a search is to
19  really narrow our concept of what it means to search on
20  the Internet. So this interface is not necessarily
21  designed for searching. It allows people to both use URLs
22  to move to different pages and to click on URLs that are
23  in the pages. Right. So in that sense it does allow for
24  searching.
25  ///

Page 54

1  BY MR. HOOD:
2  Q  Would you consider that that you just described, the
3  typing in of a URL to be a search as you understand the
4  term search?
5  A  It's part of a search. It is certainly part of
6  navigation. Right. And in the context and with the
7  display of the rest of the elements of the display window
8  of the browser window, one can navigate and one does
9  frequently navigate across the net.
10  Q  Just so I'm clear again, with reference to Figure 5A from
11  the patent, Professor --
12  A  Yes.
13  Q  -- explain to me what your understanding of the term
14  search window is as it's used in the '172 patent referring
15  to Figure 5A.
16         MR. WOLFF: Object to form. Calls for a
17  legal conclusion. Asked and answered.
18         THE WITNESS: I think I've already answered
19  that.
20  BY MR. HOOD:
21  Q  I'm sorry if I missed it, but I want to make sure I
22  understand it.
23  A  All right. So could you ask the question again?
24  Q  With respect to Figure 5A, what on this figure do you
25  consider to be the search window as it's used in the '172

Page 55

1  patent?
2          MR. WOLFF: Same objection.
3          THE WITNESS: Right. I think I've said it's
4  the browser window. The search window would be the
5  totality of functionality that's contained within the four
6  corners of the browser, period.
7  BY MR. HOOD:
8  Q  Okay. So in your opinion does the search window include
9  elements 402, for instance?
10  A  Sure.
11  Q  Okay. 412?
12  A  Yes.
13  Q  414?
14  A  Yes.
15  Q  Okay. What about element 300?
16  A  No.
17  Q  306?
18  A  No.
19  Q  I direct your attention again to column seven on the '172
20  patent. And I'm at line 22 again -- lines 22 through 26.
21  A  The alternate embodiments paragraph?
22  Q  That's correct.
23  A  All right.
24  Q  Yeah. Moving to the second sentence there on line 23, it
25  says "the user interface may include pop-up or persistent

Page 56

1  window." Do you see that?
2  A  Uh-huh.
3  Q  A Toolbar.
4  A  Uh-huh.
5  Q  And let me ask you about that where it basically says the
6  user interface may include a Toolbar. Going back to
7  Figure 5A is that embodiment in your opinion shown in
8  Figure 5A in any way, shape or form?
9  A  No, I think the embodiment is in the Internet buffet
10  rectangle that is labeled as 200.
11  Q  Okay. And you're saying that that alternate embodiment
12  that the user interface may include a Toolbar as shown by
13  element 300?
14  A  Yes.
15  Q  Okay. Point me to the Toolbar as referenced in the
16  embodiment from column seven.
17  A  Oh, you have --
18         MR. WOLFF: Object to form and ambiguous. Go
19  ahead.
20         THE WITNESS: Right. You have a Toolbar that
21  has a bunch of buttons on it there below the File, Edit,
22  Action, Help. So that's certainly in my mind part of the
23  user interface. And as it says user interface may
24  include. So again, I think I've already stated that I
25  don't find necessarily this paragraph to be very

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 17 of 44

Net Jumper Software, L.L.C. vs.    Multi-Page™    Joseph Hardin
Google Inc.    September 16, 2005

Page 57

1    consistent with the overall reading of the rest of the
2    documents, but if I were forced to point to a Toolbar that
3    is part of a user interface for the jumper window I would
4    simply go to 300 and say the buttons that are there on the
5    bar, which is the third bar after the Internet buffet,
6    File, Edit, Action, Help, and then the icon bars would be
7    what I'd characterize.
8  BY MR. HOOD:
9  Q    As the menu bar?
10 A    As the --
11 Q    Or the Toolbar rather?
12 A    Right. The Toolbar.
13 Q    Okay. I'll ask you about the next embodiment at line 24
14    of column seven. It says a menu modification of the
15    browser window.
16 A    Yes.
17 Q    Do you believe that particular embodiment is shown in
18    Figure 5A?
19        MR. WOLFF: Object to form.
20        THE WITNESS: Do I think that a menu
21    modification of the browser window is show in Figure 5A?
22    No.
23 BY MR. HOOD:
24 Q    Based on your experience, how would one make a menu
25    modification of the browser window based on your reading

Page 58

1  of the '172 patent?
2        MR. WOLFF: Object to form. Calls for a
3  legal conclusion. I don't really see this as being
4  germane to the witness' declaration. It's an incomplete
5  hypothetical.
6        MR. HOOD: Are you saying that -- I'm sorry,
7  I cut you off.
8        MR. WOLFF: It's an incomplete hypothetical.
9        MR. HOOD: Let me see if I understand your
10 objection. Are you saying that alternative embodiments
11 disclosed in the patent are not germane to his
12 declaration? If that's the case I want to ask about them.
13        MR. WOLFF: If you're asking him his opinion
14 as to how somebody might modify the browser window in the
15 abstract, I don't see that as being germane to his
16 declaration.
17        MR. HOOD: Okay. I will make it specific to
18 the '172 patent. That was my intent. If that's your
19 objection, I can certainly make it specific to this
20 particular patent and the embodiments disclosed.
21 Is that --
22        MR. WOLFF: Yeah --
23        MR. HOOD: -- your concern?
24        MR. WOLFF: -- if I could hear the question I
25 could certainly --

Page 59

1  BY MR. HOOD:
2  Q    Let me ask it again so we're all clear, Professor. How
3    would one in the context of the '172 patent make a, quote,
4    "menu modification of the browser window" as that term is
5    used in column seven of the '172 patent?
6        MR. WOLFF: Object to form. Incomplete
7    hypothetical. Go ahead and -- I suppose you can answer it
8    if you can with respect to the patent.
9        THE WITNESS: Right. With respect to the
10    patent and your question, your question says how could one
11    consistently do that, and as I've said before with respect
12    to the patent, I don't think you can consistently do that
13    because you can't at the same time have something that is
14    separate from the browser window and contained in the
15    browser window, and that would be what you would have to
16    do.
17 BY MR. HOOD:
18 Q    Well, let me ask you with respect to the claims of the
19    patent, and I think particularly the limitation that
20    you're talking about, if you could look at column 13 of
21    the '172 patent.
22 A    Yes.
23 Q    At line 53, I believe this is what you're referring to --
24    the displaying a first and second icon separate from the
25    search window on said display screen. Is that what your

Page 60

1    statement is referring to?
2  A    That's one of the things, yes.
3  Q    Okay. Am I correct to understand your opinion that the
4    alternative embodiment of a menu modification of the
5    browser window is inconsistent with displaying a first and
6    second icon separate from the search window?
7  A    Yes.
8  Q    That presumes, does it not, that search window means
9    browser window?
10 A    It -- that -- in the statement yes, it does presume that
11    in the conclusion. The characterization of the browser
12    window as the search window though is not just based on
13    that. It's based on everything that we've been talking
14    about and the characterization of 400 as the browser
15    window -- the browser interface in this case, so I think
16    it's consistent with all of the characterization that I've
17    given throughout the declaration.
18 Q    But it depends, does it not, on a characterization of 400
19    as the search window, not the browser window?
20 A    It depends on a characterization of 400 as both the search
21    window and the browser window.
22 Q    They have to be equal? The same thing?
23 A    They have to be the same. Right.
24 Q    Okay. Going back to column number seven at line 24 --
25    or 25. I'm sorry. Line 25. It says a Toolbar

Case 2:04-cv-70366-JAC-RSW   Document 62-4   Filed 11/03/2005   Page 18 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page™                         Joseph Hardin
Google Inc.                                                                      September 16, 2005

---

**Page 61**

1  modification of the browser window when it's referring to
2  alternate embodiments. I want to ask you the same
3  question about that. How would one in the context of the
4  '172 patent modify what's been shown in Figure 5A to
5  implement that embodiment?
6         MR. WOLFF: Same objection as before when you
7  asked this question.
8         THE WITNESS: Right. I notice you dropped
9  the term consistent.
10 BY MR. HOOD:
11 Q  I don't believe I used the term consistent. I think you
12    did, but --
13 A  I think you --
14 Q  -- in any event.
15 A  Okay. And again, my answer would hinge on that, that I
16    don't think you can consistently both have a modification
17    of the browser window, which is the search window and at
18    the same time have something that's separate from the
19    search window.
20 Q  As long as the browser window is the search window,
21    correct?
22 A  Yes.
23         THE WITNESS: I've been drinking too much
24    water.
25         MR. HOOD: You want to take a break?

**Page 62**

1         THE WITNESS: Five-minute break?
2         MR. HOOD: Sure. You bet.
3         (Brief recess.)
4         MR. HOOD: Back on the record.
5  BY MR. HOOD:
6  Q  Professor, you used the term earlier in your testimony
7     navigate --
8  A  Yes.
9  Q  -- do you recall that? In your opinion does navigate mean
10    something different than search?
11 A  That's a good question.
12 Q  Thank you. They're not always good. I know that. Go
13    ahead.
14 A  No, in the discussion you'd get an "A" on that. There's a
15    -- navigation is often less of a search for unknown items
16    and more a movement through known or well-known or
17    well-structured elements. The two are often used almost
18    interchangeably. We can make a distinction though.
19 Q  And the distinction would be as I take it --
20 A  Usually -- right. Usually movement through known or well-
21    structured documents.
22 Q  Is navigation?
23 A  Yeah, so you would navigate through a document and work
24    your way down. You are indeed searching for something,
25    right, but it's different from a search like you would do

**Page 63**

1  when you simply -- all you had was a text phrase, and you
2  wanted to find out all the different places where it could
3  apply. So there is a difference that could be made
4  between the two.
5  Q  Okay. Thank you. Let's move to Exhibit C of your
6     declaration. This is Exhibit 95 to the deposition, tab C.
7  A  Yes.
8  Q  I think you have a color copy.
9         MR. HOOD: Jason, you have a color --
10        MR. WOLFF: Yes, I do.
11        MR. HOOD: Okay. Good.
12 BY MR. HOOD:
13 Q  With respect to Exhibit C, and let's talk about the upper
14    window. It looks like that's the Internet Explorer Web
15    browser that you have on the upper half of the page; is
16    that correct?
17 A  Yes, it appears that way. There's a -- the icon in the
18    upper left corner of the browser window there that would
19    lead us to conclude that it's the Internet Explorer
20    browser.
21 Q  Okay. And then the lower half is -- looks like another
22    browser. Is that the Firefox Web browser?
23 A  Yes, it is. It also has its icon up in the upper left-
24    hand corner.
25 Q  There are labels on both of these windows of a 400 with a

**Page 64**

1  browser window phrase in parentheses. Do you see that?
2  With respect to the upper window can you describe for
3  me -- I see where the arrow points, but just describe for
4  me exactly what you are referring to as the number 400
5  browser window.
6  A  Certainly. It's the full rectangle that's displayed there
7  of the browser interface and the browser window. So it's
8  everything in that section of the page that's encompassed
9  in the four corners -- the four outside corners of that
10    window.
11 Q  Okay. And let me ask you with respect to the -- I'm
12    looking within the browser window now as you've defined it
13    on tab C. There is a line, I guess I'll call it that says
14    address and then there's a -- it's like an Internet
15    Explorer icon with HTTP://. Do you see where I'm --
16 A  Yes.
17 Q  -- pointing to?
18 A  Right.
19 Q  What do you call that particular area?
20 A  Again, that's the URL window.
21 Q  Okay. Just below that there is the word Google with a
22    little arrow down and then an area that says E.D. Michigan
23    District Court. Do you see that?
24 A  Yes.
25 Q  What do you call that particular area that says E.D.

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 19 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page™                    Joseph Hardin
Google Inc.                                                                September 16, 2005

Page 65

1    Michigan District Court?
2  A  Again, that could be characterized as a form or a sub
3     element of the overall browser window where you would type
4     in a search term.
5  Q  Could that be in your opinion referred to as a window?
6  A  Loosely.  Within the context of this discussion it would
7     be at the very least incomplete and probably confusing
8     given the terminology that we're using here.  It's better
9     referred to as a form element in this case specifically,
10    because we talk about forms when we're talking about sub
11    elements of browser windows and that would probably be the
12    best characterization.
13 Q  Okay.  And then let me ask you below the -- there's kind
14    of a horizontal line between the gray and the blue where
15    we get into the United States District Court down below.
16    Do you see that?  Just below the E.D. Michigan District
17    Court.  We go from gray all the way across left to right
18    to blue all the way across left to right.
19 A  Yes.  I think I know what you're referring to.
20 Q  Okay.  I just want to ask you what is that lower area that
21    has -- looks like an emblem with an eagle, United States
22    District --
23 A  Right.
24 Q  -- Court Opinions, et cetera, text.  What is that area
25    called?

Page 66

1  A  I've referred to that as the page display.
2  Q  Page display.
3  A  That's where the HTML document along with its URLs, its
4     embedded hyperlinks is displayed.
5  Q  Could that in your opinion, the page display, be referred
6     to as a window?
7  A  Again, it could be because the term window is often used
8     loosely.  In the context of the discussion here it's
9     better to refer to it as a sub element of the browser
10    window.
11 Q  Why is that?
12 A  Because it's more precise.
13 Q  And what is it with reference to tab C to your declaration
14    that is being displayed in the page display?
15 A  Are you asking for a characterization of the Web page that
16    is displayed there?
17 Q  Let me ask it a different way.  Did you do whatever was
18    done to create this particular Web shot or screen shot?
19 A  No.
20 Q  Okay.  Who did, if you know?
21 A  Well, I think Jason did or somebody who was working for
22    Jason Wolff.
23 Q  Okay.  What I'm trying to ask you is what's your
24    understanding of how the information that is set forth in
25    the page display was obtained and put into that page

Page 67

1     display?  For instance, let me try to be a little bit
2     clearer.
3  A  Sure.  Sure.
4  Q  I'm just trying to get to it.  Did somebody do a search
5     with the Internet browser and get to this particular page?
6  A  Well, we have to draw conclusions from the -- from what we
7     know, what we can see in front of us.  One would conclude
8     by seeing E.D. Michigan District Court in the form that's
9     in the Google bar that's right above the page display
10    there that one had typed in that text and hit a return and
11    to get the display that is displayed in the display
12    window.
13 Q  Okay.  You believe --
14 A  Or display page.
15 Q  I didn't mean to cut you off.
16 A  No, that's fine.  The only hesitation I have is that of
17    course I could reconstruct this window by first -- by some
18    other means, going to the URL that's displayed up in the
19    URL bar there -- the URL area and then typing in to the
20    Google search window the Google display form there those
21    letters.  We'd have the same result as far as the picture
22    goes.  But the assumption is -- and my assumption and in
23    the discussion with Jason about this was that this was as
24    the result of -- the page that's displayed there was a
25    result of the search that was done.

Page 68

1  Q  Okay.  So that page was the result of a search done
2     through the -- what I think you called a form or sub --
3  A  Yes.
4  Q  I'm sorry.  Sub element of the browser window?
5  A  Right.
6  Q  Okay.  I'm going to come back to tab C, but I wanted to
7     ask you about the opinion that you set forth in
8     paragraph 27 sub (c) as in Charlie of your declaration.
9  A  Starting off with "it is plainly evident"?
10 Q  That's correct.  You say "it is plainly evident from
11    simply installing the Google Toolbar and activating the
12    optional 'Next & Previous' Web buttons that the next and
13    previous Web buttons in the Google Toolbar, the alleged
14    'first and second icons' from claims 1 and 5, are not
15    separately displayed from the browser window."  Have I
16    gotten that correct so far?
17 A  Yes, you have.
18 Q  Okay.  "Attached as Exhibit C are two screen shots of the
19    Google Toolbar showing that the alleged 'first and second
20    icons' (bounded in red) are displayed within the browser
21    window (400)."  I just wanted to read that, make sure I
22    got it accurate.  Did I get that accurately first of all,
23    Professor?
24 A  Yes, you did.
25 Q  Okay.  Now, going back to the Exhibit C screen shots.

Case 2:04-cv-70366-JAC-RSW    Document 62-4 ™ Filed 11/03/2005    Page 20 of 44

Net Jumper Software, L.L.C. vs.    Multi-Page™    Joseph Hardin
Google Inc.    September 16, 2005

Page 69

1    There is a box, a rectangle that is around -- is red in
2    color and around two arrows, one to the left and one to
3    the right. Do you see where I'm referring to?
4  A  Yes.
5  Q  In both the upper and the lower screen shot it looks like.
6  A  Yes.
7  Q  Are those the Next & Previous Web buttons that you're
8    referring to in your opinion?
9  A  Yes.
10 Q  And you just looked at counsel for that. Is there a
11    particular reason?
12 A  I just wondered why he's been quiet for so long. I
13    thought he'd fallen asleep.
14 Q  I doubt he fell asleep. In any event -- okay. So those
15    are the Next & Previous Web buttons. Which of those two
16    buttons is the Next button, to the left or the right?
17 A  I think it's the button to the right.
18 Q  Is the Next button?
19 A  Yeah.
20 Q  So the one to the left is the Previous button?
21 A  That would be -- yes. I'd have to go back and use it to
22    be absolutely sure, but that would be my intuition just
23    from looking at the picture and remembering the use that I
24    had of it. Quite often when you're using something like
25    this, you simply hit one of the buttons to find out and

Page 70

1    then you remember in that context which is the Next and
2    which is the Previous, but I would guess that the way I
3    described it is accurate.
4  Q  Okay. As we read in your declaration, it's your opinion
5    that those first and second icons are not separately
6    displayed from the browser window; is that correct?
7  A  That's correct.
8  Q  Okay. Why do you believe those two buttons, the Next and
9    Previous Web buttons are not separately displayed from the
10    browser window?
11 A  Well, the easiest way to answer that is to direct us to
12    Exhibit C again, either of the displays, and recognize
13    that the browser window is the full rectangle there and
14    for them to be sep -- for these two buttons to be
15    separately displayed from that browser window they would
16    have to appear outside of it, and they do not.
17 Q  What if anything with reference to the upper screen shot
18    on Exhibit C to your declaration would you consider to be
19    the search window, as that term is used in the '172 patent
20    claims?
21 A  Again, I would consider it to be the whole browser window.
22 Q  Element number 400?
23 A  Yes.
24 Q  And that's the same for both the upper and lower screen
25    shots on Exhibit C?

Page 71

1  A  Yes.
2  Q  So it's your opinion, if I'm not mistaken, that the Next &
3    Previous Web buttons bounded in red are not separately
4    displayed from the search window as that term is used in
5    the '172 patent claims?
6  A  Yes.
7  Q  And that presumes again that browser window means search
8    window or vice versa?
9  A  (Nodding head.)
10 Q  You have to answer --
11 A  Yes.
12 Q  -- verbally. Okay. Are you aware of any other people
13    that you would consider to be skilled in
14    this relevant technology area that would consider the
15    search window to be something different than the entire
16    browser window as that term is used in the '172 patent?
17        MR. WOLFF: Object to form. Lacks
18    foundation. Incomplete hypothetical. You can answer. Go
19    ahead.
20        THE WITNESS: I am not aware of anybody that
21    I would consider to have expertise in this area and
22    experience who having read the documents of the patent and
23    the history -- prosecution history who would so conclude.
24 BY MR. HOOD:
25 Q  Are you aware of anybody who you would not consider to be

Page 72

1    skilled in this area that would so conclude?
2  A  Not after -- I wouldn't think so. Not after they had read
3    the documents. I think this is fairly straightforward.
4    The characterization of the browser window is stated as
5    we've said pretty clearly, and it's characterization as
6    the search window seems to me to be pretty
7    straightforward, so I don't think that anybody who could
8    read the documents -- I would have to stipulate that they
9    be able to work their way through the documents, English
10    speakers and all that. I can't imagine anybody else --
11    well, I would be surprised if anybody would conclude that
12    the browser window was anything other than what was
13    referred to as the search window.
14 Q  But claim 1 of the '172 patent uses the term search
15    window, correct?
16 A  I'm looking back just to be sure. Claim 1 -- it uses the
17    term search window.
18 Q  It does not use the term browser window, correct, claim 1
19    of the '172 patent?
20 A  I'm reading it to make sure.
21 Q  Please do.
22 A  I don't see it. No.
23 Q  How about in claim 5 of the '172 patent? Do you see the
24    term browser window used in claim 5?
25 A  So claim 5 would be on column 14 starting on line 19. And

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 21 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page™                    Joseph Hardin
Google Inc.                                                                 September 16, 2005

**Page 73**

1  you're asking if the term browser window is used in this
2  claim?
3  Q  That's correct.
4  A  No, it does not.
5  Q  If the court in this case were to rule that the term
6  search window as it's used in the '172 claims, claims 1
7  and 5, were the -- I believe you called them page display
8  as we look at Exhibit C, would your opinion change that
9  the Next & Previous buttons were separately displayed from
10  the search window?
11        MR. WOLFF: Object to form. Incomplete
12  hypothetical. Calls for a legal conclusion. Go ahead.
13        THE WITNESS: I would think the court had
14  made a mistake in its characterization.
15  BY MR. HOOD:
16  Q  So your opinion wouldn't change in that instance?
17  A  No.
18  Q  Okay. If the page display as you've defined it of Exhibit
19  C to your declaration were considered the search window,
20  how would you find that the Next & Previous Web buttons
21  were not separately displayed from the page display?
22  A  Could you rephrase that --
23  Q  Sure.
24  A  -- just for clarity?
25  Q  If the page display, the area that you've defined as the

**Page 74**

1  page display in Exhibit C --
2  A  Yes.
3  Q  -- were considered the search window as that term is used
4  in the '172 patent claims --
5  A  Yes.
6  Q  -- how would it be in your opinion that those Next &
7  Previous Web buttons would not be separately displayed
8  from that page display?
9  A  How would it be that they were not separately displayed?
10  So what characterization would there be that would result
11  in us concluding that they were not separately displayed?
12  Q  Yeah, if I understand your previous testimony just a
13  couple of minutes ago --
14  A  Uh-huh.
15  Q  -- if the court were to rule that the page display were
16  the search window as that term is used --
17  A  Right.
18  Q  -- you said your opinion would not change.
19  A  Right. I would -- my answer was that I would have thought
20  that the court had made a mistake and mischaracterized,
21  but when you're asking a hypothetical like this that has
22  "if the court ruled" what does that mean for
23  interpretation of a prosecution history or a patent
24  description like this? Is it something that then
25  overrides the rest of the contents and a reader's

**Page 75**

1  understanding of the content of that history? In other
2  words if a court rules is it something that I have to say,
3  okay in contradiction to my understanding and my reading
4  of the rest of this -- these documents, I'll have to use
5  that in drawing my conclusions?
6  Q  I can't give you advice. You'll probably want to talk to
7  counsel about that, but let's assume that's what the law
8  said. That you had to use --
9        MR. WOLFF: Object to form. You can answer
10  the question. I think that that is what you said he's
11  saying, is that he's saying okay, so the court said that
12  within these four corners that is the thing. Are those
13  buttons separate from the -- from what the court has
14  construed that element to be, and even though it
15  contradicts everything you read in the thing, and your --
16  the basis of your opinion, if you just say that that is in
17  fact the case are those -- Counsel, you ask the question.
18  I don't want to ask my own witness the question.
19        MR. HOOD: That's what I tried to say. Yeah.
20        THE WITNESS: I think I'm understanding it
21  now. And if you want to ask the question again I'll
22  answer it.
23        MR. HOOD: Yeah, let me do that.
24  BY MR. HOOD:
25  Q  Assuming that the court were to say, Professor, that the

**Page 76**

1  page display as you've defined it in tab C to your
2  declaration were the search window, as that term is used
3  in the claims of the '172 patent, would it still be your
4  opinion that the Next & Previous buttons were not
5  separately displayed from the search window?
6        MR. WOLFF: Object to form with all the
7  caveats the witness had previously testified. Go ahead
8  and answer the question.
9        THE WITNESS: Yeah. If that was an absolute
10  statement and -- then I would have to conclude that the
11  Next & Previous buttons as they're displayed in Exhibit C
12  would be separate from the display page.
13  BY MR. HOOD:
14  Q  They would be separately displayed from the display page,
15  correct?
16  A  Yes.
17  Q  Let me ask you the same question with respect to the --
18  I'm not quite sure what you call this. I think it was a
19  form or a subpart of the browser window where the term
20  E.D. Michigan District Court is entered.
21  A  Yes.
22  Q  To the left of the --
23  A  Yes.
24  Q  -- Next & Previous buttons. If the court were to say that
25  that form or subpart -- supplement of the browser window,

Page 77

1    I think you called it, were the search window as that term
2    is used in the '172 patent, would your opinion be that the
3    Next & Previous buttons were separately displayed from
4    that search window?
5        MR. WOLFF: Object to form. Incomplete
6    hypothetical. And with all the -- and understanding all
7    the caveats the witness had previously testified to, go
8    ahead and answer the question.
9        THE WITNESS: Okey-doke.
10        MR. WOLFF: If you can.
11        THE WITNESS: Yeah. That's a hard one
12    because what you asked I think was whether or not the form
13    entry element there that had -- that's contained in E.D.
14    Michigan District Court is separate from the Next &
15    Previous buttons. Is that what you meant to ask?
16 BY MR. HOOD:
17 Q    That is what I meant to ask.
18 A    All right. Then I'd have to have a context for a
19    definition of separate from. I mean I have a clear one
20    when I'm reading the current documents, but there I could
21    go either way. If we look at that bar that starts with
22    Google on the left-hand side and ends up with a couple
23    arrows on the right-hand side as one element, then I would
24    say that the E.D. Michigan Court display is part of the
25    same overall element that the Next & Previous buttons are.

Page 78

1 Q    I believe you just testified you do have a clear
2    understanding of what separate from means --
3 A    Yes.
4 Q    -- is that correct?
5 A    Yes.
6 Q    Tell me what --
7 A    In the context --
8 Q    -- that is.
9 A    -- in the context of the patent and the prosecution
10    history.
11 Q    What is that understanding?
12 A    The term is used -- I think we talked about this when we
13    looked at Figure 5A, and it's probably best to use that in
14    the patent as the clarification here. Figure 5A shows a
15    browser window 400, which is holding the contents or
16    displaying the contents of a Web page, and also a separate
17    -- separate from window labeled as 300, which has Internet
18    buffet at the top which has three bars at the top, two of
19    which are -- I would characterize as control bars.
20    Actually the top one could be too since it has the close,
21    but the "separate from" means that that element 300, that
22    Internet buffet rectangle is not part of -- in other
23    words, is not contained within the browser -- the four
24    corners of the browser window, and indeed you could go a
25    little further and say that it is independent in its

Page 79

1    actions -- in some of its actions from the browser window
2    altogether, so it can be re-sized. It can be closed. It
3    can be moved. The browser window could be placed on top
4    of it, things like that. So "separate from" means that it
5    has an independent existence and the ability to move
6    around the interface independently of the browser window
7    and is simply a separate user interface.
8 Q    Back to paragraph 27 sub (c) of your declaration. I want
9    to understand what you are referring to as the alleged
10    quote, "first and second icons," end quote from claims 1
11    and 5 of the '172 patent. You're referring to the Next &
12    Previous Web buttons, if we look back at Exhibit No. C, as
13    those alleged first and second icons, correct?
14        MR. WOLFF: Object to form.
15        THE WITNESS: But yes. As I say in the
16    declaration, it's plainly evident from simply installing
17    the Google Toolbar and activating the optional Next &
18    Previous Web buttons that the Next & Previous Web buttons
19    in the Google Toolbar, the alleged first and second icons
20    from claims 1 and 5 are not separately displayed from the
21    browser window, so yes, the Next & Previous buttons are in
22    this case the realization of the first and second icons.
23 BY MR. HOOD:
24 Q    And --
25 A    For claims 1 and 5. Excuse me.

Page 80

1 Q    I'm sorry. Go ahead. Okay. Referring to your Exhibit C
2    -- your tab C to your declaration, which of those two
3    buttons is the first icon as that term is used in claim 1
4    and 5 of the '172 patent?
5        MR. WOLFF: I just object to the form. It
6    calls for a legal conclusion, and the witness is
7    testifying about what the alleged icons are.
8 BY MR. HOOD:
9 Q    What do you believe the first icon to be as that term is
10    used in the '172 patent claims?
11 A    It's not absolutely clear, but let's go back and look at
12    column 13 and the characterization of the claim -- not the
13    characterization -- the claim itself -- the written claim
14    itself. What it talks about there in the second separate
15    paragraph, starting with, displaying a first and second
16    icon separate from the search window. That's what I'm
17    referring to. Now, what those first and second icons can
18    do is not absolutely clear, but let's move down a little
19    bit. Responsive to a selection of the first icon in the
20    fourth paragraph has to do with forming an initial list of
21    location identifiers and that list of location identifiers
22    could be on a page, and that could be the URLs that are in
23    it, so looking at the display in Exhibit C, it could be
24    really either one. Right. The Next & the Previous could
25    both perform functions similar to those described in

Case 2:04-cv-70366-JAC-RSW   Document 62-4   Filed 11/03/2005   Page 23 of 44

Net Jumper Software, L.L.C. vs.
Google Inc.

Multi-Page™

Joseph Hardin
September 16, 2005

Page 81

1    paragraph four there.

2  Q.  Okay. And what's your understanding of what the second

Page 83

1    list responsive to a selection of the first icon." Do you

2    have an opinion with respect to what the term "responsive"

Page 85

1   questions about your understanding of the term parsing and
2   parsing in response to, and just to short circuit this, as
3   I look at Exhibit Number 96, there is in the first entry
4   row the terms, quote, "parsing," end quote, and, quote,
5   "parse," end quote.  Do you see that?
6 A   Yes.
7 Q   And then to the right there is a column labeled Google's
8   construction, and it starts "the act of examining."  Do
9   you see where I'm reading there?
10 A   Yes.
11 Q   And is that the definition of the terms parsing and parse
12   that you believe apply in the context of the '172 patent?
13 A   Yes, they are.
14 Q   Moving to the third entry row in the table on document
15   number 96, it states quote, "parsing in response to
16   selection of an icon," end quote.  Do you see that?
17 A   Yes.
18 Q   And then over to the right, there's a Google construction
19   that starts, quote, "the act of parsing" et cetera.  Is
20   that stated Google construction your understanding of that
21   term as it's used in the '172 patent?
22 A   It's my -- the Google construction is in my understanding
23   a good characterization of the phrase parsing in response
24   to selection of an icon.  I haven't spent a lot of time
25   and don't have an opinion on how this precisely applies in

Page 86

1   the context of the patent.  I've been looking largely at
2   questions of interface and the question of having separate
3   windows and haven't formed an opinion yet about the
4   different levels of parsing and what would be a perfect
5   definition.  This one looks like a good one with those
6   qualifications.
7 Q   Okay.  Do you have an opinion as of today with respect to
8   whether the Google Toolbar parses the location identifiers
9   from the initial data file as that phrase is used in claim
10   one of the '172 patent?
11       MR. WOLFF:  Object to form.  Calls for a
12   legal conclusion.  And I will instruct the witness not to
13   answer questions that pertain to subject areas where he is
14   not formed an opinion.
15 BY MR. HOOD:
16 Q   My question:  Do you have an opinion?
17 A   No, I do not.  At this point in time I have not formed an
18   opinion on the parsing actions and their sequence.
19 Q   Okay.  Let me ask you questions now, Professor, on
20   paragraph 27 sub (d), as in dog, of your declaration.  You
21   can turn there, please.
22 A   Yes.
23 Q   Paragraph sub (b) states that "the arrangement by which
24   the Google Toolbar's Next & Previous Web buttons are
25   displayed in the browser window particularly given the

Page 87

1   statements made to secure the grant of the '172 patent is
2   not at all equivalent to what is required by the claims,
3   namely that the icons be 'separate from the search
4   window.'"  Did I read that correctly first?
5 A   Yes, you did.
6 Q   When you refer in that paragraph to the statements made to
7   secure the grant of the '172 patent, what are you
8   referring to specifically?  What statements are you
9   referring to?
10 A   They would be from the prosecution history and they would
11   be those leading up to the conclusion of the examiner that
12   we referenced on G000286.
13 Q   Can you point me to those statements that led up to that
14   as you just testified?
15 A   I'd have to go through the documents.  No, I can't point
16   directly to one from memory.
17 Q   Do you recall anything about any of those statements?
18 A   Well, yes, generally statements are that the two windows
19   are separate, that the map window or the jump window is
20   separate from the search window and that that distinction
21   was recognized by the examiner in the section that we just
22   referenced and that's what I'm basing that on.
23 Q   Okay.  You say at the end of that paragraph sub (d) of
24   paragraph 27 that -- I won't read the whole thing again,
25   but it "is not at all equivalent to what is required by

Page 88

1   the claims."  Let me ask you:  Is it your opinion that the
2   Google Toolbar does not infringe the claims of the '172
3   patent under the doctrine of equivalents?
4       MR. WOLFF:  Object to form to the extent it
5   calls for a legal conclusion.  I think the witness'
6   statements in the declaration are relatively clear.  I
7   just don't know whether he's going to understand the legal
8   term you've used in your particular --
9       MR. HOOD:  Yeah.
10       MR. WOLFF:  -- the idea of doctrine of
11   equivalents.
12 BY MR. HOOD:
13 Q   Let me ask you that, and that's really want I wanted to
14   get to, Professor.  Do you have an understanding of the
15   phrase or term, doctrine of equivalents infringement, as
16   it's used in patent law?
17 A   I have what I think is a basic understanding where
18   equivalents would be things that are substantially the
19   same.  Right.  I mean that would have to be interpreted
20   given the context.  This context is -- I would interpret
21   that as being substantially the same between the different
22   elements.
23 Q   And all I'm trying to understand is when you use the
24   phrase not at all equivalent to what is required by the
25   claims, are you referring there to that doctrine of

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 25 of 44

Net Jumper Software, L.L.C. vs.                Multi-Page™                          Joseph Hardin
Google Inc.                                                                 September 16, 2005

Page 89

1  equivalents as you understand it?
2          MR. WOLFF: Object to form. The statement is
3  in the declaration what the statement is. I don't know
4  that the witness has the exact legal definition of
5  doctrine of equivalents. Go ahead. Could you rephrase
6  the question?
7          MR. HOOD: Let's go off the record for a
8  minute.
9          (Off the record.)
10         MR. HOOD: We're back on the record.
11 BY MR. HOOD:
12 Q  Professor, your counsel and I just spoke about your
13    statements in paragraph 19 of your declaration.
14 A  Yes.
15 Q  And your discussion in paragraph 19 about what you call
16    the quote, "equivalent," end quote.
17 A  Uh-huh.
18 Q  Do you see where I'm talking about. The bottom --
19 A  Where it says either literally or by equivalents?
20 Q  That's correct.
21 A  That's the phrase? Yes.
22 Q  You go on to say in paragraph 19 that "with regard to
23    equivalents, it is my understanding that for an aspect of
24    an accused product to be 'equivalent' to a claim
25    limitation, it must be insubstantially different from the

Page 90

1  claim."
2  A  Right.
3  Q  "Stated another way, something is considered equivalent in
4     patent parlance if it performs substantially the same
5     function, in substantially the same way, to achieve
6     substantially the same result as that which is claimed."
7     Is that correct?
8  A  Right.
9  Q  And is that your understanding of an equivalent for
10    purposes of infringement in patent parlance as you've
11    described it?
12 A  Yes, it is.
13 Q  Okay. I'm going to go back to your paragraph 27 sub (d)
14    on page eight --
15 A  Uh-huh.
16 Q  -- of your declaration. When you refer to the phrase "is
17    not at all equivalent to what is required by the claims,"
18    end quote, are you using that term equivalents there as
19    you've stated your understanding of it in paragraph 19?
20 A  Yes.
21 Q  Okay. Tell me then how the Google Toolbar's Next &
22    Previous Web buttons in your opinion is different or
23    substantially different from what is required by the
24    claim?
25         MR. WOLFF: Object to form. You mean the

Page 91

1  display of the Web buttons or do you mean the Web buttons
2  in general?
3          MR. HOOD: I mean the arrangement by which
4  the Web buttons are displayed in the browser window.
5          MR. WOLFF: Okay.
6  BY MR. HOOD:
7  Q  Just as you said in paragraph (d) there.
8  A  So I'm sorry the question again?
9  Q  I would like to know how you believe that quote, "the
10    arrangement by which Google's [Next] -- Toolbar's Next &
11    Previous Web buttons are displayed in the browser window,"
12    end quote. And then that goes on.
13 A  Right.
14 Q  Is not equivalent to --
15 A  Right.
16 Q  -- or substantially different --
17 A  Sure.
18 Q  -- whatever terminology you want --
19 A  Right. Right.
20 Q  -- to use, what's required by the claims.
21 A  Right. They are not separate from the search window.
22 Q  Anything else?
23 A  That's enough.
24 Q  Okay. They're not literally separate from the search
25    window?

Page 92

1  A  They are not in any sense of the term separate from the
2     search window. Sense of the term that could be
3     characterized given a reading of the documents' patent and
4     the prosecution history.
5  Q  Do you have an opinion with respect to what the function
6     of the quote, "separate from the search window," end
7     quote, element of the '172 patent is?
8  A  Excuse me?
9  Q  I'm referring back to your paragraph number 19.
10 A  Right.
11 Q  If I can refresh you there.
12 A  Yeah.
13 Q  The last sentence in that paragraph you say "stated
14    another way, something is considered equivalent in patent
15    parlance if it performs substantially the same function,
16    in substantially the same way, to achieve substantially
17    the same result as that which is claimed," end quote.
18 A  Right.
19 Q  And I'm asking do you have an opinion as to what the
20    function of the claim limitation separate from the search
21    window is as it's used in the '172 patent claims?
22         MR. WOLFF: Object to form. Ambiguous.
23         THE WITNESS: Yeah. The function here, I
24    would -- my opinion would be focused around the user
25    display and the functionality that is garnered from that,

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 26 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page™                          Joseph Hardin
Google Inc.                                                                      September 16, 2005

Page 93

1  so it's separate from the search window. I was focusing
2  more on substantially the same way as well as -- or
3  focusing as much on substantially the same way as having
4  the same function. Does that -- is that clear or is that
5  -- the user interface embodies a number of things
6  simultaneously, function, form, feature. And in this case
7  I think that it's fairly clear from the characterization
8  of "separate from the search window" that it does not meet
9  any -- the criteria of the claim.
10 BY MR. HOOD:
11 Q  With respect to the "substantially the same way" is that
12    what you're saying?
13 A  Both. Right.
14 Q  Function and way?
15 A  Yeah.
16 Q  Okay. And what I'm asking you is what is your opinion as
17    to the function of that claim limitation as it's used in
18    the '172 patent on which you base that opinion.
19           MR. WOLFF: Object to form. Ambiguous. Go
20    ahead and answer.
21           THE WITNESS: The function of the separate
22    from the search window claim?
23 BY MR. HOOD:
24 Q  Correct.
25 A  This is more speculative in that I'm trying to remember

Page 94

1  specifically the reasons that were specified for having a
2  separate window. The reasons that you would normally have
3  a separate window would be to manage user focus, and I
4  don't have a strong opinion about whether or not that
5  function -- well, I think I'm drifting from the question.
6  There clearly is a functional component to having a
7  separate search window, and that clearly is part of the
8  claim.
9  Q  And is it your opinion then that the Google Toolbar Next &
10    Previous Web buttons don't perform substantially the same
11    function as you understand the term function?
12           MR. WOLFF: Object to form, and I'll instruct
13    the witness not to answer that question as it was phrased.
14    Professor Hardin has not rendered an opinion as to whether
15    the Web buttons are equivalent to the icons, but as to
16    whether the icons are displayed in the same manner as --
17    with respect to the claims. So if you want to rephrase
18    your question as to whether the Web buttons in their
19    display in the Google Toolbar are equivalent, go ahead and
20    ask that question. I'll allow that.
21           MR. HOOD: Thanks.
22 BY MR. HOOD:
23 Q  Well, let me back up, because I don't think I understand
24    paragraph 27 sub (d) based on what your counsel's just
25    said. Your statement reads literally that the arrangement

Page 95

1  by which the Google Toolbar's Next & Previous Web buttons
2  are displayed in the browser window, particularly given
3  the statements made to secure the grant of the '172 patent
4  is not at all equivalent to what is required by the
5  claims, namely that the icons be separate from the search
6  window. Let me ask the question I think that your counsel
7  suggested. Is it your opinion that the Next & Previous
8  Web buttons of the Google Toolbar are not equivalent to
9  the first and second icons as set forth in the claims of
10    the '172 patent?
11           MR. WOLFF: Object to form. Again, the same
12    instruction. If you want him to step out for a moment. I
13    don't want to create an issue with polluting him. I'm
14    happy to have a conversation with you offline.
15           MR. HOOD: Yeah, why don't we do that. I
16    just want to make sure we're on the same page. Yeah.
17           MR. WOLFF: So we know you understand why I'm
18    saying --
19           (Off the record.)
20 BY MR. HOOD:
21 Q  Professor Hardin, I'm focusing back on paragraph 27, sub
22    (d) of your declaration. And before I ask you specific
23    questions on that I would like to direct your attention to
24    the patent claims again of '172, claim number one. This
25    is in column 13, and I'd like to direct you to line 54, I

Page 96

1  believe it is, and the limitation that says displaying a
2  first and second icon separate from the search window on
3  said display screen. Do you see that limitation?
4 A  Yes.
5 Q  Do you have an opinion -- let me start with this: Do you
6    have an opinion as to what the function of that limitation
7    of claim one is in the '172 patent?
8 A  I'm not sure I understand the question. The function of
9    that limitation -- I simply approach it as a limitation.
10    Right. It's a requirement for understanding what is --
11    what the patent calls for and so hence what it would
12    restrict in other things. I'm not sure how you're using
13    the term function there. If you want to clarify for me
14    what you mean by function.
15 Q  I would. That leads me to the other part of my question.
16    As you state in paragraph 27 (d) you say that, quote, "the
17    arrangement by which the Google Toolbar's Next & Previous
18    Web buttons are displayed in the browser window" -- then
19    you have another phrase there -- "is not at all equivalent
20    to what is required by the claims."
21 A  Right.
22 Q  And I am in asking the question and using the term
23    function referring back to your understanding as you say
24    in paragraph 19 of that term, as it's used in equivalents
25    analysis in patent law. And I'm asking what if anything

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 27 of 44

Net Jumper Software, L.L.C. vs.     Multi-Page™     Joseph Hardin
Google Inc.     September 16, 2005

Page 97

1    is your opinion as to the function of that claim
2    limitation in the '172 patent.
3 A  So the function would be -- of that claim limitation would
4    be in the broadest sense but the clearest sense to simply
5    have the first and second icon separate from the search
6    window. That's the function of the claim.
7 Q  Okay. As is required by that claim limitation, I want to
8    ask you what your understanding or opinion is with respect
9    to what the way in which -- the look on your face --
10 A  The way in which --
11 Q  -- let me back up. Let me back up. I'm going back to
12    paragraph 19 of your declaration.
13 A  Okey-dokey.
14 Q  And you talk in the last sentence there -- you use the
15    words function, way, and result, which is what --
16 A  Right.
17 Q  -- the patent lawyers work with when we talk about
18    equivalents. We just asked about your opinion with
19    respect to the function of the claim limitation displaying
20    a first and second icon, et cetera. I'm now asking you
21    what your understanding is of the way that is required by
22    that claim limitation of the '172 patent.
23 A  In the phrase, in substantially the same way?
24 Q  Correct.
25 A  Is that what you mean there?

Page 98

1 Q  That is correct.
2 A  Right. In substantially the same way would be to have it
3    -- my understanding would be that it would be -- it would
4    have to be displaying a first and second icon separate
5    from the search window on said display screen. That would
6    be the way in which it would have to be displayed.
7 Q  Okay. And final question of the tripartite, substantially
8    the same result. What is your opinion with respect to
9    substantially the same result as required by the claim
10    limitation of the '172 patent that we're talking about?
11 A  To achieve substantially the same result. Displaying the
12    first and second icon separate. The result would have to
13    be having a result of separate first and second icons and
14    a separate search window on said display screens.
15 Q  Okay. Let me ask you this: Do you have an opinion as to
16    whether or not the Google Toolbar Next & Previous Web
17    buttons are the alleged first and second icons of the
18    claim limitations of the '172 patent?
19          MR. WOLFF: Object to form. Confusing.
20    You're asking about the -- whether he has an opinion that
21    the Plaintiff has alleged that these are the first and
22    second icons?
23          MR. HOOD: No. Let me ask it again. I'm
24    trying to get to what we had talked about.
25          MR. WOLFF: Or if they are the first and

Page 99

1    second icons.
2          MR. HOOD: That's correct.
3          MR. WOLFF: Okay.
4          MR. HOOD: Yeah.
5 BY MR. HOOD:
6 Q  You used the term in paragraph 27 sub (c), Professor --
7 A  Uh-huh.
8 Q  -- about three lines down, quote, "the alleged 'first and
9    second icons.'" Do you see that?
10 A  Correct.
11 Q  I want to know do you have an opinion as to whether or not
12    the Google Toolbar Next & Previous Web buttons are the
13    first and second icons as that term is used in the '172
14    patent?
15 A  No, I do not.
16 Q  Let me move to subparagraph (i) of paragraph 27(d).
17 A  Uh-huh.
18 Q  You say there that "to say the arrangement of these Web
19    buttons in the browser window is equivalent to what is
20    required by claims 1 and 5 is to completely remove this
21    requirement (that they be 'separate from the search
22    window') of the claims: because the Next & Previous Web
23    buttons are integrated into the [Web] browser, they are
24    the opposite of a set of icons separately displayed from
25    the browser window." Did I read that correctly?

Page 100

1 A  Yes, you did.
2          MR. WOLFF: Object to form. Actually you did
3    not read that correctly.
4          MR. HOOD: I'm sorry --
5          THE WITNESS: No?
6          MR. HOOD: -- what did I miss?
7          MR. WOLFF: You said Web browser instead of
8    browser window.
9          MR. HOOD: Browser window. Thank you very
10    much.
11 BY MR. HOOD:
12 Q  Continuing -- it's lunch time.
13 A  It is.
14 Q  "Stated another way, the implementation of the next and
15    back buttons in the Google Toolbar is, in this respect,
16    substantially different from that disclosed and claimed in
17    the asserted claims." Did I read at least that last
18    sentence correctly?
19 A  I'll go for it.
20 Q  Okay. Is it your opinion that -- I'm going to go back to
21    the function and way and result that we talked about
22    earlier, Professor, as you used those terms in
23    paragraph 19 of your declaration -- is it your opinion
24    that the function of the Google Toolbar Next & Previous
25    Web buttons is substantially different than the first and

Case 2:04-cv-70366-JAC-RSW   Document 62-4   Filed 11/03/2005   Page 28 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page™                           Joseph Hardin
Google Inc.                                                                       September 16, 2005

Page 101

1   second icons as set forth in claim one of the '172 patent?
2          MR. WOLFF: Object to form. I'm going to
3   instruct the witness not to answer. Again, you're asking
4   the witness about the function of the first and second
5   icons, and there is no foundation for this. If you ask
6   about the display --
7          MR. HOOD: Okay. Thanks. We'll go back to
8   that.
9   BY MR. HOOD:
10  Q  Professor, is it your opinion that the function of the
11     claim limitation displaying a first and second icon as
12     we've discussed it with respect to that, that the Google
13     Toolbar Next & Previous Web buttons are substantially
14     different in function?
15  A  Yes.
16  Q  Okay. And tell me in what way.
17  A  Because they're not displayed in a separate search window.
18  Q  Okay. I take it then that it's your opinion because
19     they're not displayed in a separate search window that the
20     way in which the Google Toolbar Next & Previous Web
21     buttons are displayed is substantially different than as
22     required by the claim limitation display in a first and
23     second icon, et cetera?
24  A  Right. And I should have said separate from the search
25     window, not in a separate search window. They're not

Page 102

1   displayed separate from the search window, and then all
2   the -- all -- the rest of what you said follows.
3   Q  Okay. And is it then your opinion that the result of the
4      Google Toolbar Next & Previous Web buttons is
5      substantially different than as required by the claim
6      limitation displaying a first and second icon?
7          MR. WOLFF: Objection, asked and answered.
8      Go ahead.
9          THE WITNESS: Yes.
10  BY MR. HOOD:
11  Q  And on what grounds?
12  A  That they are not separate from the search window.
13  Q  Okay. In paragraph 27(d) sub (i) -- let me find my place
14     here. After the colon three lines in you say "because the
15     Next & Previous Web buttons are integrated into the
16     browser window."
17  A  Uh-huh.
18  Q  Do you see where I'm reading there?
19  A  Yes.
20  Q  Tell me what you mean by the words "integrated into the
21     browser window."
22  A  Part of, not separate from.
23          MR. HOOD: Okay. When do you want to break
24     for lunch?
25          MR. WOLFF: You want to do it now or --

Page 103

1          MR. HOOD: Yeah. It might be good now and
2   then we can get some time --
3          MR. WOLFF: You want to just do -- you want
4   to do a short --
5          MR. HOOD: Yeah. Let's take like a half
6   hour.
7          (Recess taken from 11:50 a.m. to 12:30 p.m.)
8   BY MR. HOOD:
9   Q  Professor Hardin, back after lunch. Let me go back to
10     column number seven of the '172 patent.
11  A  Yes.
12  Q  And I'm back to the alternative -- or alternate
13     embodiments that we talked about earlier starting at
14     line 22 of column 7 --
15  A  Yes.
16  Q  -- through line 26. Were there any -- let me back up.
17     In 1996 -- I'm not talking 2005, but in 1996, 1995, that
18     time frame -- if we need to be more specific let me
19     know -- were there any technical reasons why an alternate
20     embodiment as described here including a Toolbar as the
21     user interface could not have been implemented with
22     respect to the invention that's claimed in the '172 patent
23     to your knowledge?
24          MR. WOLFF: Object to form. Again, it falls
25     outside of the scope on which the witness has offered a

Page 104

1   declaration. I think that it's inappropriate to ask the
2   witness this scope of questions. So I'll instruct the
3   witness not to answer and get a clarification of the
4   question that fits within the proper context.
5   BY MR. HOOD:
6   Q  Well, I believe it was your testimony, Professor, earlier
7      today that the ultimate embodiments listed here in column
8      seven are not consistent with your understanding of the
9      '172 patent; is that correct?
10  A  That's correct.
11  Q  Okay. And I want to clarify whether it in your opinion
12     was technically not feasible to implement any of these
13     particular alternate embodiments in the 1995-96 time
14     frame.
15          MR. WOLFF: Object to form. Incomplete
16     hypothetical. But go ahead and answer the question.
17          THE WITNESS: It would depend on what market
18     you were implementing for. If you were willing to work
19     with the public domain code that came from NCSA -- the
20     NCSA Mosaic code I think was still available at that time
21     -- you could take that code and do with it as you would.
22     As far as the spyglass the derivative Microsoft code or
23     the independently developed Netscape code, they were still
24     pretty well locked down at that time. It was difficult to
25     do this kind of thing. I couldn't -- I'd have to go back

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 29 of 44

Net Jumper Software, L.L.C. vs.    Multi-Page™    Joseph Hardin
Google Inc.                                          September 16, 2005

Page 105

1  and look at the specific time frame and look at the
2  specific browser states, but for the commercial browsers,
3  for those that were not in the public domain -- and Mosaic
4  wasn't the only one. There were still others at that time
5  that were open -- relatively open source -- but the
6  definition of open source changes -- that would have been
7  possible, but for the commercial ones difficult, yet
8  possible.
9  BY MR. HOOD:
10 Q  You use the term lock down. What did you mean by that?
11 A  Difficult to get inside. Difficult to use the browser
12    display area.
13 Q  Why? Because it was proprietary and Microsoft, for
14    instance, didn't allow access to it? Is that what we're
15    talking about?
16       MR. WOLFF: Object to form. Ambiguous. What
17    are you referring to? Are you referring to the source
18    code or are you referring to the API?
19 BY MR. HOOD:
20 Q  Well, you used with respect to calling it lock down.
21    That's what I'm referring to right now. And let me ask
22    you that. What were you referring to as being locked down
23    in that time period?
24 A  The browsers, the code that they were based on was not
25    publicly available. The APIs that were publicly available

Page 106

1  were limited except for the noncommercial ones that I
2  described earlier.
3  Q  Sure. Moving down to the claim, claim number one of the
4    '172 patent. We're on column 13 back there. And I am
5    focused again on the claim element displaying a first and
6    second icon at line 54. Do you see where I'm at,
7    Professor?
8  A  Yes.
9  Q  Let me ask you with respect to the first and second icon.
10    I believe it's your opinion as set forth in your
11    declaration that you talked about -- hold on one second.
12    Let me get your declaration so I'm on the right page.
13    Well, let me ask this: Do you have opinion as to whether
14    or not the Google Toolbar Next & Previous Web buttons
15    constitute or could constitute the first and second icons
16    as used in claim one?
17       MR. WOLFF: Object to form. Asked and
18    answered. I'll instruct the witness not to answer areas
19    upon which he's not rendered an opinion. We've had this
20    discussion offline without Professor Hardin in the room
21    before. If you want to limit it to the claim he examined
22    in his report that's in display, go right ahead.
23       MR. HOOD: You're not going to let him answer
24    whether he has an opinion?
25       MR. WOLFF: Yeah. Go ahead. He's --

Page 107

1       MR. HOOD: That's all I'm asking.
2       MR. WOLFF: -- asked -- you've asked the
3  question --
4       MR. HOOD: That's all I'm asking.
5       MR. WOLFF: -- and he answered it already.
6  But go ahead, Professor Hardin.
7       THE WITNESS: Could you re-ask the question
8  after all that?
9  BY MR. HOOD:
10 Q  Do you have an opinion whether the Google Toolbar Next &
11    Previous Web buttons could constitute the first and second
12    icons as set forth in claim one of the '172 patent?
13 A  No, I don't have an opinion.
14 Q  Okay. Do you have an opinion as to whether or not -- and
15    you may want to refer to Exhibit C to your declaration.
16    And I'm looking at the -- to the left of the Next &
17    Previous buttons that are bounded in red. There is what
18    looks to be a button of some sort that has an icon with
19    Search Web. Do you see that?
20 A  Yes.
21 Q  Do you have an opinion as to whether or not that button,
22    the Search Web button as I'll call it, could constitute
23    either the first or second icons as used in claim one of
24    the '172 patent?
25 A  No, I don't have an opinion. I'm sorry.

Page 108

1       MR. WOLFF: No, go ahead.
2  BY MR. HOOD:
3  Q  Based on your understanding of the '172 patent and its
4    prosecution history, do you have any reason to think that
5    or believe that the Search Web button as shown in Exhibit
6    C could not constitute a first or second icons as used in
7    claim 1 of the '172 patent?
8       MR. WOLFF: Object -- same objection as
9    before. Asked and answered.
10       THE WITNESS: Right. I don't have an
11    opinion. I wasn't -- I don't have an opinion on it.
12 BY MR. HOOD:
13 Q  We've gone through paragraph 27 of your declaration,
14    Professor Hardin, and the bases for your opinion of
15    noninfringement. Other than what you state in
16    paragraph 27 of your declaration, Exhibit 95, do you
17    presently have any other opinions with respect to the
18    noninfringement of the Google Toolbar with respect to the
19    '172 patent?
20       MR. WOLFF: Object to form. Go ahead and
21    answer.
22       THE WITNESS: No. The opinions I have are
23    laid out in the declaration.
24 BY MR. HOOD:
25 Q  Okay. And with respect to noninfringement, I just want to

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 30 of 44

Net Jumper Software, L.L.C. vs.      Multi-Page™      Joseph Hardin
Google Inc.      September 16, 2005

Page 109

1 make sure the opinions that you have currently with
2 respect to noninfringement are all set forth in
3 paragraph 27; is that correct?
4 A I'm looking to see if that's where all the conclusions
5 were. "Opinion on Noninfringement" is the title there of
6 paragraph 27. So the answer's yes.
7 Q Okay. Do you have any opinions with respect to whether
8 or not the Google Toolbar infringes United States
9 Patent 6,226,655 -- the '655 patent?
10 MR. WOLFF: Object to form, and I'll instruct
11 the witness not to answer it because there's no claim in
12 the '655 patent that has even been accused or alleged to
13 be infringed by the Google Toolbar.
14 MR. HOOD: Okay. I'm just --
15 MR. WOLFF: So --
16 MR. HOOD: -- asking him do you have an
17 opinion. I can tell what the answer's going to be, but I
18 want to make sure I know.
19 THE WITNESS: No, I do not have an opinion.
20 BY MR. HOOD:
21 Q Okay. Have you been asked to render an opinion of whether
22 or not the Google Toolbar infringes the '655 patent?
23 A No, I have not been asked to render an opinion.
24 Q Back to Exhibit C to your declaration, Professor. And I
25 want to ask you another question about the Search Web

Page 110

1 button that we talked about earlier --
2 A Yeah.
3 Q -- which is to the left of the red enclosed Previous &
4 Next buttons. Similar to a question I asked you earlier
5 on another point, but if the court were to say that the
6 Search Web button were the first icon as that term is used
7 in claim one of the '172 patent, would your opinion change
8 at all that the first icon was displayed separately from
9 the search window as used in claim one of the '172 patent?
10 MR. WOLFF: Object to the form. Incomplete
11 hypothetical and calls for a legal conclusion and lacks
12 foundation.
13 BY MR. HOOD:
14 Q Go ahead.
15 MR. WOLFF: If you can understand the
16 question --
17 THE WITNESS: Go ahead.
18 BY MR. HOOD:
19 Q Go ahead.
20 A So you're asking if a court said that the -- or ruled that
21 the Search Web button was the same as the first icon
22 that's described in the patent, then what?
23 Q Would your opinion that the first and second icons are not
24 separately displayed from the search window change?
25 A No. I'm sorry.

Page 111

1 MR. WOLFF: After he's answered, I don't know
2 what the point is of an objection at this point --
3 MR. HOOD: Go ahead.
4 MR. WOLFF: -- but it's an incomplete
5 hypothetical, and again, the same objection as before.
6 THE WITNESS: Yes. And the same elaboration
7 on my part on before. It would be inconsistent with the
8 rest of the -- of my characterization and understanding of
9 the patent and the prosecution history for a court to so
10 rule. In any case, I would not consider that element to
11 be separate from the search window.
12 BY MR. HOOD:
13 Q Is that based on your interpretation of search window
14 meaning browser window?
15 A Yes.
16 Q Okay. Moving to paragraph 28 of your declaration just
17 below the title "Opinion on Invalidity" -- this is at page
18 eight. Let me just confirm, Professor, that in your
19 opinion, claims 1 through 8 of the '172 patent are invalid
20 because of the -- what you call CyberPilot in paragraph 28
21 of your declaration?
22 A Yes.
23 Q Okay. I want to just ask you a general question to make
24 sure we're on the -- just basically the same starting
25 point. Let me ask you this: When was the first time that you

Page 112

1 had occasion to either operate, review, or have any
2 interaction with CyberPilot that you've described in your
3 declaration?
4 A Probably about three or four months ago.
5 Q Okay. Before that had you not ever come across, dealt
6 with, or otherwise interacted with CyberPilot?
7 A I might have come across it, but I hadn't spent any time
8 or evaluated it.
9 Q Okay. Tell me what you did starting several months ago
10 that you described with respect to CyberPilot. Did you
11 operate the program?
12 A Well, the first thing I did was look at some images that
13 Jason Wolff had sent to me and looked at the documentation
14 for CyberPilot, and that was the foundation for much of my
15 understanding of it. Since then I have operated the
16 program itself and confirmed what the documentation says
17 as to its operation.
18 Q Okay. What documentation was it that you reviewed with
19 respect to CyberPilot?
20 A Isn't that one of the exhibits in here? Number -- it was
21 put in here. We have an annotated screen shot.
22 MR. WOLFF: Are you referring to the
23 documents from a different exhibit -- I mean from a
24 different declaration?
25 THE WITNESS: Me?

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 31 of 44

Net Jumper Software, L.L.C. vs.          Multi-Page™                    Joseph Hardin
Google Inc.                                                       September 16, 2005

Page 113

1        MR. WOLFF:  Yes.
2        THE WITNESS:  No.
3        MR. WOLFF:  Okay.
4        THE WITNESS:  The documents are the
5    CyberPilot tutorial.
6 BY MR. HOOD:
7 Q  CyberPilot tutorial?  Yeah.  Let me direct you to tab D to
8    your declaration.  There's some materials here that appear
9    to pertain to CyberPilot.  Are these two pages at tab D
10    the CyberPilot tutorial that you're referencing or is that
11    something different?
12 A  Well, the first page in Exhibit D is the Figure 5A that's
13    been annotated, so it's not from the CyberPilot Tutorial.
14    The second page I think was constructed outside of the
15    tutorial using CyberPilot itself.
16        MR. HOOD:  Okay.  Let's mark this one,
17    please.
18        (Whereupon Exhibit Number 97 marked for
19            identification.)
20 BY MR. HOOD:
21 Q  Professor Hardin, I'm showing you what's been marked as
22    Exhibit Number 97 to the depositions.
23 A  Yes.
24 Q  And if I can -- first of all, do you recognize what's been
25    marked as Exhibit Number 97?

Page 114

1 A  Yes, I do.
2 Q  You've seen this document before?
3 A  Yes, I have.
4 Q  When did you first see the document marked Exhibit
5    Number 97?
6 A  Probably two weeks ago, maybe -- no, previous to that.
7    I'd have to stop and think.  It's been in the last --
8    within the last couple months.  I don't remember exactly
9    when.
10 Q  Okay.  Let me point you to tab B to Exhibit Number 97.
11 A  Tab B?
12 Q  Yeah, tab B.
13 A  A Trip to Hawaii?
14 Q  Yeah, with CyberPilot Pro.
15 A  Right.
16 Q  Is this by chance the tutorial -- CyberPilot tutorial that
17    you were referencing a bit earlier?
18 A  Yes, it is.
19 Q  Okay.  Go ahead and take a look through that to make sure
20    that that's what you had reviewed.
21 A  Okay.
22 Q  Do you believe what's been marked as tab B to Exhibit
23    Number 97 is the CyberPilot tutorial that you reviewed?
24 A  Yes.
25 Q  Okay.  What kind of computer did you operate CyberPilot on

Page 115

1    when you operated it?
2 A  It was an IBM box that was running a virtual machine of
3    Windows 95.
4 Q  Okay.  Where was that machine located?
5 A  It was in Ann Arbor.
6 Q  Is it still in Ann Arbor?
7 A  I don't know.
8        MR. WOLFF:  It's in my car.
9        MR. HOOD:  Oh.
10 BY MR. HOOD:
11 Q  Okay.  Who loaded CyberPilot onto that machine that you
12    just discussed?
13 A  I don't know.
14 Q  Okay.  Where did you get the machine?  Let me ask you
15    that.
16 A  Jason Wolff had it with him.
17 Q  Okay.  So Mr. Wolff provided you the machine?
18 A  Yes.
19 Q  And did you do anything to the machine as far as
20    installing any particular software, making any hardware
21    modifications before you operated CyberPilot?
22 A  No.
23 Q  Okay.  Just to preface this so you know where I'm going, I
24    want to walk you through CyberPilot and how it works, and
25    we can certainly use the tutorial if that's easier.  If

Page 116

1    you want to in the first instance walk me through what you
2    did.  I just want to make sure that we do this in the
3    easiest way possible so I understand how you operated it.
4 A  Uh-huh.
5 Q  Let me ask you first if you can just walk me through when
6    you sat down at the box, that computer that you talked
7    about in Ann Arbor, what did you do to operate the
8    CyberPilot?
9        MR. WOLFF:  Object to form.  Calls for a
10    narrative.  Go ahead and answer the question the best you
11    can.
12        THE WITNESS:  Well, I opened up the
13    CyberPilot application, and --
14 BY MR. HOOD:
15 Q  How did you do that?
16 A  By double clicking on an icon.  And looked at it a bit.
17    Basically just checked out the controls on it and then
18    closed it back down and opened up a Netscape browser and
19    reopened the CyberPilot application.
20 Q  Okay.
21 A  Clicked on open -- put in a URL, got an initial Web map.
22    Probably previous to that I displayed a page in the
23    browser and then started opening -- clicking on the
24    question mark icons that were in the CyberPilot Pro
25    application to investigate what was further down in the

Case 2:04-cv-70366-JAC-RSW   Document 62-4   Filed 11/03/2005   Page 32 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page™                         Joseph Hardin
Google Inc.                                                                        September 16, 2005

Page 117

1  tree of document pages, icons, and used that to display in
2  the Web browser. I think I closed it on one of the
3  occasions. I saved a file, a Web map file.
4  Q  Okay. You say on one of the occasions. Was there another
5  occasion that you operated the CyberPilot?
6  A  Yeah. All within the same 15-minute period. Right.
7  Sure. Opened it up, closed it down, try -- you know, see
8  if it's got any problems. I want to see if it blows up.
9  It's confused a little bit. So yeah, I opened it up and
10  closed it down a couple times, and on one of those
11  occasions I saved a Web map.
12  Q  Okay. This session or this time that you were using
13  CyberPilot you said it was about 15 minutes; is that
14  correct?
15  A  Oh, I think that the first -- when I first looked at it, I
16  spent about 15 minutes with it and then spent another
17  probably hour after I'd gotten the -- confirmed my basic
18  understanding of it just playing around with it.
19  Q  Okay. Was this on the same day -- this --
20  A  Yeah.
21  Q  -- additional hour it was?
22  A  Yeah.
23  Q  Okay. Other than those two occasions have you operated
24  CyberPilot, whether on that box or on another computer?
25  A  No, I have not.

Page 118

1  Q  Is it your opinion, Professor, that the CyberPilot as you
2  described in your declaration discloses all of the
3  elements of claim one of the '172 patent?
4        MR. WOLFF: Objection, asked and answered.
5  Go ahead and answer.
6        THE WITNESS: The answer is yes.
7  BY MR. HOOD:
8  Q  Okay. I'm going to walk you through each of those
9  elements, so you might want to pull out your patent.
10  A  Would it be useful at this point to have the invalidity
11  chart in front of us?
12        MR. WOLFF: Your decision.
13  BY MR. HOOD:
14  Q  Yeah, it probably would and what counsel just told you
15  that is your decision. I'm going to ask you some specific
16  questions and if reference to that chart assists you, feel
17  free to refer to that chart.
18  A  Certainly.
19        MR. WOLFF: Obviously as well as any counts
20  in the declaration.
21        MR. HOOD: That is correct.
22  BY MR. HOOD:
23  Q  You have to go to the claims in the '172 patent. So we're
24  in column 13 and starting at line 44. It's your opinion
25  that -- and I am referring to Exhibit -- tab F to your

Page 119

1  declaration, Professor, which it looks like you already
2  have up which is the invalidity chart. In the first row,
3  the first text entry row after the titles in tab F, you
4  indicate that the 1a -- I guess we use the tags that we
5  have there, the 1a, that that particular aspect of claim
6  one, is at least in your description you say "CyberPilot96
7  is a software product for navigating and finding
8  information on a network of nodes (computer network)." Do
9  you see where I'm reading there?
10  A  Yes, I do.
11  Q  Okay. It's your opinion, am I correct, that 1a, that
12  aspect of claim one is disclosed in CyberPilot96?
13  A  Yes.
14  Q  Okay. Moving to 1b, limitation of the '172 patent as you
15  indicate in the chart, constructing a search window on a
16  display screen of the local computer. Tell me where in
17  CyberPilot96 you find that particular claim limitation.
18  A  Well, CyberPilot was meant to work in conjunction with the
19  Web browser like Netscape Navigator. So the search window
20  that's constructed is the browser window. So in
21  constructing a browser window you have two choices with
22  CyberPilot Pro. You can independently construct the
23  search window, the browser window or having launched
24  CyberPilot Pro and double-clicked on one of the object
25  icons, you can cause Netscape to -- if I remember

Page 120

1  correctly, you can Netscape to launch and set -- take that
2  file and display it, at the very least constructing a
3  search window on a display screen of the local computer
4  can be done using the Web browser.
5  Q  You said you can independently construct that search
6  window. How do you mean you can independently construct a
7  search window?
8  A  By opening up your browser.
9  Q  Okay. And with respect to the second way you said you can
10  double click on an icon; is that correct, in CyberPilot?
11  A  I think that launches Netscape. I'd have to go back and
12  remember. It certainly loads the displays of the file
13  that you're double clicking on.
14  Q  In your understanding of having operated CyberPilot, if
15  the Netscape browser is not open or activated at the time
16  that you double click on the icon in CyberPilot, is it
17  your understanding that CyberPilot then launches Netscape?
18  A  I'd have to go back and check. I honestly don't remember.
19  Q  Okay. If that is not the case, if double clicking on that
20  object icon in CyberPilot does not launch Netscape or the
21  browser that I guess you're using, is it still your
22  opinion that this particular claim limitation as you've
23  labeled it 1b is disclosed by CyberPilot?
24  A  Since it's built to work as my understanding of Net Jumper
25  and the patent itself with a -- in conjunction with a Web

Net Jumper Software, L.L.C. vs.
Google Inc.

Multi-Page™

Joseph Hardin
September 16, 2005

Page 121

1    browser, then yes.
2  Q  Yes, what? I guess --
3  A  It would anticipate this.
4  Q  This particular claim limitation --
5  A  Right.
6  Q  -- 1b?
7  A  Yes.
8  Q  Okay. But as you sit here now, and I know we don't have
9    CyberPilot here. I don't think we have counsel's car here
10   to pull out the box --
11         MR. WOLFF: It's actually downstairs and --
12         MR. HOOD: We may do that afterwards.
13         MR. WOLFF: If you've got a network
14   connection we can -- I'm certainly open to let you guys
15   inspect it.
16         MR. HOOD: We might do that. Whether it's
17   today or not --
18         MR. WOLFF: Yeah.
19         MR. HOOD: -- that may be something else too.
20         MR. WOLFF: Absolutely. We can arrange that.
21 BY MR. HOOD:
22 Q  As we sit here today understanding that you don't have the
23   program with you right now to operate -- or I just want to
24   get a sense. Is it your belief that yes, indeed double
25   clicking on an icon will independently launch a browser --

Page 122

1    the Netscape browser or do you not recall? I just --
2  A  I simply don't recall, period. Right.
3  Q  Good enough. Let's move to 1c, claim limit 1c. Well, let
4    me back up before we move to 1c. Let me ask first, would
5    a user of CyberPilot be able to search a computer network
6    using CyberPilot?
7         MR. WOLFF: Object to form.
8         THE WITNESS: A user of CyberPilot would be
9    able to navigate and search in a couple of different ways
10   using CyberPilot.
11 BY MR. HOOD:
12 Q  And you use the words navigate and search.
13 A  Right.
14 Q  I understand you --
15 A  Be able to do both. So yes -- the answer is yes, you
16   would be able to search.
17 Q  How would a user be able to search using CyberPilot?
18 A  Searching with CyberPilot would involve clicking on the
19   icons that either pull down more information than is
20   currently in the CyberPilot window and clicking on the
21   results of that or simply scrolling up and down and
22   clicking on Previous or Next or sequentially through the
23   documents that are displayed in the CyberPilot window.
24   And indeed you don't have to do it sequentially. You can
25   -- they're displayed sequentially, but you can click and

Page 123

1    move around in that and investigate that space in that
2    fashion.
3  Q  How would a user navigate using CyberPilot?
4  A  In a similar fashion. In the distinction in the case of
5    CyberPilot would be that if I knew a starting point, for
6    instance, that I wanted to go to, I would be able to type
7    that into a form window, a URL window and use that as the
8    starting point for my search.
9  Q  Is there any way in which a user of CyberPilot could enter
10   a search query, a number of search terms, not a URL but a
11   search query and actually search a network, a computer
12   network?
13        MR. WOLFF: Object to form. Calls for a
14   narrative.
15        THE WITNESS: Not to my knowledge.
16 BY MR. HOOD:
17 Q  Turning, Professor, to Exhibit D to your declaration,
18   particularly the second page there. Does this particular
19   page, Exhibit D to your declaration show what you consider
20   to be the search window as we've used that term in claim 1
21   of the '172 patent?
22 A  Here it is labeled as the browser window, and the answer
23   is yes.
24 Q  Browser window 400 --
25 A  Yes.

Page 124

1  Q  -- with the arrow at the top? Okay. That browser window,
2    am I correct, is a Netscape browser window that currently
3    has yahoo.com displayed?
4  A  Correct. By inspection.
5  Q  I'm still on Exhibit D to your declaration. In the
6    browser window area, section 400, the area that's labeled
7    to the left of location and then it has the http:\ area,
8    what with respect to this particular screen shot would you
9    call that area where the http:\ is located?
10 A  That's the URL form.
11 Q  Okay. The area -- it's shown here in white. It's below
12   the gray. You have the buttons What's New, What's Cool,
13   Handbook, et cetera. A little bit more gray and then we
14   go into white where there's a Yahoo page --
15 A  Yes.
16 Q  -- displayed. Do you see where I'm talking about?
17 A  Yes.
18 Q  What would you consider in this particular screen shot
19   that area -- everything below the gray from left to right
20   where we have Yahoo displayed?
21        MR. WOLFF: Object to form. Go ahead and
22   answer.
23        THE WITNESS: Yeah. That is the display area
24   for the HTML file.
25 ///

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 34 of 44

Net Jumper Software, L.L.C. vs.                Multi-Page™                    Joseph Hardin
Google Inc.                                                              September 16, 2005

Page 125

1 BY MR. HOOD:
2 Q  Okay.  Within that particular area there is a -- the words
3    Search for: and then what looks to be a box -- a blank
4    box.  Do you see that, Professor?
5 A  Yes, I do.
6 Q  What would you call that area, that blank box?
7          MR. WOLFF:  Object to form.  Go ahead and
8    answer.
9          THE WITNESS:  I'd call that a search entry
10   form.  It's a place that you can put in search terms and
11   the Yahoo search engine will go and match them, return
12   hits, URLs.
13 BY MR. HOOD:
14 Q  Moving then to what's been labeled -- what you labeled
15   as 300 CyberPilot map window.  Do you see where I'm at?
16 A  Uh-huh.
17 Q  Let me ask you some questions on that.  You have a green
18   border around a number of things here in number 300.
19 A  Yes.
20 Q  Do you call that the items within that green border
21   anything in particular?
22 A  They're labeled as CyberPilot icons.
23 Q  Okay.  And I'm trying to get a sense for what is included
24   as a CyberPilot icon.  There are a number of things that
25   are within that green border.  Is everything in your

Page 126

1    opinion within that green border a CyberPilot icon?
2          MR. WOLFF:  Object to the form.  Go ahead and
3    answer.
4          THE WITNESS:  Yeah.  The buttons that you see
5    across the top row, the icons, the graphic icons that you
6    see down the left-hand side, things that can be clicked
7    on, those are what I refer to as icons.
8 BY MR. HOOD:
9 Q  Okay.  Back with respect to claim one of the '172 patent
10   the next limitation -- and feel free to refer back to
11   your --
12 A  Certainly.
13 Q  -- chart if you'd like to -- of the patent is displaying a
14   first and a second icon separate from the search window on
15   said display screen.  Is it your opinion that that
16   particular limitation is disclosed in CyberPilot?
17 A  Yes.
18 Q  Tell me in your opinion what the first icon, as that term
19   is used, in claim one of the '172 patent is in CyberPilot.
20   Feel free to reference the screen shot if you'd like or
21   anything else.
22 A  Yeah.  If we look at the Exhibit D that has the picture
23   we've been discussing the image of, the Netscape Navigator
24   browser window and the CyberPilot map window, you'll see a
25   couple of buttons that could be characterized as first

Page 127

1    icon buttons, either the question mark icon or the spider
2    icon.  The second -- did you ask for second icon too?
3 Q  I didn't, but you're anticipating a question so let's move
4    there.
5 A  Maybe I need some coffee.
6 Q  Would you like some?
7 A  Yeah, I'd like some.  Yes.
8          MR. HOOD:  Let's take a break and get some
9    coffee.  Sure.
10         (Brief recess.)
11 BY MR. HOOD:
12 Q  Professor, why do you consider the question mark -- let's
13   start with that -- to be a first icon as that term is used
14   in claim 1 of the '172 patent?
15 A  Let's go back and take a quick look at the invalidity
16   chart.  These are control icons and object icons
17   respectively as I say there.  They're displayed in a
18   separate window from the search window -- the browser
19   window.  So that's what's called for in 1c displaying a
20   first and second icon separate from the search window on
21   the said display screen.
22 Q  Why is the question mark a first icon and not a second
23   icon?
24 A  Let's see.  Isn't that more a question that would lead us
25   to 1e?

Page 128

1 Q  If that helps you, sure.  That's fine.
2 A  All right.  If we go back responsive to a selection of the
3    first icon is at the bottom of 1e there.  So functionally
4    what we're looking for is something that will take the
5    location identifiers from the initial data file to form an
6    initial list of location identifiers together with storing
7    the initial list responsive to a selection of the first
8    icon.  That's basically saying that you're taking in
9    response to a click or a double click, you are taking a
10   data file, the Web page, an HTML file, and pulling out the
11   location identifiers and displaying them, and that's what
12   happened when you click on either the spider button which
13   is a more general button or specifically the question mark
14   button that is associated with any one of the top level
15   data files there.  So it leads me to believe that it is
16   the same thing as what's described as a first icon.
17 Q  Okay.  With respect to 1a, what do you consider to be the
18   location identifiers as that term is used in claim 1 of
19   the '172 patent?
20 A  The location identifiers -- if you'll look in the example
21   here, you'll see that a location identifier is displayed
22   in the blue text that's surrounded by a box.  It's the one
23   that's selected there.  The http://rds.yahoo.com/, et
24   cetera, that is a URL, and my understanding and
25   characterization of the term location identifiers in the

Net Jumper Software, L.L.C. vs.
Google Inc.

Multi-Page™

Joseph Hardin
September 16, 2005

Page 129

1 context of the patent and the rest of the documents would
2 lead me to characterize a URL as a location identifier.
3 Q Okay. Back up in what you call the URL form window I
4 think, back up top in the Yahoo -- the Netscape window for
5 Yahoo.
6 A Are we talking about the window that says Location --
7 Q Yes.
8 A -- next to it?
9 Q Yes. That's exactly what I was getting to. Do you
10 consider that particular address, that URL address, to be
11 a location identifier as that term is used in the '172
12 patent?
13 A I think that classifies as a location identifier, yes.
14 Q Okay. Going back to 1c -- and if you need to refer to a
15 later part of the patent that's fine -- I want to ask you
16 what you consider to be the second icon disclosed by
17 CyberPilot.
18 A The second icon which in the text accompanying 1c to the
19 right there. Characterized first icon it says control
20 icons and second icons as object icons. Second icons are
21 -- let's see if we can't find a specific reference to the
22 second icon. Responsive to the selection of the second
23 icon. Look at 1f. It's on the next page there. So
24 responsive to a selection of the second icon you retrieve
25 a data file and that data file is displayed. What happens

Page 130

1 when you click on one of the object icons in CyberPilot is
2 that that page is retrieved and displayed. So it is -- it
3 performs the same activity, initiates the same activity as
4 the second icon in the patent.
5 Q Where is that page displayed when you click on the second
6 icon?
7 A The page is displayed in the search window.
8 Q And where is that search window?
9 A It's the browser window.
10 Q Okay. What do you consider to be the first data file,
11 looking at 1f on your invalidity chart with respect to
12 CyberPilot?
13 A 1f. Retrieving -- I think it's a first data file, so it's
14 basically any of the data files that one would click on.
15 That would be an initial data file. A specific first data
16 file corresponding to a selected -- in other words, one
17 that you had selected, location identifier in the stored
18 initial list together with displaying first data file,
19 that data file that you clicked on or whose icon you
20 clicked on in the search window. Does that answer the
21 question?
22 Q I'm sure you did, but I didn't understand the answer so
23 I'm going to have to ask you --
24 A Okay. So ask it --
25 Q -- a follow-up question.

Page 131

1 A -- ask it again, and I'll --
2 Q I'm just trying to --
3 A -- slow down a little bit.
4 Q Just trying to get a sense for what you consider to be the
5 first data file as shown in your Exhibit D on this, and
6 you're saying if I'm correct in my understanding that it's
7 any one of the -- I don't know what to refer these to as
8 pages or something like that. The Finance, Music, Travel,
9 Mail, et cetera?
10 A The icons that are sitting there that look like pages.
11 Q Yeah. Is that what you're referring to?
12 A Sure.
13 Q Okay. So the pages with the blue -- it looks like a
14 little folded over right-hand top part next to Finance,
15 Music, Travel, Mail, et cetera.
16 A Absolutely.
17 Q Is that it?
18 A Exactly.
19 MR. WOLFF: Object to form. Ambiguous.
20 MR. HOOD: Let's not make it ambiguous then.
21 BY MR. HOOD:
22 Q I want to make sure I understand what you're talking
23 about. I want to know what you consider to be the first
24 data file as that term is used in claim 1 of the '172
25 patent with the use of your Exhibit No. D and a

Page 132

1 CyberPilot.
2 A What the first data file is.
3 Q Correct.
4 A So let's look at the narrative that's next to it, so
5 selecting a second icon -- an object icon in this case
6 versus a first icon, right, which would be a control icon
7 -- in the CyberPilot window causes the Web browser to
8 retrieve and display a first data file, a Web page. All
9 right. Associated with the location identifier
10 hyperlinked to the icon. So the first data file would be
11 the Web page that's associated with the hyperlink that is
12 linked to that icon.
13 Q So it's not the icon?
14 A The second -- no, it's not the icon.
15 Q It's the Web page associated with that icon?
16 A Yes, indeed it is.
17 Q Okay. Did you have occasion to operate the Explore
18 feature of CyberPilot, Professor Hardin?
19 A The Explore feature. Would you point me to where that's
20 in the Tutorial?
21 Q I don't know if it's in the Tutorial. I'm just asking if
22 that rings any bell for you if you operated that feature
23 of CyberPilot.
24 A I don't recall.
25 Q Okay. Let's go to Mr. Starks' declaration. I think we

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 36 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page ™                    Joseph Hardin
Google Inc.                                                                September 16, 2005

| Page 133 | Page 135 |
|---|---|
| 1　can find that. Exhibit B to what's been marked as Exhibit | 1　CyberPilot Tutorial, constitutes either the first or |
| 2　Number 97. | 2　second icon as that term is used in claim one of the '172 |
| 3　A　Yes. | 3　patent? |
| 4　　　　MR. WOLFF: Page five. | 4　A　It would seem to characterize -- well, let me think a |
| 5　BY MR. HOOD: | 5　second. Yes. |
| 6　Q　And it's at page 5 of 30 -- top right-hand corner of each | 6　Q　And what is that opinion? |
| 7　page it says page X of 30. And you see about | 7　A　Oh, the opinion. The opinion is that yes, it does |
| 8　three-quarters of the way down it says "Explore more of | 8　characterize a -- an example of a first icon. |
| 9　the site." | 9　Q　First icon? |
| 10　A　Yes. | 10　A　Yeah. If we look at 1e in the claims on the invalidity |
| 11　Q　Go ahead and review that if you'd like to. It's that | 11　chart it talks about parsing the location identifiers from |
| 12　particular feature of CyberPilot that I'd like to know if | 12　the initial data file. 1d and 1e together, retrieving the |
| 13　you operated. | 13　data file, 1e, parsing the location identifiers, forming |
| 14　A　Choose Explore from the WebMap menu. Yes, I have. Right. | 14　an initial list. That's essentially getting the Web page, |
| 15　The Explore -- I'm trying to remember which icon the | 15　going through the Web page and looking at the URLs and |
| 16　Explore icon was. It's not clear from this. I think it | 16　indeed in this case going down to the next level of those |
| 17　was the simple page icon. It's up in the upper left-hand | 17　URLs, then storing that list responsive to a selection of |
| 18　corner. It's slightly different. | 18　the first icon. |
| 19　Q　You do recall performing work with this Explore feature as | 19　Q　Okay. I'd like to move to 1d in your invalidity chart. |
| 20　it's indicated in Exhibit B? | 20　This addresses the claim limitation, retrieving an initial |
| 21　A　I remember selecting Limit Levels to the check box, so | 21　data file. Do you see where I'm at, Professor? |
| 22　let's see. This tells -- to limit its exploration to the | 22　A　Uh-huh. |
| 23　site for how deep it goes. That's true. Then we're going | 23　Q　From the network together with displaying, et cetera. |
| 24　to -- then CyberPilot's going to build a map. Right. | 24　It's your opinion, I take it, that CyberPilot Pro |
| 25　First it located the home page. Right. Then it located | 25　disclosed this particular limitation 1d of claim one of |

| Page 134 | Page 136 |
|---|---|
| 1　any objects pointed to by links on the home page. So it's | 1　the '172 patent? |
| 2　drilling down. You're telling it how far to drill down, | 2　A　Yes. |
| 3　whether to look at all those links and all the links that | 3　Q　How did CyberPilot Pro quote, "retrieve an initial data |
| 4　link to them or go down however many levels. After that | 4　file" as that term is used there in the claim? |
| 5　it locates any links on those pages, yada, yada, yada. | 5　　　　MR. WOLFF: Object to form. Asked and |
| 6　Since you limited exploration to three levels, go to the | 6　answered. Go ahead. |
| 7　Web -- | 7　　　　THE WITNESS: Are you asking from the user |
| 8　Q　You might want to slow down. | 8　perspective or are you asking from any particular |
| 9　　　　MR. WOLFF: Slow down, please. | 9　perspective different from what I've already said? |
| 10　　　　THE WITNESS: CyberPilot Pro will go on the | 10　BY MR. HOOD: |
| 11　Web and look up objects in the site only as far as the | 11　Q　I just -- and if I asked it before, I apologize. I don't |
| 12　grandchildren -- two levels down -- of the home page. For | 12　recall asking it in that way, but I'd like to know from |
| 13　more information, yada, yada. A note on the map | 13　your understanding perspective how did CyberPilot Pro |
| 14　hierarchy. Click OK. You'll see an Exploring status box | 14　retrieve an initial data file together with displaying the |
| 15　while CyberPilot Pro looks up pages on the site. So | 15　initial data file in the search window and the initial |
| 16　that's a user interface status box. It says I'm doing | 16　data file including location identifiers? |
| 17　something. The application's telling the user. After a | 17　A　I didn't -- my understanding in response to selection of |
| 18　few minutes the map is redisplayed. The question mark | 18　an icon, CyberPilot Pro went out, got the initial data |
| 19　icons are replaced by plus icons and more of the site is | 19　file, the Web page, retrieved it, and displayed that in |
| 20　shown. You'll be clicking some of these plus icons | 20　the search window and in the browser window and including |
| 21　shortly, the Tutorial says. So yes, I do recall using | 21　its location identifiers, then parsed the location |
| 22　that feature. | 22　identifiers and built its map. |
| 23　BY MR. HOOD: | 23　Q　You said in response to selection of an icon it did that. |
| 24　Q　Do you have any opinion whether the Explore button as it's | 24　In response to selection of what icon did CyberPilot |
| 25　described in the materials marked as Exhibit B, the | 25　perform that? |

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 37 of 44

Net Jumper Software, L.L.C. vs.                    Multi-Page™                    Joseph Hardin
Google Inc.                                                                September 16, 2005

Page 137

1 A  As we pointed out, let's see, in Exhibit D.  We have some
2     choices here.  Could be the question mark icon.  Could be
3     the spider icon.
4 Q  Is your -- I'm sorry, I didn't mean to cut you off.
5 A  Right.  Right.  No.  Either of those.
6 Q  It's your opinion that CyberPilot retrieved an initial
7     data file in response to the activation of either the
8     question mark or spider icon; is that correct?
9 A  Yes.
10        MR. WOLFF:  Object to form.  Mischaracterizes
11    prior testimony.
12        THE WITNESS:  I'm sorry.  Could you ask that
13    again?
14 BY MR. HOOD:
15 Q  No, I'll move on to another question.  Thanks.  Moving to
16    limitation 1e in your invalidity chart, this is the
17    limitation, parsing the location identifiers from the
18    initial data file to form an initial list of location
19    identifiers together with storing the initial list
20    responsive to a selection of the first icon.  What is your
21    understanding -- well, first of all, let me ask is it your
22    opinion that CyberPilot did disclose this particular
23    location, 1e of the '172 patent?
24 A  Yes, it is.
25 Q  And what understanding of the term parsing, as it's used

Page 138

1     in that limitation, do you consider CyberPilot to have
2     performed?  Let me ask you, is it the same as what has
3     been indicated in Exhibit 96, Google's Proposed Claim
4     Constructions?
5 A  Yes, it is.
6 Q  So that would be, quote, "the act of examining a string of
7     text, breaking it into subunits and establishing the
8     relationships among the subunits"; is that correct?
9 A  Yes.
10 Q  Okay.  And it's your opinion that CyberPilot did that
11    parsing, as you've used that term, responsive to a
12    selection of the first icon as we've discussed; is that
13    correct?
14 A  Yes.
15 Q  Let me move to claim four, Professor Hardin, in the
16    invalidity chart.  This is claim four of the '172 patent.
17    Is it your opinion that claim four is disclosed in
18    CyberPilot96?
19 A  Yes.
20 Q  That claim says "the computer implemented method of claim
21    one wherein said retrieving act further compromises
22    retrieving the first data file corresponding to the one of
23    the location identifiers in the stored initial list
24    selected from a group consisting of a Next location
25    identifier, a Prior location identifier, a First location

Page 139

1     identifier and a Last location identifier together with
2     displaying the first data file in the search window
3     responsive to a selection of the second icon."  Let me ask
4     you, and feel free to refer back to the screen shot if
5     that helps you, what in CyberPilot96 do you consider to be
6     the Next location identifier as it's used in the claim of
7     the '172 patent?
8 A  Where was that?  That was Exhibit -- I lost the exhibit.
9     Exhibit D?
10 Q  Yes, that's correct.
11 A  All right.  Well, let's look at the -- again at the
12    narrative that's in the claims and validity chart here.
13    The location identifiers stored in the initial list, the
14    Web Map file now, are arranged in sequence and compromise
15    the Next location identifier, a prior location identifier,
16    a first location identifier, and a last location
17    identifier, and examples of this -- or let me just
18    continue reading.  For example, with reference to the
19    figure below -- and this is now a reference to the figure
20    on page 5 of the document that has the invalidity chart.
21 Q  This is Exhibit F to your declaration?
22 A  Yeah.  As reference to the figure below, the first
23    location identifier in the CyberPilot Web Map file is the
24    URL corresponding to the places label.  So we see that on
25    the left there.

Page 140

1 Q  Uh-huh.
2 A  All right.  The last location identifier is the URL
3     corresponding to the Moloka'i label.  Okay.  When the
4     Kaua'i -- the Garden Island object icon is selected -- so
5     if we selected the Kaua'i object icon, the Garden
6     Island -- if that's selected.  The Next location
7     identifier is the URL corresponding to the activities in
8     Kaua'i, and the previous location identifier is the URL
9     corresponding to the island of Kaua'i.  So you can see the
10    pattern.  Right.  There's an initial what's called here a
11    Next location, a Prior, a First location and a Last
12    location.  And those are relative to where you are.
13 Q  And it's your opinion then that those particular
14    identifiers as you've described are retrieved responsive
15    to a selection of a second icon in CyberPilot96?
16 A  I'm sorry?
17        MR. WOLFF:  Object to form.  I don't know if
18    you're trying to characterize his testimony or ask him if
19    he agrees with the statement.
20        MR. HOOD:  Well, let me ask it a different
21    way.
22 BY MR. HOOD:
23 Q  In your invalidity chart, claim number four, I understand
24    your opinion to be that CyberPilot96 discloses all of the
25    limitations of claim four; is that correct?

Page 141

1 A Yes.
2 Q And you've just gone through that you considered to be the
3    Next location identifier, prior location identifier, first
4    location identifier and last location identifier. The
5    last part of claim four, after the final comma says,
6    responsive to a selection of the second icon. We've gone
7    through your understanding of second icon with respect to
8    CyberPilot. Is it your opinion that those particular
9    identifiers, the Next location, Prior location, et cetera,
10   are retrieved responsive to selection of the second icon?
11        MR. WOLFF: Object to form. Confusing. I
12   don't understand what claim limitation you're referring
13   to, Counselor.
14 BY MR. HOOD:
15 Q Let me ask you this: What do you understand that the
16   phrase "responsive to a selection of the second icon as
17   it's used in claim four" to mean, Professor?
18 A The phrase responsive to the selection of the second icon?
19 Q Correct.
20 A Well, again, looking at the text, in this case under 1f,
21   we can talk about selecting a second icon, a page object
22   icon in the CyberPilot window, so selection of a second
23   icon in that case would result in retrieving a data file,
24   parsing it, displaying it.
25 Q And that in your view includes the Next location

Page 142

1    identifier, Prior location identifier, First location
2    identifier and Last location identifier?
3        MR. WOLFF: Object to form. Confusing.
4 BY MR. HOOD:
5 Q Let me ask this: Is it your opinion that claim four is
6    different in any respect than claim one? You've referred
7    back to claim 1f.
8        MR. WOLFF: Are you including 1f with 1?
9        MR. HOOD: No, no.
10 BY MR. HOOD:
11 Q Let me ask: Is it your opinion that claim four is
12   different in any respect, at least as we're talking about
13   it with respect to CyberPilot in claim one?
14        MR. WOLFF: Objection, ambiguous. Go ahead
15   and answer, if you can.
16        THE WITNESS: Yeah. I'm not -- it's a --
17   you're asking if claim four is different in any way than
18   claim one; is that correct?
19 BY MR. HOOD:
20 Q That's correct.
21        MR. WOLFF: Are you talking about the claim
22   itself or are you talking about as applied or as applied
23   to CyberPilot?
24        MR. HOOD: Well, right now I'm just asking
25   about the claim itself. Is it your opinion that claim 4

Page 143

1    differs in any regard to claim one of the '172 patent?
2        MR. WOLFF: It's the language of the claim?
3        MR. HOOD: Correct.
4        MR. WOLFF: Okay.
5        THE WITNESS: Well, if we're talking about
6    the language of the claim, then there is some
7    specification in four that's not in one.
8 BY MR. HOOD:
9 Q And what is that?
10 A It's the specification of the Next, Prior, First and Last
11   identifiers.
12 Q Okay. It's your opinion I think you just testified that
13   those identifiers are disclosed by the CyberPilot96; is
14   that true?
15 A Yes.
16 Q Okay. Are there any other differences in your opinion
17   between claims one and four of the '172 patent other than
18   what you've already testified to?
19        MR. WOLFF: Object to form. Ambiguous. Go
20   ahead and answer.
21        THE WITNESS: I think that this is pretty
22   much -- as I say in the declaration, they're associated
23   with claim four. This is pretty much the same as 1f. The
24   location identifiers that are referenced here or that are
25   made explicit in this claim are the initial list that is

Page 144

1    of the Web Map file that's arranged in sequence. In my
2    opinion, this doesn't add a lot of specification to that.
3    It's simply labeling what is a sequence of elements, the
4    initial list.
5 BY MR. HOOD:
6 Q Does it add any specification as you just used that term
7    to the client?
8        MR. WOLFF: Object to form. Ambiguous. Go
9    ahead and answer it.
10        THE WITNESS: Are you asking a legal
11   question? Do I think --
12 BY MR. HOOD:
13 Q No, you just said --
14 A -- do I think that --
15 Q Go ahead.
16 A Yeah. Do I think that this wording and the listing of
17   Next -- how do we go here -- Next, Prior, First and Last
18   adds any significant specification to it? Is that what
19   you're asking?
20 Q I was following up on your statement that it doesn't add a
21   lot of specification. Does it add any specification as
22   you use that phrase to the claim?
23        MR. WOLFF: Object to form. Asked and
24   answered. Go ahead and answer.
25        THE WITNESS: Yeah. It adds a set of labels

Case 2:04-cv-70366-JAC-RSW    Document 62-4    Filed 11/03/2005    Page 39 of 44

Net Jumper Software, L.L.C. vs.          Multi-Page™                    Joseph Hardin
Google Inc.                                                    September 16, 2005

## Page 145

1    to an already existing sequence.
2 BY MR. HOOD:
3 Q  Is it the case then in your opinion that claim 4 does not
4    require any additional limitations to be found in
5    CyberPilot96, in order to infringe?
6        MR. WOLFF: Object to form. Mischaracterizes
7    his prior testimony. Go ahead and answer the question.
8        THE WITNESS: Could you ask the question
9    again?
10 BY MR. HOOD:
11 Q  In your invalidity chart and in some of your testimony,
12    you have referred to this particular claim four as the
13    same as 1f, which is what you say there in column number
14    two of your invalidity chart. What do you mean by same as
15    1f as you use it in that invalidity chart?
16 A  As I've said simply labeling the Next, Prior, First and
17    Last elements of a sequentially displayed list is not in
18    my opinion adding a lot of specification. It's not adding
19    anything that would not be, you know, obvious to a user,
20    what is the First, what is the Next. If you're talking
21    about those as simply being sequential, then I think
22    that's understood. Even if that were not the case, even
23    if it were something that added some specification, it
24    still is contained in the CyberPilot product.
25 Q  Okay. I understand.

## Page 146

1        MR. WOLFF: Is this a good time for a break?
2        MR. HOOD: Yeah, it's fine.
3        (Brief recess.)
4        MR. HOOD: Back on the record, Professor.
5 BY MR. HOOD:
6 Q  I'd like to direct you to paragraph 32 of your
7    declaration, which is Exhibit 95 to the deposition.
8 A  Twenty-eight -- 32.
9 Q  It starts out "URLs found in the Web Map..."
10 A  Yes.
11 Q  Do you see that? "...or extracted from a HTML file
12    presented in the browser window by selecting a control
13    icon (e.g. shown as a gray box with a question mark)
14    displayed in the CyberPilot Map window." Let me ask you,
15    first of all, on what do you base that particular
16    statement in paragraph 32? Is that something that came
17    out of your operation of CyberPilot?
18 A  So which part of it are you asking the question about?
19 Q  Well, particularly the first sentence --
20 A  Whether or not --
21 Q  -- right now.
22 A  So URLs found in the Web Map were extracted from an HTML
23    file presented in the browser window by selecting a
24    control icon. That's how the documentation -- or that's
25    how I read the documentation. Selecting a control icon, a

## Page 147

1    gray box -- for example a gray box with a question mark in
2    it, which is -- that control icon is displayed in the
3    CyberPilot Map window, right, caused the HTML file that
4    that was next to, the object icon representing the HTML
5    file that the question mark was next to, to be parsed --
6 Q  Well --
7 A  Let's just use the terminology here. To take the URLs and
8    extract them, period. Okay?
9 Q  Okay.
10 A  So the answer to the question would be that I understood
11    that from the documentation for CyberPilot.
12 Q  Have you had occasion to review any code, source code,
13    HTML code, any of that type thing for CyberPilot?
14 A  I have not looked --
15        MR. WOLFF: Object to form. Go ahead.
16        THE WITNESS: Yeah. I have not looked at any
17    source code for CyberPilot. I have looked at some of the
18    Web Maps, indeed looking for the URLs that are described
19    here.
20 BY MR. HOOD:
21 Q  When did you do that, look at the Web Maps that you just
22    described?
23 A  I looked at those recently when I was working with
24    CyberPilot on the machine in order to verify my
25    understanding of what was going on from the documentation.

## Page 148

1 Q  Okay. Did you form any opinion as to how this extraction,
2    as you've used it in that particular paragraph 32, is
3    accomplished by CyberPilot?
4 A  Yes. And my opinion is that that extraction is performed
5    simply by parsing the HTML file and pulling out the URLs
6    and then listing those.
7 Q  And is that in response to a particular user action in
8    CyberPilot?
9 A  In the case that's described here, it's in response to
10    selecting a control icon, the question mark icon.
11 Q  Okay. Let me go back to the invalidity chart, Exhibit F
12    to your declaration.
13 A  Uh-huh.
14 Q  And let's talk about limitation that you've labeled 1E.
15    Limitation parsing the location identifiers from the
16    initial data file. You see where I'm at there?
17 A  Yes.
18 Q  Explain to me what is happening in CyberPilot during this
19    particular parsing step, if you know.
20 A  Again, the narrative that is associated with this
21    describes that. URLs from the initial data file are
22    parsed in response to selection of an icon, the question
23    mark icon, for instance, and an initial list of location
24    identifiers. The red map file identified as a file with
25    the suffix .wmp is displayed in the CyberPilot which is

| Page 149 | Page 151 |
|---|---|

**Page 149**

1   displayed in the CyberPilot window is stored for use by
2   CyberPilot. What's happening there is pretty simply
3   what's described there. The initial data file is parsed.
4   In other words, you can go to the definition and see what
5   we mean by parsing. It's examined. You can consider a
6   text to be a string of texts, a document to be a string of
7   texts. It's broken into its subunits. In this case the
8   relevant subunits are the URLs. All right. And then the
9   relationship in this case, the sequence of those URLs is
10   established, and that's what in my understanding
11   CyberPilot is doing.
12 Q   Okay. And you refer to the proposed claim constructions
13   of Exhibit 96. In that same context you define the term
14   parsing or the proposed claim construction includes the
15   term parsing in response to selection of an icon. Do you
16   see that? The third entry down.
17 A   Yes.
18 Q   And it states that the act of parsing of the hyperlinks is
19   performed on the initial data file only after one of the
20   two separately displayed icons has been selected. Is it
21   your opinion then that parsing as it's used in claim
22   limitation 1e is being performed in that manner as
23   constructed on Exhibit 96 by CyberPilot?
24 A   As the -- yeah. As we say here, the URLs from the initial
25   data file are parsed in response to selection of an icon,

**Page 150**

1   the question mark icon, for instance.
2 Q   Okay. Do you have any understanding of where the parsing
3   is I guess physically accomplished when you're using
4   CyberPilot? In other words, kind of what I'm getting at,
5   is it locally on a computer? Is it out on a network?
6   Just tell me if you have an understanding of where or by
7   what this parsing is being performed in CyberPilot.
8         MR. WOLFF: Object to form, vague. Go ahead
9   and answer.
10         THE WITNESS: It's on the client machines.
11 BY MR. HOOD:
12 Q   Okay. Have you had occasion to review the Google Toolbar
13   HTML code as part of your duties in this particular case?
14         MR. WOLFF: Object to form. Lacks
15   foundation. What is the Google Toolbar HTML code?
16 BY MR. HOOD:
17 Q   With respect to the accused Google Toolbar that we've been
18   discussing, Professor, I'm asking if you've had occasion
19   to review any software code for that particular Toolbar?
20 A   No, I have not.
21 Q   Professor, do you presently have any opinion regarding any
22   other piece of software or hardware technology of
23   some sort like CyberPilot that in your opinion invalidates
24   any claims of the '172 patent?
25         MR. WOLFF: Object to form.

**Page 151**

1         THE WITNESS: So you're asking if there are
2   any other potentially invalidating prior art pieces of
3   software that I've investigated and formed an opinion on?
4 BY MR. HOOD:
5 Q   Sure. You can answer that question for me first. That'd
6   be great. Thank you.
7         MR. WOLFF: Self-deposition.
8   Self-employed --
9         MR. HOOD: We can all go home, right? Just
10   let him do his own.
11         THE WITNESS: Right.
12 BY MR. HOOD:
13 Q   Sure. Go ahead and answer that.
14 A   Yeah. The answer is no.
15 Q   Okay. Is it then the case that you don't presently have
16   an opinion that claims of the '172 patent are invalid
17   based on anything other than CyberPilot?
18 A   It's my opinion currently that CyberPilot is sufficient to
19   invalidate the '172 claims.
20 Q   So is that a yes or a no or a maybe? I don't mean to --
21 A   Right.
22 Q   -- to be technical. I just want to understand if you
23   believe presently as you sit here today --
24 A   Right.
25 Q   -- that there is any other piece of prior art, as you've

**Page 152**

1   used that term, that invalidates any claims of the '172
2   patent other than CyberPilot, which we've reviewed?
3 A   I haven't formed an opinion on that.
4 Q   Okay. Do you have any other pieces of prior art in mind
5   that you believe might invalidate claims of the '172
6   patent?
7         MR. WOLFF: Object to form. Calls for
8   speculation.
9         THE WITNESS: None that are as complete as
10   CyberPilot.
11 BY MR. HOOD:
12 Q   List for me those that are not as complete as CyberPilot,
13   as you just referred to.
14 A   Well --
15         MR. WOLFF: Object to form. Calls for a
16   narrative. Ambiguous.
17         THE WITNESS: Yeah. If we look at the Wood
18   article, we see descriptions of things that are -- that
19   could be on further investigation invalidating, but I
20   haven't formed an opinion on it.
21 BY MR. HOOD:
22 Q   What are the names of those things as you just referred to
23   that could be invalidated?
24 A   The viewer, the use of a separate window to display search
25   results. That's from a reading of a article that was at a

Net Jumper Software, L.L.C. vs.
Google Inc.

Multi-Page™

Joseph Hardin
September 16, 2005

Page 153

1 conference. To -- if I were to consider that as -- to
2 seriously consider it as invalidating prior art, I'd have
3 to go much deeper, but first look there are things there
4 that could potentially apply to this.
5 Q The same question I asked you on infringement with respect
6 to the '655 patent. Have you been asked to render any
7 opinions on validity of that particular patent or its
8 claims?
9 A No, I have not.
10 Q Professor, we went through earlier your CV, which is
11 Exhibit -- or Exhibit A rather, to your deposition. Would
12 you consider yourself to have any particular expertise
13 right now, any specialty, anything of that nature in what
14 you currently do?
15 A Do I have any particular expertise? How would I
16 characterize a specialization?
17 Q Let me phrase that -- rephrase that. Do you have any
18 particular specialty in the work that you do?
19 A Well, I think the vitae speaks for itself. If we look at
20 it again -- where was that?
21 Q It's Exhibit A to your declaration.
22 A Right. The things that are described there are software
23 manage -- software development management, organizational
24 management, analysis and direction of software development
25 efforts and teaching, specifically teaching Web

Page 154

1 technologies.
2 Q Have you ever testified in court before?
3 A No.
4 Q Have you ever testified at deposition before today?
5 A Yes.
6 Q When was the last time you testified at a deposition?
7 A Well, I knew that was going to be the next one, and I
8 don't remember. It was probably five years ago. It was
9 after I moved to Michigan, which was in '97.
10 Q Okay. What type of case was that in?
11 A It was a software patent case.
12 Q Did you testify as an expert in that case?
13 A No, I testified about the facts of the case.
14 Q Who are the parties involved in that case?
15 A I'm trying to remember exactly. I think it was Eolas vs.
16 Microsoft.
17 Q I think we know that case. Before that had you testified
18 at any deposition?
19 A No, I don't think so.
20 Q Where did that deposition take place?
21 A That took place in Ann Arbor.
22 Q Paragraph 16 of your declaration, you say you have been
23 informed on several principles concerning validity, et
24 cetera. Who was it that informed you of those several
25 principles?

Page 155

1 A It was Jason Wolff and colleagues.
2 Q Do you have any understanding of any presumptions that
3 attached to the issuance of a patent in the United States
4 patent system?
5 A The issuance of a patent?
6 Q Any presumptions that attach to the issuance of a patent
7 in the United States?
8 A My understanding is that once issued, the patent is
9 presumed to have force.
10 Q Is it your understanding that once issued a patent is
11 presumed to be valid?
12 A Yes, that's my understanding.
13 Q Okay. On what is that understanding based?
14 A Communications with Jason Wolff and general background
15 understandings from working previously in a patent case.
16 Q What case was that?
17 A That was the Eolas case.
18 Q Okay. The same case that you testified at --
19 A Yeah.
20 Q -- deposition on?
21 A Right.
22 Q Tell me in that case what work you did on a patent. I
23 think you said you testified about facts. Is that correct
24 -- in the case?
25 A Yes, that's correct.

Page 156

1 Q Did you render any opinions in that case with respect to a
2 patent or patents?
3     MR. WOLFF: Object to form. Ambiguous.
4     MR. HOOD: Let me clarify the question unless
5 you want to --
6     MR. WOLFF: Go ahead.
7     MR. HOOD: -- go ahead. You can.
8     MR. WOLFF: No, you can clarify it.
9     MR. HOOD: Sure.
10     MR. WOLFF: I withdraw the objection.
11 BY MR. HOOD:
12 Q Let me ask first of all at the deposition that you have
13 discussed, Professor, in the Eolas vs. Microsoft case, did
14 you testify as to any opinions that you had about any
15 subject matter that was at issue in that deposition?
16 A As I remember almost all of the questions -- indeed all of
17 the questions centered around questions of facts, not
18 opinion.
19 Q Did you testify to any opinions at that deposition?
20 A Not that I remember. They were questions about where I
21 was, what I knew, who I had worked with, things like that.
22 Those are questions of fact, not opinion.
23 Q Okay. Had you been engaged by either of the parties to
24 provide any kind of consultation or assistance to those
25 parties?

Page 157

1   A   Yes.
2   Q   And who was it that hired you in that case or engaged your
3       services?
4   A   I don't remember the name of the firm. It was on the side
5       of the plaintiffs, I think -- no, since I get those terms
6       mixed up. It was on the Eolas side of the case.
7   Q   Okay. And what were you engaged to do in the Eolas case?
8           MR. WOLFF: Objection. If you're under a
9       confidentiality restriction because of that consultancy or
10      whatever it was you did, I think you'd probably have to
11      preserve that, and I suppose you have to take -- see if
12      you can take discovery upon the Eolas folks.
13          MR. HOOD: Let's ask that foundational
14      question. If we get that we'll deal with that.
15          MR. WOLFF: Okay.
16  BY MR. HOOD:
17  Q   Professor, do you have any understanding of whether you
18      are under a confidentiality requirement provision or order
19      out of the Eolas case or pertaining to that case?
20  A   I think that my conversations with counsel there, I
21      presume that they were under confidentiality, but I would
22      not be -- I could not be forced to disclose them, and I
23      would prefer not to.
24          MR. HOOD: And maybe, Counsel, for the record
25      just to be safe and not to put the professor in a bad spot

Page 158

1       -- I don't mean to go down that road if he is, in fact.
2       Maybe we can preserve that. If we find out later if it's
3       relevant that he is not, we can address it if we have any
4       questions. I don't know that we do. I don't want to
5       press it today. It doesn't sound like we know for sure,
6       and if he is I don't want press him anyway.
7           MR. WOLFF: I have no knowledge either what
8       that is. If your questions are foundational, and they
9       somehow relate to facts in the Eolas case as they pertain
10      to this case, I don't know that he's -- I mean if he's got
11      personal knowledge of facts in Eolas that would relate to
12      this case, I don't have an objection to your asking those
13      questions that pertain to facts. I don't know what it
14      could possibly do with this declaration that's been
15      submitted here, but I generally don't have questions to
16      facts about his personal knowledge. I think that the
17      consulting work that he did if any for the other side and
18      the communications he had with counsel would probably be
19      privileged or work product and may be protected for those
20      reasons, but I don't have any basis to know. But I don't
21      -- so without knowing what the relevance is, you know, I
22      can kind of -- somewhat disagree with your reservation of
23      right, but, you know, I don't have any basis to know one
24      way or the other either.
25          MR. HOOD: Well, I would. I can ask the

Page 159

1       question if you want to so that you can object, and we can
2       go on, but I would get into more the latter then the
3       former, not the facts, but, you know, the basis of any
4       consulting that he may have done. There sounds like there
5       was some consulting. So would you like me to ask --
6           MR. WOLFF: About the work product?
7           MR. HOOD: -- that question? To the --
8           MR. WOLFF: So you want to ask the work
9       product question, then I'll --
10          MR. HOOD: Effectively, yeah, to find out.
11      It sounds like we had an answer that yeah, he was engaged.
12          MR. WOLFF: Yeah. I think that my concern is
13      that if he's got a confidentiality restriction and
14      somebody holds a privilege or a work product protection to
15      those conversations, I don't know that that party has been
16      notified of your intent to go into those communications
17      and, therefore, you know, I don't know what contractual
18      issues or other legal issues Professor Hardin would have
19      as a result of your prying into these questions. So I
20      would object probably and instruct him not to answer until
21      we can figure out what exactly the scope of that --
22          MR. HOOD: Yeah. Let me --
23          MR. WOLFF: -- arrangement was.
24          MR. HOOD: -- ask that question. I'm new
25      enough to the case, I don't know. I don't know if that's

Page 160

1       been explored. It may not have been, as you say. So let
2       me ask a question.
3   BY MR. HOOD:
4   Q   Professor, with respect to the Eolas case that we've been
5       discussing -- I want to do this to allow for him to do
6       what he needs to do -- first of all, what was the law firm
7       that you were engaged by? Do you recall the name of that
8       firm?
9   A   I do not recall.
10  Q   Okay. Did you have discussions with an attorney or
11      attorneys at that law firm about the case, the Eolas case?
12  A   Yes, I did.
13  Q   And what were those discussions?
14          MR. WOLFF: Objection, calls for an opinion
15      or I should say -- strike that.
16          Objection. Calls for privileged
17      communications and/or work product information, and I do
18      not know whether Mr. Hardin has some confidentiality
19      restriction that would preclude or prevent him from
20      disclosing the substance of those communications. On the
21      basis of that instruction -- or that objection, I will
22      instruct you not to answer the question.
23  BY MR. HOOD:
24  Q   Are you going to follow the instruction?
25  A   Yes.

Case 2:04-cv-70366-JAC-RSW   Document 62-4 TM   Filed 11/03/2005   Page 43 of 44

Net Jumper Software, L.L.C. vs.
Google Inc.
Multi-Page™
Joseph Hardin
September 16, 2005

Page 161

1    MR. HOOD: Why don't we take a quick break
2  and see if there's any other follow-up questions I have,
3  and if Jason needs to we can get that done too and be
4  done.
5    (Brief recess.)
6    MR. HOOD: Okay. Back on the record,
7  Professor. We're going to wrap up here. I know you've
8  got to get going.
9 BY MR. HOOD:
10 Q I wanted to ask you a follow-up question about your
11  invalidity chart, Exhibit F to your declaration, which is
12  Exhibit 95. And I'm looking at the limitation that you've
13  labeled 1e again on page two of Exhibit F to Exhibit 95.
14  This is the limitation that starts "parsing the location
15  identifiers from the initial data file." Do you see that?
16 A Yes.
17 Q I want to go back to CyberPilot too, if you want to call
18  up that screen shot.
19 A Which one? The one that's Exhibit D?
20 Q I believe that is correct. Yes. Exhibit D to your
21  declaration.
22 A Okay.
23 Q Can you tell me with reference to Exhibit D, the screen
24  shot with CyberPilot, where or what the quote, "initial
25  data file," end quote is in that screen shot?

Page 162

1 A The initial data file would be the HTML that is being
2  displayed in the search window.
3 Q Can you point me to that on the document itself on Exhibit
4  D or just describe it for me so I know where you're
5  referring?
6 A Right. It's the Yahoo website that is displayed in the
7  browser window.
8 Q Okay. And what is the -- again, with reference to
9  limitation 1e and the CyberPilot screen shot, what is the
10  initial data file -- I'm sorry, that's what I just asked
11  you -- the initial list of location identifiers?
12    MR. WOLFF: Object to form.
13    THE WITNESS: The initial list of location
14  identifiers would be the URLs that are underlying these --
15  or that are associated with these icons.
16 BY MR. HOOD:
17 Q What icons?
18 A The icons that are in the green area that start with
19  Yahoo, have Finance, Music, Travel, Mail. And I can form
20  an initial list of location identifiers. Yes, together
21  with storing the initial list. We --
22 Q Those are the -- I'm sorry. Go ahead.
23 A Yeah. If we look at the text the URLs from the initial
24  data file are parsed in response to selection of an
25  icon -- the question mark icon. An initial list of

Page 163

1  location identifiers is stored for use by CyberPilot, and
2  then in the rest of the text down here, it says
3  CyberPilot's only located -- the home page so far as the
4  child pages have question mark icons next to them -- the
5  child pages that are being referred to are the icons that
6  look like little pages there.
7 Q That's in the CyberPilot Map window that you labeled 300
8  on Exhibit D; is that correct?
9 A Yes, it is.
10 Q Okay. Let's see, Professor, if I have any final questions
11  for you.
12    Other than your involvement in this case that
13  we're here in the deposition today for, the Net Jumper v.
14  Google case, have you worked with Mr. Wolff's law firm
15  before?
16 A No, I have not.
17 Q Have you done any work on behalf of Google, Incorporated,
18  before your involvement in this particular case?
19 A The University of Michigan has a number of projects
20  ongoing with Google. I've been peripherally involved, not
21  directly involved, with some of those, specifically the
22  ones that have to do with library and the scanning in of
23  books and indexing them. Other than that, I don't recall
24  any direct involvement with Google Corporation.
25 Q How did you come to be involved in this particular case?

Page 164

1 A In this particular case?
2 Q Correct.
3 A I was approached by Jason Wolff.
4 Q Okay. When did that take place?
5 A I think initially it was in late winter.
6 Q Of 2004/'5?
7 A Whatever we're in. Yeah, 2000 -- this year, 2005.
8    MR. HOOD: Okay. Counsel, I believe I --
9  that's all I have for now. Any follow-up questions?
10    MR. WOLFF: I have a couple of follow up.
11    -    -    -
12    EXAMINATION
13 BY MR. WOLFF:
14 Q Earlier in the day I believe there was some questions
15  about whether the Google Toolbar included a first and
16  second icon as that term was used in patent claims; is
17  that correct?
18 A Yes.
19 Q Okay. All right. Did you make any assumptions in your
20  answers earlier today regarding whether the Google --
21  strike that. It's been a long day for me, too.
22    Did you make any assumptions in your answers
23  earlier today regarding whether the Google Toolbar
24  included a first and second icon?
25 A Yes, I did.

Net Jumper Software, L.L.C. vs.    Multi-Page™    Joseph Hardin
Google Inc.    September 16, 2005

Page 165

1  Q  And what was that assumption?
2  A  That the allegations that were contained in the
3     infringement documents, the infringement chart were
4     accurate.  Those were the assumptions that I was working
5     under.
6  Q  Okay.  And I believe you already testified to those, but
7     just to make sure the record is clear, have you performed
8     any investigation as to whether the Google Toolbar
9     includes a first and second icon as that term is used in
10    claims 1 and 5?
11             MR. HOOD:  And just for the record I'll
12    object as asked and answered, but go ahead.  You can
13    answer the question.
14             THE WITNESS:  No, I have not.
15             MR. WOLFF:  Okay.  No further questions.  He
16    might have some more.  Give him a minute.
17             MR. HOOD:  We get to go back and forth here.
18    No, I have nothing further.  We'll leave it at that.
19             (At 2:55 p.m., the deposition
20             testimony of JOSEPH HARDIN is
21             concluded.)
22
23
24
25

Page 166

CERTIFICATE OF COURT REPORTER - NOTARY

STATE OF MICHIGAN)
              )ss
COUNTY OF OAKLAND)

     I, EILEEN S. HIGER, a Notary Public acting in and for
the above county and state, do hereby certify that the
deposition of JOSEPH HARDIN,  was taken before me at the time
and place hereinbefore set forth.  That the witness was, by me,
first duly sworn to testify to the truth, the whole truth and
nothing but the truth.  That thereupon the foregoing questions
were asked and the foregoing answers made by the witness, which
were duly recorded by me, later reduced to typewriting, and I
certify that this is a true and correct transcript as taken.
     I further certify that the signature to and the
reading of the deposition by the witness was waived by counsel
for the respective parties hereto.  Also, that I am not of
counsel to either party, nor interested in the events of this
cause.

     _____
     EILEEN S. HIGER, CSMR-5018
     Oakland County, Michigan
My Commission Expires:
September 7, 2010