citing to Col. 7, ll. 30-33. That is just not so: line 30 of Column 7 says "*browser interface 400*," and the other lines in that citation include "a window **406** for viewing a file." (emphasis added). One of ordinary skill in the art would not confuse these structures. I note that even in the "IBM Dictionary Of Computing," copyright 1994, attached in part as Google's Exhibit E, the term "window" is defined as "**a portion of a display surface** in which display images pertaining to a particular application can be presented...Different applications can be displayed simultaneously in different windows...(2) an area of the **screen with visible boundaries within which information is displayed. A window can be smaller than or the same size as the screen**...(3) **A division of a screen** in which one of several programs being executed concurrently can display information..." (emphasis added). The same dictionary also defines "window component" as "the smallest named visual part of a window, such as the title bar, system menu icon, action bar, and scroll bar." In particular, a window may have component sub-windows representing different functions, such as one sub-window for user input, and another for the display of results, including search results. It is my opinion that one skilled in the art would understand these terms at the time the patent was applied for, and that the inventors of the '172 Patent distinguished between the terms contained in Claims 1-8 and 15-18 when they delineated the entire browser as **400** and the display screen subpart as **406**.

27. In connection with rendering this opinion I have also examined the prosecution history of the '172 Patent to see if it is inconsistent with the understanding

Dockets.Justia.com

obtained from the claim language and the patent specification. It is my opinion that one of ordinary skill in the art would understand from reading the prior art cited by the Examiner and the patentees' response that (1) the prosecution history is consistent with the idea that "search window" is not a "browser window" (i.e., it is a "browser interface" as used in the patent) and (2) the patentees did not give up the embedded embodiment of

their invention. This is so for the following reasons.

28.     When the NetJumper patentees presented the Patent Office their first set of claims, they sought coverage for a "computer implemented method and system for retrieving information from a network." (Original Claims 1-22). The original claims 23-26 introduced the term "browser window." The Examiner rejected original claims 1-5, 7-11, and 13-22 on the basis of features contained in the Yahoo search engine. The Examiner pointed out that the Yahoo HTML site that was displayed "automatically select[s] an other of said site identifier form [sic] said list (e.g., the Yahoo search engine shown in FIG. 5C, item 588 "Next 20" shows where the user activates the next page request, and in view of the current page, the next page (i.e., site) identifier is automatically chosen.)." Also it is important to note that in the original rejection the Examiner cited to the "Yahoo search engine (in FIG.5C, **item 406**)." This shows the Examiner understood there was a distinction between the screen structure of the browser itself and the structure where the screen displays a Web page. The Examiner then referenced the Alta Vista search engine, and rejected as anticipated original claims 6 and 12, pointing out that the Alta Vista Web site provides a "Next" and other icons **within the display field** which act as automatic jump commands for the user. This reference is

photocopied in the file. With reference to the originally presented claims which used the "browser window" language (claims 23-26), the Examiner cited to a Web page of the CNN Interactive Web site. The Examiner noted that when the CNN page is displayed on a computer screen, a browser window receives a first file of information. The Examiner then called a portion of the Web display page which consists of a series of hotlinks

which appear in the browser display window, a "jumper window." In the file history that reference is photocopied and hard to read, but a current version of the same page makes the area pointed to by the Examiner easier to see:



29.    In giving his reasons for rejection, the Examiner said, "[The] CNN-like jumper window in the Yahoo search engine would have given the user the concurrent access to the URL indexes while viewing the contents of an index." It  appears the original rejection of the claims was due to a combination of (1) the Yahoo search engine HTML page, which showed a "next" icon navigational tool **in the display window** when the browser called up the Yahoo URL, and (2) the CNN Interactive page "jumper

window," which appeared **in the display window** when the user called up the CNN Interactive URL.

30.     The Examiner was therefore citing prior art which showed both the navigational tool and the "jumper window" **only within the display window**, i.e., the

area defined as structure **406** in the specification. This is graphically shown as follows:



In response to the rejection, the patentees amended the claims in two ways. First, they amended the claims that would become granted claims 1-8 by changing the scope to "a computer implemented method **for searching on a local computer...**," (emphasis added) therefore introducing the "search" concept referred to extensively in the specification as the reason behind the invention of the navigational tools. Second, they amended the claims to add the step of "**constructing a search window** on a display screen of the local computer." (emphasis added). The response pointed out

that the navigational tools of the Yahoo and Alta Vista Web pages do not achieve the same functionality as the invention because they are hard-coded **into the Web page.** They say: "Thus the button bar is a transient phenomenon, viable only within the confines of the Yahoo page." The patentees said:

> The applicant claims that the subsequent display of any of the data files stored in the network 366 in the search window upon any files from the disk 107 **will not prevent the display of a first data file corresponding to a selected one of the location identifiers in the stored initial list responsive to the selection of the second icon.** This ability to perform a two dimensional traversal to the next site on the initial list is a unique feature of the applicants' invention. (emphasis added)

31. In my opinion, one of ordinary skill in the art would understand that the patentees distinguished the prior art which contained the navigational tool/jumper window in the Web page display area, by claiming an invention whose **only** limitation was that the navigational tools, that is icon(s) which the user selects to go to the "next", "previous", and the like site, are **separate from the Web page display window**, i.e., the "search window." This was the only limitation in the art cited by the Examiner. The patentees did not need to "give up" the embedded embodiment because the invention could be carried out and the prior art avoided by separating the navigational tools only from the Web page display area identified as **406.** This is shown graphically as follows:



32.    My opinion regarding this is supported by the patent specification. There, as I point out above, the inventors disclosed an alternative embodiment which integrated a set of navigational tools into the browser and eliminated the navigational tools being placed in a separate "floating" window. One of ordinary skill in the art would understand, exactly as explained by the patentees in the amendment, that removing the possibility that the navigational tools reside in the search window, i.e., the Web page display screen, does not prevent them from being separate, since they are within the browser frame, but separated from the "search window."

33.     My opinion is further supported by the fact that the '172 Patent claims use the terms "search window" and "browser window" in a second set of claims in the '172 Patent which are essentially identical to Claims 1-8, except they use the phrase "construct a browser window" in place of "construct a search window." The embodiment described in the patent specification that would support the latter claims is

the "floating" jumper window, as in that embodiment the "separateness" between the browser and the navigational tool is maintained by the second window. But these claims would not support the embedded embodiment of the invention.


34.     Further, to read "search window" and "browser window" (as that term is defined by Google, to mean "browser interface") identically as Google suggests would obviate the need for the word "search" in the claims. As I have previously noted, the patent specification speaks extensively to the advent of Web-based search engines like Yahoo, Alta Vista, Inktomi, and the like. Many passages of the patent description pertain to the utility of the navigational tool to aid in traversing search engine results: typically a search of a search engine site like that maintained by Yahoo returns many search results to which these tools are directed. Obviously, even Google believes that its search engine can be better utilized by adding these tools to the user's browser. One of ordinary skill in the art would understand that a "search window" pertains to a particular class of Web-based activity different from just opening a browser window.  It is my opinion therefore that the patentees never disavowed a claim based on separating the navigational tools from the browser. The sole distinction introduced by them, to address the Yahoo/Alta Vista/CNN Interactive Web pages cited by the Examiner, was to require

that the navigational tools be separate from the Web display screen. Because the Google Toolbar does display its "Next and Previous" navigational tools separate from the "search window," I disagree with Professor Hardin that the Google Toolbar does not infringe Claims 1-8 of the '172 Patent.

## OPINION RELATING TO PARSING DEFINITION

35.     I further understand that Google has suggested the following definition for the terms "parse" and "parsing": "The act of examining a string of text, breaking it into subunits, and establishing the relationships among the subunits." I believe this is unnecessarily restrictive, and that one of ordinary skill in the art would not derive this definition from the patent specification or the file history. The patent specification nowhere restricts the common word "parse" to one requiring (1)"examining a string of text," (2) "breaking it into subunits," and (3) "establishing the relationships" among the subunits. What the patent specification **does** say in numerous places is that there **is** a parsing step which can take different forms and functions. It is performed when the jumper software takes the HTML file obtained by the browser and "parses" it in a variety of alternative ways for access by the local computer. For instance, the software may handle the task of "converting an HTML encoded file uploaded from browser user...into a format suitable for a single-jump or automatic-jump mode search..." (Col. 6, ll. 26-28). The parsed file may be hot-links: "The jump site window **308** has an associated drop down list...this list comprises parsed hot-links." (Col. 6, ll. 55-57). The "parsed list" may "be stored in [the local computer's] HTML storage segment **230**..." (Col. 7, ll. 20-21). The software may provide for parsing "categories... given their

25

location in the search result," or to allow the user to define "how many site identifiers should be parsed from the search results," or "what types of results should be parsed." (Col. 12, ll. 44-58). Nothing in the file specification suggests that "parsing" is limited to the elements suggested by Google.

## CYBERPILOT PRO DOES NOT ANTICIPATE CLAIMS 1-8
## OF THE '172 PATENT

36.   I understand that Google argues that a piece of art called CyberPilot Pro renders Claims 1-8 of the '172 Patent invalid due to anticipation. It is further my understanding that in order to render a claim invalid under the doctrine of anticipation, each and every element of each claim at issue must be found in the allegedly anticipatory reference.

37.   I have examined CyberPilot in a computer also equipped with a browser from 1996, Internet Explorer 2.0. In my opinion, even assuming it is art which occurred prior to the '172 Patent, this reference does not anticipate Claims 1-8. This is so for a number of reasons.

38.   First, CyberPilot does not **[1]** construct a **[2]** search window" on a display screen of a local computer. CyberPilot is a stand-alone piece of software that can be used to create a hot-links "map" of any Web site. All of the asserted claims are directed to either a computer-implemented method for searching (Claims 1-4), or a computer-usable medium having computer-readable code means embodied therein for searching (Claims 5-8). There is no indication that CyberPilot performs a "search." It is

26

merely a tool for aiding in the navigation of an already known site. The lack of a search capability is evident from the CyberPilot instructions. One does not enter keywords or terms to search the Internet, but enters an already known URL. The '172 Patent specification clearly directs the invention towards the use of the navigational tools with a search engine. There is a difference between conducting a search and navigating

through a Web site. Nor is there any indication from its description or operation that CyberPilot does anything to "construct" a search window. CyberPilot appears to be a piece of software that catalogues links that appear in a particular Web site manually selected by the computer user. When CyberPilot is activated and given a URL, it constructs a window in which to display its Map before any browser is launched. I therefore disagree with the statement in the comparison analysis presented in Exhibit F attached to the Hardin Declaration. In the analysis of the element identified as [1b], the claim is made that "The Web browser ... constructs a search window ... on the display screen..." It would be clear to one skilled in the art that the window that CyberPilot constructs does not involve the browser's graphical display services, but is displayed via the Windows operating system graphical services. Later references to "the search window" in Google's analysis seem to be subject to the same confusion regarding the separate identity of the search window and the browser window that we have seen throughout their analysis. Therefore, the first element of Claim 1, an independent claim (and Claim 5 as well) is not met.


39.     Second, CyberPilot does not appear to display "the first data file in **the** search window, responsive to a selection of the second icon." The asserted claims also

require the step of "retrieving an initial data file from the network together with displaying the initial data file in the search window…" CyberPilot does not perform this function. When a URL is entered into the CyberPilot New Map dialog box, CyberPilot merely displays an icon representing the home page, and does not display the page itself as required by the claim. (I have depended on the Stark Declaration, Exh. B, pg. 5 of 30

of the Google motion). It appears, from observing the behavior of this application, that it only retrieves the directory of links in the target file, and not the contents of the specified file. When the hot-link URL in the displayed "map" is manually clicked, the software directs the IE 2.0 browser to create another window, and to retrieve and display the manually-selected page. By definition, therefore, the first data file is not displayed in **the** search window (that is the original window), but is instead displayed in **another** window (the newly created window). This is shown below:



Claim element [1c] is therefore not met.

28

40. Third, the asserted claims also require the step of "parsing the location identifiers from the initial data file to form an initial list of location identifiers together with storing the initial list, **responsive to a selection of the first icon**..." According to the claims, the first icon is displayed separate from the search window on a display

screen. However, at the point when CyberPilot retrieves an initial data file and parses the location identifiers from that initial data file to form an initial list of location identifiers, there is no first icon (a control icon, e.g., "?" according to Google) displayed anywhere. The control icon of CyberPilot does not come into play until after its initial parsing step. Therefore, CyberPilot cannot possibly parse the location identifiers from the initial data file to form an initial list of location identifiers together with storing the initial list, **responsive to a selection of the first icon**.

41. Fourth, in the comparison chart of Exhibit F of the Hardin Declaration, there is a claim, regarding Claim 2, that "The initial data file ... comprises information in a markup language ..." From what is displayed during operation of the software, I see no basis for this statement. What is displayed is taken from links in the target file, but I cannot tell, from this display, anything about its internal representation. I would make a similar statement with respect to the comparison statement for Claim 3.

42. Fifth, there is a question as to what is the "search window" that CyberPilot is supposed to construct. Claims 1 and 5 require the first and second icons to be separately displayed from the "search window on said display screen" (Claim 1b).

CyberPilot initially generates a window that contains the two icons that Google says represent the claimed elements in the same window, that is the search window displaying the "initial data file" of Claim 1c:

And if Google believes that the window formed when the browser is activated is the "search window", that element cannot be met, since that window can only display a "first data file" of Claim 1e ("displaying the first data file in **the** search window").

43. Fifth, in my opinion Google and Professor Hardin misread the limitations of Claims 4 and 8. As I understand Professor Hardin's position, he believes that Claims 4 and 8 add nothing to Claims 1-3 (and 5-7), and therefore need not be separately and particularly addressed. I disagree with that assessment. These claims are directed to and supported by parts of the invention clearly set forth in the patent specification which

30

provide automated navigational tools, such as the "next" and "previous" buttons described in **Figure 3** and at **314** and **318**. The utility of these devices is to allow the user to click a pre-defined icon—for instance a "next" button, and be able to redirect the browser to the next file from a search result. Other embodiments described in the patent would allow the user to click a pre-defined icon and go to a "last" or "first" search

result. CyberPilot does not contain, or even suggest, any such automation. Instead, the extent of what the software does automatically is merely to create a list of URL references from the displayed Web site and make that list available to the user in a separate window. The user is **not** provided a pre-defined navigational tool to direct the browser to perform any "next", "previous," "first", or "last" function. In the absence of an automated feature the user must **manually** choose a URL link from the displayed "map" and **manually** click on that link in order to have the browser create a new window displaying that HTML file. In this the CyberPilot is no different than any Web page which displays more than one hot-link. I note that Claim 4 requires the retrieval of "the first data file corresponding to the one of the location identifiers ... selected from a group consisting of: a next ... a prior ... a first ... and a last location identifier, ..." It is ridiculous to suggest that because a user may choose manually to select the first item in a sequence, or the last, etc., this is equivalent to the existence of such a required grouping. Moreover, in my opinion, CyberPilot is less broad than the art considered and rejected by the Examiner during the prosecution history. These references (the Yahoo/Alta Vista/CNN Interactive Web sites) did provide the user with a pre-defined navigational tool such as the "Next" icon displayed on the Yahoo Web page. For that reason, there is an independent lack of anticipation of Claims 4 and 8.

FURTHER AFFIANT SAYETH NOT.

Bernard A. Galler

Dated: September 27, 2005

Subscribed and sworn to before me
This 27 day of September 2005

**Appendix A. Resume of Bernard A. Galler**
**(See Attached)**


**Appendix B. Bibliography of Bernard A. Galler**
**(See Attached)**

# BERNARD A. GALLER

BIRTHDATE:          October 3, 1928          PLACE OF BIRTH:          Chicago, IL

## EDUCATION
University of Chicago, Chicago, IL
    PhD    Mathematics    1955
University of California, Los Angeles
    MA    Mathematics    1949
University of Chicago, Chicago, IL
    BS    Mathematics    1947
    PhB    Liberal Arts    1946

## PROFESSIONAL EXPERIENCE
The University of Michigan
- Professor Emeritus of Elect. Eng. & Computer Science 1994 -
- Professor of Electrical Engineering & Computer Science 1984-1994
- Professor of Computer & Communication Sciences    1966 -1984
- Associate Professor of Mathematics 1962 - 1966
- Assistant Professor of Mathematics 1958 - 1962
- Instructor in Mathematics 1955 - 1958
- Associate Dean for Long-Range Planning, College of Literature, Science and the Arts 1975-1979
- Chairman, Dept. of Computer & Communication Sciences, 1973-1975
- Associate Director, Computing Center 1966 - 1991

Visiting Professor, Hebrew University, Jerusalem, Winter, 1988
Senior Visiting Fellow, Univ. of Newcastle-upon-Tyne, UK, Summer 1973
Overseas Visitor, Australian Computer Society, 1970
Visiting Professor in the Mathematisch Centrum, Amsterdam, The Netherlands, 1965 - 1966

## HONORS:
Fellow, ACM 1994
AFIPS Distinguished Service Award, 1984
Excellence in Concentration Advising Award, U of M, 1993
ACM Distinguished Service Award, 1980
IBM Triangle Fellow in the History of Technology, 1980
Invited Speaker, IFIP World Congress 1994, Hamburg
Invited Speaker, IFIP Congress 1974, Stockholm

Appendix A

2

Invited Speaker, 1974 Jerusalem Conference on Information
    Technology, Jerusalem
Senior Visiting Fellowship, 1973, Science Research Council, England

## OFFICES AND CURRENT ASSIGNMENTS

Member, ACM Fellows Committee (2001 - ), Chairman (2004)
Founding Editor-in-Chief, Annals of the History of Computing, AFIPS
    Press  (1978-87), Editorial Board (1987 - )
President, Association for Computing Machinery (ACM) (1968 - 70),
    Vice-President (1966 - 68)
Founder & Chairman, Board of Directors, Software Patent Institute
    (1992 - 94), President (1995 - 1998), Executive Comm. (1998 - )
Member, Board of Directors, Charles Babbage Foundation (1982-)
    Secretary (2001 - ), Chairman, Audit Comm. (2001 - ),
    Chairman, Nominating Comm. (2002 - ), Vice Chairman (2004 - )
Founder/President/Treasurer, Friends of the Ypsilanti Youth Orchestra
    (1999 - )

## PREVIOUS MAJOR COMMITTEE ASSIGNMENTS:

Member, Commercial Panel, American Arbitration Assoc. (1999 - 2002)
Member, ACM Turing Award Committee  (1971 - 75, 1988 - 1993),
    Chairman (1973 - 75, 1991 - 1992)
Member, CSNET Executive Committee (1983 - 1989),
    Vice-Chairman (1986 - 1987), Chairman (1988 - 1989)
Member, AFIPS Publications Committee (1977-87)
Member, AFIPS History of Computing Committee (1977 - 79, 1981 - 89)
Category Editor, ACM Computing Reviews (1987 - 1996)
Chairman, AFIPS Special Comm. on Electr. Funds Transfer Syst.  (1974-78)
Chairman, Board of Directors, Corp. for Research & Educational
    Networking (CREN) (1989 - 1992)
Member, HOPL II Organizing Committee (1989 - 1994)
Member, ITS AMERICA System Architecture Committee (1991 - 1996),
Chairman, ITS America Information Exchange Subcommittee (1994 - 1996)
Member, Computer Science and Technology Board, National Academy of
    Sciences-National Research Council (1977-79)
Member, Steering Committee, COSERS Study, NSF  (1975-80)
Member, Board of American Federation of Information Processing
    Societies (AFIPS) (1968-70)
Chairman, ACM Government Organization Committee (1974-75)

3

Member, Advisory Panel, National Center for Atmospheric *Research*,
   Boulder, Colorado   (Chairman, 1972-73)
Member, Advisory Committee, NSF Office of Computing Activities,
   Computer Science & Engineering Division (1971-74)
AFIPS Liaison Representative, National Academy of Sciences - National
   Research Council Division of Mathematical Sciences (1973-75)

REPRESENTATIVE CONSULTING:
   General Motors Research Laboratories, Michigan
   Booth Computer Research Division, Michigan (Booth Newspapers, Inc.)
   The Technion, Haifa, Israel
   Jet Propulsion Laboratory, California
   NCR Science Advisory Committee, Dayton, Ohio
   Nijmegen University, The Netherlands
   National CSS, Inc., Member, Board of Directors
   Naval Weapons Center, China Lake, California
   IBM Corporation

REPRESENTATIVE EXPERT WITNESS ROLES IN LITIGATION:
   Lotus Development Corp. vs Paperback Software (1990)
   Intel vs NEC (1986)
   Fairchild Camera & Instrument Corporation vs Data General
      Corporation (1981)

Contact information
   1056 Ferdon Rd.
   Ann Arbor, MI 48104

   734-668-8152

   Fax:   734-668-9998
   Cell:  734-347-9633
   Internet: galler@umich.edu

                                                Revised 5/10/05

# BERNARD A. GALLER
## Professor Emeritus
## Electrical Engineering and Computer Science
## The University of Michigan

## Bibliography

**2004**

"Annals: How the First Issue Came to Be," Annals of the History of Computing. Vol. 26,
    No. 1, 2004, pp. 4-7

**2002**

Software and Intellectual Property Protection: Copyright and Patent Issues for Computer and Legal
    Professionals. Quorum Books,  x + 205 pages (1995).  Published in Arabic, Modern Egyptian
    Press, Cairo, Egypt

**2001**

"A Career Interview with Bernie Galler," Annals of the History of Computing.  Vol. 23,
    No. 1, 2001, pp. 22-23

**1999**

"Report on the Study of University Policies on Intellectual Property,"  CSE Tech. Report CSE-TR-
    391-99, University of Michigan.  (At the request of the A. J. Sloan Foundation).
    URL: http://www.eecs.umich.edu/techreports/cse/1999/CSE-TR-391-99.html

**1997**

"Collision-Warning in a Mix of Equipped and Unequipped Vehicles," (with Harry J. Asher),
    The 4th World Congr. on Intell. Transport Systems, October 21-24, 1997, Berlin, Germany.

**1996**

"Collision Warning using Neighboring Vehicle Information," (with Harry J. Asher),
    Proc. 1996 ITS America National Meeting, April 15-18. pp. 674-684.

**1995**

Software and Intellectual Property Protection: Copyright and Patent Issues for Computer and Legal
    Professionals. Quorum Books,  x + 205 pages.

Foreword to Software Patents, by Gregory A. Stobbs, John Wiley & Sons, Wiley Law Publications, New
    York, NY.

Appendix B

"Collision Warning using Vehicle-to-Vehicle Communication," (with Harry J. Asher), IDEA Program
Final Report IVHS-1, The University of Michigan.

**1994**

"Issues Surrounding Software-Related Patents in the United States," (Invited Paper),
Proc. IFIP 13th World Congress, Vol. II, Hamburg, Germany, 1994, North-Holland,
pp. 232-238. Case 2:04-cv-70366-JAC-RSW    Document 93-5    Filed 07/31/2006    Page 21 of

**1992**

"An IVHS System Architecture Workshop." (with Kan, Chen), Proc. of the IVHS AMERICA 1992 Annual
Meeting, Newport Beach, CA. pp. 449-455.

**1991**

"The University of Michigan IVHS Education Program." (with Kan Chen and Tom Reed),
VNIS Conference, Dearborn, MI. SAE Tech. Paper Series, #912802, pp. 601-607.
"Modelling a System Architecture," (with Arvind Gupta), IVHS Tech. Report 91-04, The University of
Michigan.
"A Survey of Some Existing IVHS Systems, Their Functionality, and How They Are Achieved," (with
Aviel Rubin), IVHS Tech. Report 91-05, The University of Michigan.

**1990**

"System Considerations for Diversion Advice and Recommendation Technology", (with
K. Chen), Proceedings of the 22nd International Symposium on Automotive Technology &
Automation, Vol. 1, 1990, pp. 185-190.

"An Overview of Intelligent Vehicle-Highway Systems (IVHS) Activities in North America", (with K.
Chen), Proceedings of the Fifth Jerusalem Conference on Information Technology, 1990, pp.
694-701.

**1989**

"Thoughts on Software Engineering", Proc. 112th International Conference on Software Engineering,
May 1989, Pittsburgh, PA, p. 97.

**1988**

"A Holographic File System for a Multicomputer with Many Disk Nodes," (with Amnon Barak and Yaron
Farber), Tech. Report CSE-TR-01-88, The University of Michigan.

**1987**

"The History of the Computer, Part One..." Humanities Education. Vol. IV, No. 1, 1987, pp. 23-27

6

## 1986

The Influence of the United States and Japan on Knowledge Systems of the Future", Proceedings of IEEE
International Conference on Systems, Man, and Cybernetics, p. 1024, Atlanta, GA, Oct. 1986
"The IBM 650 and the Universities." Annals of the History of Computing. Vol. 8, No. 1, 1986,
pp. 36-38

## 1985

"A View of Artificial Intelligence." New Generation Computing. Vol. 3, No. 3, 1985, pp. 235-236
"An LSA Computer Environment." LSA, The Univ. of Michigan. Winter 1985, Vol. 8, No. 2, pp. 13-15

## 1982

"Computer-Aided Techniques for Understanding Performed Music."With M. Piszczalski. Computing in
the Humanities, May, 1982, pp. 89-95.
"A Computational Model of Music Listening." With M. Piszczalski. Proceedings Graphics Interface '82.
May 1982, pp. 80-96.

## 1981

Review of "The Computer Age: A Twenty-Year View." Edited by Michael L. Dertouzos and Joel Moses.
Michigan Quarterly Review, MIT Press, Cambridge, MA, Summer 1981, pp. 294-300.
"Performed Music:  Analysis, Synthesis and Display by Computer." With M. Piszczalski, R.
Bossemeyer, M. Hatamian, and F. Looft. Journal of Audio & Engineering Societies, Jan/Feb
1981.

## 1980

"Software Prospects for Archivists." Archivists and Machine-Readable Records. Ed. by C. L. Geda, E. W.
Austin, and F. X. Blouin, Jr.  Society of American Archivists (1981):182-187.

## 1979

"Analysis and Transcription of Musical Sound." With M. Piszczalski. Proceedings of the 1978
International Computer Music Conference 2 (1979), pp. 585-618.
"Automatic Tone Identification in Continuously Played Music." With M. Piszczalski. Journal of the
Acoustical Society of America, 65, Suppl. No. 1, p. s123.
"Computer Analysis and Transcription of Performed Music:  A Project Report." With M. Piszczalski.
Computers and the Humanities 13 (1979), pp. 195-206.

## 1978

"A Method for Computer Analysis & Transcription of Musical Sound." With M. Piszczalski. Proc. of the
Research Symposium of the Psychology & Acoustics of Music, pp. 167-189. Lawrence, Kansas:
University of Kansas, 1978.

## 1977

"Ethics in Computing." Indexed Archives of Science, Section B, October 1977, No. 082.

"Automatic Music Transcription." With M. Piszczalski. Computer Music Journal, November 1977, pp. 26-31.

"Extensible Languages." Invited Paper. Proceedings IFIP Congress, pp. 313-316. Stockholm, Sweden, 1974.

"The Need for a Time-Sharing Environment." Invited Paper. Proceedings Jerusalem Conference on Information Technology, p. 31-36. Jerusalem, Israel, 1974.

## 1973

"CRISP: An Interactive Student Registration System." With R. Wagman, J. Bravatto, G. Lift, G. Kern, V. Berstis, and E. Munn. Proceedings 1973 ACM Annual Conference, pp. 283-289. Atlanta, 1973.

## 1971

"An Advanced System Programming Course." With B. W. Arden and L. K. Flanigan. Proceedings Congress of International Federation of Information Processing Society, Vol. TA-7, pp. 115-119. Ljubljana, Yugoslavia, 1971. Ljubljana, Yugoslavia, Vol. TA-7, pp. 115-119.

## 1970

A View of Programming Languages. With A. J. Perlis. Addison-Wesley, vi + 282 pages.

"Generation of Large Software Systems." Proceedings International Computing Symposium, Part IV, pp. 63-75. Bonn, Germany, 1970.

## 1969

"Better Ways to Use People." The Office, January 1969, pp. 73-74.

"The MAD Definition Facility." With B. W. Arden and R. M. Graham. CACM 12:8:432-439.

## 1967

"A Proposal for Definitions in ALGOL." With A. J. Perlis. Communications of the ACM 10:4:204-219.

"A Method for the Solution of Transportation Problems with Tall Matrices." With P. S. Dwyer. Communications of the ACM 10:4:231-234.

## 1966

"Program and Addressing Structure in a Time-Sharing Environment." With B. W. Arden, T. C. O'Brien, and F. H. Westervelt. Journal of ACM 13:1:1-16.

8

## 1965

"The Iteration Element."  With M. J. Fischer. Communications of ACM 8:6:349.

## 1964

"An Improved Equivalence Algorithm."  With M. J. Fischer.  Communications of the ACM 7:5:301-303.

"Procedures for Submission and Processing of Jobs."  Proc. ACM National Conference, Philadelphia,
    pp. N1.2-1 - N1.2-2.

Case 2:04-cv-70366-JAC-RSW    Document 93-5    Filed 07/31/2006    Page 24 of

## 1962

"An Algorithm for Translating Boolean Expressions."  With B. W. Arden and R. M. Graham. Journal of
    the ACM 9:2:222-239.

The Language of Computers. McGraw-Hill,  x + 244 pages.

"Compiling Matrix Operations." (with A. J. Perlis). Communications of the ACM 5:12:590-594.

## 1961

"The Internal Organization of the MAD Translator."  With B. W. Arden and R. M. Graham.
    Communications of the ACM 4:4:28-31.

"An Algorithm for Equivalence Declarations."  With B. W. Arden and R. M. Graham. Communications of
    the ACM 4:7:310-314.

"The Digital Computer for Fluid-flow Calculations."  With F. H. Westervelt.  Handbook of Fluid
    Dynamics.  Edited by V. L. Streeter.  McGraw Hill, 1961, pp. 25-1 to 25-24.

"MAD."  With B. W. Arden and R. M. Graham. Datamation Magazine

## 1960

"A Generalization of a Theorem of Carr on Error Bounds for Runge-Kutta Procedures."  With D. P.
    Rozenberg. Journal of the ACM 4:28-31.

## 1959

"Some Remarks on Linear Programming."  Behavioral Science 4:167-170.

## 1957

"Cylindric and Polyadic Algebras."  Proceedings American Mathematical Society 8:1:176-183.

"Translating the Method of Reduced Matrices to Machines."  With P. S. Dwyer. Naval Research Logistics
    Quarterly 4:1:55-71.

"The Method of Reduced Matrices for a General Transportation
    Problem."  With P. S. Dwyer.  Journal of the ACM 4:5:308-313.

**Appendix C. Recent Litigation (15 years) in which**
**Bernard A. Galler has testified**

| Case | Date initiated | Retained by counsel for: |
|---|---|---|
| - Lotus v. Paperback, Mosiac (Copyright) | 1990 | Lotus |
| - AMI v. IBM (Copyright) | 1990 | IBM |
| - Frybarger v. IBM (Copyright) | 1990 | IBM |
| - Flexben v. Comerica | 1990 | Flexben (Trade secret) |
| - Apple v. Microsoft, HP (Copyright) | 1990 | Apple |
| - Lotus v. Borland (Copyright) | 1991 | Lotus |
| - Heath v. AT& | 1991 | AT&T (Non-performance) |
| - Iowa Dept. of Revenue v. Rev. | 1991 | Iowa Dept. of |
| | Burlington Railroad (Tax evaluation) | |
| - Iowa Dept. of Revenue v. IBM | 1993 Iowa Dept. of Revenue (Tax evaluation) | |
| - Nat'l Advanced Systems v. US Gov't | 1993 U.S.Gov't (Customs appeal) | |
| - Casio v. US Gov't (Customs appeal) | 1993 | U.S.Gov't |
| - RGB v. Pride (Copyright) | 1994 | Pride |
| - IBM v. Kyocera (Copyright) | 1994 | IBM |
| - Intel v. US Gov't (Customs appeal) | 1994 | U.S.Gov't |
| - Qantel v. Texas Inst. | 1994 (Copyright) | Texas Inst. |
| - Detroit Center Tool, Inc. v. Robotics N. A., Inc. (Performance) | 1994 | DCT       Fanuc |
| - Hydra-Flex v. Indice, Inc. (Trade Secrets) | 1995 | Hydra-Flex |
| - EGS, Inc. v. Lohitsa, Inc. | 1996 | EGS (Trade Secrets) |
| - Detroit Center Tool, Inc. v. Design, Inc. (Performance) | 1996 | DCT       Classic |
| - S. V. Char v. Clark Atlanta University | 1996 S. V. Char | |

|                                           |                         |                      |           |
|-------------------------------------------|-------------------------|----------------------|-----------|
|                                           | (Tenure dispute)        |                      |           |
| - Hewlett-Packard, Inc. v. US Gov't       | 1997 U.S.Gov't          |                      |           |
|                                           | (Customs appeal)        |                      |           |
| - Wonderware, Inc. v. Cyberlogic, Inc.    | 1997 Cyberlogic         |                      |           |
|                                           | (Copyright)             |                      |           |
| - Hughes Training, Inc. v. Eidetics, Inc. | 1997 Hughes Training    |                      |           |
|                                           | (Trade Secret)          |                      |           |
| - Intermedics, Inc. v.                    | 1998 Intermedics        |                      |           |
|    Cardiac Pacemakers, Inc.|                         |                      |           |

|                                           |                          |                      |           |
|-------------------------------------------|--------------------------|----------------------|-----------|
| - CTC Communications v. Bell Atlantic     | 1998 CTC Comm.           |                      |           |
|                                           | (Performance)            |                      |           |
| - State of California v. Lockheed Martin  | 1998 State of California |                      |           |
|                                           | IMS Corp.                |                      |           |
|                                           | (Performance)            |                      |           |
| - Alfa Mutual Ins. v. ISI systems, Inc.   | 1998 ISI systems, Inc.   |                      |           |
|                                           | (Performance)            |                      |           |
| - McGraw-Hill, Inc. v. Inc.               | 2000                     | Essential            | Research, |
|                                           | Essential Research, Inc. |                      |           |
|                                           | (Patent Infringement)    |                      |           |
| - Rosenbluth Int'l, Inc. v. Analytics, Inc. | 2001                   | Travel               |           |
|                                           | Travel Analytics, Inc.   |                      |           |
|                                           | (Patent Infringement)    |                      |           |
| - Norton v. Norton (Divorce)              | 2003                     | Norton               |           |
| - Pitney Bowes v. Stamps.com              | 2003 Stamps.com          |                      |           |
|                                           | (Patent Infringement)    |                      |           |
| - Agentware systems, Inc. v.              | 2005 Agentware           |                      |           |
|    Sandalwood Enterprises, Inc. |                     |                      |           |
|     (Trade Secret)    |                          |                      |           |