UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NETJUMPER SOFTWARE, L.L.C.,

                Plaintiff,                      Case number 04-70366

v.                                            Honorable Julian Abele Cook, Jr.

GOOGLE, INC.,

                Defendants.

_____

ORDER

On February 2, 2004, the Plaintiff, NetJumper Software L.L.C. (NetJumper), initiated this lawsuit, in which it accused the Defendant, Google Inc., of infringing upon two of its patents; namely, (1) U.S. Patent No. 5,890,172 (the '172 patent) and (2) U.S. Patent No. 6,226,655B1 (the '655 patent).

The parties have asked the Court to construe four terms within the '172 patent that are in dispute; namely, (1) whether the preambles of claims 1 and 5 are limitations of the claims, (2) the meaning of "parsing" or "parse," as found in claims 1 and 5, (3) the meaning of "responsive to a selection of the first icon," in claims 1 and 5, and (4) the meaning of "response to a selection of the second icon," which is used in claims 4 and 8.[1]

I.

Millions of internet users connect from their home and work computers to a vast number

_____

[1]Although the two patents in this litigation involve software for navigating the internet, the claims are quite different. Significantly as it relates to this order, neither NetJumper nor Google have asked the Court to construe any of the terms from the '655 patent.

Dockets.Justia.com

of servers which store data, pictures, and other information.  A number of businesses offer a service which searches the internet by indexing the various sites and information that are found on the world wide web.  A user may access a search engine through an internet browser.

An internet browser has a frame, which typically contains the icons that allow the user to give the directions to the software.  It also contains a web page display area. Whenever a user operates the browser to display web pages, the display area will show a different page whereas the browser frame remains unchanged.

A search engine web site permits a computer user to enter a search request through an internet browser.  When a user submits a search request, the search engine looks through its particular world wide web index.  It typically returns hundreds or thousands of site references to the user in response to a search request.  The search engine, while working through the user's internet browser, shows the listed references in the web display area.[2]  These references contain text together with a site identifier which is called a Uniform Resource Locator (URL).  By entering a particular URL reference into an internet browser, a user can visit a particular web page.  The utility of the URL is further enhanced by a computer language called Hypertext Markup Language (HTML) which allows each URL to be located by a "hotlink"in a web data file.  In a typical internet browser, a hotlink is identified by a differently colored or underlined piece of text.  By clicking on the hotlink with the mouse, a computer user instantly directs the internet browser to

---

[2] Google's motion to dismiss NetJumper's infringement action was denied by the Court because it concluded that there was a genuine issue of a material fact as to whether the search window which was cited in the '172 patent corresponded to the internet browser or some other search window.  Order, *NetJumper Software L.L.C. v. Google, Inc.*, No. 04-70366 (E.D. Mich. Mar. 29, 2006).  For the purpose of this order, the Court has assumed that the term, "search window," is applicable to any search window on which web pages are viewed.  The Court does not intend this order to modify, in any way, its prior summary judgment order.

locate the server that contains the hotlink address and to display it in the web display area.

In a typical internet search operation, once the user opens or launches the internet browser and performs a search, the web page display shows a list of search results. The user then chooses the result that seems best suited to his or her needs and, thereafter, clicks on the hotlink which is associated with that result. Thereafter, the user is taken directly to a different web page which usually contains other hotlinks that may be of interest to him or her. By clicking on those links, the user proceeds further away from the original search engine page.

When the user wants to return to the original search result, he or she may experience a problem which is known in the industry as "drilling down." In order to retrieve the original search results page, the user has to click the "back icon" on the browser frame repeatedly before returning to the results page. Only then can the user seek another search result.

In its '172 patent, NetJumper has attempted to solve the "drilling down" problem with a method of navigating a list of search results. This invented software generates a list of site identifiers that are found in the results of a search. By using the automated navigation tools, the software allows the user to jump directly between those search results without retrieving the original search results page. In its preferred embodiment, the '172 patent employs a floating window, known as the "Internet Buffet," which is separate and distinct from a web browser's window. Notwithstanding its preferred embodiment, NetJumper asserts that the '172 patent provides for its invention to be integrated within the four corners of the browser window - exactly like the Google Toolbar.

The Google Toolbar is a software program that is integrated within the internet browser. It was introduced as a browser add-on, which allowed the user to enter a search into the browser

frame without having to travel to the Google web page. The Google Toolbar contains a window for typing in searches by using its search engine. This window, which is called the "edit box" by Google, is typically shown on the left side of the browser frame. A user, after clicking on a search or a "Go" icon next to the window, starts the search. Once the user visits a result from the search page, he or she may also navigate the search results without returning to the results page by using the "next" and "previous" icons that are located in the browser frame.

II.

In 1995, the Federal Circuit Court of Appeals declared that a trial court should undertake a two-step process when attempting to determine if a patent infringement has occurred; to wit, (1) construe all of the disputed claims, and (2) then determine if the accused product infringes upon any of the claims as properly construed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

Claim construction is a matter of law which is the responsibility of the trial court. *Cybor v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998). It is "the process of giving proper meaning to the claim language." *Abtox, Inc.v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). As such, this process is designed to "define[] the scope of the protected invention." *Id.* Claim construction is a legal issue, while comparison to the accused product or the prior art are factual undertakings. *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002).

When construing claims, a court should initially consider the language of the patent claim. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). In the absence of an express intent to impart a novel meaning to a term within the claim, there is a heavy presumption that a term conveys its ordinary and customary meaning to a person of ordinary skill in the relevant

art. *Id.* at 1325. Thus, when "construing claims, the analytical focus by a court must begin and remain centered on the language of the claims. Significantly, it is the language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which [he] regards as his own invention.'" *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112 ¶ 2). Often, dictionaries are useful resources to assist the court in determining the ordinary and customary meanings of claim terms, as well as the meanings that would have been ascribed to technical terms by those of skill in the relevant art. *Texas Digital Sys., Inc., v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002), *cert. denied,* 538 U.S. 1038 (2003).

The trial courts are also encouraged to examine the intrinsic record in every case in order to "determine whether the presumption of ordinary and customary reading is rebutted." *Texas Digital*, 308 F.3d at 1204. Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and assign special definitions to the words in the claim, as long as those definitions are clearly stated in the patent specification or file history. *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996). Thus, intrinsic evidence is useful, in that it can provide a much needed "context and clarification about the meaning of claim terms." *Teleflex*, 299 F.3d at 1325.

The sources of intrinsic evidence that a court should initially examine are "the patent itself, including the claims, the specification, and, if in evidence, the prosecution history." *Ductmate Indus., Inc. v. Famous Supply Corp.*, 55 F. Supp. 2d 777, 782 (N.D. Ohio 1999). However, "[a] construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claim itself, but consults these sources to give the necessary context to the claim language." *Id.* (citing *Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998)).

Although trial courts may examine extrinsic evidence, including inventor and expert testimony, such an approach should be utilized only if the intrinsic evidence is ambiguous. *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*, 292 F.3d 1363, 1374 (Fed. Cir. 2002). The Federal Circuit Court of Appeals has held that a trial court should consult extrinsic evidence only for the limited purpose of (1) allowing it to acquire an understanding of the claim terminology or (2) resolving an ambiguity in a disputed claim term on the basis of the intrinsic evidence. *Markman,* 52 F.3d at 986. Significantly, extrinsic evidence "cannot be used to alter a claim construction dictated by a proper analysis of the intrinsic evidence." *On-Line Tech. v. Bodenseewerk Perkin-Elmer GMBH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004).

III.

A.     Preamble of claims 1 and 5:

Claims 1 and 5 of the '172 patent begin with a preamble which is the part of the claim that appears before the first colon.

The preamble to claim 1 states:

A computer implemented method for searching on a local computer a network of nodes with data files stored at corresponding ones of the nodes and each of the data files identifiable by a location identifier and several of the data files containing location identifiers for others of the data files, and the method for searching comprising of the acts performed on the local computer of:[3]

---

[3]Claim 1 specifies the following five actions, "constructing a search window on a display screen of the local computer; displaying a first and a second icon separate from the search window on said display screen; retrieving an initial data file from the network together with displaying the initial data file in the search window, and the initial data file including location identifiers; parsing the location identifiers from the initial data file to form an initial list of location identifiers together with storing the initial list, responsive to a selection of the first icon; and retrieving a first date file corresponding to a selected one of the location identifiers in the stored initial list together with displaying the first data file in the search window, responsive to a selection of the second icon." Although the parties have taken different positions regarding the

('172 Patent, Ex. 2 to Google Opening Brief, claim 1, col. 13, ll. 44–67.)

The preamble to claim 5 reads:

A computer usable medium having computer readable program code means embodied there in for searching on a local computer a network of nodes with data files stored at corresponding ones of the nodes and each of the data files identifiable by a location identifier and several of the data files containing location identifiers for others of the data files, the computer readable program code means in said article of manufacture comprising:[4]

('172 Patent, Ex. 2 to Google Opening Brief, claim 5, col 14, ll. 19–26.)  Google contends that the preamble language of these two claims is not a limitation because it simply articulates an intended use of the invention.  NetJumper disagrees, asserting that the preamble language provides an antecedent basis for the body of the claim which, in turn, places a limit upon the scope of the preamble.

Whether to treat a preamble as a limitation is a determination that is to be "resolved only on review of the entire[] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim."  *Corning Glass Works v. Sumitomo Electric U.S.A.*, Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989).  In general, the language in a claim preamble limits the

_____

second part of the claim, the Court has been asked by them only to construe the preamble.

[4]Claim 5 states: "computer readable program code means for causing a computer to construct a search window on a display screen of the local computer; computer readable program code means for causing a computer to display a first and a second icon separate from the search window on said display screen; computer readable program code means for causing a computer to retrieve an initial data file from the network and displaying the initial data file in the search window, and the initial data file including location identifiers; computer readable program code means for causing a computer to parse the location identifiers from the initial date file to form an initial list of location identifiers together with storing the initial list, responsive to a selection of the first icon; and computer readable program code means for causing a computer to retrieve a first data file corresponding to a selected one of the location identifiers in the stored initial list together with displaying the first data file in the search window, responsive to a selection of the second icon."

invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose of intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).

There is no test that defines when a preamble limits the scope of a claim. *Corning Glass*, 868 F.2d at 1257. However, some guidance has emerged from those cases which discuss the effect of a preamble on the scope of a claim. For example, dependence on a particular disputed preamble phrase for antecedent basis may limit the scope of a claim because it indicates a reliance upon the preamble and the claim body to define the claimed invention. *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).[5] Similarly, when the preamble is essential to understand the limitations or the terms in the claim body, it limits the scope of the claim. *Pitney Bowes*, 182 F.3d at 1306.

Here, NetJumper asserts that the preambles to claims 1 and 5 are limitations because "searching," as it is used in the preamble, is repeated several times by use of the word "search" within the body of the claim. Moreover, NetJumper maintains that the use of the term "searching" within the preamble provides the antecedent basis for the term "search" in the claims of the '172 patent.

Google disagrees with this analysis, asserting that the term used in the preamble is "searching" whereas the term in the claim body is "search window." According to Google, these

---

[5]In *Bell Commc'ns*, the Federal Circuit explained: "[W]hen the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." F.3d at 620.

are two completely different terms. Google points out that the term "search window" in the claim is introduced as "*a* search window" as opposed to "*the* search window." This distinction, in the view of Google, is a clear indication that the term "search window" is expressly identified as something new when it is first referenced in the claim body.

In its opposition papers, NetJumper has not persuaded the Court that the preambles in claims 1 and 5 are necessary to interpreting their respective claim bodies. NetJumper also contends that Google, in essence, is asking the Court to indirectly reexamine its summary judgment ruling through the construction of the preambles to claims 1 and 5. In its rejection of Google's motion for the entry of a summary judgment, the Court construed the term "search window" to refer to the item 406 (i.e. "The browser view window."). However, it is not clear to the Court how the construction of the preamble would alter its construction of "search window."

In summary on this issue, the Court agrees with Google. "Searching" and "search window" are different terms, and the use of the word "searching" in the preamble does not provide an antecedent basis for the term "search window." As a result, the Court concludes that the preambles to claims 1 and 5 do not act as limitations on the claims. Furthermore and by holding that the preamble is not a limitation to either of these claims, this determination is neither designed nor intended to modify or alter its earlier construction of "search window."

B.      Construction of "parse"

The challenged term, "parse," is found within the '172 patent in many forms - particularly when it made reference to a "parser" which extracts items from a web page file; however, this patent does not specifically define "parse." The Federal Circuit has opined that the use of two distinct terms in close proximity in the same claim gives rise to a strong inference that a different

meaning should be assigned to each. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996).

In addressing this issue, Google takes the position that the patent does not describe how parsing is to be performed, asserting that it is merely a process, the result of which is an extracted list of hotlinks that may be stored. Thus, it urges the Court to look beyond the patent, and to examine the prosecution history which, as originally filed, included the phraseology "parsing . . . to extract." (Google's Opening Claim Construction Brief, Ex. 3, '172 patent prosecution history, at G 125.) Google concludes that the earlier use of "parsing . . . to extract," demonstrates that "parse" means something different than "extract."

NetJumper posits that "parse" is clear and should be given its ordinary meaning which means "to extract." Thus, it urges the Court to rely only upon the specific language of the '172 patent claims and the specification within the patent rather than to give consideration to any extrinsic evidence. NetJumper asserts that the '172 patent specification notes in numerous places that the claimed invention includes a parsing step which can take different forms and functions. It points to the specification within the patent which states that "parsing" is performed when the software takes the HTML file obtained by the browser and "parses" it in a variety of alternative ways for access by the local computer. For instance, NetJumper submits that the software may handle the task of "converting an HTML encoded file uploaded from a browser user . . . into a format suitable for a single jump or automatic jump mode search . . . ." ('172 Patent, col.6, ll. 26–28.)

NetJumper also argues that the earlier version of the patent has no bearing on the '172 patent as filed. It points out that the claim language clearly states, "parsing the location identifiers

10

from the initial data file to form an initial list of location identifiers . . . ." ('172 Patent, col. 13, ll. 60–61.) Thus, in NetJumper's view, the earlier version of the '172 patent is not relevant to the construction of the use of the term in a later patent.

Google urges the Court to examine the language in the '655 patent, pointing out that prosecution histories from later related patents can be used to construe identical terms in an earlier patent, citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir.), *cert denied*, 543 U.S. 821 (2004) Like the original language in the '172 patent, claim 1 of the '655 patent reads, "parsing . . . to extract."[6] (Google's Opening Claim Construction Brief, Ex. 5, '655 patent prosecution history, G 351). Google suggests that a construction of "parse" in these two patents should be the same, since each of them use an identical term, share a common written description, and are directly related. Therefore, it is Google's belief that an adoption of NetJumper's proposed construction would make the claim circular and the limitations superfluous.

NetJumper submits that it would be improper for the Court to rely upon any statements made during the prosecution history of the '655 patent to construe terms in the '172 patent. It notes that the '655 patent, which was submitted as a continuation application, was not filed until after the '172 patent claims had been approved.[7] Moreover, NetJumper challenges Google's interpretation of the *Microsoft* case, contending that its facts are distinguishable from the case now before the Court.

In *Microsoft*, the Federal Circuit stated

---

[6] The relevant phrase used in claim 1 of the '655 patent reads: "parsing said information to extract a list of site identifiers storing the list of site identifiers. . . ."

[7] The Notice of Allowability of the '172 patent was dated August 1, 1998, whereas the '655 patent was filed on December 2, 1998.

Any statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction, and the relevance of the statement made in this instance in enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention. Accordingly, we conclude that Multi-Tech's statements made during the prosecution of the '627 patent with regard to the scope of its inventions as disclosed in the common specification are relevant not only to the '627 and '532 patents, but also to the earlier issued '649 patent.

*Microsoft*, 357 F.3d at 1350.

In support of its proposed construction, Google submits a definition from the Institute of Electrical and Electronics Engineers ("IEEE") Standard Dictionary which defines "parse" as "to determine the syntactic structure of a language unit by decomposing it into more elementary subunits and establishing the relationship among the subunits." (Google's Opening Claim Construction Brief, Ex. 4, 1996 IEEE Dictionary, at 747.) In support of its belief that the Court would be justified in using this dictionary to construe the term "parse," Google submits that while the parties may have a disagreement over the exact number of years of experience that a person of ordinary skill in the art should have, they agree that such a person is likely to have a degree in electrical engineering or computer science which, in turn, would make the use of the 1996 IEEE Dictionary a logical starting place for obtaining contemporaneous extrinsic evidence.

NetJumper does not concur, pointing to a warning by the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (2005), that an "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification, and the prosecution history,' thereby undermining the public notice function of patents." (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)).

Google, while conceding that the proposed technical dictionary offers extrinsic evidence,

argues that courts are strongly encouraged to consult such an external source as a means of identifying the ordinary meaning of a term only when the intrinsic evidence provides no guidance. *Phillips*, 415 F.3d at 1319.

> As an alternative solution to this disputed issue, NetJumper suggests that

> the court may wish to define the term [parse] as "examining the initial data file, identifying location identifiers in the initial data file, and extracting those location identifiers." While not necessary, such a construction reflects the claim language, is supported by the '172 Patent's specification, and does not import additional limitations into the claims or rely on extrinsic evidence to contract the plain meaning – as would Google's proposed construction.

(NetJumper's Reply Brief at 10 –11.)

The Court believes that the use of a dictionary is necessary where, as here, the intrinsic evidence provides no clear intention of the word "parse." In *Phillips v. AWH Corp.,* the Federal Circuit declared that a court should not initiate its inquiry into the meaning of a patent by searching for a dictionary definition. 415 F.3d at 1319. However, where the intrinsic record is not clear about the meaning of the word, the court should look to extrinsic evidence in order to understand how a person with an ordinary skill in the relevant art would interpret the patent. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). The Court finds ambiguity in the intrinsic record because the patent prosecution of the '172 patent and the related '655 patent make it clear that parse does not only mean to "extract."

The IEEE 1996 definition is acceptable to this Court. Both parties agree that a person with ordinary skill in this case would likely have a degree in electrical engineering or computer science. As such, the Court believes that a recourse to the 1996 IEEE definition of "parse" would be appropriate under the circumstances. Moreover, this definition is objective in its content and comports with the intrinsic evidence. It logically follows that the invention must recognize some

reasonable relationship between the site identifiers in order to permit a user to jump from one to the next.  NetJumper has made no effort to challenge the validity of the IEEE definition by making reference to the intrinsic evidence or to some competing objective definition.  The Court finds that a person, with ordinary skill in the art relevant to this invention, would understand "parse" in light of the IEEE definition.

The Court also rejects NetJumper's attempt to write its own definition on the basis of the intrinsic evidence.  First, NetJumper could have acted as its own lexicographer when it wrote the patent, but chose instead to use the term "parse."  *Mars, Inc. v. H. J. Heinz Co.*, 377 F.3d 1369, 1375 (Fed. Cir. 2004).  To permit the writing of its own definition after the commencement of a litigation would be suspect.  *Phillips,* 415 F.3d at 1322.  Second, the definition that has been provided by NetJumper continues to use the word "extract" which, in turn, contradicts the intrinsic record and a related patent prosecution.  It is incorrect to say that the IEEE definition imports a limitation into the patent when it can equally be said that replacing the word "parse" with NetJumper's definition eliminates a limitation chosen by the use of the word "parse."

Accordingly, the Court finds that "parse," as used in the '172 patent,  means "to determine the syntactic structure of a language unit by decomposing it into more elementary subunits and establishing the relationship among the subunits."

C.    Construction of "responsive to a selection of the first icon" used in claim 1

The language of claim 1 at issue is as follows:

"[D]isplaying a first and second icon separate from the search window on said display screen; retrieving an initial data file from the network together with displaying the initial data file in the search window, and the initial data file including location identifiers; parsing the location identifiers from the initial data file to form an initial list of location identifiers together with storing the initial list, *responsive to a selection of the first icon* . . . ."

14

('172 patent, claim 1, col. 13, ll. 54 –63) (emphasis added.)

Google contends that regardless of the construction of the term "parsing" by the Court, claim 1 requires a particular sequence of operations. It maintains that the inventors added the phrase "responsive to a selection of the first icon" to the claims by an amendment in order to avoid any references to the prior art that performed "automatic" parsing. This amendment, as well as the overall structure of the parsing clause, requires that such steps as "parsing," "forming," and "storing" be performed in direct response to, and only if, the first icon is selected. Finally, Google submits that the selection of the first icon by the user cannot occur until the initial data file has been retrieved and displayed.

NetJumper does not agree. It asserts that the language of the '172 patent claims does not require the sequence of acts which have been suggested by Google. According to NetJumper, the phrase at issue – "responsive to a selection of the first icon" – uses the article "a" which precedes the "first icon." Thus, it argues that the single selection of the first icon may, under the claims as issued, permit the performance of the entire sequence of acts. For example, NetJumper submits that such acts as (1) retrieving an initial data file, (2) displaying the initial data file in the search window, (3) parsing location identifiers from the initial data file, (4) forming a list of location identifiers, and (5) storing the list may all follow one singular selection of the first icon.

NetJumper points out that nothing in the claims prohibits this construction. In fact, it submits that such "automatic" action is specifically described as an alternative embodiment of the invention of the '172 patent specification. (*See* '172 patent, col. 12, ll. 23–32, stating that "[i]n one embodiment of the invention, when a user initiates a search in the browser, the jumper automatically starts and begins parsing the results of the search. . . " after first noting that "each of

these embodiments includes features that can be combined with the features discussed above. . . .")

In defense of its position, Google urges the Court to look to the prosecution history of the patent. The original claim clause did not contain a temporal limitation that would specify as to when or how "parsing" would occur. In relevant part, it simply read that "parsing said first file of information to extract a list comprising site identifiers." (Google's Opening Claim Construction Brief, Ex. 3, '172 patent prosecution history, original claim, G 125.) The Patent Office, in finding that the claims, as originally written, were no different from other prior art, stated:

> Claims 1-5, 7-11, and 13-22 are rejected under 35 U.S.C. 102(a) as being anticipated by Applicant's admitted prior known art . . . "parsing said 1st file information to extract a list comprising site identifiers" (since the "NETSCAPE" browser in FIGs. 4 and 5, parses the HTML document and underlines the URL hotlinks.")

(*Id.* at G 209, office action at 5.) According to Google, the inventors changed the claim which was designed to overcome the Netscape browser prior art by requiring the acts of parsing, forming, and storing the location identifiers from the received initial data file to be performed after and in direct response to a selection of the first icon – that is, only if the first icon was selected. This claim was specifically amended as follows:

> parsing [said 1st file of information] the location [to extract a list comprising site] identifiers from the initial data file to form an initial list of location identifiers together with storing the initial list, responsive to a selection of the first icon[8]

(*Id.* at G 250, response to office action at 2) The inventors further explained this amendment by stating:

> First, the Netscape browser does not provide a "first icon" for selecting which of the

---

[8]The brackets indicate deletions, whereas the underlining reflects additions.

pages displayed in the search window will be parsed to form an initial list. Second, the Netscape browser does not store the initial list of location identifiers as claimed by the applicant. In the specification at page 17 the applicant indicates that " if a determination is made that the refresh/update button [FIRST ICON] . . . has been selected, then an HTML encoded page displayed in the browser view window is parsed into . . . hot links . . . [t]hen the hot-links [are stored] . . . in a store segment 230." Thus the parsing in the applicant's invention is an optional treatment accorded to a web page displayed in the browser's view window, the selection of which option results in the extraction from the selected web page of specific information, i.e. hot links, and the storage of that information for later use.

(*Id.* at G 260, response to office action at 12.) Google submits that this explanation is a clear indication that "parsing" and "storing" are evidences of an "optional treatment accorded to a web page," meaning that the initial data file was retrieved and displayed in the browser window, then the first icon is selected, and selection of that first icon is the direct cause of the parsing, forming, and storing steps. (Google Opening Claim Construction Brief at 9.)

NetJumper takes issue with this argument, contending that its response to the Patent Office merely highlighted for the Examiner that its invention included parsing, forming, and storing acts, all responsive to a single selection of a first icon. Thus, NetJumper argues that the acts of parsing, forming, and storing need only happen in response to one selection of the first icon which may also perform the retrieving and displaying acts as well. In NetJumper's view, this selection of the first icon for these acts to be performed makes the acts "conditional" as described by the history of the file.

The parties' interpretations are not mutually exclusive. The Court finds that the phrase, "responsive to a selection of the first icon," creates the following sequence: (1) an initial data file is created when a user searches the internet on a browser, such as Netscape, and the search results are retrieved and displayed on the search browser; and (2) if, and only if, the user make a single selection of the first icon, then the initial data file is parsed, stored, and displayed in NetJumper's

separate window.[9]

The Court rejects NetJumper's reliance on the description wherein "automatic" parsing is provided as an alternative embodiment. Here, the text of the claim clearly states that a user action is required to prompt activity by the NetJumper software and, therefore, it must take priority over the description.[10] Whether the addition of this particular phrase, "responsive to a selection of the first icon" was motivated by an avoidance of the prior art during prosecution is of no consequence to this Court since the text of the claim disposes of any ambiguity. *Ductmate Indus., Inc. v. Famous Supply Corp.*, 55 F. Supp. 2d 777, 782 (N.D. Ohio 1999).

D.    <u>Claims 4 and 8; construction of "responsive to a selection of the second icon"</u>

Claims 4 and 8 are substantively similar, and in their briefs, both parties only discuss claim 4 which reads as follows:

> The computer implemented method of claim 1 wherein said retrieving act further comprises; retrieving the first data file corresponding to the one of the location identifiers in the stored initial list selected from a group consisting of: a next location identifier, together with displaying the first data file in the search window, *responsive to a selection of the second icon.*

('172 patent, claim 4, emphasis added.) This type of claim, with the language "a group consisting

---

[9] The Court finds this conclusion to be consistent with the definition of "parse" as "to determine the syntactic structure of a language unit by decomposing it into more elementary subunits and establishing the relationship among the subunits" since storage and display are separate functions.

[10] The Court has only assessed the claim language and does not reach the issue of "disclosure dedication" as it relates to the "automatic" alternative embodiment in the '172 specification. *See Johnson & Johnson Assocs., Inc. v. R. E. Service Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002). The description is, in any case, ambiguous about "automatic" parsing. (*Compare* '172 patent, abstract ("Responsive to receiving a first file of information by the browser, the first file of information is parsed . . .") *with* '172 patent, description, col. 7, ll. 15–20 ("Refresh/update button 326 causes all hot-links in a file which the browser has retrieved to be parsed and uploaded and displayed in the drop-down list of jumper window 300.").)

of A, B, C, and D," is referred to as a Markush type claim. "A Markush group is a sort of homemade generic expression covering a group of two or more different materials (elements, radicals, compounds, etc.), mechanical elements, or process steps, any one of which would work in the combination claimed." *Abbot Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003) ("A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C.").

Both NetJumper and Google agree that claims 4 and 8 are Markush claims. Their dispute over these two claims is whether (1) the additional retrieval limitation described the claims depends upon the "selection of the second icon," and (2) the second icon corresponds to the selected member of the recited group of location identifiers. Google asserts that the plain language of the claims requires that retrieval and display of the first data file (which is different from the initial data file) are performed in response to – and thus after – selection of the second icon.

In addressing the second issue, Google submits that (1) the first data file must correspond to a selected one of the location identifiers, and (2) the only thing selected in the claims that could logically correspond to the first data file is the second icon. Thus, Google insists that the second icon establishes a relationship between the first data file and the selected one of the stored location identifiers. In its reply to NetJumper's response, Google then proclaims, "If NetJumper now contends that there is an additional selecting step associated with these claims that establishes this relationship, which obviously flows from the last receiving clause in independent claims 1 and 5, Google has no objection." (Google's Reply Brief at 11.) Based on this statement, it is unclear if the parties still have a dispute regarding this issue, or whether they are in agreement on the construction of these claims. The Court interprets the parties' disagreement over the language in

claims 4 and 8 as being dependent upon the interpretation of the language by the Court "in response to a selection of the first icon" in claims 1 and 5.

The Court interprets the phrase "in response to a selection of the second icon" in claims 4 and 8 to create the following sequence that is consistent with the previous sequence in claims 1 and 5; namely, (1) an initial data file is created when a user searches the internet on a browser, such as Netscape; (2) if the user makes a single selection of the first icon, then the initial data file is parsed, stored, and displayed in NetJumper's separate window; (3) a first data file is created only if the user selects a location identifier from the search window generated in the first step; and (4) a user changes the search browser to the next, prior, first, or last location identifier if the user selects the second icon.

IV.

In summary, the Court interprets patent '172, in relevant part, as follows:

(1) The preambles to claims 1 and 5 do not act as limitations upon their respective claims.

(2) The term, "parse," as used in the '172 patent, means "to determine the syntactic structure of a language unit by decomposing it into more elementary subunits and establishing the relationship among the subunits."

(3) The phrase, "responsive to a selection of the first icon," creates a sequence to the patent in the following manner: (a) an initial data file is created when a user searches the internet on a browser, such as Netscape, and the search results are retrieved and displayed on the search browser; and (b) if the user makes a single selection of the first icon, then the initial data file is parsed, stored, and displayed in NetJumper's separate window.

(4) The phrase "in response to a selection of the second icon" in claims 4 and 8 create the following sequence which is consistent with the previous sequence in claims 1 and 5: (a) an initial data file is created when a user searches the internet on a browser, such as Netscape; (b) if the user make a single selection of the first icon, then the initial data file is parsed, stored, and displayed in NetJumper's separate window; © a first data file is created if the user selects a location identifier from the search window generated in the first step; and (d) a user changes the search browser to the next, prior, first, or last location identifier if, and only if, the user selects the second icon.

IT IS SO ORDERED.


Dated: <u>March 29, 2008</u>            <u>s/ Julian Abele Cook, Jr.</u>
      Detroit, Michigan            JULIAN ABELE COOK, JR.
                                         United States District Court Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 29, 2008.

                                      <u>s/ Kay Alford</u>
                                      Case Manager